STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF KENT

FLURESH, LLC, FPAW MICHIGAN LLC,
QPS MICHIGAN HOLDINGS, LLC,
FISH LADDER HOLDINGS, LLC,
THE DISTRICT PARK, LLC,
GREEN SKIES-HEALING TREE, LLC,
all Michigan limited liability companies,

     Plaintiffs,

v.

CITY OF GRAND RAPIDS, a
Michigan municipal corporation,

     Defendant.

Case No. 2 0 1 5 4 7 CZ

Hon. SCOTT A. NOTO
(P-67833)

_____/

William L. Thompson (P80123)
Justin M. Wolber (P85728)
Julia S. Moran (P87914)
VARNUM LLP
*Attorneys for Plaintiff*
480 Pierce St., Ste. 300
Birmingham, MI 48009
Phone: (313) 481-7330
Email: wlthompson@varnumlaw.com
     jmwolber@varnumlaw.com
     jsmoran@varnumlaw.com

_____/

*There are no other pending or resolved civil actions arising out of the transactions or occurrences alleged in the Complaint. This case involves a business or commercial dispute under MCL § 600.8031 and is to be designated as a business court case in accordance with MCR § 2.112(o).*

**VERIFIED COMPLAINT
AND DEMAND FOR JURY TRIAL**

1

NOW COMES Fluresh LLC, FPAW Michigan LLC, QPS Michigan Holdings LLC, Fish Ladder Holdings LLC, The District Park LLC, and Green Skies-Healing Tree LLC (collectively, "Plaintiffs") by and through their counsel, Varnum LLP, and for their Verified Complaint and Demand for Jury Trial against the City of Grand Rapids, state as follows:

## INTRODUCTION

1. The City of Grand Rapids has devised a convoluted framework to fine, tax, and/or penalize its cannabis licensees through improper fees, for failing to comply with "social equity" policies that have been incorporated into the City's cannabis ordinance. Substantively, the City has adopted what is really a revenue generating policy under the veil of "social equity," as a means of avoiding scrutiny from voters or to circumvent the explicit cannabis fee and fine limitations placed on municipalities under State law. In addition to these grounds, the social equity components of the City's cannabis Ordinance and related policies violate both the Michigan and U.S. Constitution. Indeed, no business in the City of Grand Rapids, other than cannabis licensees, faces the same type of municipal extortion under the guise of "social equity." For these reasons, Plaintiffs have filed this lawsuit to enjoin and invalidate the social equity components of the City's cannabis Ordinance, and to also seek damages in relation thereto.

## PARTIES

2. Plaintiff Fluresh LLC d/b/a Tend.Harvest.Cultivate ("Fluresh") is a Michigan limited liability company having a principal place of business located at 1213 Phillips Avenue SW, Grand Rapids, Michigan 49507.

3. Plaintiff FPAW Michigan LLC d/b/a Ascend Cannabis ("Ascend") is a Michigan limited liability company having a principal place of business located at 1336 Scribner Avenue, Grand Rapids, Michigan 49504.

2

4.     Plaintiffs QPS Michigan Holdings, LLC ("QPS") and Fish Ladder Holdings, LLC d/b/a High Profile ("Fish Ladder" and collectively, "High Profile") are Michigan limited liability companies having principal places of business located at 2321 44th St. SE, Grand Rapids, Michigan 49508 and 1148 Leonard St. NW, Grand Rapids, Michigan 49504.

5.     Plaintiffs The District Park, LLC and Green Skies-Healing Tree, LLC d/b/a Skymint Cannabis (collectively "Skymint") are Michigan limited liability companies having principal places of business located at 2900 Division Ave S. Grand Rapids, Michigan 49548 and 3423 Plainfield Ave NE, Grand Rapids, Michigan 49525.

6.     Defendant the City of Grand Rapids (the "City") is a Michigan municipal corporation located in Kent County, Michigan.

## JURISDICTION AND VENUE

7.     The Circuit Court has original jurisdiction over this matter pursuant to MCL § 600.605.

8.     Personal jurisdiction is appropriate in the Circuit Court because all parties exist, conduct business, and have their storefronts in the City.

9.     Venue is proper in this Circuit Court pursuant to MCL § 600.1615 because the City is located in Kent County, Michigan.

10.     The dispute is within the jurisdiction of this Court because Plaintiffs seek equitable relief and damages in excess of $25,000.00.

## BACKGROUND AND COMMON ALLEGATIONS

### A.     State and Municipal Licensing History

11.     As the State's first widespread foray into cannabis, in November of 2008, Michigan voters approved a ballot initiative legalizing medical marihuana for patients suffering from serious

3

health issues. This ballot initiative would eventually be codified as the Michigan Medical Marihuana Act, MCL § 333.26421.

12.     Subsequently, on December 20, 2016, lawmakers passed multiple bills that together overhauled the State's medical marihuana program and set forth a licensing and comprehensive regulatory framework for medical marihuana licensees, which in primary part was codified in the Medical Marihuana Facilities Licensing Act ("MMFLA"). See Michigan Medical Marihuana Facilities Licensing Act, Public Act 281 of 2016, MCL § 333.27101 et seq.[1]

13.     Included in the MMFLA were provisions that prohibited individuals and businesses from applying for licenses thereunder until at least December 15, 2017.

14.     Under the MMFLA, municipalities were allowed to adopt cannabis ordinances authorizing one or more licensees set forth under the MMFLA to operate within the municipality, which was a process known as "opting in." *Id.* at MCL § 333.27205(1).

15.     The State of Michigan began issuing a majority of its licenses pursuant to the MMFLA in 2018.

16.     On November 6, 2018, 55.9% of Michigan voters approved Proposition No. 1, making Michigan the first state in the Midwest to legalize cannabis for adults 21 and older. Subsequent thereto, the legislature enacted the Michigan Regulation & Taxation of Marihuana Act, Public Act 1 of 2018, MCL § 333.27951 et seq. ("MRTMA"), which sought to regulate the recreational use of marihuana in Michigan.

17.     Section 6.1 of the MRTMA provides that a municipality may adopt an ordinance to completely limit or prohibit adult-use cannabis licenses within its boundaries.

---

[1] Per MCR 2.112(M), attached as Exhibits to this Complaint are all ordinances and other documentary evidence in support of Plaintiff's claims.

18.     In contrast to the MMFLA, to which a municipality must affirmatively "opt in," the MRTMA requires a municipality, if it chooses not to permit recreational marihuana businesses in the community, to affirmatively "opt out." MCL § 333.27956(1).

19.     The State of Michigan began accepting applications pursuant to the MRTMA in November of 2019, and shortly thereafter began issuing licenses for recreational cannabis use.

**B.     The City's Licensing Scheme for the "Cannabis Social Equity Program"**

20.     On July 24, 2018, the City adopted its initial cannabis ordinance that primarily focused on decriminalization and the sale off medical marihuana within Grand Rapids.

21.     On December 4, 2018, the City Commission adopted Policy No. 900-58, styled the Marihuana Industry Voluntary Equitable Development Agreement ("MIVEDA"). See **Exhibit 1**, *Policy No. 900-58 (2018)*.

22.     MIVEDA was established "for marihuana facility applicants to offer voluntary elements to further the City's goals in the administration of marihuana facility applications." At the time Policy No. 900-58 was enacted, it did not contain sanctions for non-compliance or include a so-called equity "point transfer system." *Id.*

23.     On October 8, 2019, the City adopted Marihuana Related Municipal Licensing Ordinance, Chapter 105, Ordinance No. 2019-66 (the "Ordinance"), which, *inter alia*, allowed the City to license and regulate marihuana facilities and establishments as authorized by the MMFLA. See **Exhibit 2**, *Marihuana Ordinance*.

24.     At the time of its adoption, the Ordinance did not include a social equity component. *Id.*

25.     Shortly after enacting the Ordinance, the City began accepting applications from entities seeking to operate 'medical' cannabis companies within Grand Rapids.

5

26.     On or about December 17, 2019, with the enactment of the MRTMA at the state level, the City updated its ordinance to include provisions for "recreational" cannabis businesses.

27.     On July 7, 2020, the City Commission adopted Policy No. 900-59, which amended the Ordinance to add the Cannabis Social Equity Program component ("CSEP") and the requirements that potential licensees adopt a "Social Equity Plan" that, *inter alia*, detailed any "practices, initiatives, or policies the applicant will implement to promote and encourage participation in the cannabis industry by people from communities that have been disproportionately impacted by cannabis prohibition and enforcement and to positively impact those communities." See **Exhibit 3**, *Policy No. 900-59 (2020 version).*

28.     As a derivative of CSEP, the City also created the Cannabis Industry Social Equity Voluntary Agreement ("CISEVA") form, which once submitted with a land use application, the City deemed a legally enforceable agreement. *Id.*

29.     Pursuant to the CSEP component of the amended Ordinance, all licensees are required to "make good faith effort to meet the objectives of the social equity plan submitted with the application or license renewal." *Id.*

30.     The CSEP component of the amended Ordinance defines "good faith effort" to mean "efforts designed to implement the established objectives of the licensee's Social Equity Plan which by their scope, intensity and appropriateness to the objective, can reasonably be expected to fulfill the Plan objective." *Id.*

31.     "License renewals shall require reporting on the licensee's good faith efforts" under the CSEP component of the amended Ordinance. *Id.*

32. Following the additions MIVEDA and CISEVA, license applicants would apply to have their licenses reviewed supposedly on an order of priority that equated to their social equity commitments.

33. The City began accepting cannabis applications for medical marihuana in 2019 and recreational marihuana in 2020.

34. On April 26, 2022, the City Commission was briefed on the status of social equity compliance in the local cannabis industry, including, but not limited to the fact that most licensees were not in compliance with CSEP, MIVEDA, and CISEVA and could not sustain compliance given the heightened requirements thereof. The City considered different options for cannabis licensees to attempt to achieve compliance, including a recommended option by City staff that entailed a so-called "social equity transfer system."

35. On May 10, 2022, the City Commission approved a stay of enforcement of CSEP, MIVEDA, and CISEVA policies through August 10, 2022.

36. More than two years after originally incorporating CSEP into its Ordinance, on August 9, 2022, the City Commissioners narrowly approved a resolution to amend the City's CSEP and hold off enforcement until the beginning of 2023. During this meeting, the City Commission recognized, *inter alia*, that: (i) "most cannabis operators will not meet all of their voluntarily offered MIVEDA and/or CISEVA commitments made with Special Land Use applications;" and (ii) "[t]he local cannabis industry faces imminent action at both local and State levels as a result of social equity noncompliance by the end of the stay of enforcement, which would impact State and local licensing renewals and the validity of cannabis Special Land Uses, unless it is addressed otherwise." See **Exhibit 4**, *August 9, 2022, City Commission Meeting Minutes*.

37.     Following this meeting, the City amended and restated Policy No. 900-58 (see

**Exhibit 5)** and Policy No. 900-59 (see **Exhibit 6**), to include the following:

> Policy No. 900-58, §IV(c)(i):
> Administrative Policies may establish options that include transferring MIVEDA and
> CISEVA "points" from one category to another and establishing a fund, managed by
> directors of the City formed nonprofit.

> Policy No. 900-59, §6.1:
> Reporting and compliance requirements may be further articulated in Administrative
> Policies. Administrative Policies may establish an option for compliance to social equity
> commitments that contemplates transferring MIVEDA and CISEVA "points" from one
> category to another and establishing a fund, managed by directors of the City formed
> nonprofit.

38.     Policy No. 900-58 had the stated purpose of "establish[ing] criteria for marihuana

facility applicants to offer voluntary elements to further the City's goals in the administration of

marihuana facility applications" under MIVEDA.  See **Ex. 5**.

39.     Pursuant to Policy No. 900-58, "[t]he City Commission, at its sole discretion, shall

determine whether modifications to this policy or additional Administrative Policies are necessary

to increase the effectiveness of its programs in achieving desired outcomes."  *Id.*, Section V.

40.     Concurrently on August 9, 2022, the City Commission amended Policy No. 900-

59, which greatly expanded the CSEP requirements of the City's Ordinance and licensees'

obligations under MIVEDA and CISEVA.  See **Ex. 6**.

41.     Policy No. 900-59 also contained seemingly conflicting statements that

participation with the CSEP was "voluntary," however, once applications had been submitted and

accepted by the City, compliance with CSEP would be "considered legally enforceable." *Compare*

**Ex. 6**, Section 1.2 (Purpose) *with* **Ex. 6**, Section 3.1.

42. It was through the Amendments to Policy Nos. 900-58 and 900-59 that the City disclosed to licensees and made possible, a so-called equity "point transfer system". *Id.*, Section 6.1. See **Ex. 5**, at Section IV(c)(i); **Ex. 6**, at Section 6.1.

43. Almost three months after amending Policy No. 900-58 and Policy No. 900-59, on November 3, 2022, the City's Manager, Mark Washington, issued Administrative Policy No. 22-01, that interpreted and further expanded on the City's requirements set forth in Policy No. 900-58 and Policy No. 900-59. See **Exhibit 7**, *Administrative Policy No. 22-01*.

44. Administrative Policy No. 22-01 pertained to "[a]ll cannabis business operations that received land use approvals that are conditioned upon MIVEDA and/or CISEVA commitments." According to the City, the purpose of Administrative Policy No. 22-01 was to "further articulate the process for achieving compliance with social equity commitments in the medical and recreational cannabis industries." *Id.*

45. Administrative Policy No. 22-01 provided that prior to the expiration of a local license, the City shall conduct an inspection of the cannabis business. Administrative Policy No. 22-01 provided further that, prior to the inspection, the cannabis licensee shall submit a report of social equity compliance in the most recent year of licensure, and that the "annual City inspection will include an evaluation of social equity compliance." *Id.*, Section V.

46. Pursuant to Administrative Policy No. 22-01, if a licensee was determined to have partial social equity performance, the licensee would be required to "return to compliance" by using a "transfer request" in accordance with Administrative Policy No. 22-01. *Id.*, Section VI(c).

47. What is not inherent in the otherwise ambiguous language of Administrative Policy No. 22-01, is that submitting to a mandatory "transfer request" requires a licensee to pay to the

City up to one percent (1.0%) of its gross revenue to achieve MIVEDA compliance and up to two percent (2.0%) of its gross revenue to achieve CÍSEVA compliance. *Id.* at Section VIII.

48.     According to Administrative Policy No. 22-01, licensees with only partial CSEP compliance were required to pay the City up to three percent (3%) of their annual gross sales in order to achieve the City's social equity compliance standards.

49.     This amounts to nothing more than an improper fee or fine, or an improper tax that has been levied against cannabis licensees in the City of Grand Rapids.

50.     Moreover, this so-called point transfer system (i.e., fee, fine, or improper tax), was not in place when Plaintiffs submitted their MIVEDA and CISEVA forms prior to the August 9, 2022 amendments.

51.     Policy Nos. 900-58, 900-59, and Administrative Policy No. 22-01, were administrative policies that were created by the City Manager and City Executives.

52.     A failure to adhere to the City's CSEP requirements may also result in the City issuing the cannabis licensee a Notice of Violation. Thereafter, the City may conduct supplemental inspections, during business hours to "verify adherence with social equity elements . . . ." *Id.*, Section IX.

53.     Cannabis licensees that remain out of compliance with the City's social equity requirements will be reported to the State and will be subject to local enforcement action, including, but not limited to: (i) fines; (ii) denial of certificate of occupancy and/or final permit for future expansions of the cannabis facility; (iii) denial of local license renewals; (iv) revocation of current local licenses; and (v) any other penalties or remedies available via City Ordinance, at law, or in equity. *Id.*, Section IX(c).

54.     Since its inception, there has been little substantive enforcement of the City's social equity requirements placed on cannabis licensees, and the only true mechanism the City appears to have employed is the "transfer option," which in substance, is nothing more than a financial penalty.

55.     By directive of the City Council, enforcement of the City's social equity requirements pertaining to cannabis licensees was deferred from at least 2020 until sometime in 2023, at which time the City began issuing invoices for the "fees" licensees were required to satisfy in order to remain compliant with the City's social equity requirements. See e.g., **Exhibit 8**, *Fluresh 9/29/2023 Invoice*; **Exhibit 9**, *Fluresh 6/26/2024 Invoice*.

C.     **Facts Regarding Fluresh's Business Along With State and Municipal Licensing History**

56.     Fluresh was formed in 2018 for the purpose of obtaining cannabis licenses and operating in the Michigan cannabis industry.

57.     On October 22, 2018, Fluresh achieved prequalification status with the State in order to seek State licenses under the MMFLA. Thereafter, Fluresh was approved for its first State licenses under the MMFLA on or about July 16, 2019.

58.     Concurrent with seeking cannabis licenses from the State of Michigan, Fluresh also sought cannabis licenses from the City.

59.     On or about March 1, 2020, Fluresh submitted a Special Land Use Application and Supplemental Applications to the City seeking a municipal cannabis license. In conjunction with submitting the Special Land Use Application, Fluresh also submitted its original MIVEDA Form to the City.

60.     On or about September 16, 2020, Fluresh received its first set of municipal cannabis licenses from the City, which enabled Fluresh to cultivate and sell medical marihuana within the City, pursuant to the MMFLA.

61.     After Michigan enacted the MRTMA, Fluresh began to apply for the applicable State and municipal adult-use (also called 'recreational') cannabis licenses. In accordance therewith, on or about July 20, 2020, Fluresh submitted a Social Equity Plan and CISEVA form to the City. Thereafter, Fluresh sought to expand its operations by seeking growers' licenses to be co-located at its existing facility (September 16, 2020) and by continuing to seek additional cannabis licenses within the City.

62.     Fluresh has been fully licensed to grow, process, and sell both medical and adult-use cannabis since October 2021.

63.     Today, Fluresh operates a brick-and-mortar licensed cannabis indoor grow, production, and retail establishment located at 1213 Phillips Avenue SW in the City, and it also maintains non-licensed office space for its employees elsewhere in the City. Fluresh currently employs around 130 employees, with around 129 of those employees working in its Grand Rapids locations. Fluresh currently maintains 15 State cannabis licenses issued under the MMFLA or MRTMA, likewise Fluresh maintains 13 municipal licenses with the City and 2 municipal licenses with the City of Adrian.

64.     Fluresh, and its closely held affiliate, Steele Oz LLC, have invested over $60 million dollars into the 1213 Phillips Ave SW property, which qualities as an opportunity zone. Fluresh is located on one of the 17 census tracks in the near west and south side of Grand Rapids that has been designated as a Neighborhood of Focus due to systematic and historic inequities. Per the Cities own publications, these neighborhoods have experienced the most disparate outcomes

12

in income, educational attainment opportunities, home ownership, and wealth accumulation compared to the other Grand Rapids census tracks and the City as a whole.

**D.    Facts Regarding Ascend's Business Along With State and Municipal Licensing History**

65.    Ascend is a subsidiary of Ascend Wellness Holdings, a vertically integrated multistate cannabis operator with licenses and assets in Illinois, Michigan, Ohio, Massachusetts, New Jersey, Pennsylvania, and Maryland.

66.    Ascend was formed in 2018 for the purpose of obtaining cannabis licenses and operating in the Michigan cannabis industry.

67.    On May 29, 2019, Ascend achieved prequalification status with the State in order to seek State licenses under the MMFLA. Thereafter, Ascend was approved for its first State licenses under the MMFLA on or about October 14, 2019.

68.    On or about March 15, 2019, Ascend's predecessor, Oak Flint LLC ("Oak Flint"), submitted a Special Land Use Application and Supplemental Applications to the City seeking a municipal cannabis license for the 28th Street and Scribner Avenue locations. In conjunction with submitting the Special Land Use Application, Oak Flint also submitted its original MIVEDA Form to the City.

69.    On July 25, 2019, the City Planning Commission approved the medical Special Land Use Application for the 28th Street location and on July 16, 2019 the City Planning Commission approved the medical Special Land Use Application for the Scribner Avenue location.

70.    Special land use approval for an adult use retail facility was granted for 28th Street on December 11, 2020, and on January 30, 2021 for Scribner Avenue.

71.    In March 2022, Ascend opened its third retail establishment in the City located at 503 Century Avenue.

72.    Today, Ascend's Michigan operations include a grow and processing facility, seven brick-and-mortar licensed cannabis retail establishments, including three retail establishments in the City. Ascend's parent company, AWH, operates 6 cultivation and processing facilities, and 39 dispensaries across seven states. AWH has demonstrated commitment to equity in the industry through contributions to the Last Prisoner Project ("LPP"), and through its own official brand and campaign for social equity work, The Ascend CO-LAB for Social equity ("CO-LAB"). The CO-LAB works with local partners to make contributions more rooted in our local communities, investing over $350,000 in donations to local grassroots organizations. It has hosted more than 23 expungement clinics/resource fairs to date, across 5 states, serving 1,200 community members.

### E.    Facts Regarding High Profile's Business Along With State and Municipal Licensing History

73.    High Profile is a subsidiary of Ann Arbor based C3 Industries, Inc., a vertically integrated multistate cannabis operator with licenses and assets in Michigan, Missouri, Massachusetts, Illinois, Connecticut, and New Jersey, which currently operates 31 cannabis dispensaries across the country, in addition to multiple production and processing facilities.

74.    QPS was formed in 2017 and Fish Ladder was formed in 2018 for the purpose of obtaining cannabis licenses and operating in the Michigan cannabis industry.

75.    On August 10, 2018 (QPS) and September 10, 2020 (Fish Ladder), achieved prequalification status with the State in order to seek State issued cannabis licenses.

76.    On or about October 20, 2020, High Profile submitted a Special Land Use Application and Supplemental Applications to the City seeking a municipal cannabis license. In

conjunction with submitting the Special Land Use Application, High Profile also submitted its original MIVEDA and CISEVA Forms to the City.

77.     On or about March 11, 2021, High Profile received its first set of municipal cannabis licenses from the City, which enabled High Profile to sell medical marihuana commercially within the City.

78.     Today, High Profile operates two brick-and-mortar licensed cannabis retail establishments in the City, with nearly 50 employees. QPS is itself a wholly minority-controlled entity, being managed by Ankur Rungta and Vishal Rungta, both first generation Indian-Americans. QPS is owned by C3 Industries, Inc., in which Ankur Rungta and Vishal Rungta have substantial ownership and broad control over both Board and day-to-day operations as CEO and President, respectively. C3 Industries, Inc. and its local partners also hold state certified equity licenses in New Jersey, Connecticut, and Massachusetts.

F.     **Facts Regarding Skymint's Business Along With State and Municipal Licensing History**

79.     Skymint is a subsidiary of Ann Arbor based Green Peak Industries, Inc., a company that has 18 different cannabis dispensaries in Michigan.

80.     In 2019, Skymint's predecessor company, 3Fifteen Cannabis, submitted a Special Land Use Application and Supplemental Applications to the City seeking a municipal cannabis license. In conjunction with submitting the Special Land Use Application, Skymint also submitted its MIVEDA and CISEVA Forms to the City.

81.     On information and belief, in 2019 the City approved Skymint's MIVEDA form and in 2020 the City approved Skymint's CISEVA form.

82.     Today, Skymint operates two brick-and-mortar licensed cannabis retail establishments in the City, and maintains 35 employees, nearly all of whom are City residents.

15

83. Skymint is currently in receivership. *See Tropics, L.P. v. Green Peak Industries, Inc., et al.*, Case No. 23-00149-CB, Ingham County Circuit Court, Judge Jamo presiding. The court-appointed receiver is in support of the relief sought herein.

**COUNT I**
**Violations of the Headlee Amendment**
**to the Michigan Constitution**

84. The forgoing Paragraphs are all incorporated herein by reference.

85. Units of local government are prohibited from levying any tax not authorized by law or charter or from increasing the rate of an existing tax above that rate authorized by law or charter, without the approval of a majority of the qualified electors of that unit of local government voting thereon. MI CONST Art. 9, § 31.

86. The City's so-called CSEP, MIVEDA, and CISEVA regulations and the penalties assessed thereunder are, in substance, a prohibited tax.

87. Since 2022, the City has taxed, or is attempting to tax Plaintiffs in the aggerate amount of $2,254,898.03.

88. A majority of the qualified electors of the City never voted to allow the City to tax cannabis licensees pursuant to its Ordinance based on the social equity components thereof.

89. The City's social equity taxes are calculated as a percentage of the cannabis licensee's annual gross sales.

90. In 2022, 2023 and 2024, there was no direct or indirect benefit conferred upon Plaintiffs based on the City's CSEP, MIVEDA, and CISEVA social equity requirements.

91. There is no reasonable relationship between the City's social equity requirements, and the funds derived by the City therefrom, to any benefit conferred directly on Plaintiffs.

92. The City's stated purpose of the CSEP portion of its Ordinance is to "embed equality throughout government operations" and "be a step toward helping to support equitable economic initiatives, including job creation, removing barriers to local ownership, and contracting opportunities for traditionally disadvantaged groups within the community." **Ex. 6**, Section 1.

93. Invoices from the City pertaining to CSEP, MIVEDA, and CISEVA indicate that funds need to be paid directly to the Grand Rapids City Treasurer. See e.g., **Ex. 8**; **Ex. 9**; **Ex. 10**; **Ex. 11**; **Ex. 12**; **Ex. 13**; **Ex. 14**; **Ex. 15**; **Ex. 16**; **Ex. 17**; **Ex. 18**; **Ex. 19**; **Ex. 20**.

94. On information and belief, the social equity funds that are collected from cannabis licensees are deposited into the City's general fund.

95. The City's social equity requirements for cannabis licensees are being imposed for a public, rather than a private purpose.

96. Per the City's regulatory social equity policy, it was to form a City-controlled nonprofit pursuant to the Home Rule City Act MCL § 117.4o for a "public purpose" into which the City would transmit any funds it received from cannabis licensees. See **Ex. 7**, *Administrative Policy No. 22-01*.

97. The stated purpose of the City in forming a city-controlled nonprofit for the purpose of receiving social equity funds was due to the fact that a nonprofit can perform many of the activities that the city cannot due to its restrictions on use of public funds, budgeting concerns, and relative inexperience in execution of equitable initiatives.

98. The City's CSEP, MIVEDA, and CISEVA programs are designed to raise revenue for the City either directly, or through distributions to a City-controlled non-profit.

99. The City is not using CSEP, MIVEDA, or CISEVA funds to defray the cost of administering its cannabis Ordinance.

100. There is no legitimate regulatory purpose for the City imposing CSEP, MIVEDA, or CISEVA.

101. The City has wielded adherence to the social equity provisions in its Ordinance in a manner that makes compliance contingent on cannabis license renewal and maintaining a cannabis license.

102. If Plaintiffs refuse to comply with the tax levied under CSEP, MIVEDA, and CISEVA, the City will either suspend or revoke their cannabis licenses, or refuse to renew their license annually.

103. The City has made the monetary amounts chargeable under CSEP, MIVEDA, and CISEVA against cannabis licensees compulsory by law.

104. Originally, the MMFLA imposed a 3% tax on retail revenues generated under the act. MCL § 333.27601; MCL § 27602(5).

105. When the City amended Policy Nos. 900-58 and 900-59 and enacted Administrative Policy No. 22-01, it adopted a "social equity transfer" provision that, in essence, taxes cannabis licensees at up to 3% of their annual gross sales. See **Ex. 5, Ex. 6., Ex. 7**.

106. In substance, the City's so-called "social equity transfer" provision is clearly modeled off the MMFLA's original 3% excise tax and is being implemented by the City as a means to tax cannabis licensees in violation of the Michigan Constitution.

107. Plaintiffs believe the facts alleged herein will be disputed by the City, and the Court will be required pursuant to MCR § 2.112(M) to reach a resolution regarding these disputed facts.

WHEREFORE, based upon the City's violation of the Headlee Amendment to the Michigan Constitution, Plaintiffs seek the following: (i) a refund of any CSEP, MIVEDA, or CISEVA amounts paid to the City in 2023 and 2024; (ii) injunctive relief against the City for the

enforcement of the CSEP portion of its Ordinance; (iii) declaratory relief against the City finding

that the CSEP constitutes an unconstitutional tax; and (iv) the costs and attorneys' fees Plaintiffs

incurred in invalidating the CSEP as an unconstitutional tax.

**COUNT II**
**Violations of the MMFLA and**
**MRTMA's $5,000 Fee Provision**

108.    The forgoing Paragraphs are all incorporated herein by reference.

109.    If the social equity regulatory scheme adopted by the City is not a prohibited tax,

then it is a veiled licensing fee or fine that is being levied against cannabis licensees.

110.    Under the Michigan Constitution 1963, art. 7, s 22, a Michigan municipality's

power to adopt resolutions and ordinances relating to municipal concerns is subject to the

constitution and law.

111.    The City is prohibited from enacting an ordinance that is in direct conflict with the

State statutory scheme or where the State statutory scheme preempts the ordinance by occupying

the field of regulation.

112.    Preemption may be established (1) where state law is expressly preemptive; (2) by

examination of the legislative history; (3) by the pervasiveness of the state regulatory scheme,

although this factor alone is not generally sufficient to infer preemption; or (4) where the nature of

the subject matter regulated demands exclusive state regulation to achieve the uniformity

necessary to serve the state's purpose or interest. *People v Llewellyn*, 401 Mich 314, 322 (1977).

113.    The Michigan MMFLA provides that the City "may adopt an ordinance to authorize

1 or more types of marihuana facilities within its boundaries and to limit the number of each type

of marihuana facility." See MCL § 333.27205(1).

114. The MMFLA provides further that the City "may establish an annual, nonrefundable fee of not more than $5,000.00 to help defray administrative and enforcement costs associated with the operation of a marihuana facility in the municipality." *Id.*, MCL § 333.27205(1).

115. Similarly, the MRTMA states that the City "may charge an annual fee of not more than $5,000 to defray application, administrative, and enforcement costs associated with the operation of the marihuana establishment in the municipality." MCL § 333.27956(4).

116. The City charges Plaintiffs an annual fee of $5,000 per year for renewal of each of their municipal cannabis licenses ("Renewal Fees").

117. In addition to the annual Renewal Fees, the City charges Plaintiffs a yearly CSEP, MIVEDA, and/or CISEVA "fee" that is calculated based on a percentage of Plaintiffs annual gross sales.

118. The social equity fees the City charged Fluresh in 2023 and 2024 were approximately $65,984.53 and $344,785.38, respectively. **Ex. 8** and **Ex. 9**.

119. The social equity fees the City charged Ascend in 2023 and 2024 were approximately $142,387.28 and $297,167.89, respectively. **Ex. 14**, **Ex. 15**, **Ex. 16** and **Ex. 17**.

120. The social equity fees the City charged High Profile in 2023 and 2024 were approximately $40,507.06 and $211,620.90, respectively. **Ex. 18**, **Ex. 19**, and **Ex. 20**.

121. The social equity fees the City charged Skymint in 2022, 2023 and 2024 were approximately $512,904.78, $302,435.34, and $337,104.87, respectively. **Ex. 10** and **Ex. 11**.

122. Through years 2022 to 2024, the City has levied approximately $2,254,898.03 in social equity fees against the Plaintiffs.

123. The City maintains a cannabis licensee application called the Automated Cannabis Enforcement and Licensing Application ("Accela") portal, which amongst other things, allows cannabis licensees to track and pay fees owed to the City.

124. Once the City issues an invoice for its so-called social equity point transfer, a tandem entry appears in Plaintiffs' Accela portal as "APPLICATION FEES," and notes the "TOTAL FEES" to be paid by each licensee. See e.g., **Exhibit 21**, **Exhibit 22**, and **Exhibit 23**.

125. Once Plaintiffs make their social equity fee payments to the City, it is reflected in Plaintiffs' Accela Portals referencing both the City's invoice and the "FEES" paid. Contrast **Exhibit 18** (Invoice No. 1000486274), to **Exhibit 25** (Fees paid for Invoice No. 1000486274).

126. While the City may sometimes refer to the amounts that it charges cannabis licensees pursuant to its social equity policies as something other than "fees," the substance over the form of these payments dictates that they are in fact fees.

127. The City's Accela portal specifically identifies that the monetary sums attributable to its social equity point transfer system are "FEES."

128. The MMFLA and MRTMA both explicitly provide that the City may not charge Plaintiffs more than a $5,000 fee per year to help defray administrative and enforcement costs associated with the operation of a marihuana establishment in the municipality.

129. Under the MMFLA and MRTMA, the City has exceeded the allowable fees it may charge Plaintiffs per year.

130. Any additional fees charged by the City under its cannabis Ordinance are explicitly preempted by the MMFLA and MRTMA.

131.     The MMFLA and MRTMA preempt the City from charging cannabis licensees additional social equity "fees" by occupying the field of regulation which the City seeks to enforce, even if there is no direct conflict between State law and the City's cannabis Ordinance.

132.     The nature of the regulated subject matter under the MMFLA and MRTMA with respect to the fees that a municipality may charge a cannabis licensee demand exclusive state regulation to achieve the uniformity necessary to serve the State's purpose in regulating such fees.

133.     The legislative history behind the MMFLA and MRTMA supports that State legislators did not intend for municipalities to be able to charge cannabis licensees fees in excess of the $5,000 annual renewal fees permitted by State law.

WHEREFORE, based upon the social equity portion of the City's Ordinance being preempted by the MMFLA and MRTMA, Plaintiffs seek the following: (i) monetary damages in an amount of any social equity fees paid to the City in 2022, 2023, and 2024, with accruing interest; (ii) injunctive relief against the City for the enforcement the social equity portions of its Ordinance; (iii) declaratory relief against the City finding that the fees assessed against cannabis licensees pursuant to the City's social equity policies were preempted by State law; and (iv) Plaintiffs' costs and attorneys' fees.

## COUNT III
### Violations of the MMFLA and MRTMA's prohibition on Interfering with Licensees, Enacting Unreasonably Impractical Ordinances, and Charging Penalties in Excess of $500

134.     The forgoing Paragraphs are all incorporated herein by reference.

135.     Under the Michigan Constitution 1963, art. 7, s 22, a Michigan municipality's power to adopt resolutions and ordinances relating to municipal concerns is subject to the constitution and law.

136. The City is prohibited from enacting an ordinance that is in direct conflict with the state statutory scheme or where the state statutory scheme preempts the ordinance by occupying the field of regulation.

137. The MMFLA provides that the City "may adopt other ordinances relating to marihuana facilities within its jurisdiction, including zoning regulations, but *shall not impose regulations . . . interfering or conflicting with this act or rules for licensing marihuana facilities*." MCL § 333.27205(1) (emphasis added).

138. In a similar vein, the MRTMA provides that the City "may adopt other ordinances that *are not unreasonably impracticable* and do not conflict with this act or with any rule promulgated pursuant to this act." MCL § 333.27956(2) (emphasis added).

139. Section 3 of the MRTMA defines "unreasonably impracticable" to mean "that the measures necessary to comply with the rules or ordinances adopted pursuant to this act subject licensees to unreasonable risk or require such a high investment of money, time, or any other resource or asset that a reasonably prudent businessperson would not operate the marihuana establishment." *Id*. at MCL § 333.27953(cc).

140. Likewise, under the MRTMA the City "may not impose qualifications for licensure that conflict with this act or rules promulgated by the department." *Id.*, MCL § 333.27956(3).

141. Furthermore, the MRTMA provides that the City may only "designate a violation of [its] ordinance and provide for a penalty for that violation by a marihuana establishment, provided that such violation is a civil infraction and such penalty is a civil fine of *not more than $500*." *Id*. at MCL § 333.27956(2)(d) (emphasis added).

142. The social equity portions of the City's Ordinance are in direct conflict with the MMFLA and MRTMA, or at a minimum, the MMFLA and MRTMA preempts the field of regulation that the social equity portions of the City's Ordinance seek to regulate.

143. In 2024, the City caused significant disruptions in the renewal of Fluresh's State issued cannabis licenses by filing with the State Cannabis Regulatory Agency ("CRA") Notices of Noncompliance in accord with the CSEP.

144. This action prevented Fluresh from renewing its State issued licenses in a timely manner and nearly forced Fluresh to close all of its Grand Rapids based operations, as well as its operations based in other municipalities.

145. During this time period, Fluresh was in constant communication with the City and it was clear that the City expected payment of its CSEP, MIVEDA, and/or CISEVA fees as a condition of removing the Notice of Noncompliance with the CRA.

146. Eventually, the City was told by the CRA to remove or withdraw the Notices of Noncompliance that it filed against Fluresh because a violation had not occurred, and as a result of this, Fluresh's state issued licenses were renewed on the last day possible under state law.

147. As part of its coercive scheme, the City files notices of noncompliance with the State a few weeks before Plaintiffs' state and municipal licenses are set to expire, citing as the basis for noncompliance the City's CSEP, MIVEDA, and CISEVA policies. Then, in the narrow window in which licenses have to renew their licenses, the City forces licensees to choose between paying the City's social equity fees or making a decision that would force Plaintiffs to lose both their municipal _and_ state licenses. In pattern and practice, the City would only remove the notices of noncompliance within days – and sometimes hours – before Plaintiffs' licenses were set to expire, and only after Plaintiffs agreed to pay the coerced fees.

148.    By undertaking the activities described in the aforementioned Paragraph, the City also invaded the authority of the CRA by, in effect, making unilateral dispositive decisions as to whether Plaintiffs were entitled to hold state-issued cannabis licenses. In this regard, there was no due process or recourse afforded to Plaintiffs when the City made decisions which held their state-issued licenses at stake.

149.    To comply with the City's social equity framework, Plaintiffs have hired their own compliance employees or have needed to seek outside counsel in order to interpret the City's ever-evolving social equity requirements.

150.    The CSEP, MIVEDA, and CISEVA requirements of the City's Ordinance are unreasonable and impractical, and far exceed the requirements placed on cannabis licensees by the State of Michigan or comparable municipalities.

151.    If the funds derived from the social equity portion of the City's Ordinance are not a tax nor are they a fee, they must be, at minimum, a fine that is imposed upon municipal cannabis licensees by the City.

152.    Section 6.2 of the City's CSEP list all of the sanctions that the City may levy against a non-compliant licensee, which include:

- Written warning (published list of businesses with violations)
- Opportunity to cure
- Reduction in duration of licenses
- Report to the State if related to type of business activity licensed under the MRTMA or MMFLA
- Contractual remedies as may exist
- Revocation (for egregious violations)
- Zoning violations will be addressed under the zoning ordinance
- The City's existing municipal ordinances provide for administrative appeals procedures related to city code/ordinance violations and enforcement.

**Ex. 6**, Section 6.2.

153.    Notably, the City's Ordinance does not allow for monetary sanctions to be imposed on non-compliant licensees, in excess of the amounts provided for under the MMFLA and MRTMA. See **Ex. 2**.

154.    In essence, however, Plaintiffs are being fined by the City for failing to adhere to the social equity components of its Ordinance.

155.    To remain compliant with the CSEP, the City forces Plaintiffs to purchase so-called "transfer points" by agreeing to pay the City a percentage of their annual sales revenue. The costs to Plaintiffs of this is severely detrimental to their business operations and is not sustainable.

156.    If Plaintiffs refuse to pay for these so-called "transfer points," they are in jeopardy of having their cannabis licenses revoked by the City, which would cause all of their operations to immediately cease.

157.    In form, the City attempts to refer to the process set forth in the paragraphs above as a "voluntary donation," however, in substance, this amounts to a fine and/or fee from the City for a licensee's failure to adhere to the City's social equity requirements.

158.    The City has imposed the framework around compliance with its social equity requirements in order to circumvent the MMFLA and MRTMA's explicit prohibition on municipalities charging more than $5,000 in annual renewal fees and "penalties" of more than $500.

159.    With respect to MIVEDA, the City appears to be enforcing compliance against licenses outside of the three-year term applicable to MIVEDA.

160.    On information and belief, the City is the only municipality in Michigan that penalizes cannabis licensees for failure to adhere to social equity requirements that are a component of a municipal cannabis ordinance. Moreover, the City is the only municipality that

uses non-compliance with the social equity component of its Ordinance as a basis to suspend cannabis licenses or punish licensees.

161.    While it is true that other municipalities, and even the State, have cannabis regulations that incorporate some form of a social equity component, it is almost universal across these regulations that obtaining some level of social equity determination merely results in a waiver of licensing fees.

162.    The City has, in effect, weaponized its social equity policies. These policies are nearly impossible to comply with, and as a result, the City has developed a scheme to tax, fine, or penalize cannabis licensees to generate additional revenue for the City.

WHEREFORE, based upon the social equity requirements placed on cannabis licensees by the City's Ordinance being in direct violation of the MMFLA and MRTMA, Plaintiffs seek the following: (i) monetary damages for any social equity amounts paid to the City in 2022, 2023, and 2024, with accruing interest; (ii) injunctive relief against the City for the enforcement of its social equity requirements; (iii) declaratory relief against the City finding that the fees assessed against cannabis licensees pursuant to the social equity components of the City's ordinance are preempted by State law; and (iv) Plaintiffs' costs and attorneys' fees.

## COUNT IV
### Violation of the Michigan Constitution's Contract Clause
### And Lack of Mutual Consent for Contract Changes

163.    The forgoing Paragraphs are all incorporated herein by reference.

164.    Both the federal and state constitutions prohibit laws that "impair obligations under contracts." See US Const, Art 1 § 10, cl. 1 et seq.; Mich Const, Art 1, § 10. The contracts clauses of the Federal and State Constitutions provide that vested rights acquired under a contract may not be destroyed by subsequent legislation. *Id.*

165.     The City treats the MIVEDA and CISEVA social equity components of its Ordinance as enforceable contracts.

166.     Fluresh's MIVEDA form was submitted to the City on March 1, 2019. Fluresh's MIVEDA form was accepted by the City on September 12, 2019. Fluresh's CISEVA form was submitted to the City on or about July 20, 2020. Fluresh's CISEVA form was accepted by the City on September 16, 2020.

167.     All of the Plaintiffs' MIVEDA and CISEVA forms were submitted to the City, and approved by the City, prior to May 9, 2022.

168.     On or before May 10, 2022, it was apparent to the City that a majority of its cannabis licensees could not comply with CSEP, MIVEDA, and CISEVA. As a result of this, the City Council made the decision to defer enforcement of the social equity components of its Ordinance. See **Ex. 4**, *Council Meeting Minutes*.

169.     In reaction to the City Council's conclusions about a majority of its cannabis licensees not being able to comply with CSEP, MIVEDA, and CISEVA, on or about August 9, 2022 – more than two years after most of the Plaintiffs had submitted their MIVEDA and CISEVA commitments – the City amended Policy Nos. 900-58 and 900-59, which greatly expanded on cannabis licensees' social equity requirements and implemented an "equity transfer" provision that was not contemplated by the City's original Ordinance the prior versions of MIVEDA and CISEVA.

170.     In doing so, the City essentially changed its so-called social equity "contract" with cannabis licensees many years after the adoption of CSEP, MIVEDA, and CISEVA.

171.     Almost three months after amending Policy No. 900-58 and Policy No. 900-59, on November 3, 2022, the City's Manager, Mark Washington, issued Administrative Policy No. 22-

01, that interpreted and further expanded on the City's requirements set forth in Policy No. 900-58 and Policy No. 900-59. See **Ex. 7**, *Administrative Policy No. 22-01*.

172. In relevant part Administrative Policy No. 22-01 required "Social equity performance that remains incomplete shall return to compliance using a transfer request in accordance with this Policy." *Id* at Administrative Policy No. 22-01(VI)(c).

173. There is no question that the City's actions in implementing Policy No. 900-58, Policy No. 900-59, and Administrative Policy No. 22-01, was a material change from the original CSEP, MIVEDA, and CISEVA provisions that were incorporated into the City's Ordinance in 2020.

174. The parties did not achieve mutual consent to the changes in MIVEDA and CISEVA that were brought on by the City's unilateral actions in amending Policy Nos. 900-58 and 900-59 and enacting Administrative Policy No. 22-01.

175. The impairments caused by the City's social equity policies are substantial. Plaintiffs did not anticipate, and could not have anticipated, such large fines/fees/taxes in deciding to locate their businesses within the City and invest tens of millions of dollars into a federally-designated economically disadvantaged opportunity zones when they submitted their MIVEDA and CISEVA forms.

176. At the time when Plaintiffs submitted their MIVEDA and CISEVA forms, the City's Ordinance did not contain a provision for requiring that the Plaintiffs "*shall* return to compliance" by paying the City up to 3% of their annual gross sales. *Id.* at Administrative Policy No. 22-01(VI)(c).

177.   Additionally, by unilaterally amending MIVEDA and CISEVA and enacting Administrative Policy No. 22-01, the City greatly enhanced the sanctions that it could place on licensees for partial social equity compliance.

178.   Continuation of these improper fees, fines, and or taxes, as well as the additional risks to licensure, threatens the ongoing viability of Plaintiffs' businesses. Plaintiffs have all demonstrated good faith compliance with the City's ordinance and, in fact, each maintains a true desire to promote social equity and the employment of economically-disadvantaged City residents and those impacted by the past criminalization of cannabis.

179.   Indeed, if Plaintiffs were not forced to engage in the City's so-called "equity transfer option" (i.e., paying the City's fine in order to keep their cannabis licenses), then Plaintiffs could put those funds towards further investment in the City and attracting more employees that have been disproportionately impacted by cannabis regulations in the past.

180.   The City's implementation of CESP, MIVEDA, and CISEVA is not necessary for the public good, and the means chosen by the City to address the public need are unreasonable—particularly given that the fines, penalties, and/or the unauthorized tax Plaintiffs have been forced to pay is not in the spirit of social equity—it is purely being done by the City as a means to raise revenue.

181.   At the time of submitting its applications under the City's Ordinance and taking into account CSEP, MIVEDA, and CISEVA, Plaintiffs would have made different social equity considerations or located their business in a different municipality if they had known that the City would subsequently enact policies that would require them to pay up to 3% of their annual gross sales as a fine, tax, or penalty for non-compliance with the City's near impossible social equity requirements.

182.    The City's violation of the Contracts Clause has substantially damaged Plaintiffs.

WHEREFORE, Plaintiffs seek the following: (i) injunctive relief against the City for the enforcement of CSEP, MIVEDA, and CISEVA; and (ii) declaratory relief against the City finding that Plaintiffs' obligations under CSEP, MIVEDA, and CISEVA are null and void on a contractual basis.

## COUNT V
### Violation of the Michigan and U.S. Constitutions' Equal Protection Clauses and Commerce Clause

183.    The forgoing Paragraphs are all incorporated herein by reference.

184.    The United States Constitution empowers the federal Congress "[t]o regulate Commerce . . . among the several States." US Const, art I, § 8, cl 3.

185.    The United States Supreme Court has "long held that this Clause also prohibits state and municipal laws that unduly restrict interstate commerce." *Tenn Wine & Spirits Retailers Ass'n v Thomas*, 139 US 2449, 2459 (2019); see also *Dean Milk Co v City of Madison*, 340 US 349, 354 (1951).

186.    It is well established that a corporation is a "person" within the meaning of the Fourteenth Amendment. *Metro Life Ins Co v Ward*, 470 US 869, 881 (1985).

187.    A law that discriminates against interstate commerce is "virtually per se invalid, and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." See *Dep't of Revenue of Ky v Davis*, 553 US 328, 338 (2008).

188.    The Michigan Constitution provides that "[a]ll political power is inherent in the people. Government is instituted for their equal benefit, security and protection." Const 1963, art 1, § 1.

31

189. The Michigan Constitution further guarantees that "[n]o person shall be denied the equal protection of the laws. . . ." Const 1963, art 1, § 2.

190. The Michigan Constitution also provides that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law." Const 1963, art 1, § 17.

191. Collectively, these constitutional provisions guarantee, among other things, a right to intrastate travel, a right to interstate travel, a right to pursue one's livelihood, and right to be free from arbitrary or impermissible discrimination.

192. The CSEP portion of the City's Ordinance violates these provisions of the U.S. and Michigan Constitution because its prefers City of Grand Rapids resident applicants in awarding cannabis licenses and punishes Plaintiffs, and their owners, for exercising their rights to intrastate and interstate travel, violates their right to pursue a livelihood, and draws distinctions between the owners of Plaintiffs and other City of Grand Rapids residents that are not rationally related to any legitimate government purpose.

193. The CSEP portion of the City's Ordinance violates the U.S. Constitution Commerce Clause because it discriminates against out-of-state residents and punishes people for moving between states.

194. The CSEP portion of the City's Ordinance violates the Michigan Commerce Clause because it discriminates against residents and punishes people for moving outside of Kent County.

195. The Ordinance's preference for City of Grand Rapids applicants does not advance a legitimate local purpose—and, even to the extent that it does, that interest could be adequately served by reasonable nondiscriminatory alternatives.

196. In September of 2020, Brandon Kanitz, a founder and the Chief Executive Officer (CEO) of Fluresh, moved from the City of Grand Rapids to Traverse City, Michigan. The move

was precipitated by the COVID-19 pandemic, which had effectively closed his children's schools in Grand Rapids and disrupted his family's childcare infrastructure. This factor forced Kanitz to move back to the Grand Traverse region where his wife's family resided and could provide better support for his family. This was one of the factors by which Fluresh was found to be noncompliant under the City's cannabis social equity policies, and Fluresh was fined $65,984.53 by the City in 2023.

197.  Plaintiffs have been damaged by the City's discriminatory CSEP, MIVEDA, and CISEVA policies.

WHEREFORE, Plaintiffs seek the following: (i) injunctive relief against the City for the enforcement of CSEP, MIVEDA, and CISEVA; and (ii) declaratory relief against the City finding that CSEP, MIVEDA, and CISEVA are unconstitutional.

## COUNT VI
### 42 U.S.C. § 1983 Claim

198.  The forgoing Paragraphs are all incorporated herein by reference.

199.  42 U.S.C. § 1983 provides in relevant part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

200.  In seeking to enforce the social equity provisions of its Cannabis Ordinance, the City has violated Plaintiffs' Fourteenth Amendment rights to equal protection and substantive rights under the dormant commerce clause of the U.S. Constitution.

201.   The City has enacted the social equity component of its Ordinance under the color of state law and is thus explicitly acting in its official capacity, and by doing so it has violated Plaintiffs' constitutional rights.

202.   Plaintiffs have been damaged, and continue to be damaged, as a result of the City's unconstitutional Ordinance.

WHEREFORE, as a result of its U.S. Constitutional rights being violated, Plaintiffs seek the following: (i) monetary damages for any actual injury caused by the City's Ordinance; (ii) compensatory damages, including the out of pocket fees the City charged under the social equity component of the Ordinance, as well as damages for impairment to Plaintiffs' reputation; and (iii) Plaintiffs' reasonable attorneys' fees, costs, and expenses incurred in sustaining this litigation.

### COUNT VII
**The Social Equity Component of the
City's Ordinance is Void for Vagueness**

203.   The forgoing Paragraphs are all incorporated herein by reference.

204.   A statute may qualify as void for vagueness if: (1) it is overbroad and impinges on First Amendment freedoms; (2) it does not provide fair notice of the conduct it regulates; or (3) it gives the trier of fact unstructured and unlimited discretion in determining whether the statute has been violated. *Proctor v White Lake Twp Police Dep't,* 248 Mich App 457, 467; 639 NW2d 332 (2001). Laws may also be void for vagueness where there is "arbitrary and discriminatory enforcement." *People v Boomer*, 250 Mich App 534, 539; 655 NW2d 255 (2002).

205.   The City's Ordinance fails to provide fair notice of its social equity requirements.

206.   The City's cannabis Ordinance was enacted in 2019 and was amended in 2020 to include the CSEP component. Numerous provisions of the CSEP are decidedly vague, including, but not limited to the following:

a. The Ordinance only requires that licensees provide the City with a "social equity plan detailing any practices, initiatives, or policies the applicant will implement to promote and encourage participation in the cannabis industry by people from communities that have been disproportionately impacted by cannabis prohibition and enforcement and to positively impact those communities." The City's enforcement of the Ordinance has far exceeded this standard.

b. The Ordinance does not specify what penalties a licensee will face for non-compliance with submitting a social equity plan.

c. The Ordinance only states that a licensee must make a "good faith effort" to meet the objectives of its social equity plan. This so-called "good faith effort" seems to be rendered nearly unobtainable by the City, as evidenced by its 2022 recognition that a majority of its cannabis licensees cannot comply with CSEP, MIVEDA, and CISEVA.

d. Nowhere in the Ordinance does it give the City the right to fine, tax, or penalize cannabis licensees for non-compliance with social equity requirements.

e. Nowhere in the Ordinance does it give the City rights to engage in a "social equity transfer" with licensees, which is in essence a thinly-veiled program the City uses to transfer up to 3% of licensees' annual sales revenue to the City or city-controlled nonprofits.

207. The City amended Policy Nos. 900-58 and 900-59, which greatly expand on the social equity provision of the City's Ordinance. Likewise, the City Manager has signed Administrative Policy No. 22-01, which implemented the City's "social equity transfer" scheme.

Collectively, these policies have strayed far from the City's original Ordinance, which has rendered the Ordinance vague and impossible to comply with.

208.　The social equity requirements of the City's Ordinance are not clear. As proof of this, after more than two years in existence, the City Manager's stated purposed in effectuating Administrative Policy No. 22-01 was "[t]o provide supplemental criteria for achieving compliance with the social equity commitments made by the medical and recreational cannabis industry."

209.　Administrative Policy No. 22-01 further provided that this "[p]olicy serves as a tool to further articulate the process for achieving compliance with social equity commitments in the medical and recreational cannabis industries."

210.　In reality, Administrative Policy No. 22-01 adds more confusion and regulatory vagueness to the City's social equity policies.

211.　The City has arbitrarily enforced its Ordinance in the past and will continue to do so in the future.

212.　Indeed, the City Council Meeting Minutes from May 10, 2022, show that the City Council decided to defer enforcement of its cannabis social equity policies through August of 2022. On August 10, 2022, the City Council then made the decision to defer enforcement of its cannabis social equity policies until 2023. These decisions were predicated on the observation that a majority of licensees could not comply with the City's so-called social equity requirements.

213.　Accordingly, there was more than a three-year period of non-enforcement (or selective enforcement) of the City's CSEP, MIVEDA, and CISEVA requirements; running at least from the time its amended Ordinance was enacted in 2020, until sometime in 2023 when the City began enforcement. As it stands in early-2025, the City's cannabis social equity requirements have seen longer periods of non-enforcement than enforcement.

214. The City has also attempted to enforce the Ordinance's social equity requirements in an arbitrary and overbearing manner. For example, in order to assess Fluresh's workplace diversity, the City requested all of the *personal tax returns for the past 10 years* of Fluresh's employees. In a similar vein, the City has requested documents from Brandon Kanitz verifying his personal residency and has requested an ever-evolving set of documents to support so-called "supplier diversity."

215. Compliance with the social equity provisions of the City's Ordinance is nearly impossible from a purely regulatory standpoint, but in practice, the City also treats licensees arbitrarily under the Ordinance on a reoccurring basis. Inherent in all of this is the fact that compliance was never intended, when non-compliance puts the City in a position to collect up to 3% of cannabis licensees' annual gross sales.

216. Plaintiffs' compliance personnel and attorneys have engaged in numerous written and verbal communications with the City's Cannabis Manager regarding the City's social equity policies, and they have received vague and often conflicting advice on how to comply with the Ordinance.

217. On information and belief, the City holds cannabis licensees to different standards and applies a discriminatory application of the CSEP, MIVEDA, and CISEVA requirements of its Ordinance.

WHEREFORE Plaintiffs seek relief consisting of the following: (i) an injunction against the City for the enforcement of CSEP, MIVEDA, and CISEVA; and (ii) declaratory relief against the City finding that Plaintiffs' obligations under CSEP, MIVEDA, and CISEVA are null and void.

## COUNT VIII
### The Social Equity Component of the
### City's Ordinance is in Violation of the Michigan Zoning Enabling Act

218. The forgoing Paragraphs are all incorporated herein by reference.

219. Under the MZEA, "conditions imposed with respect to the approval of a land use or activity shall be recorded in the record of the approval action and remain unchanged except upon the *mutual consent of the approving authority and the landowner*. The approving authority shall maintain a record of conditions which are changed." MCL 125.3504(5) (*emphasis added*).

220. In this instance the Plaintiffs all committed to CSEP, MIVEDA, and/or CISEVA commitments in 2020, but then the City materially changed the requirements of the Ordinance in 2022 by amending Policy Nos. 900-58, 900-59, and enacting Administrative Policy No. 22-01.

221. These new changes in 2022, not only required Plaintiffs to pay up to 3% of their annual gross sales to the City in order to remedy partial compliance, the City also elevated the standards for licensees to sustain compliance with CSEP, MIVEDA, and CISEVA.

222. Specifically, ever evolving administrative policies changed the interpretation of "supplier diversity." Previously, the City's Ordinance defined "[a] diverse supplier [as], *in the broadest sense possible*, a business owned and operated by an individual or group that is part of a traditionally underrepresented or underserved group." See **Exhibit 6**, CSEP Ordinance, 3.6.3 Supplier Diversity (*emphasis added*). In a continuing evolution of its Ordinance, the City now appears to require that diverse suppliers actually be certified by the state or City as minority owned business, woman owned businesses, etc.

223. This specific requirement does not adhere to the explicit language of the Ordinance where "diverse suppliers" are to be determined "in the broadest sense possible." This has led City officials to question and deny Plaintiffs' assessments of a diverse supplier on the basis that these suppliers might not have state or City certification.

224. Unlike the City's Ordinance, which was adopted by a legislative body at a public meeting in 2018, Policy Nos. 900-58, 900-59, and Administrative Policy No. 22-01, were administrative policies that were unilaterally created by the City Manager and City Executives.

225. Policy Nos. 900-58, 900-59, and Administrative Policy No. 22-01 represent material changes to the City's Ordinance and zoning enforcement, and these provisions were never approved or consented to by the landowner Plaintiffs.

WHEREFORE Plaintiffs seek relief consisting of the following: (i) an injunction against the City for the enforcement of CSEP, MIVEDA, and CISEVA; and (ii) declaratory relief against the City finding that Plaintiffs' obligations under CSEP, MIVEDA, and CISEVA are null and void.

## COUNT IX
### Declaratory Judgment Pursuant to MCR § 2.605

226. The forgoing Paragraphs are all incorporated herein by reference.

227. To assert a claim for declaratory judgment, Plaintiffs must allege a case of actual controversy within the jurisdiction of the Court, and Plaintiffs must be an interested party in seeking a declaratory judgment.

228. As set forth in the Paragraphs above, Plaintiffs have asserted claims against the City relative to CSEP, MIVEDA, and CISEVA: (i) under the Headlee Amendment to the Michigan Constitution; (ii) for state law preemption of its Ordinance; (iii) for violation of the Michigan Constitution's contracts clause; (iv) for violations of the equal protection and commerce clause of both the U.S. and Michigan constitutions; (v) pursuant to 42 U.S.C § 1983; (vi) under the void for vagueness doctrine; and (vii) under the Michigan Zoning Enabling Act.

229. Undoubtedly, there is an actual case in controversy between the parties.

230. Plaintiffs are also an interested party to this matter because their rights and business interests are being adversely affected by the City's actions.

231. Plaintiffs are entitled to a declaratory judgment regarding the abovementioned causes of action.

232. Pending an outcome of this litigation, the Court should issue a declaratory judgment regarding the enforceability of the social equity components of the City's Ordinance to clarify for Plaintiffs and other cannabis licensees that compliance with those conditions is no longer mandated.

WHEREFORE, Plaintiffs seek a declaratory judgement from the Court declaring the social equity components of the City's Ordinance, to include CSEP, MIVEDA, and CISEVA, unenforceable as a matter of law.

Respectfully submitted,

Date: February 14, 2025

By: _/s/ William L. Thompson_
William L. Thompson (P80123)
Justin M. Wolber (P85728)
Julia S. Moran (P87914)
VARNUM LLP
*Attorneys for Plaintiff*
480 Pierce St., Ste. 300
Birmingham, MI 48009
Phone: (313) 481-7330
Email: wlthompson@varnumlaw.com
jmwolber@varnumlaw.com
jsmoran@varnumlaw.com

## **VERIFICATION**

I, Jacob Fein, am the Chief Financial Officer of Fluresh, LLC. I am authorized to verify the foregoing Verified Complaint and do so based on my personal knowledge, company books and records, and/or matters made known to me. I declare under the penalties of perjury that this Verified Complaint has been examined by me and that its contents are true to the best of my information, knowledge, and belief. For those matters stated upon information and belief, I believe them to be true after reasonable inquiry.

Executed on February 14, 2025      By: _____

                                         Jacob Fein

FLURESH, LLC, FPAW MICHIGAN LLC,
QPS MICHIGAN HOLDINGS, LLC,
FISH LADDER HOLDINGS, LLC,
THE DISTRICT PARK, LLC,
GREEN SKIES-HEALING TREE, LLC,
all Michigan limited liability companies,

     Plaintiffs,

v.

CITY OF GRAND RAPIDS, a
Michigan municipal corporation,

     Defendant.

Case No. _____-CB

Hon. _____

_____/

William L. Thompson (P80123)
Justin M. Wolber (P85728)
Julia S. Moran (P87914)
VARNUM LLP
*Attorneys for Plaintiff*
480 Pierce St., Ste. 300
Birmingham, MI 48009
Phone: (313) 481-7330
Email: wlthompson@varnumlaw.com
     jmwolber@varnumlaw.com
     jsmoran@varnumlaw.com

_____/

## **PLAINTIFFS' DEMAND FOR JURY TRIAL**

    Plaintiffs demand a jury trial on all issues triable by a jury set forth in its Complaint.

               Respectfully submitted,

Date: February 14, 2025        By:   */s/ William L. Thompson*
                         William L. Thompson (P80123)

Justin M. Wolber (P85728)
Julia S. Moran (P87914)
VARNUM LLP
*Attorneys for Plaintiff*
480 Pierce St., Ste. 300
Birmingham, MI 48009
Phone: (313) 481-7330
Email: wlthompson@varnumlaw.com
       jmwolber@varnumlaw.com
       jsmoran@varnumlaw.com

26045903

# EXHIBIT 1

# CITY COMMISSION POLICY

| GRAND RAPIDS MICHIGAN | **NUMBER:** | **HISTORY** FILE #        DATE |
|---|---|---|
| | **DATE:**     December 4, 2018 | |
| | **FILE NUMBER:** | |
| | **DEPARTMENT:**  Planning | |

**SUBJECT:**   **MARIHUANA INDUSTRY VOLUNTARY EQUITABLE DEVELOPMENT AGREEMENT (MIVEDA)**

**PURPOSE:**   To establish criteria for marihuana facility applicants to offer voluntary elements to further the City's goals in the administration of marihuana facility applications.

**POLICY:**

## I. Introduction

A MIVEDA is a voluntarily-offered document that is proposed by an applicant for a marihuana facility use which shall become part of the applicant's submission.  The MIVEDA has various pre-defined options in the interest of offering conditions that align with the goals articulated in this policy.

## II. Goals

The City's goals in providing the opportunity for marihuana applicants to participate in Marihuana Industry Voluntary Equitable Development Agreement (MIVEDA) include, but are not limited to:

1. Encouraging equitable development within this new industry;

2. Maximizing local economic impact; and

3. Streamlining the marihuana facility application process.

## III. Eligibility Criteria

Attachment: MIVEDA City Commission Policy 11-26-18  (Medical Marihuana MIVEDA Policy)

Applicants seeking land use approval for marihuana grower, processor, or provisioning center, including co-location of these uses, are eligible to provide a MIVEDA as part of their Special Land Use Application ("Eligible Applicants").

## IV. MIVEDA FORM

a. The City Commission approves the use of the attached MIVEDA form, in a form approved by the City Attorney.

b. The MIVEDA form shall apply to all Eligible Applicants who wish to participate in a MIVEDA. No changes, departures, substitutions, or additions to the terms contained in the MIVEDA form may be offered by an Eligible Applicant or accepted by City staff.

c. Reporting and compliance requirements are detailed in the MIVEDA and may be further articulated in administrative documents.

d. Participation in the MIVEDA program is voluntary. The selection of any voluntarily offered conditions on the MIVEDA form is voluntary. However, all voluntarily offered conditions selected on a MIVEDA submitted by an Eligible Applicant as part of an application for a marihuana facility will be required and implemented in the final project approval.

e. Marihuana facility applications that offer a MIVEDA as part of the submission will receive application consideration precedence, based on the number of voluntarily offered conditions contained in the MIVEDA, in accordance with procedures established by the City Manager.

## V. Evaluation

Staff shall provide the City Commission with a yearly report on the active MIVEDAs, which shall include, at a minimum, the following:

1. A list of approved marihuana facilities which included a MIVEDA;

2. Quantitative analysis of active MIVEDA projects achieving one or more City criteria, including but not limited to:

    a. Projected and actual employment data; and

    b. Projected and actual MLBE participation.

The City Commission will utilize this information to determine the effectiveness of the Policy in achieving the City's goals. The City Commission, at its sole discretion, shall determine whether modifications to this policy are necessary to increase the effectiveness of its programs in achieving desired outcomes.

Attachment: MIVEDA City Commission Policy 11-26-18 (Medical Marihuana MIVEDA Policy)

# EXHIBIT 2

**89279 Result: Adopted.**
**Mover: Jones. Supporter: O'Connor.**
**Yeas: Bliss, Kelly, Lenear, O'Connor, Jones, Reppart, Moody**

## AN ORDINANCE TO ADD CHAPTER 105
## OF TITLE VII TO THE CODE OF THE CITY
## OF GRAND RAPIDS ENTITLED
## "MARIHUANA RELATED MUNICIPAL LICENSING"
## ORDINANCE NO. 2019 - 66

### THE PEOPLE OF THE CITY OF GRAND RAPIDS DO ORDAIN:

Section 1. That Chapter 105, entitled "MARIHUANA RELATED MUNICIPAL LICENSING" be added to Title VII of the Code of the City of Grand Rapids, to read as follows:

### "Sec. 7.361. – Purpose and Intent.

The City of Grand Rapids intends to license and regulate marihuana facilities and establishments as authorized under the Michigan Medical Marihuana Facilities Licensing Act (MMFLA), Public Act 281 of 2016, MCL 333.27101 *et seq.*, and the Michigan Regulation & Taxation of Marijuana Act (MRTMA), Public Act 1 of 2018, MCL 333.27951 *et seq.*, and to exercise authority as a home rule city to enforce ordinances under its police power in order to preserve the public health, safety, and welfare. By requiring a license and compliance with the requirements of this Chapter, the City intends to protect the public health, safety, and welfare by:

(1) Promoting the safe, regulated manufacturing, production, and sale by state-licensed marihuana establishments and facilities;

(2) Discouraging the sale of unsafe and unlicensed marihuana products;

(3) Preserving and protecting the health, safety, and welfare of the residents of the City and the general public by minimizing unsafe and unregulated marihuana production and sale;

(4) Minimizing the impact of the cannabis industry's intensive use of water and energy, particularly the growing process of cannabis plants. It is the City of Grand Rapids' intention to minimize the impact marihuana establishments have on public infrastructure and the environment by maximizing efficiency and reducing the need for the use of nonrenewable resources wherever possible.

### Sec. 7.362. – Definitions

The following terms shall have the definitions indicated for the purposes of this Chapter:

(1) Terms contained in the Michigan Medical Marihuana Facilities Licensing Act (MMFLA), Public Act 281 of 2016, MCL 333.27101 *et seq.*, and the Michigan Regulation and Taxation of Marijuana Act, Public Act 1 of 2018, MCL 333.27954 *et seq.*, as amended (MRTMA), apply to the terms found herein. This Chapter contains some words and phrases that are defined in the MMFLA & the MRTMA. As used in this Chapter, they have the same meaning as provided in the MMFLA & MRTMA, unless the term is otherwise defined in this Chapter or the context requires a different meaning.

(2) "Applicant" means a person who applies for a Marihuana Related Municipal License under this Chapter.

(3) The words "Establishments" and "Facilities" are used interchangeably and refer to any marihuana related locations at which a licensee is licensed to operate under either MMFLA, MRTMA, or both.

(4) "Licensee" means a person or entity issued a marihuana establishment or facility license under this Chapter or by the State, including safety compliance facilities, Marijuana Event Organizers, temporary events, and secure transporters.

(5) "Municipal Marihuana license" or "license" means a required Marihuana Related Municipal License issued pursuant to this Chapter that allows the licensee to operate within the City as one of the following, as specified in the license:

    (a) Grower, including Class A Grower, Class B Grower, Class C Grower, and Excess Grower;
    (b) Processor;
    (c) Provisioning Center;
    (d) Retailer;
    (e) Designated Consumption Establishment;
    (f) Microbusiness;
    (g) Safety Compliance Facility;
    (h) Secure Transporter;
    (i) Marihuana Related Event Coordinator;
    (j) Marihuana Related Temporary Event.

## Sec. 7.363 - Marihuana Establishments & Licensees Authorized to Operate within the City.

(1) Pursuant to the MMFLA & MRTMA, the City of Grand Rapids authorizes the operation in the City of the following marihuana licensees, provided they possess a state operating license issued under the MMFLA, MRTMA, or both and they comply with the additional requirements of this Chapter, Chapter 61 (Zoning), and all other applicable laws and ordinances:

    (a) Class A Grower, Class B Grower, Class C Grower, and Excess
        Marijuana Grower;

    (b) Processor;

    (c) Provisioning Center;

    (d) Retailer;

    (e) Designated Consumption Establishment;

    (f) Microbusiness;

    (g) Secure Transporter;

    (h) Safety Compliance Facility;

    (i) Marihuana Related Event Coordinator;

    (j) Marihuana Related Temporary Event.

## Sec. 7.364 - Marihuana Related Municipal License Required.

(1) No person shall operate a marihuana establishment or hold a marihuana event in the City of Grand Rapids without first obtaining a municipal license and/or permit to do so as required by this Chapter.

(2) For co-located marihuana establishments, as authorized by this Code and state law, a separate Marihuana Related Municipal License is required for each type of establishment operated.

(3) For marihuana establishments with stacked and/or excess grow operations as authorized by this Code and state law, a license is required for each stacked and excess marihuana grower license.

(4) For Marihuana Events organized by state licensed Marihuana Event Organizers, a Temporary Event License and/or temporary use permit shall first be issued by the City to the licensee through the City prior to events being held.

(5) The license requirement in this Chapter shall be in addition to any other requirements imposed by any other state or local law, including but not limited to state or local laws applicable to commercial entities performing functions similar to the functions performed by marihuana establishments.

(6) A license issued under this Chapter shall be valid for one (1) year after the date of issuance. The expiration date of the state operating license that corresponds to a marihuana facility license issued under this Chapter constitutes the expiration date of the Marihuana Related Municipal License. Expiration of the Marihuana Related Municipal License does not affect a person's licensure under MMFLA or MMRTA but does affect the person's ability to operate a marihuana establishment in the City.

(7) This Chapter does not apply to, or regulate, any patient or caregiver conduct protected by the Michigan Medical Marihuana Act, 2008 IL 1, MCL 333.26421 et seq. (MMMA).

## Sec. 7.365 - General Provisions.

(a) A Marihuana Related Municipal License is a revocable privilege and not a right. Nothing in this Chapter may be held or construed to grant a vested right, license, permit or privilege to continued operations within the City.

(b) A license issued under this Chapter is valid only for the applicant named on the license, the location of the establishment, and type of establishment identified on the license. Each license is personal and exclusive to the licensee.

(c) The revocation, suspension, and placement of restrictions by the state on a state operating license apply equally to a license issued by the City.

(d) An applicant or licensee has a continuing duty to provide information requested by the City and to ccoperate in any investigation, inquiry, or hearing conducted by the City.

(e) Acceptance of a license from the City under this Chapter constitutes consent by the licensee for the City to conduct inspections of the licensed premises to ensure compliance with this Chapter.

(f) The issuance of any license pursuant to this Chapter does not create an exception, defense, or immunity to any person with regard to any potential criminal or civil liability the person may have under any federal or state law or city ordinance.

(g) No Marihuana Related Municipal License may be sold, assigned, mortgaged or otherwise transferred.

## Sec. 7.366 - Application Requirements.

(1) An application for a marihuana facility license shall be submitted to the City Clerk in a form provided by the City. Any application that does not include all information requested by the application form or is not supported by the materials required by this Chapter or the license application shall be denied and/or rejected.

(2) The application may require information that will enable the City Clerk to make a fair determination as to the applicant's fitness and ability to comply with the provisions of this Code and all other applicable laws, ordinances and regulations, including but not limited to:

    (a) The name and address of the facility and any other contact information requested on the application form.

    (b) The name and address of all owners (entities and individuals) of the real property where the facility is located.

(c) A copy of official paperwork issued by LARA indicating that the applicant has successfully completed the prequalification step of the application for a state operating license.

(d) Proof of applicant's ownership, legal possession, or otherwise legal interest in the premises.

(e) Proof that the appropriate zoning approval has been received.

(f) Copy of the security plan required by State Administrative Rule 35, R. 333.235.

(g) Evidence of a valid and effective policy for general liability insurance within minimum limits of $1,000,000 per occurrence and a $2,000,000 aggregate limit issued from a company licensed to do business in Michigan having an AM Best rating of at least B++ shall be produced that includes the name/s of the insured, effective and expiration dates, and policy number. The City of Grand Rapids and its officials and employees shall be named as additional insureds. The City shall be notified of any cancellation, expiration, reduction in coverage, or other policy changes within five business days of the event.

(h) If the application is for a grower's license, the maximum number of plants that the applicant intends to grow.

(i) Proof of universal design plan conforming to the requirements of this Chapter.

(j) Proof of environmental sustainability plan conforming to the requirements of this Chapter.

(k) Other information and materials specific to the type of establishment or activity being licensed as indicated on the license application.

(3) Payment of a non-refundable application fee per marihuana license sought and/or proof that the applicant has, within the prior 365 days, paid the zoning application fee for zoning approval associated with the marihuana facility type identified in the application as required in Chapter 61, Sec. 5.9.19. Fees shall be offset to ensure the annual fees required by marihuana facility ordinances or zoning regulations promulgated pursuant to the MMFLA & MRTMA do not exceed $5,000 annually.

## Sec. 7.367 - Environmental Sustainability

(1) All establishments, with the exception of event locations used by event coordinators shall enroll in the Grand Rapids 2030 District prior to operation. Enrollment shall be, at a minimum, as a building owner or

substantially similar enrollment option that enables the reporting of marihuana facility performance data on a confidential basis and at no cost to the licensee. Energy consumption data shall be reported via Energy Star Portfolio Manager on at least an annual basis and no later than 16 months after operations begin.

(2) A grower of any class and microbusinesses shall be required to meet the following environmental sustainability requirements:

(a) Create and submit an environmental sustainability plan to the City's Office of Sustainability as well as all energy utilities serving the applicant, including electricity, natural gas, and steam, within six months after operations commence, that includes the following items:

    i.    Analysis of predictive energy load, including design energy use intensity (EUI);

    ii.    Estimated greenhouse gas (GHG) emissions for the coming year and reporting on the past year's GHG emissions;

    iii.    Identification of water efficiency measures planned or implemented;

    iv.    A list of wastewater pollutant loadings and toxics; and

    v.    A solid waste management plan detailing disposal plans for plants, soils and other wastes generated as well as reporting on the annual tons of each type of waste generated and disposed.

(b) At least 50% of plant canopy area that is partially or fully illuminated by electric lighting shall be illuminated by fixtures with photosynthetic photon efficacy of at least 1.9 µmol/J at the time operations commence.

(c) Submit a whole building energy audit meeting ASHRAE Level II guidelines or better to the City's Office of Sustainability within 16 months after operations.

(d) All applications for renewal of any license shall include the environmental sustainability plan submission required by this section and proof of compliance with the annual reporting requirements under this section.

## Sec. 7.368 - Conduct of Business at Licensed Marihuana Establishment

(1) The operations at a licensed marihuana facility shall be conducted in compliance with the MMFLA and the MRTMA, and any rules

promulgated pursuant to other laws, rules, and regulations of the state of Michigan and the City of Grand Rapids.

(2) All security measures required by the State shall be maintained.

    (a) Security devices and all components of those devices required by the State, including but not limited to, video surveillance systems, alarm systems, and locks, shall be in good working order.

    (b) Licensees shall register their video surveillance systems with the Grand Rapids Police Department.

(3) All marihuana in any form on the premises of a licensed marihuana facility shall be cultivated, manufactured, tested, sold, and packaged in the State of Michigan.

(4) Access to the licensed marihuana establishment is restricted to the licensee, employees of the licensee, and adult patrons age 21 or older in establishments licensed for recreational marihuana, and the department, through its investigators, agents, auditors, or the State Police or authorized City employees acting within the scope of their employment. A separate waiting area may be created for visitors not authorized to enter the marihuana establishment.

(5) Recreational marihuana products must be separated from medical marihuana products.

(6) A licensee shall display all marihuana facility licenses issued under this Chapter and state operating licenses in plain view clearly visible to patrons, clients, city officials, and state authorized agents.

(7) A licensee shall not permit or allow the sale, consumption, or use of alcohol or tobacco products on licensed premises unless it is licensed to do so by the state and the city, and/or as otherwise permitted by law.

(8) A licensee shall not permit or otherwise allow the use, smoke, inhalation, or consumption of marihuana, in any form, anywhere within a licensed marihuana establishment or on the property of a licensed establishment unless it is licensed to do so by the state and the city.

(9) A licensee shall comply with the Michigan Construction Code and Americans with Disabilities Act Amendment Act of 2008 (ADAA) meeting ANSI A117.1.

### Sec. 7.369 – Reserved.

### Sec. 7.370 - License Denial, Suspension, or Revocation.

(1) A license issued under this Chapter may be denied, suspended, revoked, or nonrenewed for any of the following reasons:

(a) The applicant or licensee is ineligible or does not hold the appropriate state operating license under the MMFLA or MRTMA.

(b) The applicant or licensee, or his or her agent, manager or employee, has violated, does not meet, or has failed to comply with any of the terms, requirements, conditions or provisions of this Chapter, City Code, or with any applicable state law.

(c) A license application contains any misrepresentation or omission of any material fact, or false or misleading information, or the applicant has provided the city with any other false or misleading information related to the establishment.

(d) Marihuana is grown, dispensed, possessed, distributed, or sold on the premises in violation of this Chapter or any other applicable state or local law, rule or regulation.

(e) The establishment is operated or is operating in violation of the specifications of the license application, license, any conditions of approval by the City or any other applicable state or local law, rule or regulation.

(f) The City, the county, or any other governmental entity with jurisdiction, has closed the establishment temporarily or permanently or has issued any sanction for failure to comply with health and safety provisions of this Chapter or other applicable state or local laws related to public health and safety.

(g) The establishment's state operating license has been suspended, revoked, denied, or not renewed.

(h) The marihuana establishment has been operated in a manner that adversely affects the public health, safety or welfare. Evidence to support a finding under this Section may include, without limitation, a recurring pattern of conduct that violates City Code directly related to or arising from the operation of the marihuana establishment ; a recurring pattern or drugrelated criminal conduct within the premises of the marihuana establishment or in the immediate area surrounding the establishment; a recurring pattern of criminal conduct directly related to or arising from the operation of the marihuana establishment; or an ongoing nuisance condition emanating from or caused by the marihuana establishment. Criminal drug-related conduct considered under this Section shall be

limited to the violation of a State law, state regulation, or city ordinance.

(2) These grounds for denial, suspension or revocation of a license provided for in this Chapter shall be in addition to other grounds for denial, suspension or revocation of licenses or permits provided for in Chapter 91 and elsewhere in this Code.

(3) Prior to suspension, revocation, or nonrenewal of any license issued under this Chapter, the licensee shall be entitled to a hearing as provided in Section 7.16 of Chapter 91 of this Code.

(4) An applicant has the right to appeal the denial of a license as provided in Section 7.16 of Chapter 91 of this Code.

## Sec. 7.371 - Revocation Not Exclusive Penalty or Remedy.

Nothing in this Chapter shall be deemed to prohibit the City from imposing other penalties or seeking other remedies authorized by the Grand Rapids City Code or other ordinance of the City, including filing a public nuisance action or any other legal action in a court of competent jurisdiction.

## Sec. 7.372 – Fees

The annual license fee shall be as specified in Chapter 92 of this Code.

## Sec. 7.373 - Renewal of Existing Licenses.

(1) The same procedures that apply to applying for a new license shall apply to the renewal of existing licenses.

(2) An application for renewal of an existing license shall be submitted no sooner than 60 days before the existing license expires and no later than 31 days before the expiration date.

(3) If a license renewal is not submitted by the license expiration date, the license may be renewed within 60 days after its expiration date upon application, payment of applicable fees and penalties, and satisfaction of any renewal requirements if state licensure is still active.

## Sec. 7.374 - Issuance of License and Authorization to Operate Under License.

(1) If, after investigation, the City Clerk shall be reasonably satisfied that the applicant has successfully demonstrated compliance with all requirements for issuance of a license, the City Clerk shall issue the applicable Marihuana Related Municipal License or grant renewal of an existing license.

(2) A licensee is authorized to operate under a municipal license issued pursuant to this Chapter only after the following additional requirements are met.

    (a) The licensee also holds a valid current state operating license for that location and establishment type. A copy of the valid current state operating license shall be provided to the City Clerk.

    (b) A certificate of occupancy has been issued.

    (c) The licensee is not operating in violation of any City ordinances or state law.

    (d) Zoning is deemed appropriate by the City for the location and any and all Special Land Use permits and/or waivers have been approved.

    (e) Any other license specific requirements as stated in the license application have been met.

### Sec. 7.375 - Penalty for Violations.

(1) Any person who violates a provision of this Chapter shall be responsible for a municipal civil infraction and shall be subject to such civil infraction fines and costs as provided in Chapter 170, but the fee will not exceed the fee limitation set by the state.

(2) Each day of violation shall be a separate violation.

### Sec. 7.376 – Coordination with State Licensing Authorities.

The City Clerk shall coordinate with the Michigan Marijuana Regulatory Agency (MRA) to provide information that LARA or the MRA deems necessary to carry out licensing under the MMFLA and MRTMA, including but not limited to:

(1) Attestation as to ordinances and zoning regulations adopted by the City relating to marihuana establishments, and amendments thereto.

(2) Information regarding a licensee or applicant for a state operating license including:

    (a) Information that the board deems necessary to determine whether a state operating license should be issued or renewed;

    (b) Description of a violation of an ordinance or a zoning regulation committed by the licensee, but only if the violation relates to activities licensed under this Chapter, zoning regulations relating to marihuana establishments, or applicable marihuana laws;

(c) Denial, suspension, revocation, or nonrenewal of a marihuana facility license; or

(d) Whether there has been a change to an ordinance or zoning regulation relating to marihuana establishments and/or licensing since the state operating license was issued, and a description of the change.

(3) Recommendation to LARA that a state operating license for a marihuana establishment located in Grand Rapids be restricted or not renewed. The Clerk shall provide specific written input and information necessary for LARA to consider the recommendation.

## Sec. 7.377 - Conflicts with Other Laws or Regulations.

Nothing in this Chapter shall be construed in such a manner as to conflict with the MMFLA, MMMA, MMRTA, or other applicable state marihuana law or rules. If any provision of this Chapter differs from a provision of any other applicable law, ordinance, rule or regulation, both the provision of this Chapter and the differing provision shall apply if possible. If the two (2) provisions are in conflict, then the provision establishing the higher or stricter standard shall apply, consistent with state law.

## Sec. 7.378 – Severability.

The various parts, sections, and clauses of this Chapter are hereby declared to be severable. If any part, sentence, paragraph, section or clause is adjudged unconstitutional or invalid by a Court of competent jurisdiction, the remainder of the Chapter shall not be affected thereby.

## Sec. 7.379 – Acceptance of Licensing Applications.

The Clerk shall begin accepting license applications for the uses authorized herein six (6) months after adoption of this ordinance. Medical Marihuana Facilities previously licensed under MMFLA and granted special land use approval by the City Planning Commission prior to April 20, 2020 may continue to operate using their special land use approval as a temporary license until the City begins accepting Marihuana Related Municipal License applications. All marihuana related businesses, including operating medical marihuana facilities, must obtain a Marihuana Related Municipal License once the City begins accepting applications for licensure. Operation of such a facility absent a license to do so once the City begins accepting applications is prohibited."

I hereby certify that the foregoing is a true transcript of the action of the City Commission of the City of Grand Rapids, Michigan, in public session held October 8, 2019.

*Joel H. Hondorp*

Joel H. Hondorp, City Clerk

**EXHIBIT 3**



# CITY OF GRAND RAPIDS
# AGENDA ACTION REQUEST

**DATE:**          July 7, 2020

**TO:**            Mark Washington, City Manager

**COMMITTEE:**     Committee of the Whole
**LIAISON:**       Mark Washington, City Manager

**FROM:**          Eric DeLong, Deputy City Manager
                   Executive Office

**SUBJECT:**       **Resolution adopting a City Commission policy to advance social equity within the cannabis industry**

## OVERVIEW
This resolution would adopt the attached Cannabis Social Equity Policy as a City Commission policy. A draft of the policy was presented to the Committee of the Whole on June 16, 2020 as one of the recommendations of the Cannabis Justice Work Group (CJWG). The policy's objective is to improve social equity outcomes within Grand Rapids' new cannabis industry.

## CANNABIS SOCIAL EQUITY POLICY
The Cannabis Social Equity Policy is a framework to ensure the City's actions related to the cannabis industry are rooted in equity. This policy guides the regulatory focus of the City (licensing and zoning), encouraging the new industry to provide economic opportunities to communities that have been disproportionately impacted by cannabis prohibition and enforcement as a result of the War on Drugs. Participation in the program is voluntary. However, once a completed, signed Cannabis Industry Social Equity Voluntary Agreement (CISEVA) form is submitted with a license or a land use application and is accepted by the City, it is legally enforceable.

The policy addresses two ways in which businesses can advance equity outcomes. The first is by welcoming individuals who qualify as "Equity Applicants" – people who meet the criteria of having been economically and socially disadvantaged by cannabis prohibition and enforcement before it was decriminalized and legalized – to participate in this new industry as business owners. Equity Applicants will receive highest priority in the processing of complete applications received in the zoning and licensing processes. Additionally, any applicants that commit to provide opportunities to members of these disadvantaged communities in the form of local ownership, supplier and/or workforce diversity, new business development, and/or contribution to the Cannabis Reinvestment Fund will be considered "Applications Advancing Equity". These applicants will be ranked based on a points system for equity commitments and will receive priority in the

processing of complete applications received over lower-scoring applicants in the zoning and licensing processes.

Beyond the licensing and zoning processes, the formation of a nonprofit entity would enable equity-advancing activities which the City otherwise could not carry out due to restrictions on the use of public funds. The nonprofit would be able to distribute loans and grants, award equity certifications, encourage wage rate considerations, provide resources for equity-centered human resources practices, etc. The nonprofit also would oversee the Cannabis Reinvestment Fund.

The Cannabis Social Equity Policy ties into the licensing process by providing license renewal benefits to businesses that embed equity in their practices. These benefits include multi-year licenses and license renewal discounts. The policy also ties into the zoning process by establishing a priority tier system, where Equity Applicants and highest-scoring Applications Advancing Equity receive priority in the queue for Planning Commission consideration.

**CHANGES FROM JUNE 16 LANGUAGE**
Minor changes to the policy language that was presented to the City Commission on June 16 have since been recommended by members of the Cannabis Justice Work Group (CJWG) to finalize the document. These are the noteworthy changes:

**Section 1 – Introduction**
- Added language to define the authority for the document

**Section 2 – Definitions**
- Added a new definition for "minority"
- Provided additional clarity and specificity for the following definitions: cannabis, the community fund, equity, microlocal business enterprise, minority business enterprise, and women-owned business enterprise
- Modified Equity Applicant definition
  - Clarified cannabis conviction language for Charter 292
  - Removed the number of years residency combination formula and replaced it with a revised proof of residency for ten years between 1971-2016

**Section 3 – Policy Overview**
- Removed all efforts columns on the social equity points tables in an effort to remove potential for subjective interpretation
- Changed social equity point allocation
  - Local ownership weight was decreased from 4 points to 3 points
  - Community fund investment weight was increased from 3 points to 4 points
- Clarified language in the table that outlines the City vs. Non-profit roles

**Section 4 – Application & Selection**

- Removed several subheadings for fast track and deliberative tracks and replaced them with "selection of applications"
- Clarified selection processes
  - Fast track content changes
    - Added dates and procedures for applications that qualify for Director Review, and applications that qualify for Special Land Use
  - Deliberative track changes
    - Provided additional clarity; December 2020 dates were removed because the new time frame for review, processing, application queueing and application review for Planning Commission will take place from November 2 to November 30 was designated as review for applications
    - Added January 2021 date as the estimated beginning of application reviews for Planning Commission

Staff consider these changes to be minor, consistent with the intent of the previous language, and desirable to support a strong Cannabis Social Equity Policy, and to clarify zoning procedures.

## STAFF STATEMENT AND NEXT STEPS

CJWG recommends adoption of the attached policy in order to ensure that the new recreational cannabis industry has a significant positive impact upon social equity in our community. The members of CJWG believe that this policy, combined with the proposed "fast-track" zoning ordinance and licensing ordinance amendments on the City Commission agenda for this evening, will give a head start to those applicants and businesses that are best able to advance equity outcomes in the near term. On July 21, a separate resolution to establish a nonprofit organization will be introduced. Later this month, staff will present to the City Commission regarding the "deliberative" track, which is expected to include microbusinesses, and may also include consumption establishments, event-related, and other uses authorized by MRTMA.

YOUR COMMITTEE OF THE WHOLE recommends adoption of the following resolution adopting a City Commission policy to advance social equity within the cannabis industry.

WHEREAS:

1.    The legalization of cannabis in the State of Michigan has made possible a new industry, which the City Commission has decided to allow within the City of Grand Rapids; and

2.    Cannabis legalization follows decades of cannabis prohibition and enforcement, which had a negative effect on historically impacted communities; and

3.    The City Commission has set expectations for the new cannabis industry to benefit the local community, especially the members of the community historically impacted by the War on Drugs;

4.    A policy has been prepared for City Commission consideration which promotes participation in the cannabis industry by individuals historically affected by the War on Drugs, implements a framework to advance social equity outcomes from the City's internal processes, and allows non-City entities to assist in the equitable development of the community from this new industry.

RESOLVED:

That the attached City Commission Policy 900-59 to advance social equity within the cannabis industry is hereby adopted by the City Commission, effective immediately.

**Prepared by Al Romero-Gibu and Ciarra Adkins**

CORRECT IN FORM

DEPARTMENT OF LAW



# CITY OF GRAND RAPIDS

# CANNABIS SOCIAL EQUITY POLICY

**CITY COMMISSION POLICY 900-59**

Attachment: Cannabis Social Equity Policy (Cannabis Social Equity Policy)

# TABLE OF CONTENTS

## SECTION 1: INTRODUCTION
1.1 Foreword
1.2 Authority, Purpose, and Applicability
## SECTION 2: DEFINITIONS
## SECTION 3: POLICY OVERVIEW
3.1 Voluntary Participation
3.2 Participation Point Allocation
3.3 Equity Applicant
3.4 Application Advancing Equity
3.5 Social Justice Policy Administration and Nonprofit
3.6 Social Equity Policies
   3.6.1 Local Ownership
   3.6.2 Workforce Diversity
   3.6.3 Supplier Diversity
   3.6.4 New Business Development
## SECTION 4: APPLICATION AND SELECTION
4.1 Expedited Review Eligibility Criteria
4.2 Prioritization and Selection
   4.2.1 Prioritization Tiers
   4.2.2 Selection of Applications
## SECTION 5: LICENSE RENEWAL
## SECTION 6: REPORTING AND SANCTIONS
6.1 Reporting
6.2 Sanctions
## SECTION 7: APPEALS AND EXCEPTIONS
7.1 Appeal of Administrative Decisions
## SECTION 8: SEVERABILITY
8.1 Severability Clause

Attachment: Cannabis Social Equity Policy (Cannabis Social Equity Policy)

# SECTION 1: INTRODUCTION

## 1.1 Foreword

The replacement of underground cannabis markets with licensed cannabis businesses has the potential to have an unprecedented impact on our consumer economy and social system at all levels. As we transition into the age of legalized cannabis, it is important that we prioritize the first objective listed in the City's Strategic Plan, which is to "embed equity throughout government operations." With that objective in mind, we are committed to creating equitable policies and opportunities that address the historical systemic and institutional injustices often connected to cannabis. To achieve success, it is critical that we support and incentivize a diverse, equitable, and inclusive cannabis industry. To reach this goal, we will embrace our core values of accountability, customer service, equity, innovation, collaboration and sustainability.

In their 2013 report, "The War on Marijuana in Black and White," the American Civil Liberties Union found that "despite the fact that marijuana is used at comparable rates by Whites and Blacks, state and local governments have aggressively enforced marijuana laws selectively against Black people and communities." As such, African Americans are more likely to be arrested and prosecuted for possession of cannabis. The report further states that "the higher arrest, conviction and incarceration rates in communities of color is not reflective of a greater percentage of illegal activity, but rather of systemic discrimination including, but not limited to, disparate policing of urban areas, low income communities, and communities of color."

Nationwide, significant harm has been caused to communities of color by the War on Drugs and oppressive cannabis regulation. Through partnerships with business allies and community we have the ability to be on the right side of history and help make real change – equitably. This Policy is intended to be a step toward helping to support equitable economic initiatives, including job creation, removing barriers to local ownership, and contracting opportunities for traditionally disadvantaged groups within the community. The Strategic Plan for the City of Grand Rapids details our commitment to "advancing equitable outcomes and opportunities." This Cannabis Social Equity Policy is an important extension of that commitment.

## 1.2 Authority, Purpose, and Applicability

**Authority**

- City Commission "Resolution approving a City Commission policy to advance social equity within the cannabis industry" (7/7/2020)

Attachment: Cannabis Social Equity Policy (Cannabis Social Equity Policy)

- Chapter 105 "Cannabis Related Municipal Licensing" of the City Code authorizes the City to discount fees, issue multi-year licenses, and prioritize the review of applications in accordance with the Cannabis Social Equity Policy
- Chapter 61 "Zoning Ordinance" of the City Code regulates land use by cannabis facilities
- City Policy

**Purpose**

In support of the City's Strategic Plan, the purpose of this Policy is to:

- Establish expectations and voluntary commitments for all recreational cannabis applicants;
- Employ strategies that enhance the growth and development of traditionally disadvantaged local, small, and emerging businesses;
- Enhance business and real-estate ownership by people from communities that have been disproportionately affected by cannabis prohibition and enforcement, and to positively impact those communities;
- Increase employment opportunities for socioeconomically disadvantaged groups;
- Improve supplier opportunities for socioeconomically disadvantaged groups;
- Increase opportunities within our Neighborhoods of Focus; and
- Eliminate and reduce barriers of entry into the cannabis industry.

# SECTION 2: DEFINITIONS

As used in these Policy guidelines, the following definitions apply:

| TERM | DEFINITION |
|---|---|
| Cannabis | Medical: Cannabis as recommended by a doctor in the treatment of a diagnosed medical condition as evidenced by the issuance of a state medical card.<br>Recreational: Cannabis that is used without diagnosis of a specified medical condition and user is not issued a state medical card. |
| Cannabis Conviction | Conviction(s) related to cannabis within the limitations specified below (limitations to qualification under this definition are as follows)<br>• Conviction occurred between 1971-2018<br>• Conviction occurred in Kent County<br>• Applicant must not have a conviction for selling cannabis to a minor as this conviction does not meet application criteria[1] |
| City | City of Grand Rapids. |
| Community Cannabis Reinvestment Fund | An innovative financial mechanism to help increase the flow of capital to desired initiatives outlined in this policy. |
| Compliance | Acting in conformity with a rule, policy, standard, law, or regulation. |
| Diversity | Inclusion of different types of people. |

[1] See Section 4(c) of the Michigan Regulation and Taxation of Marihuana Act (MRTMA) explicitly states "any person under the age of 21 to possess, consume, purchase or otherwise obtain, cultivate, process, transport, or sell marihuana."

| | |
|---|---|
| Equity | Exists when an organization succeeds in removing and preventing barriers created by systemic and institutional injustice. |
| Equity Applicant (EA) | An Equity Applicant is an individual that meets 3 of 6 of the criteria: <br> 1. Has a Kent County cannabis conviction(s) and/or a finding of responsibility for violation of City of Grand Rapids Charter Paragraph 292 "Restrictions of Marijuana" Section (a)[2] between the years 1971-2018 <br> 2. A guardian, grandparent, parent, sibling, or current spouse has a record of cannabis related offenses or was incarcerated due to a cannabis related conviction in Kent County and/or a finding of responsibility under Charter 292[3] <br> 3. Grand Rapids Resident was displaced from housing due to cannabis related offenses, or other documented experiences of housing injustice as determined on a case-by-case basis (within Kent County) <br> 4. Grand Rapids Residency - at least 10 years between 1971-2016 within Neighborhoods of Focus <br> 5. Income is no more than 80% of current Kent County area median income for five of the last ten years as calculated by Housing and Urban Development (HUD) at time of application.[4] <br> 6. Suffered at least one type of economic harm due to cannabis-related infractions <br>    a. Education injustice <br>       i. Denial of FAFSA <br>       ii. College expulsions <br>       iii. High school suspensions <br>    b. Employment <br>       i. Cannabis-related discipline <br>    c. Public Assistance <br>       i. Loss of public assistance <br>    d. Any other form of economic harm, as defined on a case-by-case basis |
| Equity Employee | An employee that meets the same criteria listed for Equity Applicant. |
| Incubator | A company or organization committed to nurturing the growth and success of startup and early stage companies. |
| Micro-Local Business Enterprise (MLBE)[5] | A business designation provided by the City of Grand Rapids to businesses that meet all of the following criteria: <br> 1. Business Age: Verification that the business has been in operation for a minimum of two full years <br> 2. Registration: Verification of registration with the following entities: <br>    a. Federal Government's System for Award Management (SAM), formerly known as the Central Contractors Registry (CCR), database as a small business <br>    b. City of Grand Rapids Purchasing Department <br> 3. Location: Verification that the principle place of business has been in operation for at least six (6) months from a fixed office located in Kent County, Michigan. The local office must operate in accordance with the following criteria: <br>    a. The local office functions on a daily or regular basis, and provides all services to operate the business for which certification is sought <br>    b. The local office contains all fixtures, equipment and/or space necessary to operate, including but not limited to, as appropriate, floorplan, computer(s), software, copy machine(s), furniture, vehicle(s), tools, appliances and/or machinery necessary to operate the business for which certification is sought <br>    c. The local office must be the main office for assigned personnel who conduct the business' activities necessary to operate the local business for which certification is sought |

*Attachment: Cannabis Social Equity Policy (Cannabis Social Equity Policy)*

---

[2] City of Grand Rapids Charter Paragraph 292 "Restrictions of Marijuana" Section (a) "No person shall possess, control, use, or give away marijuana or cannabis, which is defined as all parts of the plant cannabis sativa L., whether growing or not; its seeds or resin; and every compound, manufacture, salt, derivative, mixture, or preparation of the above, unless such possession, control, or use is pursuant to a license or authorization as provided in Public Act 196 of 1971, as amended. This definition does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compounds, manufacture, sale, derivative, mixture or preparation of the mature stalks, except the resin extracted therefrom, fiber, oil or cake, or the sterilized seed of the plant which is incapable of germination."

[3] City of Grand Rapids Charter §292(a)

[4] https://www.grandrapidsmi.gov/Government/Programs-and-Initiatives/Homebuyer-Assistance-Fund/Community-Development-Program-Income-Limits

[5] See Equal Business Opportunity-Construction (City Commission Policy 600-12) and Goods and Services (City Commission Policy 600-15) Administrative Guidelines.

| | |
|---|---|
| | 4. Business Size: Verification that the latest three-year average business revenue or number of permanent employees is 25% or less of the Small Business Administration's (SBA) NAICS industry small business standards<br>5. Personal Net Worth: Verification that the controlling owners' (totaling 51% or more) individual personal net worth, as determined for SBA (8a) status (13CFR124.104), is $250,000 or less at the time of initial application. For continued Micro-LBE eligibility after admission to the program, net worth shall not exceed $750,000 |
| Minority | A person who is actual or perceived to be:<br>a. Black, a person having origin in any of the black racial groups of Africa<br>b. Hispanic or Latino, a person of Cuban, Mexican, Puerto Rican, South or Central American ancestry. Persons with European Spanish ancestry are not included as Hispanic or Latino for purposes of these administrative guidelines<br>c. Asian American, a person having origins in any of the original people of the Far East, Southeast Asia, the Indian sub-continent, or the Pacific Islands<br>d. American Indian, a person having origins in any of the original peoples of North America |
| Minority Business Enterprise (MBE)[6] | A business whose majority owner(s) and operators identify and/or certified as one or more of the identified minority groups listed in our Minority definition. |
| Neighborhoods of Focus (NOF) | 17 Census tracks in Grand Rapids, Michigan as defined by the W.K. Kellogg Foundation. |
| Prioritization | The ranking earned through establishment of Equity Applicant status or through voluntary participation in the social justice program as an Applicant Advancing Equity under these policy guidelines. |
| Resident Owner | Residents who:<br>1. Have lived in Grand Rapids for at least 10 years between 1971-2016<br>2. Maintain a minimum of a 25% financial stake in the company, decision-making rights and/or incur the potential for economic risk and reward as defined by the company's Articles of Incorporation and/or Operating Agreement |
| Sanction | A penalty for actions that are contrary to a prior written agreement with the City of Grand Rapids. |
| Supplier Diversity | A proactive business program which encourages the use of diverse suppliers. A diverse supplier is, in the broadest sense, a business owned and operated by an individual or group that is part of a traditionally underrepresented or underserved group. |
| Women Business Enterprise (WBE) | A business whose majority owned and operated by one or more women. |

# SECTION 3: POLICY OVERVIEW

## 3.1 Voluntary Participation

This document shall be made available for use by all applicants applying for a City of Grand Rapids cannabis related business license or related zoning approval.

Participation in the Cannabis Social Equity Program, and any components thereof, is entirely voluntary. The selection by the applicant of any voluntarily offered conditions on the form provided by the City is at the applicant's sole discretion. However, once a completed and signed and witnessed form has been submitted with a license or a zoning application and is accepted by the City, it shall be considered legally enforceable if approved. All conditions voluntarily

---

[6] See Equal Business Opportunity-Construction (City Commission Policy 600-12) and Goods and Services (City Commission Policy 600-15) Administrative Guidelines.

offered by the Applicant shall be included on the form provided by the City and shall be part of the final approval of the license and zoning.

## 3.2 Participation Point Allocation

The social equity commitment levels in each category detailed below accumulate points that determine the priority for license and zoning application review and approval, as well as renewal license duration and frequency of license renewal. Points may be earned in any or all five categories. Up to 3 unweighted points may be earned in each category.

The points achieved in each category are then weighted according to a factor assigned to each category in order to produce a weighted point total. Up to 45 weighted points may be gained by participation.

| CATEGORY | POINTS | WEIGHT |
|---|---|---|
| Local Ownership | 0-3 | 3 |
| Workforce Diversity | 0-3 | 3 |
| Supplier Diversity | 0-3 | 2 |
| New Business Development (Minority Business Incubator) | 0-3 | 3 |
| Cannabis Community Fund Investment | 0-3 | 4 |

Each category detailed below will accumulate prioritization points for application review and approval. Participation allows a total of 45 points. The City will use the weighted point totals included in each application to determine:

- Prioritization order of applicant review for a cannabis license and zoning approval from the City of Grand Rapids
- License renewal for duration and frequency

## 3.3 Equity Applicant

An Equity Applicant is an individual that meets <u>at least three</u> of the following six criteria:

1. Has a Kent County cannabis conviction(s) and/or a finding of responsibility for violation of City of Grand Rapids Charter Paragraph 292 "Restrictions of Marijuana" Section (a) between the years 1971-2018
2. A guardian, grandparent, parent, sibling, or current spouse has a record of cannabis related offenses or was incarcerated due to a Kent County cannabis related conviction and/or a finding of responsibility under Charter 292[7]

---

[7] City of Grand Rapids Charter §292(a)

3. Grand Rapids Resident was displaced from housing due to cannabis related offenses, or other documented experiences of housing injustice as determined on a case-by-case basis (no farther than Kent County)
4. Grand Rapids Residency – at least 10 years between 1971-2016 within NOF
5. Income is no more than 80% of current Kent County area median income for five of the last ten years as calculated by Housing and Urban Development (HUD) at the time of application[8]
6. Suffered different types of economic harm due to cannabis-related infractions
   a. Education injustice
      i. Denial of FAFSA
      ii. College expulsions
      iii. High school expulsion
   b. Employment
      i. Cannabis-related discipline
   c. Public Assistance
      i. Loss of public assistance
   d. Any other form of economic harm, as defined on a case-by-case basis

For purposes of assigning priority consideration for zoning and licensing applications, businesses more than 50% owned by Equity Applicants shall be considered Tier 1 applicants (See section 4.2).

## 3.4   Application Advancing Equity

An Application Advancing Equity is determined by achieving at least 20 of 45 points accumulated through voluntary participation the Cannabis Social Justice program that significantly advances equity.

## 3.5   Social Justice Policy Administration & Nonprofit

| CITY ADMINISTERED | NONPROFIT ADMINISTERED |
|---|---|
| *Non-discrimination policy (Mandatory)* | *HR Diversity, Equity, and Inclusion Policy* |
| *Socioeconomically disadvantaged and Neighborhoods of Focus* | *Socioeconomically disadvantaged and donor specific gifts in line with nonprofit purpose and bylaws* |
| 1.   Supplier Diversity (Sec. 3.6.3) | 1.   Supplier Diversity |
| 2.   Regular Employee Diversity (Sec 3.6.2) | 2.   Regular Employee Diversity |
| 3.   Management Diversity (Sec. 3.6.1) | 3.   Management Diversity |

[8] https://www.grandrapidsmi.gov/Government/Programs-and-Initiatives/Homebuyer-Assistance-Fund/Community-Development-Program-Income-Limits

Attachment: Cannabis Social Equity Policy (Cannabis Social Equity Policy)

| 4. | Voluntary Investment in Community Fund (Sec. 3.6.4) | 4. | Community Investment Funding and Administration |
|----|------|----|------|
| 5. | License Renewals (Various Intervals) | 5. | Wage Rate Considerations |
| 6. | Real Estate Ownership (Sec. 3.6.1) | 6. | Non-Cannabis Business Incubators in NOF |
|    |      | 7. | Cannabis Business Incubators in NOF |
|    |      | 8. | Distribute Loans and Grants |
|    |      | 9. | Receive Equity Champion Certification |

## 3.6 Social Equity Policies

### 3.6.1 Local Ownership

Local ownership is achieved when Resident Owners have at least 25% of the ownership of the cannabis business or real estate interest, which may include either an operating company or a real estate holding company, or both.

The total percentage calculated will be based upon the total financial allocation of risk and reward to the Resident Owners as a percentage of the total.

Local Ownership Point System – Meet the criteria and earn points for either A or B below:

A. Local ownership in the facility

| OWNERSHIP % | POINTS |
|-------------|--------|
| 0%-24.9% | 0 |
| 25%-33.9% | 1 |
| 34%-65.9% | 2 |
| 66%-100% | 3 |

B. Local ownership in the underlying real estate owned or leased by the applicant/licensee for this business

| OWNERSHIP % | POINTS |
|-------------|--------|
| 0%-24.9% | 0 |
| 25%-49.9% | 1 |
| 50%-74.9% | 2 |
| 75%-100% | 3 |

### 3.6.2 Workforce Diversity

Workforce Diversity is achieved when companies are committed and demonstrate the intent to recruit, hire and promote equity applicants from diverse backgrounds for positions throughout the company.

A commitment to maintaining a diverse workforce and supporting actions to further diversity within the cannabis industry is critically important to reduce economic disparities and harm experienced by communities of color caused in part by the War on Drugs.

A. Year 1 – points are awarded based on submission of a Social Equity Plan that includes the following criteria, along with a commitment to achieve one of the percentage ranges listed in B, below:

   i. Cannabis convictions (other than distribution to a minor) not a barrier to employment

   ii. Intentional strategies and investments to recruit for employment Grand Rapids residents that meet one or more criteria of Equity Applicant

   iii. Giving GR NOF residents the first round of interview

   iv. Other approved strategies as described by the company on a case by case basis

B. Year 2 and after – points are awarded based on the actual diversity of the workforce

   i. Percentage of workforce diversity defined as employees that meet one or more Equity Employee criteria

| WORKFORCE DIVERSITY % | POINTS |
|---|---|
| 0% - 24.9% | 0 |
| 25.0% – 49.9% | 1 |
| 50.0% - 74.9% | 2 |
| 75% - 100% | 3 |

## 3.6.3 Supplier Diversity

Supplier Diversity is a proactive business program which encourages the use of diverse suppliers. A diverse supplier is, in the broadest sense, a business owned and operated by an individual or group that is part of a traditionally underrepresented or underserved group. There are many different diverse businesses categories. A common example is Minority-owned Business Enterprises (MBE's). This requirement can be met by utilizing Minority-Owned Business Enterprises, Women-Owned Businesses or Micro-Local Businesses whenever possible in construction activity and purchasing of supplies.

Companies committed to integrating local minority-owned businesses into their supply chain will be awarded points based on their annual spend percentage with these firms. Annual spend is determined by the total fiscal/year end operational cost and the percentage of these costs spent with minority business enterprises. Operational costs exclude utilities and taxes.

The following is a schedule of point percentages based upon minority business enterprise participation achieved by the company:

| SUPPLIER DIVERSITY % | POINTS |
|---|---|
| 0% - 4.9% | 0 |
| 5.0% - 9.9% | 1 |
| 10.0% - 23.9% | 2 |

| 24.0% - 100% | 3 |
|---|---|

Documentation/Validation Process:
- Vendor policy
- Purchasing policy
- Existing contracts
- Annual review of dollars spent on all business contracts

### 3.6.4 New Business Development

| STRATEGY | POINTS |
|---|---|
| Mentor-Protégée | 1 |
| Mentor + External Incubation Support (Cannabis) | 2 |
| Mentor + External Incubation Support (Non-Cannabis) | 2 |
| Mentor + Support for Internal Incubation (Cannabis) | 3 |
| Mentor + Support for Internal Incubation (Non-Cannabis) | 3 |
| Contribution over 2% of gross sales to the Community Investment Fund for business incubation support (restricted funds in addition to any contributions made) | 3 |

Mentor
A mentor is someone who offers their knowledge, wisdom, and advice to someone with less experience. In a business mentor program, both the mentor and the mentee gain personal and professional experience.

Incubation
Due to the difficulty of starting a business in various industries, business incubators provide services which helps new and start-up companies to get through initial hurdles in starting up a business as many start-up companies, particularly equity applicants, may lack many necessary resources, experience and networks. The incubator helps alleviate these barriers as it assists new and startup companies to develop, launch, manage, and grow their new business. These hurdles may include space, funding, legal, accounting, computer services and more.

Cannabis Incubator
A company that provides below market or free space and "incubates" Equity Applicants. Incubator qualifications: The applicant must provide an Equity Applicant with all of the following:
- Essential resources and guidance to plan, launch, manage, and grow their business
- One to three years of below market or rent-free commercial space /non-commercial space (as applicable to the business type)

- Access to commercial space to conduct its business operations
- All required security measures as determined by state and local cannabis industry regulations

## Other Non-Cannabis Business Incubator

A company that provides below market or free space and "incubates" non-cannabis businesses that meet the definition of Equity Applicants. Incubator qualifications: The applicant must provide incubated businesses all of the following:

- Essential resources and guidance to plan, launch, manage, and grow their business
- One, two, or three years (aligned with license duration) of below market or rent-free commercial space
- Access to appropriate business space(s) (as applicable to the business type) to conduct its business operations
- All required state and local security measures

This commercial/non-commercial space may be located either at the Applicant's place of business or in another location in zones approved for that specific type of cannabis related business activity.

## Reinvestment Funding

The Grand Rapids Community Cannabis Reinvestment Fund is envisioned to be administered by a nonprofit entity and will receive funding from voluntary donation commitments, investments by the City from cannabis industry proceeds, grants and other sources. Contingent upon sufficient generation of funds, the fund will operate for the public benefit via the administration of social equity programs, grants, loans and community investments.

Nonprofit permitted activities:

- Grants/lending according to criteria beyond the City's authority
- Accept tax-deductible donations from marijuana industry participants and others
- Funding of initiatives within Neighborhoods of Focus

Applicants can earn points by voluntarily investing in the Fund on a scheduled basis matched to the length of their license. The number of years for the investment of donation amounts is based upon the length of the license certification. An applicant seeking to receive points can meet this requirement by signing a commitment to invest the following amounts:

| SELECT PERCENTAGE OF GROSS CANNABIS SALES | POINTS BASED ON SALES PERCENTAGE AND # OF YEARS |
|---|---|
| 0.50% | 1 |
| 1% | 2 |
| 2% | 3 |

# SECTION 4: APPLICATION & SELECTION

## 4.1  Expedited Review Eligibility Criteria

**Eligibility**

A point system has been established to support the City's commitment to administer equitable policies and opportunities that address the historic, systemic and institutional injustices connected to cannabis. The points will be used prioritize rankings for the review process for adult-use cannabis licensing and land use applications, the term of renewal licenses and to further the purposes of this Policy.

Both zoning and licensing applications for adult-use cannabis will be reviewed and processed in accordance with the review schedules outlined in Sections 4.2.2 and 4.2.3 of this Policy. An Administrative Policy will provide further detail about the proposed review and tiebreaking processes with the intent of furthering the goals of this Social Equity Policy.

## 4.2  Prioritization and Selection

### 4.2.1 Prioritization Tiers

Based on the number of points accumulated through the voluntary commitments offered by the applicant, the application will be sorted into one of five Priority Tier categories for license and zoning application review/approvals and renewals:

| PRIORITY TIER | POINTS EARNED |
|---|---|
| 1 | 40+ |
| 2 | 30-39 |
| 3 | 20-29 |
| 4 | 10-19 |
| 5 | 0-9 |

### 4.2.2 Selection of Applications

Land use applications that qualify for Director Review will be received between July 20-31, 2020 and reviewed for completeness and points. The applications will be tiered based on the total number of points from their equity commitments. An administrative policy will set procedures to rank applications within the same tier and break ties between applications with the same

Attachment: Cannabis Social Equity Policy (Cannabis Social Equity Policy)

points. Once all the applications are tiered and ranked in order of number of points (highest to lowest) they will queued and processed as follows:

- August 2020: Review and processing of all Equity Applicants and Tier 1 applications. Equity Applicants are considered Tier 1 applicants and will be processed before applications Advancing Equity.
- September 2020: Review and processing of all Tier 2 and 3 applications.
- October 2020: Review and processing of all Tier 4 and 5 applications.

Applications submitted after July 31, 2020 will be reviewed after all applications in the queue have been reviewed and processed, but not before November 1, 2020.

Land use applications that qualify for Special Land Use review will be received between September 1-11, 2020 and reviewed for completeness and points. The applications will be ranked based on the total number of points from the equity commitments. An administrative policy will set procedures to rank applications within the same tier and break ties between applications with the same points. Once all the applications are ranked in order of number of points (highest to lowest), they will be queued for the next available Planning Commission meeting[9], based on the ranking. Equity Applicants are considered Tier 1 applicants and will be processed before Applications Advancing Equity. Applications submitted after September 11, 2020 will be reviewed after all applications in the queue have been reviewed and processed, but not before November 1, 2020.

Contingent on City Commission approval, land use applications for Microbusinesses or other cannabis uses that may be authorized in future City Commission actions will be received processed as follows:

- October 20-30, 2020: Application submission window for initial queuing.
- November 2-30, 2020: Applications will be reviewed for completeness and ranked based on the total number of points from the equity commitments. Once all the applications are ranked in order of number of points (highest to lowest), they will be queued for Planning Commission consideration.
- January 2021: Planning Commission review of applications using order of queue, highest ranking applications will be reviewed first.

Attachment: Cannabis Social Equity Policy (Cannabis Social Equity Policy)

---

[9] An application processed in August, September, or October may not necessarily be placed in the queue for Planning Commission meetings for that same month.

# SECTION 5: LICENSE RENEWAL

All initial (year one) cannabis licenses issued by the City will be for a duration of one year. Upon renewal, license applicants have to ability to receive a multi-year license renewal if the following criteria are met:

| DURATION OF LICENSURE | ELIGIBILITY CRITERIA | FEES |
|---|---|---|
| 3-Year License | 1. Same business owner as for the previous license/renewal<br>2. No orders or citations for violations of Chapter 105[10] and Chapter 175[11] or MMFLA Public Act 281[12]., and MRTMA Public Act 1[13]. Licensee arranges any inspection required by the City 90 days before the expiration of current license<br>3. License renewed prior to expiration date of current license<br>4. No outstanding fees/taxes on the property<br>5. Social equity program participation – standard 30 points or more<br>6. Evaluation of past social equity program performance | 3-Year duration for a single license fee (66% savings/$10,000) |
| 2-Year License | 1. Same business owner as for the previous license/renewal<br>2. Licensee arranges any inspection required by the City 90 days before the expiration of current license<br>3. License renewed prior to expiration date of current license<br>4. Any orders or citations for violations of Chapter 105[14] and Chapter 175[15] or MMFLA Public Act 281[16] and MRTMA Public Act 1[17] are brought into compliance before current license expires or by time stated on the order or citation<br>5. Social equity program participation –standard 20-29 points<br>6. Evaluation of past social equity program performance | 2-Year duration for a single license fee (50% savings/$5,000) |
| 1-Year License (Standard) | No social equity program participation or did not meet participation threshold 0-19 pts. | Standard fee ($5,000) |

# SECTION 6: REPORTING AND SANCTIONS

## 6.1 Reporting

Licensees will self-report on each social equity commitment on a quarterly basis in a format to be provided by the City. Reports will contain relevant information for each social equity commitment included in the application with sufficient detail to determine whether the applicant has adhered to the commitment(s) made in the initial application. The City will review all self-reports and determine whether the applicant complies with the commitment(s) made in the application.

Licensees that do not comply are expected to become compliant by the end of the next quarterly reporting period. Licensees that are out of compliance for more than one reporting period or

Attachment: Cannabis Social Equity Policy (Cannabis Social Equity Policy)

---

[10] "Cannabis Related Municipal Licensing",
[11] "Crime Prevention Through Environmental Design (CPTED) Ordinance"
[12] 2016, MCL 333.27101 et seq.
[13] 2018, MCL 333.27951 et seq.
[14] "Cannabis Related Municipal Licensing",
[15] "Crime Prevention Through Environmental Design (CPTED) Ordinance"
[16] 2016, MCL 333.27101 et seq.
[17] 2018, MCL 333.27951 et seq.

fail to self-report within 30 days of the reporting deadline, are subject to the sanctions prescribed in Section 6.2 of this Policy.

## 6.2 Sanctions

The following sanctions will apply to any license holder that fails to meet the required commitments at any time, as determined by the City.

- Written warning (published list of businesses with violations)
- Opportunity to cure
- Reduction in duration of licenses
- Report to the State if related to type of business activity licensed under the MRTMA or MMFLA
- Contractual remedies as may exist
- Revocation (for egregious violations)
- Zoning violations will be addressed under the zoning ordinance

# SECTION 7: APPEALS AND EXCEPTIONS

## 7.1    Appeal of Administrative Decisions

Appeals will be heard according to procedures specified in the licensing ordinance

# SECTION 8: SEVERABILITY

## 8.1    Severability Clause

If any provisions of this Policy or any application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of this article which can be given effect without the invalid provisions or applications and are to this end declared to be severable.

**EXHIBIT 4**

# OFFICIAL PROCEEDINGS
## OF THE
# City Commission
## OF THE
## CITY OF GRAND RAPIDS, MICHIGAN
### Regular Session, August 9, 2022

## CALL TO ORDER

Commission was called to order by Mayor Rosalynn Bliss at 7:00 PM

## ROLL CALL

**Present: Mayor Bliss, Commissioner Lenear, Commissioner O'Connor, Commissioner Jones, Commissioner Ysasi, Commissioner Reppart, Commissioner Moody**
**Absent: None.**
The roll was called by the City Clerk.

## APPROVAL OF MINUTES

On the motion of Com. Joseph D. Jones, supported by Com. Milinda Ysasi, the reading of the minutes of the Regular Session of July 26, 2022 was waived and said minutes were accepted as presented. Carried.

## PETITIONS AND COMMUNICATIONS

**91904 Result: Referred to Committee on Appointments.**
Communication from John Helmholdt regarding their resignation from the SmartZone Local Finance Development Authority.

## REPORTS OF CITY OFFICERS

**91905 Result: Received and Filed.**
Comptroller's report for the period of July 13, 2022 through July 26,2022 in the amount of $41,124,505.03.

**91906 Result: Received and Filed.**
Treasurer's report for the period of July 13, 2022 through July 27, 2022.

## CONSENT AGENDA

### A. CONSENT AGENDA

**91907 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**
Adoption of the following items under the consent agenda.

## B. COMMITTEE ON APPOINTMENTS

### 91908  Result: Adopted.
### Mover: O'Connor.  Supporter: Reppart.

RESOLVED, that Mayor Bliss' appointment of Mary Byron to the Grand Rapids Historical Commission for the remainder of a three-year term ending January 6, 2025, be confirmed.

### 91909  Result: Adopted.
### Mover: O'Connor.  Supporter: Reppart.

RESOLVED, that Mayor Bliss' appointment of Jeff Edwards to the Westside Corridor Improvement Authority for the remainder of a four-year term ending December 31, 2024, be confirmed.

### 91910  Result: Adopted.
### Mover: O'Connor.  Supporter: Reppart.

RESOLVED, that the City Commission's appointment of Jeffrey King to the Board of Zoning Appeals for the remainder of a three-year term ending January 2, 2023, be approved.

## C. FISCAL COMMITTEE

### 91911  Result: Adopted.
### Mover: O'Connor.  Supporter: Reppart.

WHEREAS:

1. On May 4, 2005, the City entered into a National Pollutant Discharge Elimination System (NPDES) Storm Water Program Agreement with the Grand Valley Metro Council (GVMC) as part of the GVMC regional effort for compliance with NPDES Storm Water Regulations (City Commission Proceeding No. 73656); and

2. The City has enjoyed watershed benefits and reduced costs as one of the 27 partner agencies in the Lower Grand River Watershed in Kent and Ottawa Counties and wishes to continue its participation in the program; and

3. The budget for such program is subject to annual review and approval by the participants in the regional initiative; therefore

RESOLVED:

1. That the City of Grand Rapids renews its commitment and continued participation in the GVMC regional effort for compliance with the NPDES Storm Water Regulations for years 2022-2025. The Mayor is authorized to execute documents signifying the City's continued participation in the program.

2. That the Comptroller is authorized and directed to make three (3) annual payments to GVMC as requested by the City's Environmental Services Manager in an annual amount "not-to-exceed" $35,642 for the period of October 1, 2022, through September 30, 2025, from account 1010-533-1000-8010.

**91912 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

WHEREAS:

1. The Office of the Kent County Drain Commissioner has advised the City of Grand Rapids that, pursuant to Chapter 20 of the Michigan Drain Code, maintenance is needed at the Knapp's Corner drain.

RESOLVED:

1. That expenditures for the City's share of costs for the Project be authorized in an annual "not-to-exceed" amount of $400,000.

2. That the Comptroller is authorized and directed to make payments to the Drain Commissioner for the Project in FY2023 from account 1010-533-3000-8010.

**91913 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

RESOLVED:

1. That the City accepts a grant award in the amount of $700,000 from the Michigan Department of Health and Human Services for the FY 2023 Michigan Medicaid CHIP Lead Hazard Control Community Development grant program; and

2. That an agreement between the City and the Michigan Department of Health and Human Services for the FY 2023 Michigan Medicaid CHIP Lead Hazard Control Community Development grant program be approved, and the Mayor is authorized to execute said agreement and any amendments thereto in a form approved by the City Attorney; and

3. That contractual agreements and/or memoranda of understanding may be executed with organizations to carry out activities specified in the grant agreement, and the Mayor is authorized to execute said agreements; to approve amendments, including extensions to periods of performance and non-substantial project amendments; and other necessary documents related to the grant in a form approved by the City Attorney.

**91914 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

RESOLVED:

1. That a Donated Funds Agreement between the City and the Michigan Department of Health and Human Services (MDHHS) for the Grand Rapids Eviction Prevention Program in an amount "not-to-exceed" Seventy-Five Thousand Dollars ($75,000) is hereby approved; and

2. That the agreement period shall be from October 1, 2022 through September 30, 2023; and

3. That, after approval by the City Attorney, the Mayor is authorized to execute said agreement, related documents, and necessary modifications and extensions of time.

**91915 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

RESOLVED:

1. That an agreement between the City of Grand Rapids and the Grand Rapids Urban League in an amount "not-to-exceed" One Hundred Twenty-Five Thousand Dollars ($125,000) to serve as the Lead Agency and implement the Cure Violence Global's violence interruption and prevention model be approved; and

2. That an agreement between the City of Grand Rapids and Cure Violence Global in an amount "not-to-exceed" One Hundred Thousand Dollars ($100,000) for the provision of professional training and technical assistance be approved; and

3. That the period of performance for the agreements is from July 27, 2022, through July 26, 2023; and

4. That the Mayor is authorized to execute said agreements upon approval as to form by the City Attorney.

**91916 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

RESOLVED:

1. That the City accepts a grant award in the amount of $180,000 from the U.S. Department of Justice for the FFY 2022 Byrne Discretionary Grants Program; and

2. That an agreement between the City and Network180 for the Mental Health Crisis Co-Response Program in an amount "not-to-exceed" Three Hundred Thirty Thousand Dollars ($330,000) is hereby approved, and that upon approval as to form by the City Attorney, the Mayor is authorized to execute said agreement, related documents and necessary modifications and extensions of time; and

3.  That the agreement period shall be from July 1, 2022, through June 30, 2023; and

4.  That two consecutive, one-year agreement renewals are authorized dependent upon funding availability and mutual agreement by the City and Network180.

**91917 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

WHEREAS ArtPrize has become the signature event in the City of Grand Rapids since its inception in 2009; and

WHEREAS ArtPrize and other events were significantly impacted operationally and economically by the COVID-19 pandemic; and

WHEREAS the City of Grand Rapids has a vested interest and commitment to events as a component of its Economic Prosperity and Affordability goals; and

WHEREAS the United States Government has granted funding to the City of Grand Rapids for economic recovery through the American Rescue Plan Act; and

WHEREAS the City of Grand Rapids has set aside a portion of said funding for support of local special events; therefore

RESOLVED:

Approval for a supplemental General Fund sponsorship of ArtPrize 2022 in the amount of $50,000.

**91918 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

WHEREAS:

ArtPrize has partnered with the City of Grand Rapids Mobile GR Department as an Official Parking and Mobility Sponsor since 2012 and has agreed to feature the City's facilities and services as a preferred parking and mobility provider in its event publications.

RESOLVED:

Approval for the sponsorship for ArtPrize 2022 through a $50,000 funding contribution and up to $50,000 of in-kind services is approved from the Parking Fund to be administered by the Mobile GR department.

**91919 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

WHEREAS:

1. ArtPrize and the City of Grand Rapids are committed to ensure that all of our diverse communities feel welcome during ArtPrize; and

2. As part of our continuing commitment to equity, the City and ArtPrize have partnered to enhance the experience of the community and visitors during ArtPrize; and

3. As a means to increase economic benefits to the City of Grand Rapids; therefore

RESOLVED:

1. That the City of Grand Rapids is authorized to fund costs in collaboration with West Michigan Hispanic Chamber of Commerce, the West Michigan Asian Association, and the African American Art and Music Festival at a cost of $5,000 each for a total of $15,000; and

2. The funds shall be spent consistent with Grand Rapids internal city policies and the Michigan Department of Treasury guidance outlined in the Audit Manual for Local Governments; and

3. That the Mayor and City Clerk are hereby authorized to execute said agreement on behalf of the City, in a form approved by the City Attorney; and

4. That the City Comptroller is directed to make payment consistent with this resolution.

**91920  Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

WHEREAS, the Fiscal Committee has considered the attached bids; therefore

RESOLVED that contracts be prepared between the City and the following vendors, and that the Mayor be authorized to sign the contracts on behalf of the City, as follows, in a form to be approved by the City Attorney:

1. **Hurst, Inc.**
   One-year term contract with two, one-year renewal options for heat pump replacement services for the Facilities Management Department from Hurst, Inc. for an annual "not-to-exceed" amount of $195,000.00; the estimated three-year total is $585,000.00.

2. **Geotech**
   **Fiber Optic Management (dba Turnkey Network Solutions)**
   **Severance Electric**
   Contract increase in the annual amount of $220,000.00 to add the additional fiber optic infrastructure for security cameras in City parking ramps, City parking lots and in City parks. The new annual "not-to-exceed"

amount will be $550,000.00.

Contract amounts for this increase will be allocated as follows:

| Vendor | Items | Annual |
|---|---|---|
| Geotech | All Items | $280,000.00 |
| Fiber Optic Management | All Items | $135,000.00 |
| (dba Turnkey Network Solutions) | | |
| Severance Electric | All Items | $135,000.00 |

3. **Tablet Command, Inc.**

One-year term contract with two, one-year renewal options for annual O.E.M. (Original Equipment Manufacturer) licensing and support subscription of the Tablet Command Solution for the Fire Department from Tablet Command Inc. for the annual "not-to-exceed" amounts as follows:

| | |
|---|---|
| Year 1 annual license subscription plus integration | $15,000.00 |
| Year 2 annual license subscription | $11,025.00 |
| Year 3 annual license subscription | $12,836.00 |

The three-year total amount is $38,861.00.

4. **Projetech, Inc.**

Three-year term contract, budgeted annually, for continued O.E.M. Maximo as a Service (MaaS) hosting and support from Projectech, Inc. for the for the first-year annual "not-to-exceed" amount of $142,664.50; the estimated three-year total amount is $427,993.50.

5. **Josh Leffingwell, LLC**

One-year term contract with two, one-year renewal options for continued multi-year strategic marketing and communications services for the Environmental Services Department from Josh Leffingwell, LLC (dba Well Design Studio) for the annual "not-to-exceed" amount of $45,000.00; the estimated three-year total amount is $135,000.00.

6. **The Grand Rapids Times**
**MLive Media Group**

One-year term contracts with two, one-year renewal options for continued "as-needed" classified and display advertising for various City items and procedures for Citywide use from MLive Media Group for an annual "not-to-exceed" amount of $105,000.00 (estimated 3-year total amount of $315,000.00); and from The Grand Rapids Times for an annual "not-to-exceed" amount of $8,000.00 (estimated 3-year total amount of $24,000.00).

7. **Interphase, Inc.**
**Modern IS Service, Inc.**

One-year term contracts with two, one-year renewal options for "as-needed" purchase and delivery of office furniture with Interphase, Inc.

(through MiDEAL cooperative agreements #071B7700023 and #071B7700074) for the annual "not-to-exceed" amount of $200,000.00; and with Modern IS Service, Inc. (through Omnia cooperative agreement #R191817 and #R180102) for the annual "not-to-exceed" amount of $200,000.00.

FURTHER RESOLVED that the Purchasing Agent be authorized to proceed with awards to the following vendors:

**8. Metro Wire and Cable**
Purchase of various high voltage electric cable for the Energy Lighting and Communications department from Metro Wire & Cable for the total amount of $21,000.00.

**9. Database Development Services, Inc.**
Three-year term contract for annual licensing and support services for the Filemaker software solution for the Police Department from Database Development Services, Inc. for the total three-year amount of $64,550.00.

**10. Everbridge**
One-year term contract, with two, one-year renewal options, budgeted annually, for the Office of Emergency Management for continued Original Equipment Manufacturer (O.E.M.) licensing and support from Everbridge for the first year annual "not-to-exceed" amount of $27,672.00. Future renewals for continued licensing and support will be executed at the current pricing received from Everbridge; the estimated three-year total amount at this time is $83,016.00.

## D. COMMUNITY DEVELOPMENT COMMITTEE

**91921 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

RESOLVED that the request to grant Hamburg Fireworks Display, Inc. a Fireworks Discharge Permit to be used in conjunction with the Breakaway Music Festival at Belknap Park on August 19 and 20, 2022, is approved, pending an inspection by the Fire Department.

**91922 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

RESOLVED that the request to grant Pyrotek Special Effects, Inc. a Fireworks Discharge Permit to be used in conjunction with the Pitbull concert at the Van Andel Arena on August 30, 2022 is approved, pending an inspection by the Fire Department.

**91923 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

WHEREAS:

1.  Chapter 53 of Title IV of the Code of the City of Grand Rapids provides for the adoption of a resolution establishing rules and regulations to control certain activities associated with a given special event; and

2.  The City Manager, through his designee, has determined that the special event sponsored by the ArtPrize organization and the City of Grand Rapids called "*ArtPrize*", which is scheduled to be held September 15 to October 2, 2022, is of general interest and importance to the community; and

3.  The City Commission has determined that the extended time period for the event as set forth herein is important to the nature of the event and that the application of the special rules and regulations for the extended time periods set forth herein will not unduly interfere with the orderly conduct of normal life activities in the City; and

4.  The ArtPrize organization requests the establishment of certain rules and regulations to control certain activities associated with the event, in order to insure to the greatest extent possible, that the objectives of the special event are achieved, consistent with the public health, safety and welfare; therefore

     RESOLVED:

1.  That the special event sponsored by the ArtPrize organization and the City of Grand Rapids called "*ArtPrize*", scheduled for September 15 to October 2, 2022, be and is hereby made subject to the provisions of Chapter 53 of Title IV of the Code of the City of Grand Rapids for the time period beginning at 8 a.m. on September 1, 2022, through 10 p.m. on October 15, 2022; and

2.  That the boundaries of the ArtPrize special event are specifically three square miles of the Grand Rapids' downtown area as described in the attached map demarcating ArtPrize boundaries as well as the below mentioned public sites and satellite venues:

              555 Monroe North Lot
              Ah Nab Awen
              Blue Bridge
              Calder Plaza
              City Hall
              Gillett Bridge
              Highland Park - satellite site
              MacKay Jaycees Park - satellite site
              Monroe Center Parking Ramp
              Riverwalk
              Sixth Street Park
              The Ecliptic at Rosa Parks Circle
              Frederik Meijer Gardens and Sculpture Park - satellite site

> Fountain Street Church Parking Lot - satellite site
> Gerald R. Ford International Airport - satellite site
> GRCC West Fulton Lot - satellite site
> John Ball Zoo - satellite site
> Plainfield and Ann Lot - satellite site

3. That all City ordinances will be enforced except to the extent as they apply to the rules and regulations outlined below; and

4. That the following rules and regulations will apply to the ArtPrize special event as described in the previous paragraphs:

    a) From September 15 to October 2, 2022, no vendors or transient merchants, including commercial and promotional advertising activity, will be allowed within the event boundaries other than a) those specifically authorized under the Downtown Vendor License, Sidewalk Vendor License, Transient Merchants License or Mobile Vending Carts Operator License and under the terms and conditions of those existing licenses or b) those specifically authorized by ArtPrize under the Special Event License issued by the City Clerk. All authorized vendors and transient merchants shall carry credentials of such authorization; and

    b) No person shall land a hot air balloon, parachute from an airplane, fly a drone, or drop items from an airplane into the event boundaries unless they have been approved in writing by the ArtPrize organization. The person shall have any such approval upon their person during the event; and

    c) No person shall operate any sound amplification devices, equipment or systems within the event boundaries other than those systems specifically authorized by the ArtPrize organization in consultation with the City Manager or his designee; and

    d) From September 15 to October 2, 2022, unless approved by the ArtPrize organization, as provided for in Section 7.211 of the City Code, no person owning or operating a parking facility shall sublet, sublease or otherwise permit any parking facility or any portion of a parking facility to be used by any vendor of goods, wares or merchandise or services for the conduct of such vendor's business unless the business is conducted in a permanent building or structure or the operation is otherwise licensed or permitted pursuant to law or ordinance; and

    e) No installation of artwork in the public right-of-way or City-owned properties will be permitted unless authorized by the ArtPrize organization and approved by the City of Grand Rapids; and

f) Signs associated with the ArtPrize special event must be clearly identified with the official ArtPrize participant seal. For the duration of the event, Chapter 61 of the City Code shall be waived as it pertains to venues, sponsors, artwork, events, and signs sanctioned by the ArtPrize organization. All requirements shall be adhered to for the benefit of public safety; and

g) For the duration of the event, Chapter 68 of the City Code, regarding Historic Preservation, shall be waived as it pertains to venues, sponsors, artwork, events and signs sanctioned by the ArtPrize organization only insofar as the work is temporary and does not damage or destroy any resource. All requirements shall be adhered to for the benefit of public safety; and

h) All signs, structures, and modifications to buildings not approved for permanent installation by the City shall be removed upon expiration of the event; and

i) For the duration of the event, the City Manager is hereby authorized to approve a parking facility or any other City-owned facility for the purpose of locating a telecommunication facility to accommodate increased demand and call volume during the ArtPrize special event. Such telecommunications facilities may be placed temporarily only as agreed to by execution of a license between a licensed carrier and the City. Such license shall be in a form to be approved by the City Attorney and signed by the Mayor. Chapters 61, 68, and any regulations of the City Code deemed necessary by the City Manager to accommodate such an installation shall be waived for the duration of the event; and

j) Notwithstanding this approval, the ArtPrize organization must coordinate with the City and coordinators of other previously scheduled special events within the boundary of the ArtPrize special event so as not to detract from the operation, character and nature of those special events; and

k) In addition, the City Manager is hereby authorized to reduce, waive or otherwise modify normal fees; and

l) The City Manager is hereby authorized to approve the ArtPrize special event activities, additional sites, and events other than as described herein when, in his judgment, such approval is important to the success of the event and he determines such approval will not unduly or unreasonably interfere with any person's rights; and

m) The Mayor is hereby authorized to execute, upon approval as to form by the City Attorney, any ArtPrize hosting agreements as approved by the City Manager.

5. That pursuant to the requirements of Chapter 53 of the City Code, this resolution shall be published in its entirety.

## 91924 Result: Adopted.
## Mover: O'Connor. Supporter: Reppart.

WHEREAS the City Commission, after due and legal notice to all interested parties, has duly met as a Board of Review for the purpose of reviewing the Downtown Improvement District Special Assessment Roll prepared by the Assessor for the purpose of assessing the share of the cost of maintaining the Downtown Area service enhancements to be borne by the parcels of property in special assessment district 8768; and

WHEREAS said special assessment roll has been open to review before the City Assessor for the length of time required by Chapter 23 of the City Code, the Charter of the City of Grand Rapids, and the laws of the State of Michigan; and

WHEREAS the City Commission, acting as such Board of Review, has given opportunity to all persons interested in and affected by said special assessment roll to appear before said Board of Review, has carefully considered all objections and appeals made thereto, and has made such corrections and changes in such special assessment roll as in its judgment ought to be made; and

WHEREAS the City Commission is of the opinion that said special assessment roll, results in the special assessment spread and levied thereon to be in accordance with the advantages which each parcel of property in said district is benefited by the maintaining of such improvements therein, and that said special assessment roll is in all respects fair, just, and equitable, and results in the assessment levied being in proportion to the benefits to be derived.

THEREFORE, BE IT RESOLVED:

1. The City Commission, sitting as a Board of Review, is satisfied with Downtown Improvement District Special Assessment Roll 8768, is of the opinion that such special assessment roll results in the assessments being levied in accordance with the benefits to be derived by the maintaining of such separate, respective public improvements, and has caused, and does hereby cause, such determination to be entered upon its minutes.

2. The following described special assessment roll, as prepared by the Assessor and as reviewed by the City Commission acting as a Board of Review, is hereby ratified and confirmed in the following amounts and shall bear the following number, which corresponds to the respective number of the special assessment district as hereinbefore set forth:

### Areawide Services by Class

| | |
|---|---|
| Class 1 – Private Taxable Property | $ 713,103.00 |
| Class 2 – Private Tax Exempt | $ 86,975.24 |
| Class 3 – Public Tax Exempt | $ 347,490.99 |
| Class 4 – Residentially Classified | $ 74,280.00 |
| | $ 1,221,849.23 |

### Special Sub-Area Services - Snowmelt

| | |
|---|---|
| Class 1 – Private Taxable Property | $ 113,126.31 |
| Class 2 – Private Tax Exempt | $ 4,925.32 |
| Class 3 – Public Tax Exempt | $ 51,948.37 |
| Class 4 – Residentially Classified | $ 0.00 |
| | $ 170,000.00 |
| Grand total assessments and contributions | $ 1,391,849.23 |

3. Said special assessment roll shall be billed on September 1, 2022. In the event that any special assessment shall not be paid within one month of the due date thereof, penalties and collection fees shall thereafter be charged and added to such past due assessment as follows provided by Section 1.375 of Chapter 9 of Title I of the City Code. Such penalties and collection fees shall be collected at the same time and in the same manner as the special assessment and interest thereon are collected. The entire assessment may be paid during the first month after the due date thereof without penalty.

Penalties shall be added at one (1) percent for each month until the tax is paid, until the tax sale, or until return of the tax to the County Treasurer, whichever shall first occur. There shall also be added on the first of March next following a collection fee in addition to such penalties. The collection fee shall be four (4) percent of the total then due or the amount provided by State law for such collection fees for counties making such collection fees, whichever amount shall be the greater.

As provided by Section 1.969 of Chapter 23 of the Code of the City of Grand Rapids, a lien is hereby established as follows:

"Except as otherwise stated in this Section, all special assessments contained in any special assessment roll, including any part thereof deferred as to payment and such administrative charge as may be applicable thereto, shall from the date and time of the receipt thereof by the City Treasurer constitute a lien upon the respective parcels of land or interest in land assessed, and until paid shall be a charge against the respective owners of the several parcels of land or interest in land. Such lien shall be of the same character and effect as the lien created for City taxes and shall include accrued interest and penalties. No judgment or decree nor any act of the City Commission vacating a special assessment

shall destroy or impair the lien of the City on the premises assessed for such amount of the assessment as may be equitably charged against the same. For a special assessment to provide Ongoing Activity exceeding one (1) year in duration, a separate lien shall be established for each annual installment. For the first annual installment, the lien shall be established as of the date and time of the receipt of the special assessment roll by the City Treasurer. For the second annual installment, the lien shall be established on the first anniversary of the receipt of the roll by the City Treasurer; for the third installment, it shall be the second anniversary date; for the fourth installment, it shall be the third anniversary date; for the fifth installment, it shall be the fourth anniversary of the receipt of the roll by the City Treasurer."

**91925 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

RESOLVED:

1. That a public hearing to obtain public comment on the Federal Fiscal Year 2021 Consolidated Annual Performance and Evaluation Report and for future housing and community development needs be held on Tuesday, September 6, 2022, at 7:00 p.m. in City Commission Chambers, City Hall, 300 Monroe Avenue, NW; and

2. That the draft Federal Fiscal Year 2021 Consolidated Annual Performance and Evaluation Report be available for review at the Community Development Department, City Hall, Suite 460, Grand Rapids, Michigan, during normal business hours from 8:00 a.m. on August 25, 2022 through 5:00 p.m. on September 12, 2022 at www.grcd.info; and

3. That the City Clerk is directed to publish notice of said public hearing.

**91926 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

RESOLVED:

1. That a Lease Agreement ("Agreement") is approved in a form to be approved as to content by the City Manager or his designee and as to form by the City Attorney; and

2. That the terms and conditions of the Agreement, BSG Group, LLC shall set forth a ten-year initial term with two (2) additional five-year options to renew, establish a rental rate of $1,170.00 per year with 2% annual escalations, require insurance and indemnification acceptable to the City, require the lessee to obtain all necessary permits for improvements, maintain the leased property in accordance with all applicable laws, codes and ordinances, and timely pay all real and personal property taxes levied against the leased property; and

3. That after depositing a 3.5% commission to the Property Management Fund, all remaining rent payments received pursuant to the Agreement will be deposited in the Water System Fund; and

4. That the Mayor is authorized to execute the Agreement on behalf of the City; and

5. That all resolutions or parts of resolutions in conflict herewith are hereby rescinded.

**91927 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

WHEREAS, bids were received on July 12, 2022, for the following project:

> Replacement of Heating System at Plainfield Fire Station
> (hereinafter referred to as the "Project")

and Hurst, Inc dba Hurst Mechanical (Hurst) submitted a bid of $53,927 for which the engineer's estimate, prepared by Integrated Architecture PC (Integrated) is $55,000; therefore

RESOLVED:

1. That the bid of Hurst be accepted and that, upon approval as to form by the City Attorney, the Mayor and City Clerk be authorized to execute the contract documents for the Project on behalf of the City.

2. That total expenditures for the Project be authorized in an amount "not-to-exceed" $77,427 which includes the costs of the construction contract, previously authorized design phase services by Integrated, construction phase services including inspection by Integrated, engineering/inspection/administration, and contingencies. Said amount of $77,427 to be charged to Code No. 4010-265-9000-9750-401022009.

3. That the City Comptroller is hereby authorized and directed to make payment, in amounts and to said payees, as the City Engineer or his designee requests in connection with the Project.

**91928 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

WHEREAS, bids were received on July 14, 2022 for the following project:

> Reconstruction of Emerald Avenue from Leonard Street to Sweet Street
> (hereinafter referred to as the "Project")

and Ponstein Enterprises, LLC dba Georgetown Construction Company (Georgetown) submitted a bid of $1,906,500.00 for which the engineer's estimate is $1,982,762.50; therefore

RESOLVED:

1. That the City of Grand Rapids tentatively awards the construction contract for the Project to Georgetown, contingent upon successful financial arrangements with the Michigan Finance Authority (MFA) through the State Revolving Fund Program.

2. That the bid of Georgetown be accepted and that, upon completion of financing with MFA and upon approval as to form by the City Attorney, the Mayor is authorized to execute a contract with Georgetown in the amount of $1,906,500.00 for the Project on behalf of the City, which execution shall constitute the award of the contract.

3. All resolutions or parts of resolutions in conflict herewith shall be, and the same are, rescinded.

4. That total expenditures for the Project be authorized in an amount "not-to-exceed" $2,540,000 which includes the costs of the construction contract, public information program, testing, engineering/inspection/administration, previously authorized services by Professional Service Industries, Inc. (PSI), and contingencies. Said amount of $2,540,000 to be charged as follows: $1,135,600 to the applicable Vital Streets Codes and $1,404,400 to the applicable Water System Codes.

5. That the City Comptroller is hereby authorized and directed to make payment, in amounts and to said payees, as the City Engineer or his designee requests in connection with the Project.

6. That the City of Grand Rapids, pursuant to Section 1.150-2 of the Treasury Regulations promulgated pursuant to the Internal Revenue Code of 1986, as amended, declares its intent to reimburse itself the costs of the Project and other related costs in an amount "not-to-exceed" $1,404,400 (Water System Fund) through the issuance of tax-exempt bonds.

7. That a copy of this resolution be available for inspection at the City Clerk's Office, 2nd Floor, City Hall, 300 Monroe Avenue N.W., Grand Rapids, Michigan 49503.

**91929 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

WHEREAS, It is necessary to accept a Sidewalk and Utility Easement and to authorize a payment in connection with Sidewalk Improvements in 44th Street from Eastern Avenue to Trade Drive; therefore

RESOLVED:

1. That a Sidewalk and Utility Easement is hereby accepted from the following property owner for the described property for the compensation amount noted:

> East James Properties, L.L.C.    ($300.00)
> 909 Post Avenue
> Holland, Michigan 49424

> <u>1151 44th St. SE, Parcel No. 41-18-20-300-064</u>

A FOUR-FOOT (4') WIDE SIDEWALK EASEMENT LOCATED IN THE SOUTHWEST 1/4 OF SECTION 20, TOWNSHIP 6 NORTH, RANGE 11 WEST, CITY OF GRAND RAPIDS, KENT COUNTY, MICHIGAN, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:  COMMENCING AT THE SOUTH 1/4 CORNER OF SAID SECTION 20; THENCE N88°43'07"W 431.59 FEET ALONG THE SOUTH LINE OF SAID SECTION 20 AND THE CENTERLINE OF 44TH STREET (100 FEET WIDE); THENCE N01°16'53"E 50.00 FEET TO THE NORTHERLY RIGHT OF WAY LINE OF SAID 44TH STREET AND THE POINT OF BEGINNING; THENCE N88°43'07"W 40.00 FEET EAST ALONG THE NORTH RIGHT OF WAY LINE OF SAID 44TH STREET; THENCE N01°16'53"E 4.00 FEET; THENCE S88°43'07"E 40.00 FEET ALONG A LINE THAT IS 54.00 FEET NORTH OF AND PARALLEL WITH THE SOUTH LINE OF SAID SECTION 20; THENCE S01°16'53"W 4.0 FEET TO THE POINT OF BEGINNING. CONTAINING 00.4 ACRES OR 174.25 SQUARE FEET, MORE OR LESS; and

2. That the Mayor is hereby authorized to execute the aforementioned easement on behalf of the City, contingent on approval as to form by the City Attorney; and

3. That the City Comptroller is hereby authorized and directed to make payments, in amounts and to said payees, as the City Engineer or his designee requests in connection with the aforesaid Sidewalk and Utility Easement; and

4. That the City Clerk is hereby authorized and directed to record the aforesaid Sidewalk and Utility Easement with the Kent County Register of Deeds.

**91930 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

WHEREAS:

1. On July 23, 2013 (Proceeding No. 82631), the City approved agreements for a three-year period to July 31, 2016 with Exxel Engineering, Inc.; Fishbeck, Thompson, Carr & Huber, Inc; Holland Engineering, Inc.; Meyers, Bueche & Nies, Inc.; Moore & Bruggink, Inc.; and Nederveld, Inc., for Surveying, Drafting, and Construction Staking Services for Various

Projects for the City of Grand Rapids and approved expenditures in connection therewith in an amount of $200,000; and

2. On May 10, 2016 (Proceeding No. 85618) the City approved an amendment to the agreements extending the period of performance to July 31, 2019 and approved an increase in expenditures for services pursuant to the aforesaid agreements in an amount of $200,000; and

3. On June 11, 2019 (Proceeding No. 88911) the City approved an amendment to the agreements extending the period of performance to July 31, 2022; and

4. The City desires to extend the agreements Exxel Engineering, Inc.; Fishbeck, Thompson, Carr & Huber, Inc; Holland Engineering, Inc.; Meyers, Bueche & Nies, Inc.; Moore & Bruggink, Inc.; and Nederveld, Inc. for an additional one-year period to July 31, 2023; therefore

RESOLVED:

5. That the amendment to the agreements with Exxel Engineering, Inc.; Fishbeck, Thompson, Carr & Huber, Inc; Holland Engineering, Inc.; Meyers, Bueche & Nies, Inc.; Moore & Bruggink, Inc.; and Nederveld, Inc. for Surveying, Drafting, and Construction Staking Services for Various Projects for the City of Grand Rapids is hereby approved and that, upon approval by the City Attorney, the Mayor, and the Clerk be authorized to execute the amendments on behalf of the City. The period of performance for each amendment will be from August 1, 2022, to July 31, 2023; and

6. That the City Comptroller is hereby authorized and directed to make payment, in amounts and to said payees, as the City Engineer or his designee requests in connection with the referenced agreement.

**91931 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

WHEREAS, Pursuant to the Charter and Ordinances of the City, the City Manager has caused to be prepared a map of the proposed improvements and plans and specifications therefore and certain recommendations in connection therewith for the acquisition and construction of the following described public improvements:

Special Assessment District No. 8774

Improvement of Crescent Street Alley
from Grand Avenue to Eastern Avenue; therefore

RESOLVED:

1. That the map of the proposed special assessment district for said public improvements, the estimate of the costs and plans and specifications for

said public improvements, and the recommendations of the City Manager with respect to said public improvements shall be filed with the City Engineer and shall be available for public examination. The public improvements listed above shall be known as Special Assessment District No. 8774.

2. That the City Commission shall meet at Sibley Elementary School, 943 Sibley Street NW, Grand Rapids, Michigan 49504 on Tuesday, August 23, 2022 with regular business beginning at 7:00 p.m. for the purpose of hearing all persons affected by said public improvements.

3. That notice of the time, place and purpose of said hearing shall be published once in the official newspaper of the City not less than ten (10) days prior to the date of said hearing, and notice of said hearing shall be sent by first-class mail at least ten (10) days before the date of the hearing to each owner of property subject to assessment for said public improvements to the address and to the person shown on the current tax assessment roll of the City, as indicated by the records of the Assessor's Office.

**91932 Result: Adopted.**
**Mover: O'Connor. Supporter: Reppart.**

WHEREAS, bids were received on July 26, 2022 for the following project:

> Water Main and Water Service Replacement in Page Street,
> Lister Court, Plainfield Avenue and Public Easement (NE)
> and Water Service Replacement in Carrier Street
> (hereinafter referred to as the "Project")

and Schippers Excavating, Inc. (Schippers) submitted a bid of $1,109,865.00 for which the engineer's estimate is $946,242.00; therefore

RESOLVED:

1. That the City of Grand Rapids tentatively awards the construction contract for the Project to Schippers, contingent upon successful financial arrangements with the Michigan Finance Authority (MFA) through the State Revolving Fund Program.

2. That the bid of Schippers be accepted and that, upon completion of financing with MFA and upon approval as to form by the City Attorney, the Mayor is authorized to execute a contract with Schippers in the amount of $1,109,865.00 for the Project on behalf of the City, which execution shall constitute the award of the contract.

3. All resolutions or parts of resolutions in conflict herewith shall be, and the same are, rescinded.

4.  That total expenditures for the Project be authorized in an amount "not-to-exceed" $1,464,000 which includes the costs of the construction contract, public information program, testing, engineering/inspection/administration, costs associated with easement acquisition, geotechnical services by Materials Testing Consultants, Inc. (MTC), design phase services by Geotech, Inc., and contingencies.  Said amount of $1,464,000 to be charged as follows: $365,900 to the applicable Vital Streets Codes, $35,800 to the applicable Parking System Capital Codes, and $1,062,300 to the applicable Water System Codes.

5.  That the City Comptroller is hereby authorized and directed to make payment, in amounts and to said payees, as the City Engineer or his designee requests in connection with the Project.

6.  That the City of Grand Rapids, pursuant to Section 1.150-2 of the Treasury Regulations promulgated pursuant to the Internal Revenue Code of 1986, as amended, declares its intent to reimburse itself the costs of the Project and other related costs in an amount "not-to-exceed" $1,062,300 (Water System Fund) through the issuance of tax-exempt bonds.

7.  That a copy of this resolution be available for inspection at the City Clerk's Office, 2nd Floor, City Hall, 300 Monroe Avenue N.W., Grand Rapids, Michigan 49503.

## E. COMMITTEE OF THE WHOLE

### 91933 Result: Adopted.
### Mover: O'Connor. Supporter: Reppart.

RESOLVED that the request from One Beer at a Time, LLC, for On-Premise and Off-Premise Tasting Room liquor licenses to be located at 443 & 445 Bridge St NW and 411 Broadway St, Grand Rapids, MI 49504, be approved.

### 91934 Result: Adopted.
### Mover: O'Connor. Supporter: Reppart.

RESOLVED:

1.  The City agrees to raise the shift premium pay from .70 cents to .85 cents per hour; and

2.  The City agrees to raise the Certified Training Officer (CTO) pay from $2.25 to $3.25 per hour; and

3.  The City agrees to the annual conversion of one week of sick leave accrued hours into one week of personal leave to match the Dispatch Supervisors Agreement; and

4.  The City agrees to allow the option to cash-out accrued Hazard Leave time; and

5.  The City agrees to a three-year Agreement with a wage increases of 4.0% July 1, 2022, 3.0% July 1, 2023, and 2.0% on July 1, 2024.

    FURTHER RESOLVED that:

1.  Upon reduction of said understanding to an Agreement in a form approved by the City Attorney, the Mayor and City Clerk are authorized to execute the same on behalf of the City; and

2.  The City Commission shall consider and act upon the Salary Ordinance amendments necessary in order to effectuate this labor agreement.

**91935  Result: Adopted.**
**Mover: O'Connor.  Supporter: Reppart.**

    RESOLVED that:

1.  The City agrees to raise the shift premium pay from .70 cents to .85 cents per hour; and

2.  The City agrees to increase the Union Leave for approved Union Business to 4 days annually; and

3.  The City agrees to pay an annual stipend for Supervisors who obtain the Certification of ENP, RPL, or CISSP of $750; and

4.  The City agrees to increase the Parental Leave from one week to two weeks; and

5.  The City agrees to a three-year term with wage increases of 5% on July 1, 2022, 2% on July 1, 2023, and 2% on July 1, 2024.

    FURTHER RESOLVED that:

1.  Upon reduction of said understanding to an Agreement in a form approved by the City Attorney, the Mayor and City Clerk are authorized to execute the same on behalf of the City; and

2.  The City Commission shall consider and act upon the Salary Ordinance amendments necessary in order to effectuate this labor agreement.

**91936  Result: Adopted.**
**Mover: O'Connor.  Supporter: Reppart.**

    WHEREAS:

1.  The City of Grand Rapids is experiencing a significant shortage of affordable housing and housing supply and the proposed text amendment will provide opportunities for additional housing supply, add residents who can support commercial businesses, and support new investment within our residential neighborhoods, all critical elements contributing to the

vibrancy of our neighborhoods; and

2. Given the purpose and intent of the NOS Zone District, and the explicit prohibition of most entertainment, hospitability and recreation uses in the NOS Zone District, there was no intent to permit alcohol uses in the NOS Zone District; and

3. The significant impacts to project feasibility and timelines brought about by the COVID-19 pandemic necessitate an additional six-month extension to the six-month extension already permitted for Site Plan Review and Optional Plan Review approvals, thus providing a period of validity for up to two years after the date of effectiveness; and

4. The Planning Commission recommended approval of the text amendments after holding a public hearing on July 14, 2022, at which time all interested persons had an opportunity to be heard.

     RESOLVED:

1. In accordance with Title V, Section 10(b) [Compiler's Paragraph 60(b)] of the Charter of the City of Grand Rapids, that the attached Summary of the Ordinance be published in the official City Commission Proceedings and in a newspaper of general circulation in the City, in lieu of publishing the full text of the Ordinance; and

2. That the amendments be considered for adoption by the City Commission at its meeting of August 23, 2022.

SUMMARY OF ORDINANCE 2022 – __
AN ORDINANCE TO AMEND CHAPTER 61 OF TITLE V OF THE
CODE OF THE CITY OF GRAND RAPIDS
ENTITLED "ZONING ORDINANCE"

The City of Grand Rapids is requesting consideration of text amendments to the Zoning Ordinance, summarized as follows:

1. Section 5.2.05.B.6.: Administrative departures for a reduction in lot area; and

2. Table 5.6.06.B.: Amendments to clarify that no alcohol uses are permitted in the NOS Zone District; and

3. Sections 5.12.08.F.6.c. and 5.12.14.I.2. and 3.: Extension of the existing one year approval to allow up to two six-month extensions for Site Plan Review and Optional Plan Review approvals.

The proposed Zoning Ordinance text amendments are available at the City's website at https://tinyurl.com/ZOtextamendments or examined by contacting the Planning Department at (616)456-4100 or planning@grcity.us during business hours.

ORDINANCE AMENDING VARIOUS SECTIONS OF CHAPTER 61,
TITLE V OF THE CODE OF THE CITY OF GRAND RAPIDS
ENTITLED "ZONING ORDINANCE"

ORDINANCE NO. 2022-__

THE PEOPLE OF THE CITY OF GRAND RAPIDS DO ORDAIN:

Section 1. That Title V, Chapter 61, Section 5.2.05.b.6. of the Code of the City of Grand Rapids be amended to read as follows:

### Sec. 5.2.05. Lot and Yard Requirements.

"6. Administrative Departures.

a. New Lots. This Departure applies to lots that contain a Single-Family or Two-Family use in an existing principal structure. A reduction to the required lot area and/or lot width may be granted for all newly created lots, provided the application meets the requirements of Section 5.2.05.B.6.c.

b. Existing vacant lots. This Departure applies to existing lots that do not contain a principal structure. A reduction to the required lot area and/or lot width may be granted to allow for (a) the creation of new lots to be used for Single- or Two-Family use, or (b) the use of an existing vacant lot for Single- or Two-Family use, provided the application meets the requirements of Section 5.2.05.B.6.c.

c. All Administrative Departures will be reviewed by the standards outlined in Section 5.12.16. in addition to the following standards and requirements below:

    i. The Administrative Departure may not result in the demolition of any principal household building or structure; and

    ii. The lot shall be no less than the minimum lot area and lot width required in Table 5.5.06.A. for a detached Single-Family interior lot, unless accessible from a usable alley, in which case the lot area and lot width may be less than the minimum, but no less than as originally platted; and

    iii. Tandem parking may be permitted for detached Single-Family and Two-Family uses on lots thirty-six (36) feet or less; and

    iv. A property survey shall be provided to ensure that all site layout and building placement standards can be met. If applicable, the survey shall also show the lot lines of the original plat.

    d.  An Administrative Departure of not more than three (3) percent of the required lot area of the Zone District may be granted where unusual lot configurations, topography or natural features exist, or where the Departure would be in keeping with the character of the neighborhood."

Section 2. That Title V, Chapter 61, Section 5.2.05.D. be amended to read as follows:

### Sec. 5.2.05. Lot and Yard Requirements.

"D. Lot Widths.

1. Established Areas. See Section 5.5.06.B. for site placement and building layout requirements for lots in established areas.

2. Lot widths are measured at the front setback line or RBL, as applicable, and the minimum lot width shall be maintained throughout the depth of the lot. Lot width for a corner lot is measured at the horizontal distance between the shorter of the two (2) dimensions of the front lot line.

3. There shall be no less than thirty-six (36) feet between the two (2) side lot lines measured at the required front setback line or required building line of the district in which it is located and the requirements of Sections 5.2.05.B.6 and 5.12.16. are satisfied upon approval by the Director.

4. Minimum Lot Widths for Irregular Lots.

    a.  There shall be not less than thirty-six (36) feet between the two (2) side lot lines measured at the public or private rights-of-way, except as permitted in Tables 5.5.06.A. and 5.6.07.A. of this Chapter and the requirements of Sections 5.2.05.B.6. and 5.12.16. are satisfied upon approval by the Director.

    b.  For cul-de-sac lots or other irregular lots, if the minimum lot width at the front setback line or RBL cannot be met, the minimum setback line or RBL shall be moved farther into the lot to the point at which the minimum lot width is met."

Section 3. That the following rows in the Commercial, Office, Retail use category of Table 5.6.06.B. of Title V, Chapter 61, Section 5.6.06. of the Code of the City of Grand Rapids be amended as follows:

**Sec. 5.6.06. Uses of Land.**

| Entertainment, Hospitality and Recreation | "Alcohol sales for on-site consumption (LCC permit) | See Section 5.9.05. Alcohol Sales | X" | 5.9.05. |
|---|---|---|---|---|
| | "Bar, tavern, taproom, tasting room | See Section 5.9.05. Alcohol Sales | X" | 5.9.05. |
| Alcohol sales for off-site consumption (including package good store - LCC Permit) | "24,999 sq. ft. GFA or less | See Section 5.9.05. Alcohol Sales | X" | 5.9.05. |

Section 4. That Title V, Chapter 61, Section 5.12.08.F.6.c. of the Code of the City of Grand Rapids be amended to read as follows:

**Sec. 5.12.08. Site Plan Review.**

6. Duration of Approval.

c. "Extension. Upon written request prior to expiration of the approval, two (2) extensions of up to six (6) months may be granted for a Final Site Plan Review approval if the Planning Commission finds that the extension is warranted due to circumstances beyond the control of the applicant. "

Section 4. That Title V, Chapter 61, Section 5.12.14.I.2. and 3. of the Code of the City of Grand Rapids be amended to read as follows:

Sec. 5.12.14. Optional Plan Review (OPR) Procedures.

I.     Duration of Approval.

1. An Optional Plan Review approval shall be valid for a period of one (1) year, provided the project has demonstrated substantial progress in that period.

2. "Upon written request prior to the expiration of the approval, two (2) extensions of up to six (6) months may be granted if the Planning Commission finds that the extension is warranted due to circumstances beyond the control of the applicant.

3. If no action is taken to use the property as approved or demonstrated substantial progress has not been made after the one (1) year approval period, or as extended per this subsection, the Optional Plan Review

approval shall expire when applicable LUDS and/or building permits expire."

## ITEMS REMOVED FROM CONSENT

**91937  Result: Adopted.**
**Mover: Jones. Supporter: O'Connor.**
**Yeas: Rosalynn Bliss, Jon O'Connor, Joseph D. Jones, Kurt Reppart**
**Nays: Senita Lenear, Milinda Ysasi, Nathaniel Moody**

WHEREAS:

1.  The City of Grand Rapids adopted social equity policies related to the medical and recreational cannabis Special Land Use processes in 2018 and 2020; and

2.  The voluntary commitments made by applicants under both policies are conditions of approval of a cannabis Special Land Use, are legally enforceable for as long as the use is active, and can impact future determinations of zoning and licensing at local and State levels; and

3.  Current monitoring of social equity performance projects that most cannabis operators will not meet all of their voluntarily offered MIVEDA and/or CISEVA commitments made with Special Land Use applications; and

4.  On April 26, 2022, City Commission was briefed on the status of social equity compliance in the local cannabis industry, was offered different options for pathways to continue to achieve compliance, including a recommended option by City staff, and heard the Commission identify the main pillars of the intent of the social equity policies under; and

5.  On May 10, 2022, City Commission approved a stay of enforcement of MIVEDA and CISEVA policies through August 10, 2022; and

6.  The adopted stay of enforcement provided local licensing benefits to multiple operators during that period, and said benefits could assist other local operators not covered by the recent extension while the pathway towards compliance is implemented, including the completion of the City-approved nonprofit; and

7.  A proposed series of direct amendments to the MIVEDA and CISEVA policies will allow staff to implement a Transfer System as an additional pathway towards compliance with all voluntarily offered commitments, which would advance the main pillars of concern as identified by the City Commission, and allow staff to effectively attest to compliance with municipal ordinances using forms provided by the State; and

8.  The local cannabis industry faces imminent action at both local and State levels as a result of social equity noncompliance by the end of the stay of

enforcement, which would impact State and local licensing renewals and the validity of cannabis Special Land Uses, unless it is addressed otherwise.

NOW THEREFORE BE IT RESOLVED THAT:

1. That the City Commission does re-number and revise the policy adopted pursuant to proceeding 91691 as City Commission Policy 900-64 temporarily extending enforcement of compliance with local cannabis industry commitments to City Commission policies 900-58 (MIVEDA) and 900-59 (Cannabis Social Equity Policy) through December 31, 2022.

2. That the City Commission does adopt amendments to City Commission policies 900-58 (MIVEDA) and 900-59 (Cannabis Social Equity Policy/CISEVA) allowing staff to implement administrative processes and policies that include a pathway for cannabis operators to return to compliance with social equity commitments, and allowing staff to attest to compliance with municipal ordinances using forms provided by the State.

## ORDINANCES

**91938 Result: Adopted.**
**Mover: O'Connor. Supporter: Moody.**
**Yeas: Bliss, Lenear, O'Connor, Jones, Ysasi, Reppart, Moody**

### AN ORDINANCE AMENDING SECTION 3.2
### OF SALARY ORDINANCE 2019-53

### ORDINANCE NO. 2022 - 25

### THE PEOPLE OF THE CITY OF GRAND RAPIDS DO ORDAIN:

Section 1. That Section 3.2 of Salary Ordinance 2019-53, be amended to read as follows:

"Section 3.2. Executive Level Group

| | | |
|------|------------------------------------------------|-----|
| 132  | Wellness Coordinator                           | 12U |
| 134  | Assistant Employee Benefits Manager            | 15U |
| 135  | Employee Benefits Manager                      | 18U |
| 143  | Director of Oversight and Public Accountability| 22U |
| 206U | Deputy Fire Chief                              | 22U |
| 343  | Parking Systems Director                       | 21U |
| 372  | Public Services Director                       | 24U |
| 373  | Director of Public Works                       | 24U |
| 553  | Mobile GR Manager                              | 21U |
| 554  | Communications Director                        | 22U |
| 570  | Customer Service Director                      | 23U |
| 572  | Senior Labor Relations Specialist              | 19U |
| 574  | Performance and Sustainability Officer         | 22U |

| | | |
|---|---|---|
| 575 | Government and Legislative Affairs Officer | 21U |
| 599 | Deputy Chief Financial Officer | 23U |
| 601U | Management Services Coordinator | 16U |
| 610 | Income Tax Administrator | 20U |
| 613 | Budget Director | 20U |
| 616 | City Assessor | 23U |
| 617 | Deputy City Manager | 29U |
| 618 | Director of Information Technology | 24U |
| 623 | Assistant City Manager | 28U |
| 625 | City Purchasing Agent | 20U |
| 627 | Risk Manager | 19U |
| 628 | Labor Relations Specialist | 17U |
| 629 | Assistant Human Resources Director | 22U |
| 630 | Director of Human Resources | 24U |
| 634 | Labor Relations Manager | 21U |
| 643 | Chief Services Officer | 25U |
| 654 | Chief Financial Officer | 27U |
| 655 | Managing Director | 25U |
| 657 | Environmental Services Manager | 24U |
| 661 | Water System Manager | 24U |
| 662 | Utilities Director | 26U |
| 665 | Director of Facilities & Fleet Management | 23U |
| 667 | Traffic Safety Director | 23U |
| 670 | City Engineer | 26U |
| 675 | Facilities Management Director | 21U |
| 678 | Fiscal Services Manager | 20U |
| 679 | Executive Director – DDA | 21U |
| 683 | Assistant City Attorney I | 15U |
| 684 | Assistant City Attorney II | 19U |
| 685 | Assistant City Attorney III | 22U |
| 686 | Deputy City Attorney | 26U |
| 711 | Planning Director | 23U |
| 713 | Director of Parks and Recreation | 23U |
| 720 | Neighborhood Improvement Director | 22U |
| 724 | Community Development Director | 23U |
| 727 | Director of Legal Affairs | 24U |
| 730 | Economic Development Director | 23U |
| 739 | Director of Equity and Engagement | 22U |
| 801 | Fire Chief | 27U |
| 816 | Deputy Police Chief | 23UF |
| 817 | Police Chief | 27UF" |

Section 2.  That all Ordinances in conflict herewith are repealed.

**91939  Result: Adopted.**
**Mover:  O'Connor.  Supporter:  Reppart.**
**Yeas: Bliss, Lenear, O'Connor, Jones, Ysasi, Reppart, Moody**

### AN ORDINANCE AMENDING SECTION 4.2
### OF SALARY ORDINANCE 2019-56

### ORDINANCE NO. 2022 - 26

### THE PEOPLE OF THE CITY OF GRAND RAPIDS DO ORDAIN:

Section 1.  That Section 4.2 of Salary Ordinance 2019-56, be amended to read as follows:

"Section 4.2.  Managerial and Supervisory Professional Group:

| | | |
|---|---|---|
| 101 | FMS Subject Matter Expert | 01SME |
| 102 | Financial Systems Analyst | 13 |
| 110 | Accounts Payable Supervisor | 12 |
| 114 | Payroll Supervisor | 12 |
| 115 | Financial Systems Administrator | 17 |
| 117 | Deputy City Treasurer | 18 |
| 118 | Records Manager | 15 |
| 127 | Performance & Management Reporting Specialist | 14 |
| 141 | Partnerships and Development Coordinator | 10 |
| 148 | Deputy City Clerk | 17 |
| 234 | Social Worker | 14 |
| 329 | Special Events Supervisor | 13 |
| 336 | Parks Maintenance Supervisor | 11 |
| 337 | Materials Resource Planning Supervisor | 10 |
| 338 | Utility Maintenance Supervisor | 12 |
| 339 | Cemetery Supervisor | 11 |
| 341 | Parking Meter Operations Supervisor | 14 |
| 342 | Parking Facility Supervisor | 14 |
| 344 | Parking Operations Superintendent | 16 |
| 345 | Parking Services Shift Supervisor | 10 |
| 346 | Inventory and Asset Manager | 15 |
| 348 | Wastewater Operations and Maintenance Supervisor | 14 |
| 349 | Wastewater/Stormwater Maintenance Superintendent | 17 |
| 350 | Collection System Asset Supervisor | 14 |
| 351 | Wastewater Plant Supervisor | 17 |
| 352 | Wastewater Technical Control Supervisor | 14 |
| 353 | Utility Supervisor | 14 |
| 354 | Traffic System Engineer | 16 |
| 355 | Utilities Field Operations Supervisor | 14 |
| 357 | Building Maintenance Supervisor I | 9 |
| 358 | Building Maintenance Supervisor II | 11 |
| 359 | Facilities Maintenance Superintendent | 17 |

| 360 | Facilities Maintenance Supervisor | 14 |
|-----|-----------------------------------|----|
| 362 | Water Distribution Shift Supervisor | 10 |
| 363 | Forester | 13 |
| 364 | Forestry Supervisor | 13 |
| 365 | Signal & Lighting Supervisor | 14 |
| 367 | Signal & Lighting Superintendent | 17 |
| 368 | Utilities Field Operations Superintendent | 17 |
| 370 | Streets & Sanitation Supervisor | 12 |
| 371 | Public Services Supervisor | 13 |
| 375 | Equipment Maintenance Supervisor | 12 |
| 376 | Equipment Maintenance Superintendent | 17 |
| 381 | Public Services Manager | 18 |
| 453 | Fleet Equipment Manager | 12 |
| 497 | Wastewater Plant Shift Supervisor | 10 |
| 498 | Wastewater Lab Superintendent | 14 |
| 515 | Sign Shop Supervisor | 09 |
| 518 | Sign Supervisor | 10 |
| 528 | Housing Inspections Administrator | 16 |
| 529 | Code Compliance Administrator | 18 |
| 530 | Housing Inspections Supervisor | 13 |
| 532 | Code Compliance Supervisor | 14 |
| 533 | Development Center Administrator | 16 |
| 534 | Assistant Code Compliance Director | 20 |
| 549 | Assistant Mobile GR Director | 20 |
| 551 | City Transportation Engineer | 18 |
| 552 | Transportation Planning Supervisor | 13 |
| 556 | Debt and Authority Finance Officer | 17 |
| 557 | Equal Opportunity Officer | 14 |
| 558 | Information Systems Coordinator | 15 |
| 559 | GIS Manager | 18 |
| 560 | 311 Customer Service Manager | 18 |
| 561 | Assistant Information Technology Director | 20 |
| 562 | Network and Operations Administrator | 18 |
| 565 | CRM Systems Administrator | 16 |
| 571 | Customer Service Community Liaison | 11 |
| 594 | Income Tax Compliance Supervisor | 14 |
| 595 | Income Tax Operations Supervisor | 14 |
| 598 | Financial Analyst II | 15 |
| 600 | Administrative Services Officer I | 16 |
| 601 | Community Services Administrator | 13 |
| 606 | Accountant II | 12 |
| 607 | Financial Analyst | 12 |
| 609 | Income Tax Examination Supervisor | 14 |
| 611 | Internal Auditor II | 14 |
| 614 | Information Technology Manager | 18 |
| 615 | Assistant City Assessor | 17 |

| 620 | Senior Buyer | 15 |
| 621 | Administrative Analyst I – Accounting | 11 |
| 626 | Administrative Services Officer II | 18 |
| 631 | Deputy City Assessor | 18 |
| 633 | Utility Financial Officer | 17 |
| 635 | Contract Compliance Officer | 12 |
| 638 | Communications Manager | 18 |
| 639 | Customer Service Administrator | 16 |
| 640 | Housing Development Officer | 18 |
| 641 | Administrative Analyst II | 16 |
| 642 | Administrator – Office Children Youth Families | 16 |
| 646 | Senior Human Resources Analyst | 14 |
| 647 | Senior Electrical Engineer | 15 |
| 650 | Project Engineer | 15 |
| 651 | Senior Project Engineer | 17 |
| 653 | Building Inspections Supervisor | 13 |
| 656 | Utilities System Manager | 20 |
| 660 | Wastewater Plant Superintendent | 18 |
| 663 | Water Filtration Plant Superintendent | 18 |
| 664 | Hydraulic Engineer | 17 |
| 666 | Building Inspections Administrator | 16 |
| 672 | Facilities Project Engineer Coordinator | 18 |
| 676 | Environmental Assessment Supervisor | 17 |
| 677 | Athletic Supervisor | 10 |
| 687 | Golf Course Manager | 10 |
| 688 | Recreation Supervisor | 13 |
| 689 | Marketing and Program Specialist | 10 |
| 701 | Recreation Program Technical Supervisor | 07 |
| 705 | Planning Supervisor | 13 |
| 712 | Recreation Center Supervisor | 10 |
| 714 | Parks Superintendent | 18 |
| 715 | Recreation Superintendent | 18 |
| 716 | Recreation Services Specialist | 16 |
| 721 | Assistant Building Official | 15 |
| 722 | Housing Rehab Supervisor | 14 |
| 723 | Community Development Officer | 14 |
| 725 | Building Official | 18 |
| 728 | Assistant Community Development Director | 20 |
| 729 | Assistant Economic Development Director | 20 |
| 732 | Business Advocate | 18 |
| 733 | Real Property Manager | 16 |
| 735 | Economic Development Coordinator II | 17 |
| 738 | Minority Business Enterprise Advocate | 18 |
| 740 | Telecommunications Administrator | 17 |
| 840 | Forensic Services Manager | 14 |
| 910 | Business Manager | 13 |

| 911 | Construction Inspection Supervisor | 13 |
| 915 | Assistant Project Manager | 15 |
| 916 | Engineering Design Services Supervisor | 13 |
| 917 | Project Manager | 18" |

Section 2. That all Ordinances in conflict herewith are repealed.

**91940  Result: Adopted.**
**Mover: O'Connor.  Supporter: Reppart.**
**Yeas: Bliss, Lenear, O'Connor, Jones, Ysasi, Reppart, Moody**

**AN ORDINANCE TO ESTABLISH HOURLY RATES OF PAY FOR NON-UNIFORM SEASONAL PERSONNEL AND TO ESTABLISH METHODS OF PROVIDING INCREASES AND DECREASES AS ESTABLISHED BY THIS ORDINANCE; TO PROVIDE FOR THE REGULATION OF OTHER PERSONNEL MATTERS, AND TO REPEAL ALL ORDINANCES IN CONFLICT HEREWITH, SAID REPEAL TO BECOME EFFECTIVE AUGUST 9, 2022**

## ORDINANCE NO. 2022 - 27

### THE PEOPLE OF THE CITY OF GRAND RAPIDS DO ORDAIN:

Section 1. There is hereby established the following position and hourly pay range which shall be the basis for establishing the rates of compensation of all employees in this class of positions. The Classification and Position Title used shall be paid in the amount or within the range of hourly amounts listed opposite the Classification or Position title described in Section 1.1. effective August 9, 2022.

Section 1.1 Seasonal Class

| Class Code | Title | Pay Step/Range |
|---|---|---|
| 821 | Fire Cadet | A) $15.00 Hourly |

Section 2. Adjustments in the assignment of hourly rates to a class of positions or these classification titles shall be effected by Ordinance assigning to such class or titles a rate of the basic hourly schedules provided in Section 1.1 which is higher or lower than the one assigned in this Ordinance.

Section 3. No employee shall be paid at a rate lower than the minimum or higher than the maximum rate of compensation in the hourly rates established by Section 1.1.

Section 4. The salary provisions of this Ordinance shall take effect as of August 9, 2022, and all Ordinances in conflict herewith are repealed as of August 9, 2022.

**91941  Result: Adopted.**
**Mover: O'Connor.  Supporter: Ysasi.**
**Yeas: Bliss, Lenear, O'Connor, Jones, Ysasi, Reppart, Moody**

**AN ORDINANCE TO FIX THE SALARIES AND RATES OF COMPENSATION OF CERTAIN EMPLOYEES IN THE CITY OF GRAND RAPIDS CLASSIFIED IN CLASS TITLES WHICH ARE WITHIN A NON-UNIFORMED EMPLOYEE UNIT, TO ADOPT A SCHEDULE OF ANNUAL PAY RANGES FOR SUCH EMPLOYEES, TO PROVIDE FOR THE ADOPTION OF RULES PRESCRIBING THE METHOD OF PROVIDING FOR INCREASES AND DECREASES IN COMPENSATION WITHIN THE PAY RANGES ESTABLISHED BY THIS ORDINANCE, TO PROVIDE FOR THE REGULATION OF OTHER PERSONNEL MATTERS AND TO REPEAL ALL ORDINANCES IN CONFLICT HEREWITH, SAID REPEAL TO BECOME EFFECTIVE AS OF JULY 1, 2022**

**ORDINANCE NO. 2022 - 28**

**THE PEOPLE OF THE CITY OF GRAND RAPIDS DO ORDAIN:**

<u>Section 1</u>.  There is hereby established the following schedule of hourly and annual pay ranges which shall be the basis for establishing the rates of compensation for all employees in the classes of positions described in Section 1, 1.1 and 1.2, inclusive, and which shall be effective July 1, 2022.

Non-Uniformed Employees of the Police Officers Labor Council

| Title | Class | Salary Range | Hourly Rate/ Annual Equivalent |
|---|---|---|---|
| Part Time Emergency Communications Operator | 950 | 01K | H $22.5637/46,933 |
| | | | A $23.9178/49,749 |
| Emergency Communications Operator I | 951 | 01K | H $22.5637/46,933 |
| | | | A $23.9178/49,749 |
| | | | B $24.7936/51,571 |
| | | | C $25.7018/53,460 |
| | | | D $26.7261/55,590 |
| | | | E $27.6842/57,583 |
| | | | F $28.7579/59,816 |
| Emergency Communications Operator II | 952 | 02K | H $24.3547/50,658 |
| | | | A $25.5731/53,192 |
| | | | B $26.8514/55,851 |
| | | | C $28.1945/58,645 |
| | | | D $29.6039/61,576 |

| Title | | | Class | Salary Range | Hourly Rate/ Annual Equivalent |
|-------|---|---|-------|-------|-------|
| | | | | | E $31.0838/64,654 |
| | | | | | F $32.6385/67,888 |
| Emergency Communications Operator III | | | 954 | 03K | H $28.1947/58,645 |
| | | | | | A $29.6039/61,576 |
| | | | | | B $31.0838/64,654 |
| | | | | | C $32.6385/67,888 |
| | | | | | D $34.2704/71,282 |
| | | | | | E $35.9837/74,846 |
| | | | | | F $34.2702/71,282 |

Each of the foregoing salary ranges shall consist of a minimum rate, which is the lowest amount in the columns opposite the range number; a maximum rate, which is the highest amount in the columns opposite the range number; and the intermediate steps, which are stated in the columns between the minimum and the maximum.

Section 1.1. Effective July 1, 2023, the following classifications shall be paid in an amount listed opposite the class title.

Non-Uniformed Employees of the Police Officers Labor Council

| Title | | | Class | Salary Range | Hourly Rate/ Annual Equivalent |
|-------|---|---|-------|-------|-------|
| Part | Time | Emergency Communications Operator | 950 | 01K | H $23.2406/48,340 |
| | | | | | A $24.6353/51,241 |
| Emergency Communications Operator I | | | 951 | 01K | H $23.2406/48,340 |
| | | | | | A $24.6353/51,241 |
| | | | | | B $25.5374/53,118 |
| | | | | | C $26.4729/55,064 |
| | | | | | D $27.5279/57,258 |
| | | | | | E $28.5147/59,311 |
| | | | | | F $29.6206/61,611 |
| Emergency Communications Operator II | | | 952 | 02K | H $25.0853/52,178 |
| | | | | | A $26.3403/54,788 |
| | | | | | B $27.6569/57,526 |
| | | | | | C $29.0403/60,404 |
| | | | | | D $30.4920/63,423 |
| | | | | | E $32.0163/66,594 |
| | | | | | F $33.6177/69,925 |

| | Class | Salary Range | Hourly Rate/Annual Equivalent |
|---|---|---|---|
| Emergency Communications Operator III | 954 | 03K | H $29.0405/60,404 |
| | | | A $30.4920/63,423 |
| | | | B $32.0163/66,594 |
| | | | C $33.6177/69,925 |
| | | | D $35.2985/73,421 |
| | | | E $37.0632/77,091 |
| | | | F $35.2983/73,420 |

Each of the foregoing salary ranges shall consist of a minimum rate, which is the lowest amount in the columns opposite the range number; a maximum rate, which is the highest amount in the columns opposite the range number; and intermediate steps, which are stated in the columns between the minimum and the maximum.

Section 1.2. Effective July 1, 2024, the following classifications shall be paid in an amount listed opposite the class title.

Non-Uniformed Employees of the Police Officers Labor Council

| Title | Class | Salary Range | Hourly Rate/Annual Equivalent |
|---|---|---|---|
| Part Time Emergency Communications Operator | 950 | 01K | H $23.7054/49,307 |
| | | | A $25.1280/52,266 |
| Emergency Communications Operator I | 951 | 01K | H $23.7054/49,307 |
| | | | A $25.1280/52,266 |
| | | | B $26.0481/54,180 |
| | | | C$27.0024/56,165 |
| | | | D $28.0785/58,403 |
| | | | E $29.0850/60,497 |
| | | | F $30.2130/62,843 |
| Emergency Communications Operator II | 952 | 02K | H $25.5870/53,221 |
| | | | A $26.8671/55,884 |
| | | | B $28.2100/58,677 |
| | | | C $29.6211/61,612 |
| | | | D $31.1018/64,692 |
| | | | E $32.6566/67,926 |
| | | | F $34.2901/71,323 |
| Emergency Communications Operator III | 954 | 03K | H $29.6213/61,612 |
| | | | A $31.1018/64,692 |

B $32.6566/67,926
C $34.2901/71,323
D $36.0045/74,889
E $37.8045/78,633
F $36.0043/74,889

Each of the foregoing salary ranges shall consist of a minimum rate, which is the lowest amount in the columns opposite the range number; a maximum rate, which is the highest amount in the columns opposite the range number; and intermediate steps, which are stated in the columns between the minimum and the maximum.

Section 2.    No employee shall be paid at a rate lower than the minimum rate for his/her classification as established by Section 1., 1.1, and 1.2. Employees shall be paid at a step based upon the length of service and merit that does not exceed the amounts established in Sections 1., 1.1. and 1.2. except that an employee may be paid an additional amount as provided in the labor agreement between the City of Grand Rapids and the Union.

Section 3.  That all Ordinances in conflict herewith are repealed."

**Result: Adopted.**
**Mover: O'Connor. Supporter: Ysasi.**
**Yeas: Bliss, Lenear, O'Connor, Jones, Ysasi, Reppart, Moody**
Motion for salary ordinance to take immediate effect.

**91942  Result: Adopted.**
**Mover: Lenear. Supporter: Ysasi.**
**Yeas: Bliss, Lenear, O'Connor, Jones, Ysasi, Reppart, Moody**

**AN ORDINANCE TO FIX THE SALARIES AND RATES OF COMPENSATION OF CERTAIN EMPLOYEES IN THE CITY OF GRAND RAPIDS CLASSIFIED IN CLASS TITLES WHICH ARE WITHIN A NON-UNIFORMED EMPLOYEE UNIT, TO ADOPT A SCHEDULE OF ANNUAL PAY RANGES FOR SUCH EMPLOYEES, TO PROVIDE FOR THE ADOPTION OF RULES PRESCRIBING THE METHOD OF PROVIDING FOR INCREASES AND DECREASES IN COMPENSATION WITHIN THE PAY RANGES ESTABLISHED BY THIS ORDINANCE, TO PROVIDE FOR THE REGULATION OF OTHER PERSONNEL MATTERS AND TO REPEAL ALL ORDINANCES IN CONFLICT HEREWITH, SAID REPEAL TO BECOME EFFECTIVE AS OF JULY 1, 2022**

**ORDINANCE NO. 2022 - 29**

**THE PEOPLE OF THE CITY OF GRAND RAPIDS DO ORDAIN:**

Section 1.  There is hereby established the following schedule of hourly and annual pay ranges which shall be the basis for establishing the rates of

compensation for all employees in the classes of positions described in Section 1.1, 1.2 and 1.3, inclusive, and which shall be effective July 1, 2022.

Section 1.1. Effective July 1, 2022, the following classifications shall be paid in an amount listed opposite the class title.

Employees of the Emergency Communication Supervisors –
Teamsters Local 406
(With Rounded Annual Equivalents)

| Title | Class | Salary Range | Hourly Rate/ Annual Equivalent |
|---|---|---|---|
| Emergency Communication Supervisor | 953 | 11O | A $32.5769/67,760 |
| | | | B $34.2909/71,325 |
| | | | C $36.0961/75,080 |
| | | | D $37.9956/79,031 |
| | | | E $39.9958/83,191 |
| | | | F $42.1003/87,569 |
| Assistant Communications Manager | 955 | 12O | A $38.1314/79,313 |
| | | | B $40.0098/83,220 |
| | | | C $42.0039/87,368 |
| | | | D $44.1132/91,756 |
| | | | E $46.3045/96,313 |
| | | | F $48.6285/101,147 |

Each of the foregoing salary ranges shall consist of a minimum rate, which is the lowest amount in the columns opposite the range number; a maximum rate, which is the highest amount in the columns opposite the range number; and the intermediate steps, which are stated in the columns between the minimum and the maximum.

Section 1.2. Effective July 1, 2023, the following classifications shall be paid in an amount listed opposite the class title.

Non-Uniformed Employees of the Police Officers Labor Council

| Title | Class | Salary Range | Hourly Rate/ Annual Equivalent |
|---|---|---|---|
| Emergency Communication Supervisor | 953 | 11O | A $33.2284/69,115 |
| | | | B $34.9767/72,752 |
| | | | C $36.8180/76,581 |
| | | | D $38.7555/80,611 |
| | | | E $40.7957/84,855 |
| | | | F $42.9423/89,320 |
| Assistant Communications | 955 | 12O | A $38.8940/80,900 |

Manager

B $40.8100/84,885
C $42.8440/89,115
D $44.9955/93,591
E $47.2306/98,240
F $49.6011/103,170

Each of the foregoing salary ranges shall consist of a minimum rate, which is the lowest amount in the columns opposite the range number; a maximum rate, which is the highest amount in the columns opposite the range number; and intermediate steps, which are stated in the columns between the minimum and the maximum.

Section 1.3. Effective July 1, 2024, the following classifications shall be paid in an amount listed opposite the class title.

Non-Uniformed Employees of the Police Officers Labor Council

| Title | Class | Salary Range | Hourly Rate/ Annual Equivalent |
|-------|-------|--------------|-------------------------------|
| Emergency Communication Supervisor | 953 | 110 | A $33.8930/70,497 |
| | | | B $35.6762/74,207 |
| | | | C $37.5544/78,113 |
| | | | D $39.5306/82,224 |
| | | | E $41.6116/86,552 |
| | | | F $43.8011/91,106 |
| Assistant Communications Manager | 955 | 120 | A $39.6719/82,518 |
| | | | B $41.6262/86,582 |
| | | | C $43.7009/90,898 |
| | | | D $45.8954/95,462 |
| | | | E $48.1752/100,204 |
| | | | F $50.5931/105,234 |

Each of the foregoing salary ranges shall consist of a minimum rate, which is the lowest amount in the columns opposite the range number; a maximum rate, which is the highest amount in the columns opposite the range number; and intermediate steps, which are stated in the columns between the minimum and the maximum.

Section 2. No employee shall be paid at a rate lower than the minimum or higher than the maximum rate of compensation in the salary range established by Sections 1.1, 1.2 and 1.3 for the class to which their position has been allocated, provided that any employee who upon the adoption of this Ordinance is receiving a rate of compensation higher than the maximum rate herein established for their position shall receive the rate of compensation now in effect and subsequent generally applied increases.

Section 3.  That all Ordinances in conflict herewith are repealed.

**ADJOURNMENT**

Commission adjourned at 8:26 PM

JOEL H. HONDORP
City Clerk

**EXHIBIT 5**

# CITY COMMISSION POLICY

| GRAND RAPIDS | | PROCEEDING# | DATE |
|---|---|---|---|
| **MICHIGAN** | **POLICY NUMBER:** 900-58 <br> **DATE:** August 9, 2022 <br> **PROCEEDING#:** 91937 <br> **DEPARTMENT:** Planning | 88364 <br> 91937 | Dec. 4, 2018 <br> Aug. 9, 2022 |

**SUBJECT:**   MARIHUANA INDUSTRY VOLUNTARY EQUITABLE DEVELOPMENT AGREEMENT (MIVEDA)

**PURPOSE:**   To establish criteria for marihuana facility applicants to offer voluntary elements to further the City's goals in the administration of marihuana facility applications.

**POLICY:**

### I.   Introduction

A MIVEDA is a voluntarily-offered document that is proposed by an applicant for a marihuana facility use which shall become part of the applicant's submission.  The MIVEDA has various pre-defined options in the interest of offering conditions that align with the goals articulated in this policy.

### II.   Goals

The City's goals in providing the opportunity for marihuana applicants to participate in Marihuana Industry Voluntary Equitable Development Agreement (MIVEDA) include, but are not limited to:

1. Encouraging equitable development within this new industry;

2. Maximizing local economic impact; and

3. Streamlining the marihuana facility application process.

### III.   Eligibility Criteria

Applicants seeking land use approval for marihuana grower, processor, or provisioning center, including co-location of these uses, are eligible to provide a MIVEDA as part of their Special Land Use Application ("Eligible Applicants").

IV. **MIVEDA FORM**

    a. The City Commission approves the use of the attached MIVEDA form, in a form approved by the City Attorney.

    b. The MIVEDA form shall apply to all Eligible Applicants who wish to participate in a MIVEDA. No changes, departures, substitutions, or additions to the terms contained in the MIVEDA form may be offered by an Eligible Applicant or accepted by City staff.

    c. Reporting and compliance requirements are detailed in the MIVEDA and may be further articulated in Administrative Policies.

        i. Administrative Policies may establish options that include transferring MIVEDA and CISEVA "points" from one category to another and establishing a fund, managed by directors of the City formed nonprofit.

    d. Participation in the MIVEDA program is voluntary. The selection of any voluntarily offered conditions on the MIVEDA form is voluntary. However, all voluntarily offered conditions selected on a MIVEDA submitted by an Eligible Applicant as part of an application for a marihuana facility will be required and implemented in the final project approval.

    e. Marihuana facility applications that offer a MIVEDA as part of the submission will receive application consideration precedence, based on the number of voluntarily offered conditions contained in the MIVEDA, in accordance with procedures established by the City Manager.

V. **Evaluation**

Staff shall provide the City Commission with a yearly report on the active MIVEDAs, which shall include, at a minimum, the following:

    1. A list of approved marihuana facilities which included a MIVEDA;

    2. Quantitative analysis of active MIVEDA projects achieving one or more City criteria, including but not limited to:

        a. Projected and actual employment data; and

        b. Projected and actual MLBE participation.

The City Commission will utilize this information to determine the effectiveness of the Policy in achieving the City's goals. The City Commission, at its sole discretion, shall determine whether modifications to this policy or additional Administrative Policies are necessary to increase the effectiveness of its programs in achieving desired outcomes.

**EXHIBIT 6**

# CITY COMMISSION POLICY

| GRAND RAPIDS | | PROCEEDING# | DATE |
|---|---|---|---|
| **MICHIGAN** | **POLICY NUMBER:** 900-59<br>**DATE:** August 9, 2022<br>**PROCEEDING#:** 91937<br>**DEPARTMENT:** Planning | 90035<br>91937 | July 7, 2020<br>Aug. 9, 2022 |

**SUBJECT:** **CANNABIS SOCIAL EQUITY POLICY**

## Table of Contents

1 INTRODUCTION .......................................................................................................... 2
  1.1  Foreword .......................................................................................................... 2
  1.2  Authority, Purpose, and Applicability ............................................................. 2
2 DEFINITIONS ............................................................................................................... 3
3 POLICY OVERVIEW ..................................................................................................... 6
  3.1  Voluntary Participation ..................................................................................... 6
  3.2  Participation Point Allocation ........................................................................... 6
  3.3  Equity Applicant ............................................................................................... 7
  3.4  Application Advancing Equity .......................................................................... 8
  3.5  Social Justice Policy Administration & Nonprofit ............................................ 8
  3.6  Social Equity Policies ...................................................................................... 8
    3.6.1  Local Ownership ..................................................................................... 8
    3.6.2  Workforce Diversity ................................................................................ 9
    3.6.3  Supplier Diversity ................................................................................... 9
    3.6.4  New Business Development .................................................................. 10
4 APPLICATION & SELECTION ................................................................................... 12
  4.1  Expedited Review Eligibility Criteria ............................................................. 12
  4.2  Prioritization and Selection ............................................................................ 12
    4.2.1  Prioritization Tiers ................................................................................ 12
    4.2.2  Selection of Applications ...................................................................... 12
5 LICENSE RENEWAL .................................................................................................. 13
6 REPORTING AND SANCTIONS ................................................................................ 14
  6.1  Reporting ....................................................................................................... 14

   **6.2 Sanctions** ............................................................................................... **14**

**7 APPEALS AND EXCEPTIONS** ................................................................... **15**

   **7.1 Appeal of Administrative Decisions** ..................................................... **15**

**8 SEVERABILITY** ........................................................................................... **15**

   **8.1 Severability Clause** ............................................................................... **15**

## 1 INTRODUCTION
### 1.1 Foreword

The replacement of underground cannabis markets with licensed cannabis businesses has the potential to have an unprecedented impact on our consumer economy and social system at all levels. As we transition into the age of legalized cannabis, it is important that we prioritize the first objective listed in the City's Strategic Plan, which is to "embed equity throughout government operations." With that objective in mind, we are committed to creating equitable policies and opportunities that address the historical systemic and institutional injustices often connected to cannabis. To achieve success, it is critical that we support and incentivize a diverse, equitable, and inclusive cannabis industry. To reach this goal, we will embrace our core values of accountability, customer service, equity, innovation, collaboration, and sustainability.

In their 2013 report, "The War on Marijuana in Black and White," the American Civil Liberties Union found that "despite the fact that marijuana is used at comparable rates by Whites and Blacks, state and local governments have aggressively enforced marijuana laws selectively against Black people and communities." As such, African Americans are more likely to be arrested and prosecuted for possession of cannabis. The report further states that "the higher arrest, conviction and incarceration rates in communities of color is not reflective of a greater percentage of illegal activity, but rather of systemic discrimination including, but not limited to, disparate policing of urban areas, low income communities, and communities of color."

Nationwide, significant harm has been caused to communities of color by the War on Drugs and oppressive cannabis regulation. Through partnerships with business allies and community we have the ability to be on the right side of history and help make real change – equitably. This Policy is intended to be a step toward helping to support equitable economic initiatives, including job creation, removing barriers to local ownership, and contracting opportunities for traditionally disadvantaged groups within the community. The Strategic Plan for the City of Grand Rapids details our commitment to "advancing equitable outcomes and opportunities." This Cannabis Social Equity Policy is an important extension of that commitment.

### 1.2 Authority, Purpose, and Applicability

**Authority**
- City Commission "Resolution approving a City Commission policy to advance social equity within the cannabis industry" (7/7/2020)

- Chapter 105 "Cannabis Related Municipal Licensing" of the City Code authorizes the City to discount fees, issue multi-year licenses, and prioritize the review of applications in accordance with the Cannabis Social Equity Policy
- Chapter 61 "Zoning Ordinance" of the City Code regulates land use by cannabis facilities

**Purpose**

In support of the City's Strategic Plan, the purpose of this Policy is to:

- Establish expectations and voluntary commitments for all recreational cannabis applicants
- Employ strategies that enhance the growth and development of traditionally disadvantaged local, small, and emerging businesses
- Enhance business and real-estate ownership by people from communities that have been disproportionately affected by cannabis prohibition and enforcement, and to positively impact those communities
- Increase employment opportunities for socioeconomically disadvantaged groups
- Improve supplier opportunities for socioeconomically disadvantaged groups
- Increase opportunities within our Neighborhoods of Focus; and
- Eliminate and reduce barriers of entry into the cannabis industry.

## 2 DEFINITIONS

As used in these Policy guidelines, the following definitions apply:

| TERM | DEFINITION |
|------|------------|
| Cannabis | Medical: Cannabis as recommended by a doctor in the treatment of a diagnosed medical condition as evidenced by the issuance of a state medical card.<br>Recreational: Cannabis that is used without diagnosis of a specified medical condition and user is not issued a state medical card. |
| Cannabis Conviction | Conviction(s) related to cannabis within the limitations specified below (limitations to qualification under this definition are as follows)<br>• Conviction occurred between 1971-2018<br>• Conviction occurred in Kent County<br>• Applicant must not have a conviction for selling cannabis to a minor as this conviction does not meet application criteria[1] |
| City | City of Grand Rapids. |
| Community Cannabis Reinvestment Fund | An innovative financial mechanism to help increase the flow of capital to desired initiatives outlined in this policy. |
| Compliance | Acting in conformity with a rule, policy, standard, law, or regulation. |
| Diversity | Inclusion of different types of people. |

[1] See Section 4(c) of the Michigan Regulation and Taxation of Marihuana Act (MRTMA) explicitly states "any person under the age of 21 to possess, consume, purchase or otherwise obtain, cultivate, process, transport, or sell marihuana."

| TERM | DEFINITION |
|------|-----------|
| Equity | Exists when an organization succeeds in removing and preventing barriers created by systemic and institutional injustice. |
| Equity Applicant (EA) | An Equity Applicant is an individual that meets 3 of 6 of the criteria: <br> 1. Has a Kent County cannabis conviction(s) and/or a finding of responsibility for violation of City of Grand Rapids Charter Paragraph 292 "Restrictions of Marijuana" Section (a)[2] between the years 1971-2018 <br> 2. A guardian, grandparent, parent, sibling, or current spouse has a record of cannabis related offenses or was incarcerated due to a cannabis related conviction in Kent County and/or a finding of responsibility under Charter 292[3] <br> 3. Grand Rapids Resident was displaced from housing due to cannabis related offenses, or other documented experiences of housing injustice as determined on a case-by-case basis (within Kent County) <br> 4. Grand Rapids Residency - at least 10 years between 1971-2016 within Neighborhoods of Focus <br> 5. Income is no more than 80% of current Kent County area median income for five of the last ten years as calculated by Housing and Urban Development (HUD) at time of application.[4] <br> 6. Suffered at least one type of economic harm due to cannabis-related infractions <br>    a. Education injustice <br>       i. Denial of FAFSA <br>       ii. College expulsions <br>       iii. High school suspensions <br>    b. Employment <br>       i. Cannabis-related discipline <br>    c. Public Assistance <br>       i. Loss of public assistance <br>    d. Any other form of economic harm, as defined on a case-by-case basis |
| Equity Employee | An employee that meets the same criteria listed for Equity Applicant. |
| Incubator | A company or organization committed to nurturing the growth and success of startup and early stage companies. |
| Micro-Local Business | A business designation provided by the City of Grand Rapids to businesses that meet all of the following criteria: <br> 1. Business Age: Verification that the business has been in operation for a minimum of two full years |

---

[2] City of Grand Rapids Charter Paragraph 292 "Restrictions of Marijuana" Section (a) "No person shall possess, control, use, or give away marijuana or cannabis, which is defined as all parts of the plant cannabis sativa L., whether growing or not; its seeds or resin; and every compound, manufacture, salt, derivative, mixture, or preparation of the above, unless such possession, control, or use is pursuant to a license or prescription as provided in Public Act 196 of 1971, as amended. This definition does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compounds, manufacture, sale, derivative, mixture or preparation of the mature stalks, except the resin extracted therefrom, fiber, oil or cake, or the sterilized seed of the plant which is incapable of germination."
[3] City of Grand Rapids Charter §292(a)
[4] https://www.grandrapidsmi.gov/Government/Programs-and-Initiatives/Homebuyer-Assistance-Fund/Community-Development-Program-Income-Limits

| TERM | DEFINITION |
|---|---|
| Enterprise (MLBE)[5] | 2. Registration: Verification of registration with the following entities:<br>  a. Federal Government's System for Award Management (SAM), formerly known as the Central Contractors Registry (CCR), database as a small business<br>  b. City of Grand Rapids Purchasing Department<br>3. Location: Verification that the principle place of business has been in operation for at least six (6) months from a fixed office located in Kent County, Michigan. The local office must operate in accordance with the following criteria:<br>  a. The local office functions on a daily or regular basis, and provides all services to operate the business for which certification is sought<br>  b. The local office contains all fixtures, equipment and/or space necessary to operate, including but not limited to, as appropriate, floorplan, computer(s), software, copy machine(s), furniture, vehicle(s), tools, appliances and/or machinery necessary to operate the business for which certification is sought<br>  c. The local office must be the main office for assigned personnel who conduct the business' activities necessary to operate the local business for which certification is sought<br>4. Business Size: Verification that the latest three-year average business revenue or number of permanent employees is 25% or less of the Small Business Administration's (SBA) NAICS industry small business standards<br>5. Personal Net Worth: Verification that the controlling owners' (totaling 51% or more) individual personal net worth, as determined for SBA (8a) status (13CFR124.104), is $250,000 or less at the time of initial application. For continued Micro-LBE eligibility after admission to the program, net worth shall not exceed $750,000 |
| Minority | A person who is actual or perceived to be:<br>**a.** Black, a person having origin in any of the black racial groups of Africa<br>**b.** Hispanic or Latino, a person of Cuban, Mexican, Puerto Rican, South or Central American ancestry. Persons with European Spanish ancestry are not included as Hispanic or Latino for purposes of these administrative guidelines<br>**c.** Asian American, a person having origins in any of the original people of the Far East, Southeast Asia, the Indian sub-continent, or the Pacific Islands<br>**d.** American Indian, a person having origins in any of the original peoples of North America |
| Minority Business | A business whose majority owner(s) and operators identify and/or certified as one or more of the identified minority groups listed in our Minority definition. |

[5] See Equal Business Opportunity-Construction (City Commission Policy 600-12) and Goods and Services (City Commission Policy 600-15) Administrative Guidelines.

| TERM | DEFINITION |
|---|---|
| Enterprise (MBE)[6] | |
| Neighborhoods of Focus (NOF) | 17 Census tracks in Grand Rapids, Michigan as defined by the W.K. Kellogg Foundation. |
| Prioritization | The ranking earned through establishment of Equity Applicant status or through voluntary participation in the social justice program as an Applicant Advancing Equity under these policy guidelines. |
| Resident Owner | Residents who:<br>1. Have lived in Grand Rapids for at least 10 years between 1971-2016<br>2. Maintain a minimum of a 25% financial stake in the company, decision-making rights and/or incur the potential for economic risk and reward as defined by the company's Articles of Incorporation and/or Operating Agreement |
| Sanction | A penalty for actions that are contrary to a prior written agreement with the City of Grand Rapids. |
| Supplier Diversity | A proactive business program which encourages the use of diverse suppliers. A diverse supplier is, in the broadest sense, a business owned and operated by an individual or group that is part of a traditionally underrepresented or underserved group. |
| Women Business Enterprise (WBE) | A business whose majority owned and operated by one or more women. |

## 3  POLICY OVERVIEW
### 3.1  Voluntary Participation
This document shall be made available for use by all applicants applying for a City of Grand Rapids cannabis related business license or related zoning approval.

Participation in the Cannabis Social Equity Program, and any components thereof, is entirely voluntary. The selection by the applicant of any voluntarily offered conditions on the form provided by the City is at the applicant's sole discretion. However, once a completed and signed and witnessed form has been submitted with a license or a zoning application and is accepted by the City, it shall be considered legally enforceable if approved. All conditions voluntarily offered by the Applicant shall be included on the form provided by the City and shall be part of the final approval of the license and zoning.

### 3.2  Participation Point Allocation
The social equity commitment levels in each category detailed below accumulate points that determine the priority for license and zoning application review and approval, as well as renewal license duration and frequency of license renewal. Points may be earned in any or all five categories. Up to 3 unweighted points may be earned in each category.

---

[6] See Equal Business Opportunity-Construction (City Commission Policy 600-12) and Goods and Services (City Commission Policy 600-15) Administrative Guidelines.

The points achieved in each category are then weighted according to a factor assigned to each category in order to produce a weighted point total. Up to 45 weighted points may be gained by participation.

| CATEGORY | POINTS | WEIGHT |
|---|---|---|
| Local Ownership | 0-3 | 3 |
| Workforce Diversity | 0-3 | 3 |
| Supplier Diversity | 0-3 | 2 |
| New Business Development (Minority Business Incubator) | 0-3 | 3 |
| Cannabis Community Fund Investment | 0-3 | 4 |

Each category detailed below will accumulate prioritization points for application review and approval. Participation allows a total of 45 points. The City will use the weighted point totals included in each application to determine:

- Prioritization order of applicant review for a cannabis license and zoning approval from the City of Grand Rapids
- License renewal for duration and frequency

### 3.3 Equity Applicant

An Equity Applicant is an individual that meets <u>at least three</u> of the following six criteria:

1. Has a Kent County cannabis conviction(s) and/or a finding of responsibility for violation of City of Grand Rapids Charter Paragraph 292 "Restrictions of Marijuana" Section (a) between the years 1971-2018
2. A guardian, grandparent, parent, sibling, or current spouse has a record of cannabis related offenses or was incarcerated due to a Kent County cannabis related conviction and/or a finding of responsibility under Charter 292[7]
3. Grand Rapids Resident was displaced from housing due to cannabis related offenses, or other documented experiences of housing injustice as determined on a case-by-case basis (no farther than Kent County)
4. Grand Rapids Residency – at least 10 years between 1971-2016 within NOF
5. Income is no more than 80% of current Kent County area median income for five of the last ten years as calculated by Housing and Urban Development (HUD) at the time of application[8]
6. Suffered different types of economic harm due to cannabis-related infractions
   a. Education injustice
      i. Denial of FAFSA
      ii. College expulsions
      iii. High school expulsion
   b. Employment
      i. Cannabis-related discipline
   c. Public Assistance

[7] City of Grand Rapids Charter §292(a)
[8] https://www.grandrapidsmi.gov/Government/Programs-and-Initiatives/Homebuyer-Assistance-Fund/Community-Development-Program-Income-Limits

      **i.** Loss of public assistance

   **d.** Any other form of economic harm, as defined on a case-by-case basis

For purposes of assigning priority consideration for zoning and licensing applications, businesses more than 50% owned by Equity Applicants shall be considered Tier 1 applicants (See section 4.2).

### 3.4 Application Advancing Equity
An Application Advancing Equity is determined by achieving at least 20 of 45 points accumulated through voluntary participation the Cannabis Social Justice program that significantly advances equity.

### 3.5 Social Justice Policy Administration & Nonprofit

| CITY ADMINISTERED | NONPROFIT ADMINISTERED |
|---|---|
| *Non-discrimination policy (Mandatory)* | *HR Diversity, Equity, and Inclusion Policy* |
| *Socioeconomically disadvantaged and Neighborhoods of Focus* | *Socioeconomically disadvantaged and donor specific gifts in line with nonprofit purpose and bylaws* |
| 1. Supplier Diversity (Sec. 3.6.3) | 1. Supplier Diversity |
| 2. Regular Employee Diversity (Sec 3.6.2) | 2. Regular Employee Diversity |
| 3. Management Diversity (Sec. 3.6.1) | 3. Management Diversity |
| 4. Voluntary Investment in Community Fund (Sec. 3.6.4) | 4. Community Investment Funding and Administration |
| 5. License Renewals (Various Intervals) | 5. Wage Rate Considerations |
| 6. Real Estate Ownership (Sec. 3.6.1) | 6. Non-Cannabis Business Incubators in NOF |
| | 7. Cannabis Business Incubators in NOF |
| | 8. Distribute Loans and Grants |
| | 9. Receive Equity Champion Certification |

### 3.6 Social Equity Policies
#### 3.6.1 *Local Ownership*
Local ownership is achieved when Resident Owners have at least 25% of the ownership of the cannabis business or real estate interest, which may include either an operating company or a real estate holding company, or both.

The total percentage calculated will be based upon the total financial allocation of risk and reward to the Resident Owners as a percentage of the total.

Local Ownership Point System – Meet the criteria and earn points for either A or B below:
   **A.** Local ownership in the facility

| OWNERSHIP % | POINTS |
|---|---|
| 0%-24.9% | 0 |
| 25%-33.9% | 1 |

| | |
|---|---|
| 34%-65.9% | 2 |
| 66%-100% | 3 |

**B.** Local ownership in the underlying real estate owned or leased by the applicant/licensee for this business

| OWNERSHIP % | POINTS |
|---|---|
| 0%-24.9% | 0 |
| 25%-49.9% | 1 |
| 50%-74.9% | 2 |
| 75%-100% | 3 |

### 3.6.2 *Workforce Diversity*
Workforce Diversity is achieved when companies are committed and demonstrate the intent to recruit, hire and promote equity applicants from diverse backgrounds for positions throughout the company.

A commitment to maintaining a diverse workforce and supporting actions to further diversity within the cannabis industry is critically important to reduce economic disparities and harm experienced by communities of color caused in part by the War on Drugs.

**A.** Year 1 – points are awarded based on submission of a Social Equity Plan that includes the following criteria, along with a commitment to achieve one of the percentage ranges listed in B, below:
  **i.** Cannabis convictions (other than distribution to a minor) not a barrier to employment
  **ii.** Intentional strategies and investments to recruit for employment Grand Rapids residents that meet one or more criteria of Equity Applicant
  **iii.** Giving GR NOF residents the first round of interview
  **iv.** Other approved strategies as described by the company on a case by case basis
**B.** Year 2 and after – points are awarded based on the actual diversity of the workforce
  **i.** Percentage of workforce diversity defined as employees that meet one or more Equity Employee criteria

| WORKFORCE DIVERSITY % | POINTS |
|---|---|
| 0% - 24.9% | 0 |
| 25.0% – 49.9% | 1 |
| 50.0% - 74.9% | 2 |
| 75% - 100% | 3 |

### 3.6.3 *Supplier Diversity*
Supplier Diversity is a proactive business program which encourages the use of diverse suppliers. A diverse supplier is, in the broadest sense, a business owned and operated by an individual or group that is part of a traditionally underrepresented or underserved group. There are many different diverse businesses categories. A common example is Minority-owned Business Enterprises (MBE's). This requirement can be met by utilizing Minority-Owned Business Enterprises, Women-Owned Businesses or Micro-Local Businesses whenever possible in construction activity and purchasing of supplies.

Companies committed to integrating local minority-owned businesses into their supply chain will be awarded points based on their annual spend percentage with these firms. Annual spend is determined by the total fiscal/year end operational cost and the percentage of these costs spent with minority business enterprises. Operational costs exclude utilities and taxes.

The following is a schedule of point percentages based upon minority business enterprise participation achieved by the company:

| SUPPLIER DIVERSITY % | POINTS |
|---|---|
| 0% - 4.9% | 0 |
| 5.0% - 9.9% | 1 |
| 10.0% - 23.9% | 2 |
| 24.0% - 100% | 3 |

Documentation/Validation Process:
- Vendor policy
- Purchasing policy
- Existing contracts
- Annual review of dollars spent on all business contracts

### 3.6.4 *New Business Development*

| STRATEGY | POINTS |
|---|---|
| Mentor-Protégée | 1 |
| Mentor + External Incubation Support (Cannabis) | 2 |
| Mentor + External Incubation Support (Non-Cannabis) | 2 |
| Mentor + Support for Internal Incubation (Cannabis) | 3 |
| Mentor + Support for Internal Incubation (Non-Cannabis) | 3 |
| Contribution over 2% of gross sales to the Community Investment Fund for business incubation support (restricted funds in addition to any contributions made) | 3 |

Mentor
A mentor is someone who offers their knowledge, wisdom, and advice to someone with less experience. In a business mentor program, both the mentor and the mentee gain personal and professional experience.

Incubation
Due to the difficulty of starting a business in various industries, business incubators provide services which helps new and start-up companies to get through initial hurdles in starting up a business as many start-up companies, particularly equity applicants, may lack many necessary resources, experience, and networks. The incubator helps alleviate these barriers as it assists new and startup companies to develop, launch, manage, and grow their new business. These hurdles may include space, funding, legal, accounting, computer services and more.

## Cannabis Incubator

A company that provides below market or free space and "incubates" Equity Applicants. Incubator qualifications: The applicant must provide an Equity Applicant with all of the following:

- Essential resources and guidance to plan, launch, manage, and grow their business
- One to three years of below market or rent-free commercial space /non-commercial space (as applicable to the business type)
- Access to commercial space to conduct its business operations
- All required security measures as determined by state and local cannabis industry regulations

## Other Non-Cannabis Business Incubator

A company that provides below market or free space and "incubates" non-cannabis businesses that meet the definition of Equity Applicants. Incubator qualifications: The applicant must provide incubated businesses all of the following:

- Essential resources and guidance to plan, launch, manage, and grow their business
- One, two, or three years (aligned with license duration) of below market or rent-free commercial space
- Access to appropriate business space(s) (as applicable to the business type) to conduct its business operations
- All required state and local security measures

This commercial/non-commercial space may be located either at the Applicant's place of business or in another location in zones approved for that specific type of cannabis related business activity.

## Reinvestment Funding

The Grand Rapids Community Cannabis Reinvestment Fund is envisioned to be administered by a nonprofit entity and will receive funding from voluntary donation commitments, investments by the City from cannabis industry proceeds, grants and other sources. Contingent upon sufficient generation of funds, the fund will operate for the public benefit via the administration of social equity programs, grants, loans and community investments.

Nonprofit permitted activities:

- Grants/lending according to criteria beyond the City's authority
- Accept tax-deductible donations from marijuana industry participants and others
- Funding of initiatives within Neighborhoods of Focus

Applicants can earn points by voluntarily investing in the Fund on a scheduled basis matched to the length of their license. The number of years for the investment of donation amounts is based upon the length of the license certification. An applicant seeking to receive points can meet this requirement by signing a commitment to invest the following amounts:

| SELECT PERCENTAGE OF | POINTS BASED ON SALES PERCENTAGE AND # OF YEARS |
|---|---|

| GROSS CANNABIS SALES | |
|---|---|
| 0.50% | 1 |
| 1% | 2 |
| 2% | 3 |

## 4  APPLICATION & SELECTION

### 4.1  Expedited Review Eligibility Criteria

**Eligibility**

A point system has been established to support the City's commitment to administer equitable policies and opportunities that address the historic, systemic and institutional injustices connected to cannabis. The points will be used prioritize rankings for the review process for adult-use cannabis licensing and land use applications, the term of renewal licenses and to further the purposes of this Policy.

Both zoning and licensing applications for adult-use cannabis will be reviewed and processed in accordance with the review schedules outlined in Sections 4.2.2 and 4.2.3 of this Policy. An Administrative Policy will provide further detail about the proposed review and tiebreaking processes with the intent of furthering the goals of this Social Equity Policy.

### 4.2  Prioritization and Selection

#### 4.2.1  Prioritization Tiers

Based on the number of points accumulated through the voluntary commitments offered by the applicant, the application will be sorted into one of five Priority Tier categories for license and zoning application review/approvals and renewals:

| PRIORITY TIER | POINTS EARNED |
|---|---|
| 1 | 40+ |
| 2 | 30-39 |
| 3 | 20-29 |
| 4 | 10-19 |
| 5 | 0-9 |

#### 4.2.2  Selection of Applications

Land use applications that qualify for Director Review will be received between July 20-31, 2020 and reviewed for completeness and points. The applications will be tiered based on the total number of points from their equity commitments. An administrative policy will set procedures to rank applications within the same tier and break ties between applications with the same points. Once all the applications are tiered and ranked in order of number of points (highest to lowest) they will queued and processed as follows:

- August 2020: Review and processing of all Equity Applicants and Tier 1 applications. Equity Applicants are considered Tier 1 applicants and will be processed before applications Advancing Equity.
- September 2020: Review and processing of all Tier 2 and 3 applications.
- October 2020: Review and processing of all Tier 4 and 5 applications.

Applications submitted after July 31, 2020 will be reviewed after all applications in the queue have been reviewed and processed, but not before November 1, 2020.

Land use applications that qualify for Special Land Use review will be received between September 1-11, 2020 and reviewed for completeness and points. The applications will be ranked based on the total number of points from the equity commitments. An administrative policy will set procedures to rank applications within the same tier and break ties between applications with the same points. Once all the applications are ranked in order of number of points (highest to lowest), they will be queued for the next available Planning Commission meeting[9], based on the ranking. Equity Applicants are considered Tier 1 applicants and will be processed before Applications Advancing Equity. Applications submitted after September 11, 2020 will be reviewed after all applications in the queue have been reviewed and processed, but not before November 1, 2020.

Contingent on City Commission approval, land use applications for Microbusinesses or other cannabis uses that may be authorized in future City Commission actions will be received processed as follows:
- October 20-30, 2020: Application submission window for initial queuing.
- November 2-30, 2020: Applications will be reviewed for completeness and ranked based on the total number of points from the equity commitments. Once all the applications are ranked in order of number of points (highest to lowest), they will be queued for Planning Commission consideration.
- January 2021: Planning Commission review of applications using order of queue, highest ranking applications will be reviewed first.

## 5   LICENSE RENEWAL
All initial (year one) cannabis licenses issued by the City will be for a duration of one year. Upon renewal, license applicants have to ability to receive a multi-year license renewal if the following criteria are met:

| DURATION OF LICENSURE | ELIGIBILITY CRITERIA | FEES |
|---|---|---|
| 3-Year License | 1. Same business owner as for the previous license/renewal <br> 2. No orders or citations for violations of Chapter 105[10] and Chapter 175[11] or MMFLA Public Act 281[12]., and MRTMA Public Act 1[13]. Licensee arranges any inspection required by the City 90 days before the expiration of current license <br> 3. License renewed prior to expiration date of current license <br> 4. No outstanding fees/taxes on the property | 3-Year duration for a single license fee (66% savings/$10,000) |

---

[9] An application processed in August, September, or October may not necessarily be placed in the queue for Planning Commission meetings for that same month.
[10] "Cannabis Related Municipal Licensing",
[11] "Crime Prevention Through Environmental Design (CPTED) Ordinance"
[12] 2016, MCL 333.27101 et seq.
[13] 2018, MCL 333.27951 et seq.

| DURATION OF LICENSURE | ELIGIBILITY CRITERIA | FEES |
|---|---|---|
| | 5. Social equity program participation – standard 30 points or more<br>6. Evaluation of past social equity program performance | |
| 2-Year License | 1. Same business owner as for the previous license/renewal<br>2. Licensee arranges any inspection required by the City 90 days before the expiration of current license<br>3. License renewed prior to expiration date of current license<br>4. Any orders or citations for violations of Chapter 105[14] and Chapter 175[15] or MMFLA Public Act 281[16] and MRTMA Public Act 1[17] are brought into compliance before current license expires or by time stated on the order or citation<br>5. Social equity program participation –standard 20-29 points<br>6. Evaluation of past social equity program performance | 2-Year duration for a single license fee (50% savings/$5,000) |
| 1-Year License (Standard) | No social equity program participation or did not meet participation threshold 0-19 pts. | Standard fee ($5,000) |

## 6   REPORTING AND SANCTIONS
### 6.1   Reporting
Licensees will self-report on each social equity commitment on a quarterly basis in a format to be provided by the City. Reports will contain relevant information for each social equity commitment included in the application with sufficient detail to determine whether the applicant has adhered to the commitment(s) made in the initial application. The City will review all self-reports and determine whether the applicant complies with the commitment(s) made in the application.

Licensees that do not comply are expected to become compliant by the end of the next quarterly reporting period. Licensees that are out of compliance for more than one reporting period or fail to self-report within 30 days of the reporting deadline, are subject to the sanctions prescribed in Section 6.2 of this Policy.

Reporting and compliance requirements may be further articulated in Administrative Policies. Administrative Policies may establish an option for compliance to social equity commitments that contemplates transferring MIVEDA and CISEVA "points" from one category to another and establishing a fund, managed by directors of the City formed nonprofit.

### 6.2   Sanctions
The following sanctions will apply to any license holder that fails to meet the required commitments at any time, as determined by the City.
- Written warning (published list of businesses with violations)
- Opportunity to cure

---

[14] "Cannabis Related Municipal Licensing",
[15] "Crime Prevention Through Environmental Design (CPTED) Ordinance"
[16] 2016, MCL 333.27101 et seq.
[17] 2018, MCL 333.27951 et seq.

- Reduction in duration of licenses
- Report to the State if related to type of business activity licensed under the MRTMA or MMFLA
- Contractual remedies as may exist
- Revocation (for egregious violations)
- Zoning violations will be addressed under the zoning ordinance
- The City's existing municipal ordinances provide for administrative appeals procedures related to city code/ordinance violations and enforcement.

## 7 APPEALS AND EXCEPTIONS
### 7.1 Appeal of Administrative Decisions
Appeals will be heard according to procedures specified in the licensing ordinance

## 8 SEVERABILITY
### 8.1 Severability Clause
If any provisions of this Policy or any application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of this article which can be given effect without the invalid provisions or applications and are to this end declared to be severable.

**EXHIBIT 7**



# ADMINISTRATIVE POLICY

| | |
|---|---|
| **SUBJECT** | **CANNABIS INDUSTRY SOCIAL EQUITY COMPLIANCE** |
| **NUMBER** | 22-01        **DATE SIGNED:** 11/3/22 |
| **ISSUED BY** | Mark Washington, City Manager |
| **REVISED** | NA |
| **ASSOCIATED POLICIES** | City Commission Policies 900-58 and 900-59 |
| **CITY VALUES** | ☒ Accountability      ☐ Collaboration <br> ☒ Customer Service   ☒ Equity <br> ☐ Innovation           ☐ Sustainability |

**APPLICABILITY:**      All cannabis business operations that received land use approvals that are conditioned upon MIVEDA and/or CISEVA commitments.

**PURPOSE:**      To provide supplemental criteria for achieving compliance with the social equity commitments made by the medical and recreational cannabis industry.

## I. INTRODUCTION

Applicants for cannabis facilities voluntarily selected social equity commitments under City Commission Policies 900-58 "Marihuana Industry Voluntary Economic Development Agreement (MIVEDA)" and 900-59 "Cannabis Social Equity Policy" via the Cannabis Industry Social Equity Voluntary Agreement (CISEVA) form. This Administrative Policy serves as a tool to further articulate the process for achieving compliance with social equity commitments in the medical and recreational cannabis industries.

## II. GENERAL PROCEDURES

**(a)** Cannabis business applications accepted by the City can be accompanied by a MIVEDA and/or CISEVA form that is signed by the applicant and that has a declared number of points. Upon businesses receiving a zoning approval via a Special Land Use by the Planning Commission or Director Review, all of their MIVEDA and/or CISEVA commitments become conditions of approval and remain binding for as long as the cannabis use is active.

**(b)** Except as otherwise provided herein, all medical cannabis licensees are bound by any MIVEDA commitments made at that location and all recreational cannabis licensees are bound by any MIVEDA and/or CISEVA commitments made at that location.

(c) The City of Grand Rapids will verify adherence to MIVEDA commitments for a minimum of three (3) years, measured from the date of the cannabis facility license issuance by the State. Operators that are deemed fully compliant by the City, in accordance with MIVEDA Policy or this Administrative Policy, for a minimum of three (3) non-consecutive years shall not be required to show further compliance with MIVEDA commitments in future licensure years.

(d) Following the issuance of a State license, a local license issued by the City will match the expiration date of that State license. No person shall operate a cannabis establishment without a local license. Failure to honor the conditions of a cannabis zoning approval may result in revocation or nonrenewal of local licenses.

## III. *SOCIAL EQUITY DOCUMENTATION*

(a) Cannabis business shall submit official business documentation, certified by a principal, CEO, or counsel of record and notarized, to report on social equity performance. All documentation shall be specific to that business location.

(b) Documentation of MIVEDA performance shall be consistent with the following criteria:

1. Local Residency (commitments 1-A, 1- B, 1-C, and 1-D)
   - Entire ownership structure of the cannabis business, indicating the percentage of ownership that meets the selected commitment(s)
   - Proof of residency of all members that comprise the selected commitment(s)

2. Employment (commitments 2-A, 2-C)
   - Payroll journals and/or internal business records, deidentified when applicable, indicating the percentages that meet the selected commitment(s)
   - Photocopies of employee(s) drivers' license or state identification cards

3. MLBE Participation (commitment 2-B)
   - Schedule of Values provided by a General Contractor, or the equivalent, indicating the percentage of participation by City-certified MLBEs in the buildout of the facility, or the period between the date of initial zoning approval and the date of beginning of operations
   - Vendor invoices, contracts, and/or proof of payment to City-certified MLBEs

(c) Documentation of CISEVA performance shall be consistent with the following criteria and the Cannabis Social Equity Policy:

1. Local Ownership
   - Entire ownership structure of the cannabis business or underlying real estate, indicating the percentage of Resident Owners that meet the selected commitment(s)
   - Proof of residency of all members that comprise the selected commitment(s)

2. Workforce Diversity
   - Internal business records, deidentified when applicable, indicating the percentage of the workforce that meets the selected commitment(s)
   - Proof of employees meeting not less than one (1) of six (6) Equity Applicant criteria

3. Supplier Diversity
   - Entire operating budget or balance sheet of the business, or the equivalent, indicating the percentage of costs spent with City-certified MBEs, MLBEs, and WBEs. Costs under this commitment exclude the items listed below:
     - ✓ Utilities
     - ✓ Taxes, including federal, state, property, and cannabis excise taxes
     - ✓ Employee wages, including all W-2 full- and part-time employees
     - ✓ Employee benefits
   - Vendor invoices, contracts, and/or proof of payment to City-certified MBEs, MLBEs, and WBEs
4. New Business Development
   - Internal business records of mentorship and/or incubator agreements
   - Records of program outcomes, if applicable

(d) Under some circumstances, City staff may require more additional sets of social equity documentation.

## IV. *QUARTERLY SELF-REPORTING*

(a) Cannabis businesses shall self-report compliance with MIVEDA and/or CISEVA commitments on a quarterly basis using a form provided by the City. A self-reporting form shall only include documentation of MIVEDA and/or CISEVA performance within that period.

(b) A self-reporting form shall be submitted to the City prior to the end of the following quarterly periods:
1. January 1-March 31
2. April 1-June 30
3. July 1-September 30
4. October 1-December 31

(c) Failure to submit a quarterly self-reporting form within the allowed periods may result in all social equity performance from that period not being considered for the social equity report accompanying an annual City inspection in accordance with this Policy.

## V. *ANNUAL CITY INSPECTION*

(a) Prior to the expiration of a local and/or State license, the City shall conduct an inspection of the cannabis business. The inspection shall be scheduled close to thirty (30) days from the license expiration date and shall cover the most recent licensure period at that location, not to exceed one (1) year. Facilities holding multiple licenses at the same location, including medical and/or recreational local and/or State licenses, shall be scheduled for an inspection based on the license with the earliest expiration date in a calendar year.

(b) An annual City inspection will include an evaluation of social equity compliance. Prior to the inspection, the business shall submit a report of social equity compliance in the most recent year of licensure. The report shall remain consistent with the quarterly self-reporting forms previously submitted to the City in the same period. A quarterly

self-reporting form shall not replace a social equity evaluation from an annual inspection.

(c) Upon conclusion of the annual inspection, the City will determine whether the business has complied with all commitments made under MIVEDA and/or CISEVA. Compliance with CISEVA shall not apply to businesses within their first year of recreational operation. Otherwise, the City may begin local enforcement action in accordance with this Policy.

## VI.   PARTIAL SOCIAL EQUITY PERFORMANCE

(a) Cannabis businesses that anticipate an ability to partially comply with social equity commitments by the date of an annual City inspection may be awarded partial compliance credit for the following social equity categories:
- MIVEDA Local Residency
- MIVEDA Employment
- MIVEDA MLBE Participation
- CISEVA Local Ownership
- CISEVA Workforce Diversity
- CISEVA Supplier Diversity

(b) Partial credit shall equate to a level of performance of not less than fifty percent (50%) of the original category. Facilities shall submit all documentation demonstrating partial compliance with the commitment(s) within that year of licensure, along with a notarized statement by the CEO, principal, or counsel of record attesting to the level of partial compliance, with the social equity report to be submitted prior to an annual City inspection.

(c) The City shall make a determination on partial credit in advance of an annual inspection. The City may consider partial credit documented in quarterly self-reporting forms submitted within the same year of licensure. Social equity performance that remains incomplete shall return to compliance using a transfer request in accordance with this Policy.

## VII.   SOCIAL EQUITY TRANSFER OPTION

(a) Cannabis businesses that anticipate an inability to comply with social equity commitments, including performance deemed incomplete following an approval of partial credit, by the date of an annual City inspection shall attach a thorough description of the reason(s) for noncompliance, using exact performance indicators when applicable, to a quarterly self-reporting form.

(b) Beginning on January 1, 2023, cannabis operators may submit one (1) annual request to transfer social equity points using a form provided by the City. Transfer request forms shall be signed by the principal, CEO, and/or counsel of record and notarized and attached to a quarterly self-reporting form. No transfer requests shall be accepted at an annual City inspection.

(c) The City shall make a determination on a transfer request in advance of an annual inspection. Once approved by the City, a transfer shall become binding for the

performance period requested to the City. A transfer request expires on the first day of operations under a renewed State and/or local license. Cannabis operators shall return to their original MIVEDA and/or CISEVA commitments at the end of the performance period.

(d) Businesses may move unweighted CISEVA points from one category to another, except for any points originally offered under the New Business Development and/or Community Reinvestment Fund categories. A CISEVA category that receives points shall not increase its unweighted points total to a number greater than three (3), except for the Community Reinvestment Fund category.

(e) The CISEVA Community Reinvestment Fund may receive an unlimited number of unweighted points. Each CISEVA point transferred to the Community Reinvestment Fund shall equate to a donation of not less than one half of a percentage point (0.50%) of the business' annual gross sales.

(f) Businesses may move MIVEDA points to the CISEVA Community Reinvestment Fund. Each MIVEDA point transferred to the Community Reinvestment Fund shall equate to a donation of not less than one fourth of a percentage point (0.25%) of the business' annual gross sales.

(g) Facilities may request new transfers in subsequent years using the same process as provided herein. Businesses that fail to honor all transfer request commitments by the end of the performance period shall become ineligible to submit future transfer requests to the City.

## VIII.   COMMUNITY REINVESTMENT FUND CONSIDERATIONS

(a) Annual gross sales are defined as the grand total of sales transactions by all licensed cannabis operations on a City-approved parcel, minus local and State taxes, within the most recent calendar year.

(b) Following City approval of a MIVEDA points transfer to the Community Reinvestment Fund, the financial contribution shall be capped at one percentage point (1.0%). Operators deemed in compliance with MIVEDA by the City for a minimum of three (3) non-consecutive years shall not be required to make future contributions to the Community Reinvestment Fund.

(c) Following City approval of a CISEVA points transfer to the Community Reinvestment Fund, the financial contribution shall be capped at two percentage points (2.0%). This cap is not applicable to commitments previously offered to the Community Reinvestment Fund in the initial zoning approval.

(d) All contributions to the Community Reinvestment Fund shall be honored once a City-approved nonprofit in charge of managing the Fund is formed and eligible to receive funds. The nonprofit may establish a payment plan for operators, which may extend beyond the end of the performance period approved by the City. The nonprofit shall communicate to the City by the end of a business' performance period whether the operator is in good standing with their obligations, either from original commitments or transfer requests.

## IX. CONSEQUENCES OF SOCIAL EQUITY NONCOMPLIANCE

(a) Failure to maintain voluntary commitments resulting in violations of social equity compliance observed during an annual City Inspection may result in the City issuing the cannabis business a Notice of Violation indicating noncompliance with social equity commitments. Absent extraordinary circumstances justifying an extension, the business will be expected to become fully compliant within the following quarterly period from the date of the Notice of Violation.

(b) The City may conduct supplemental inspections, during business hours, to verify adherence with social equity elements from the most recent annual inspection. Reports from these inspections shall be considered additional documentation for the next scheduled annual inspection at that location. A supplemental inspection shall not replace an annual City Inspection.

(c) Businesses that remain out of compliance following the time allotted to resolve the violation will be reported to the State, in line with State procedures for licensure and renewals, and subject to local enforcement action, including, but not limited to:
   1. Fines
   2. Denial of Certificate of Occupancy and/or final permit for future expansions of the cannabis facility
   3. Denial of local license renewals
   4. Revocation of current local licenses
   5. Any other penalties or remedies available via city ordinance, at law, or in equity.

(d) Operators who are facing enforcement or appeals proceedings may resolve their matter with an agreement to transfer their points in accordance with this Policy.

## X. APPEALS PROCESS

(a) If a license issued by the City is under threat of suspension or revocation for cause by the City Clerk[1] (for reasons spelled out in Chapter 105 of the code related to Cannabis Business Licensure) a hearing shall be scheduled by the City Manager or the City Manager's designee or issuing authority.

(b) The holder of the license or permit shall be notified of the time, date and place of the hearing and shall be notified of the reason or reasons for the proposed suspension or revocation. The license or permit holder shall be entitled to be represented by counsel, to submit evidence, to cross-examine testifying witnesses, and to make arguments concerning the factual and legal issues. The hearing officer or body shall render a written decision stating the reasons for the decision.

(c) In any hearing held pursuant to the provisions of this Chapter, the rules of evidence shall be followed as far as practicable, but a hearing officer or body may admit and give probative effect to evidence of a type commonly relied upon by reasonably prudent people in the conduct of their affairs. Irrelevant, immaterial or unduly repetitious evidence may be excluded. Notice may be taken of facts within the general knowledge of the community.

---

[1] Title VII, Chapter 91, Sec. 7.14 – 7.16

**(d)** Any person dissatisfied with the decision of the City Manager or other appropriate hearing officer, or body may appeal to the City Commission, provided that a written request for such an appeal shall be filed within seven (7) days of the date of the decision to be appealed. The City Commission shall schedule a hearing on the appeal within eight (8) days of the receipt of the request for appeal by the City Clerk. Argument as to relevant factual and legal issues shall be permitted. The decision of the City Commission shall be by majority vote. The Commission may affirm, reverse or modify any action taken relative to a license. The decision of the City Commission shall be final.

**EXHIBIT 8**



**CITY OF GRAND RAPIDS**

**Cannabis Recreational Grower Class C**

**(616) 456-4100**

# INVOICE

**CUSTOMER #:** LIC-C-RGCC-0025
**INVOICE #:** 1000476862
**LAST SERVICE DATE:** 10/20/2020
**INVOICE DATE:** 09/29/2023
**DUE DATE:** 10/29/2023
**Property Inspected / Serviced**
1213 PHILLIPS AVE SW
**Assigned Staff:**
**Phone #:**
**Record #:** LIC-C-RGCC-0025

FLURESH, LLC
CHRIS ANDERSON
1213 PHILLIPS AVE SW
GRAND RAPIDS, MI 60022

| Description of Service | Amount |
|---|---|
| Social Equity Transfer Option - Seeding Justice Fund Contribution | $65,984.53 |
| **Total Amount Due** | **$65,984.53** |

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

| | MAKE CHECKS PAYABLE AND MAIL PAYMENT TO: |
|---|---|
| Customer #: LIC-C-RGCC-0025 | |
| Service Address: 1213 PHILLIPS AVE SW | GRAND RAPIDS CITY TREASURER |
| Invoice #: 1000476862 | ROOM 220 CITY HALL |
| Service Date: 10/20/2020 | 300 MONROE AVE NW |
| Invoice Date: 09/29/2023 | GRAND RAPIDS, MI 49503-2296 |

FLURESH, LLC
CHRIS ANDERSON
1213 PHILLIPS AVE SW
GRAND RAPIDS, MI 60022

| **Due Date:** | **10/29/2023** |
|---|---|
| **Amount Due:** | **$65,984.53** |

1000476862 006598453 6

**EXHIBIT 9**



**CITY OF GRAND RAPIDS**

## Cannabis Recreational Grower Class C
### (616) 456-4100

# INVOICE

**CUSTOMER #:** LIC-C-RGCC-0024
**INVOICE #:** 1000500969
**LAST SERVICE DATE:** 10/20/2020
**INVOICE DATE:** 06/26/2024
**DUE DATE:** 07/26/2024
**Property Inspected / Serviced**
1213 PHILLIPS AVE SW
**Assigned Staff:**
**Phone #:**
**Record #:** LIC-C-RGCC-0024

THORNAPPLE RIVER CAPITAL
BRANDON J. KANITZ
320 HALL ST SW
GRAND RAPIDS, MI 49507

| Description of Service | Amount |
|---|---|
| Social Equity Transfer Option – Seeding Justice Fund Contribution | $344,785.38 |
| **Total Amount Due** | **$344,785.38** |

---

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

| | |
|---|---|
| Customer #: LIC-C-RGCC-0024 | **MAKE CHECKS PAYABLE AND MAIL PAYMENT TO:** |
| Service Address: 1213 PHILLIPS AVE SW | GRAND RAPIDS CITY TREASURER |
| Invoice #: 1000500969 | ROOM 220 CITY HALL |
| Service Date: 10/20/2020 | 300 MONROE AVE NW |
| Invoice Date: 06/26/2024 | GRAND RAPIDS, MI 49503-2296 |
| THORNAPPLE RIVER CAPITAL BRANDON J. KANITZ 320 HALL ST SW GRAND RAPIDS, MI 49507 | **Due Date:** 7/26/2024 **Amount Due:** $344,785.38 |

1000500969 034478538 9

**EXHIBIT 10**



**CITY OF GRAND RAPIDS**

**Cannabis Adult Use Retailer**
**(616) 456-4100**

# INVOICE

**CUSTOMER #:** LIC-C-AUR-0038
**INVOICE #:** 1000489677
**LAST SERVICE DATE:** 06/15/2021
**INVOICE DATE:** 02/21/2024
**DUE DATE:** 03/22/2024
**Property Inspected / Serviced**
2900 DIVISION AVE S
**Assigned Staff:**
**Phone #:**
**Record #:** LIC-C-AUR-0038

THE DISTRICT PARK, LLC
NATHAN KARK
10070 HARVEST PARK  DIMONDALE MI
48821
DIMONDALE, MI 48821

| Description of Service | Amount |
|---|---|
| Social Equity Transfer Option - Seeding Justice Fund Contribution | $271,780.04 |
| **Total Amount Due**   Skymint/3 Fifteen - 2022/2023 Transfer | **$271,780.04** |

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

| | |
|---|---|
| Customer #: LIC-C-AUR-0038 | **MAKE CHECKS PAYABLE AND MAIL PAYMENT TO:** |
| Service Address: 2900 DIVISION AVE S | GRAND RAPIDS CITY TREASURER |
| Invoice #: 1000489677 | ROOM 220 CITY HALL |
| Service Date: 06/15/2021 | 300 MONROE AVE NW |
| Invoice Date: 02/21/2024 | GRAND RAPIDS, MI 49503-2296 |

THE DISTRICT PARK, LLC
NATHAN KARK
10070 HARVEST PARK  DIMONDALE MI 48821
DIMONDALE, MI 48821

| | |
|---|---|
| **Due Date:** | **3/22/2024** |
| **Amount Due:** | **$271,780.04** |

1000489677 027178004 3

# EXHIBIT 11



**CITY OF GRAND RAPIDS**

**Cannabis Adult Use Retailer**
**(616) 456-4100**

# INVOICE

**CUSTOMER #:** LIC-C-AUR-0038
**INVOICE #:** 1000494958
**LAST SERVICE DATE:** 06/15/2021
**INVOICE DATE:** 04/22/2024
**DUE DATE:** 05/22/2024
**Property Inspected / Serviced**
2900 DIVISION AVE S
**Assigned Staff:**
**Phone #:**
**Record #:** LIC-C-AUR-0038

THE DISTRICT PARK, LLC
NATHAN KARK
10070 HARVEST PARK  DIMONDALE MI
48821
DIMONDALE, MI 48821

| Description of Service | Amount |
|---|---|
| Social Equity Transfer Option - Seeding Justice Fund Contribution | $271,780.04 |
| **Total Amount Due**    Skymint/3 Fifteen - 2022/2023 Transfers | **$271,780.04** |

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

Customer #: LIC-C-AUR-0038

Service Address: 2900 DIVISION AVE  S

Invoice #: 1000494958

Service Date: 06/15/2021

Invoice Date: 04/22/2024

THE DISTRICT PARK, LLC
NATHAN KARK
10070 HARVEST PARK  DIMONDALE MI 48821
DIMONDALE, MI 48821

**MAKE CHECKS PAYABLE AND MAIL PAYMENT TO:**

GRAND RAPIDS CITY TREASURER
ROOM 220 CITY HALL
300 MONROE AVE NW
GRAND RAPIDS, MI 49503-2296

| Due Date: | 5/22/2024 |
|---|---|
| **Amount Due:** | **$271,780.04** |

1000494958 027178004 0

**EXHIBIT 12**



**CITY OF GRAND RAPIDS**

**Cannabis Adult Use Retailer**
**(616) 456-4100**

# INVOICE

**CUSTOMER #:** LIC-C-AUR-0091
**INVOICE #:** 1000518652
**LAST SERVICE DATE:** 11/27/2024
**INVOICE DATE:** 01/16/2025
**DUE DATE:** 02/15/2025
**Property Inspected / Serviced**
3423 PLAINFIELD AVE NE
**Assigned Staff:**
**Phone #:**
**Record #:** LIC-C-AUR-0091

SKYMINT BRANDS
JEFFREY DONAHUE
5 RESEARCH DRIVE
ANN ARBOR, MI 48103

| Description of Service | Amount |
|---|---|
| Social Equity Transfer Option - Community Reinvestment Fund Contribution | $130,392.16 |
| **Total Amount Due** | **$130,392.16** |

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

| | |
|---|---|
| Customer #: LIC-C-AUR-0091 | **MAKE CHECKS PAYABLE AND MAIL PAYMENT TO:** |
| Service Address: 3423 PLAINFIELD AVE NE | |
| Invoice #: 1000518652 | GRAND RAPIDS CITY TREASURER |
| Service Date: 11/27/2024 | ROOM 220 CITY HALL |
| Invoice Date: 01/16/2025 | 300 MONROE AVE NW |
| | GRAND RAPIDS, MI 49503-2296 |
| SKYMINT BRANDS | |
| JEFFREY DONAHUE | |
| 5 RESEARCH DRIVE | |
| ANN ARBOR, MI 48103 | |

| | |
|---|---|
| **Due Date:** | **2/15/2025** |
| **Amount Due:** | **$130,392.16** |

**EXHIBIT 13**



CITY OF
GRAND
RAPIDS

**Cannabis Adult Use Retailer**
**(616) 456-4100**

# INVOICE

**CUSTOMER #:** LIC-C-AUR-0090
**INVOICE #:** 1000518646
**LAST SERVICE DATE:** 11/21/2024
**INVOICE DATE:** 01/16/2025
**DUE DATE:** 02/15/2025
**Property Inspected / Serviced**
2900 DIVISION AVE S
**Assigned Staff:**
**Phone #:**
**Record #:** LIC-C-AUR-0090

SKYMINT BRANDS
JEFFREY DONAHUE
5 RESEARCH DRIVE
ANN ARBOR, MI 48103

| Description of Service | Amount |
|---|---|
| Social Equity Transfer Option - Community Reinvestment Fund Contribution | $206,712.71 |
| **Total Amount Due** | **$206,712.71** |

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

Customer #: LIC-C-AUR-0090

Service Address: 2900 DIVISION AVE S

Invoice #: 1000518646

Service Date: 11/21/2024

Invoice Date: 01/16/2025

SKYMINT BRANDS
JEFFREY DONAHUE
5 RESEARCH DRIVE
ANN ARBOR, MI 48103

**MAKE CHECKS PAYABLE AND MAIL PAYMENT TO:**

GRAND RAPIDS CITY TREASURER
ROOM 220 CITY HALL
300 MONROE AVE NW
GRAND RAPIDS, MI 49503-2296

| Due Date: | 2/15/2025 |
|---|---|
| **Amount Due:** | **$206,712.71** |

1000518646 020671271 0

**EXHIBIT 14**



CITY OF GRAND RAPIDS

**Cannabis Adult Use Retailer**
**(616) 456-4100**

# INVOICE

CUSTOMER #: LIC-C-AUR-0033
INVOICE #: 1000486285
LAST SERVICE DATE: 04/05/2021
INVOICE DATE: 01/08/2024
DUE DATE: 02/07/2024

Property Inspected / Serviced
1336 SCRIBNER AVE NW
Assigned Staff:
Phone #:

Record #: LIC-C-AUR-0033

FPAW MICHIGAN, LLC DBA ASCEND
CANNABIS GROUP
FRANCIS PERULLO
2741 28TH ST SE
GRAND RAPIDS, MI 49504

| Description of Service | Amount |
|---|---|
| Social Equity Transfer Option - Seeding Justice Fund Contribution | $75,445.74 |
| **Total Amount Due** | **$75,445.74** |

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

| | |
|---|---|
| Customer #: LIC-C-AUR-0033 | **MAKE CHECKS PAYABLE AND MAIL PAYMENT TO:** |
| Service Address: 1336 SCRIBNER AVE NW | GRAND RAPIDS CITY TREASURER |
| Invoice #: 1000486285 | ROOM 220 CITY HALL |
| Service Date: 04/05/2021 | 300 MONROE AVE NW |
| Invoice Date: 01/08/2024 | GRAND RAPIDS, MI 49503-2296 |
| FPAW MICHIGAN, LLC DBA ASCEND CANNABIS GROUP | |
| FRANCIS PERULLO | **Due Date:** 2/7/2024 |
| 2741 28TH ST SE | **Amount Due:** $75,445.74 |
| GRAND RAPIDS, MI 49504 | |

1000486285 007544574 5

**EXHIBIT 15**



**Cannabis Adult Use Retailer**
**(616) 456-4100**

# INVOICE

| | |
|---|---|
| **CUSTOMER #:** | LIC-C-AUR-0043 |
| **INVOICE #:** | 1000486283 |
| **LAST SERVICE DATE:** | 10/04/2021 |
| **INVOICE DATE:** | 01/08/2024 |
| **DUE DATE:** | 02/07/2024 |

**Property Inspected / Serviced**
2741 28TH ST SE

**Assigned Staff:**

**Phone #:**

**Record #:** LIC-C-AUR-0043

FPAW MICHIGAN, LLC DBA ASCEND
CANNABIS GROUP
FRANCIS PERULLO
2741 28TH ST SE
GRAND RAPIDS, MI 49504

| Description of Service | Amount |
|---|---|
| Social Equity Transfer Option - Seeding Justice Fund Contribution | $66,941.54 |
| **Total Amount Due** | **$66,941.54** |

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

| | |
|---|---|
| Customer #: LIC-C-AUR-0043 | **MAKE CHECKS PAYABLE AND MAIL PAYMENT TO:** |
| Service Address: 2741 28TH ST SE | GRAND RAPIDS CITY TREASURER |
| Invoice #: 1000486283 | ROOM 220 CITY HALL |
| Service Date: 10/04/2021 | 300 MONROE AVE NW |
| Invoice Date: 01/08/2024 | GRAND RAPIDS, MI 49503-2296 |
| FPAW MICHIGAN, LLC DBA ASCEND CANNABIS GROUP FRANCIS PERULLO 2741 28TH ST SE GRAND RAPIDS, MI 49504 | **Due Date:** 2/7/2024 |
| | **Amount Due:** $66,941.54 |

1000486283 006694154 2

# EXHIBIT 16



**CITY OF GRAND RAPIDS**

**Cannabis Adult Use Retailer**
**(616) 456-4100**

# INVOICE

**CUSTOMER #:** LIC-C-AUR-0033
**INVOICE #:** 1000517167
**LAST SERVICE DATE:** 04/05/2021
**INVOICE DATE:** 12/26/2024
**DUE DATE:** 01/25/2025
**Property Inspected / Serviced**
1336 SCRIBNER AVE NW
**Assigned Staff:**
**Phone #:**
**Record #:** LIC-C-AUR-0033

FPAW MICHIGAN, LLC DBA ASCEND
CANNABIS GROUP
FRANCIS PERULLO
2741 28TH ST SE
GRAND RAPIDS, MI 49504

| Description of Service | Amount |
|---|---|
| Social Equity Commitment - Community Reinvestment Fund Contribution | $158,123.96 |
| Social Equity Transfer Option - Community Reinvestment Fund Contribution | $79,061.98 |
| **Total Amount Due** | **$237,185.94** |

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

| | |
|---|---|
| Customer #: LIC-C-AUR-0033 | **MAKE CHECKS PAYABLE AND MAIL PAYMENT TO:** |
| Service Address: 1336 SCRIBNER AVE NW | GRAND RAPIDS CITY TREASURER |
| Invoice #: 1000517167 | ROOM 220 CITY HALL |
| Service Date: 04/05/2021 | 300 MONROE AVE NW |
| Invoice Date: 12/26/2024 | GRAND RAPIDS, MI 49503-2296 |
| FPAW MICHIGAN, LLC DBA ASCEND CANNABIS GROUP | |
| FRANCIS PERULLO | **Due Date:** 1/25/2025 |
| 2741 28TH ST SE | **Amount Due:** $237,185.94 |
| GRAND RAPIDS, MI 49504 | |

1000517167 023718594 4

# EXHIBIT 17



**CITY OF GRAND RAPIDS**

**Cannabis Adult Use Retailer**

**(616) 456-4100**

# INVOICE

**CUSTOMER #:** LIC-C-AUR-0043
**INVOICE #:** 1000517158
**LAST SERVICE DATE:** 10/04/2021
**INVOICE DATE:** 12/26/2024
**DUE DATE:** 01/25/2025
**Property Inspected / Serviced**
2741 28TH ST SE
**Assigned Staff:**
**Phone #:**

**Record #:** LIC-C-AUR-0043

FPAW MICHIGAN, LLC DBA ASCEND
CANNABIS GROUP
FRANCIS PERULLO

2741 28TH ST SE
GRAND RAPIDS, MI 49504

| Description of Service | Amount |
|---|---|
| Social Equity Transfer Option - Community Reinvestment Fund Contribution | $59,981.95 |
| **Total Amount Due** | **$59,981.95** |

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

Customer #: LIC-C-AUR-0043

Service Address: 2741 28TH ST  SE

Invoice #: 1000517158

Service Date: 10/04/2021

Invoice Date: 12/26/2024

FPAW MICHIGAN, LLC DBA ASCEND CANNABIS
GROUP
FRANCIS PERULLO
2741 28TH ST SE
GRAND RAPIDS, MI 49504

**MAKE CHECKS PAYABLE AND MAIL PAYMENT TO:**

GRAND RAPIDS CITY TREASURER
ROOM 220 CITY HALL
300 MONROE AVE NW
GRAND RAPIDS, MI 49503-2296

| **Due Date:** | **1/25/2025** |
|---|---|
| **Amount Due:** | **$59,981.95** |

1000517158 005998195 6

EXHIBIT 18



CITY OF
GRAND
RAPIDS

**Cannabis Adult Use Retailer**
**(616) 456-4100**

# INVOICE

CUSTOMER #: LIC-C-AUR-0046
INVOICE #: 1000486274
LAST SERVICE DATE: 10/15/2021
INVOICE DATE: 01/08/2024
DUE DATE: 02/07/2024
Property Inspected / Serviced
2301 44TH ST SE
Assigned Staff:
Phone #:
Record #: LIC-C-AUR-0046

QPS HOLDINGS LLC
ANKUR RUNGTA
4420 VARSITY DRIVE
ANN ARBOR, MI 48108

| Description of Service | Amount |
|---|---|
| Social Equity Transfer Option - Seeding Justice Fund Contribution | $27,008.89 |
| Total Amount Due | $27,008.89 |

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

| | |
|---|---|
| Customer #: LIC-C-AUR-0046 | **MAKE CHECKS PAYABLE AND MAIL PAYMENT TO:** |
| Service Address: 2301 44TH ST SE | GRAND RAPIDS CITY TREASURER |
| Invoice #: 1000486274 | ROOM 220 CITY HALL |
| Service Date: 10/15/2021 | 300 MONROE AVE NW |
| Invoice Date: 01/08/2024 | GRAND RAPIDS, MI 49503-2296 |
| QPS HOLDINGS LLC | |

| | | |
|---|---|---|
| QPS HOLDINGS LLC | **Due Date:** | **2/7/2024** |
| ANKUR RUNGTA | | |
| 4420 VARSITY DRIVE | **Amount Due:** | **$27,008.89** |
| ANN ARBOR, MI 48108 | | |

1000486274 002700889 2

EXHIBIT 19



**CITY OF GRAND RAPIDS**

**Cannabis Adult Use Retailer**
**(616) 456-4100**

# INVOICE

**CUSTOMER #:** LIC-C-AUR-0048
**INVOICE #:** 1000486281
**LAST SERVICE DATE:** 10/18/2021
**INVOICE DATE:** 01/08/2024
**DUE DATE:** 02/07/2024
**Property Inspected / Serviced**
1148 LEONARD ST NW
**Assigned Staff:**
**Phone #:**
**Record #:** LIC-C-AUR-0048

QPS HOLDINGS LLC
ANKUR RUNGTA
4420 VARSITY DRIVE
ANN ARBOR, MI 48108

| Description of Service | Amount |
|---|---|
| Social Equity Transfer Option - Seeding Justice Fund Contribution | $13,498.17 |
| **Total Amount Due** | **$13,498.17** |

---

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

Customer #: LIC-C-AUR-0048

Service Address: 1148 LEONARD ST NW

Invoice #: 1000486281

Service Date: 10/18/2021

Invoice Date: 01/08/2024

QPS HOLDINGS LLC
ANKUR RUNGTA
4420 VARSITY DRIVE
ANN ARBOR, MI 48108

**MAKE CHECKS PAYABLE AND MAIL PAYMENT TO:**

GRAND RAPIDS CITY TREASURER
ROOM 220 CITY HALL
300 MONROE AVE NW
GRAND RAPIDS, MI 49503-2296

| | |
|---|---|
| **Due Date:** | **2/7/2024** |
| **Amount Due:** | **$13,498.17** |

1000486281 001349817 1

**EXHIBIT 20**



CITY OF
GRAND
RAPIDS

**Cannabis Adult Use Retailer**
**(616) 456-4100**

# INVOICE

CUSTOMER #: LIC-C-AUR-0048
INVOICE #: 1000493004
LAST SERVICE DATE: 10/18/2021
INVOICE DATE: 03/29/2024
DUE DATE: 04/28/2024
Property Inspected / Serviced
1148 LEONARD ST NW
Assigned Staff:
Phone #:
Record #: LIC-C-AUR-0048

QPS HOLDINGS LLC
ANKUR RUNGTA
4420 VARSITY DRIVE
ANN ARBOR, MI 48108

| Description of Service | Amount |
|---|---|
| Social Equity Transfer Option - Seeding Justice Fund Contribution | $83,204.24 |
| Total Amount Due | $83,204.24 |

**Return This Portion Of The Bill With Your Payment - Please Include Record # And Invoice # On Your Check**

Customer #: LIC-C-AUR-0048

Service Address: 1148 LEONARD ST NW

Invoice #: 1000493004

Service Date: 10/18/2021

Invoice Date: 03/29/2024

QPS HOLDINGS LLC
ANKUR RUNGTA
4420 VARSITY DRIVE
ANN ARBOR, MI 48108

**MAKE CHECKS PAYABLE AND MAIL PAYMENT TO:**

GRAND RAPIDS CITY TREASURER
ROOM 220 CITY HALL
300 MONROE AVE NW
GRAND RAPIDS, MI 49503-2296

| Due Date: | 4/28/2024 |
|---|---|
| Amount Due: | $83,204.24 |

1000493004 008320424 7

# EXHIBIT 21



# CITY OF GRAND RAPIDS

## Citizen Access

🔍 Search...   

Home   Permits   Registration   Planning   Economic   Enforcement   Grants   **Business**

🗂 Apply for a License      📋 Search Licenses

Listed below are preliminary fees based upon the information you've entered. Some fees are based on the quantity of work items installed or repaired. Enter quantities where applicable. The following screen will display your total fees.

### Application Fees

| Fees | Qty. | Amount |
|---|---|---|
| Social Equity Transfer Option - Seeding Justice Fund Contribution | 344785.38 | $344,785.38 |

**TOTAL FEES: $344,785.38**
Note: This does not include additional inspection fees which may be assessed later.

**Check Out »**

City Of Grand Rapids • Grand Rapids Permits Map

**EXHIBIT 22**

City of Grand Rapids

🏠 Home   🔍 Search ▾   + New ▾

Announcements   Logged in as:Stacia Lyons   Collections (0)   🛒 Cart (0)   Account Management   Logout

# Citizen Access

Search....   

**Home**   **Permits**   **Registration**   **Planning**   **Economic**   **Enforcement**   **Grants**   Business ▸

📋 Apply for a License      🔳 Search Licenses



Listed below are preliminary fees based upon the information you've entered. Some fees are based on the quantity of work items installed or repaired. Enter quantities where applicable. The following screen will display your total fees.

## Application Fees

| Fees | Qty. | Amount |
|------|------|--------|
| Social Equity Transfer Option - Seeding Justice Fund Contribution | 75445.74 | $75,445.74 |

**TOTAL FEES: $75,445.74**
Note: This does not include additional inspection fees which may be assessed later.

Check Out »      Continue Shopping »

**EXHIBIT 23**

City of Grand Rapids

Home  Q Search ▾  + New ▾

Announcements   Logged in as:Stacia Lyons   Collections (0)   🛒 Cart (0)   Account Management   Logout

# Citizen Access



Search…

Home   Permits   Registration   Planning   Economic   Enforcement   Grants   Business

Apply for a License    Search Licenses

Listed below are preliminary fees based upon the information you've entered. Some fees are based on the quantity of work items installed or repaired. Enter quantities where applicable. The following screen will display your total fees.

### Application Fees

| Fees | Qty. | Amount |
|---|---|---|
| Social Equity Transfer Option - Seeding Justice Fund Contribution | 66941.54 | $66,941.54 |

**TOTAL FEES: $66,941.54**
Note: This does not include additional inspection fees which may be assessed later.

Check Out »    Continue Shopping »

# EXHIBIT 24



# Citizen Access



| Search... | 🔍 ▾ |
|---|---|

**Home    Permits    Registration    Planning    Economic    Enforcement    Grants**

Business
▾

💼 **Apply for a License**        📊 **Search Licenses**

Listed below are preliminary fees based upon the information you've entered. Some fees are based on the quantity of work items installed or repaired. Enter quantities where applicable. The following screen will display your total fees.

## Application Fees

| Fees | Qty. | Amount |
|---|---|---|
| Social Equity Transfer Option – Community Reinvestment Fund Contribution | 79061.98 | $79,061.98 |
| Social Equity Commitment – Community Reinvestment Fund Contribution | 158123.96 | $158,123.96 |

**TOTAL FEES: $237,185.94**
Note: This does not include additional inspection fees which may be assessed later.

Check Out »        Continue Shopping »

**City Of Grand Rapids • Grand Rapids Permits Map**

**EXHIBIT 25**



# Citizen Access

Search...   🔍

Home   Permits   Registration   Planning   Economic   Enforcement   Grants   Business

🎒 Apply for a License        🔢 Search Licenses

## Record LIC-C-AUR-0046:

**Add to cart**
**Add to collection**

### Cannabis Adult Use Retailer

**Record Status: About to Expire**
**Expiration Date: 04/22/2025**

Record Info ▼          Payments ▼

### Fees

**Paid:**

| Date | Invoice Number | Amount |
|------|----------------|--------|
| 06/26/2024 | 1000500968 | $126,416.66 |
| 01/08/2024 | 1000486274 | $27,008.89 |
| 11/29/2021 | 1000412578 | $1,973.00 |

*Total paid fees: $157,398.55*