UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

FLURESH, LLC, FPAW MICHIGAN
LLC, QPS MICHIGAN HOLDINGS,
LLC, FISH LADDER HOLDLINGS,
LLC, THE DISTRICT PARK, LLC,
GREEN SKIES-HEALING TREE, LLC,
all Michigan limited liability companies,

     Plaintiffs,

v.                                                               Civil Action No. 1:25-cv-0252

                                              Hon. Hala Y. Jarbou

CITY OF GRAND RAPIDS,
A Michigan municipal corporation,

     Defendant.

| | |
|---|---|
| William L. Thompson (P80123) | Elizabeth J. Fossel (P41430) |
| Justin M. Wolber (P85728) | Sarah J. Hartman (P71458) |
| Julia S. Moran (P87914) | *Attorneys for Defendants* |
| Varnum LLP | City of Grand Rapids Law Department |
| *Attorneys for Plaintiff* | 300 Monroe Ave. NW, Ste. 620 |
| 480 Pierce St., Ste. 300 | Grand Rapids, MI 49503 |
| Birmingham, MI 48009 | Ph: (616) 456-3181 |
| (313) 481-7330 | efossel@grand-rapids.mi.us |
| wlthompson@varnumlaw.com | shartman@grand-rapids.mi.us |
| jmwolber@varnumlaw.com | |
| jsmoran@varnumlaw.com | |

## ANSWER TO VERIFIED COMPLAINT,
## AFFIRMATIVE DEFENSES,   AND RELIANCE ON JURY DEMAND

     Defendant, City of Grand Rapids, a municipal corporation, by and through its counsel,

hereby submits its answer to Plaintiffs' Complaint as follows:

## INTRODUCTION

1. The City of Grand Rapids has devised a convoluted framework to fine, tax, and/or penalize its cannabis licensees through improper fees, for failing to comply with "social equity" policies that have been incorporated into the City's cannabis ordinance. Substantively, the City has adopted what is really a revenue generating policy under the veil of "social equity," as a means of avoiding scrutiny from voters or to circumvent the explicit cannabis fee and fine limitations placed on municipalities under State law. In addition to these grounds, the social equity components of the City's cannabis Ordinance and related policies violate both the Michigan and U.S. Constitution. Indeed, no business in the City of Grand Rapids, other than cannabis licensees, faces the same type of municipal extortion under the guise of "social equity." For these reasons, Plaintiffs have filed this lawsuit to enjoin and invalidate the social equity components of the City's cannabis Ordinance,  and to also seek damages in relation  thereto.

**ANSWER: This allegation contains legal conclusions to which no response is required. To the extent a response is required, the allegation is denied as untrue.**

## PARTIES

2. Plaintiff Fluresh LLC d/b/a Tend.Harvest.Cultivate ("Fluresh") is a Michigan limited liability company having a principal place of business located at 1213 Phillips Avenue SW, Grand Rapids, Michigan 49507.

**ANSWER: This allegation is admitted upon information and belief.**

3. Plaintiff FPAW Michigan LLC d/b/a Ascend Cannabis ("Ascend") is a Michigan limited liability company having a principal place of business located at 1336

Scribner Avenue, Grand Rapids, Michigan 49504.

**ANSWER: The City has insufficient knowledge or information to form a belief as to the truth of the allegation that this street address represents Ascend's principal place of business, as this address is only one of three street addresses for Ascend.**

4.  Plaintiffs QPS Michigan Holdings, LLC ("QPS") and Fish Ladder Holdings, LLC d/b/a High Profile ("Fish Ladder" and collectively, "High Profile") are Michigan limited liability companies having principal places of business located at 2321 44th St. SE, Grand Rapids, Michigan 49508 and 1148 Leonard St. NW, Grand Rapids, Michigan 49504.

**ANSWER: This allegation is admitted upon information and belief except that the address on 44th Street is believed to be 2301 rather than 2321.**

5.  Plaintiffs The District Park, LLC and Green Skies-Healing Tree, LLC d/b/a Skymint Cannabis (collectively "Skymint") are Michigan limited liability companies having principal places of business located at 2900 Division Ave S. Grand Rapids, Michigan 49548 and 3423 Plainfield Ave NE, Grand Rapids, Michigan 49525.

**ANSWER: This allegation is admitted upon information and belief.**

6.  Defendant the City of Grand Rapids (the "City") 1s a Michigan municipal corporation located in Kent County, Michigan.

**ANSWER: This allegation is admitted.**

## JURISDICTION AND VENUE

7.  The Circuit Court has original jurisdiction over this matter pursuant to MCL § 600.605.

**ANSWER: This allegation states a legal conclusion to which no response is necessary. To the extent as response is necessary, the allegation is admitted only to the extent that**

the complaint was initially filed in 17th Circuit Court, but denied as untrue that the Circuit Court continues to have jurisdiction as this matter has been removed to the United States District Court for the Western District of Michigan.

8. Personal jurisdiction is appropriate in the Circuit Court because all parties exist, conduct business, and have their storefronts in the City.

**ANSWER: The allegation states a legal conclusion to which no response is necessary. To the extent that a response is necessary, the City admits, upon information and belief, that all parties exist, conduct business, and have their storefronts in the City and that, in light of the removal, personal jurisdiction is appropriate in the United States District Court for the Western District of Michigan.**

9. Venue is proper in this Circuit Court pursuant to MCL § 600.1615 because the City is located in Kent County, Michigan.

**ANSWER: The allegation states a legal conclusion to which no response is necessary. To the extent that a response is necessary, the City states that, in light of the removal, venue is appropriate in the United States District Court for the Western District of Michigan.**

10. The dispute is within the jurisdiction of this Court because Plaintiffs seek equitable relief and damages in excess of $25,000.00.

**ANSWER: The allegation states a legal conclusion to which no response is necessary. To the extent that a response is necessary, the City admits that Plaintiffs seek equitable and monetary relief, but denies as untrue any allegation or implication that Plaintiffs are entitled to relief in any form or of any nature.  The City states that the United States District Court for the Western District of Michigan has jurisdiction over**

this action.

## BACKGROUND AND COMMON ALLEGATIONS

### A.    State and Municipal Licensing History

11. As the State's first widespread foray into cannabis, in November of 2008, Michigan voters approved a ballot initiative legalizing medical marihuana for patients suffering from serious health issues. This ballot initiative would eventually be codified as the Michigan Medical Marihuana Act, MCL § 333.26421.

**ANSWER: The City admits the allegation that Michigan voters approved a ballot initiative legalizing medical marihuana which was then codified as the Michigan Medical Marihuana Act, MCL 333.26421 et seq. The City lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations.**

12. Subsequently, on December 20, 2016, lawmakers passed multiple bills that together overhauled the State's medical marihuana program and set forth a licensing and comprehensive regulatory framework for medical marihuana licensees, which in primary part was codified in the Medical Marihuana Facilities Licensing Act ("MMFLA"). See Michigan Medical Marihuana Facilities Licensing Act, Public Act 281 of 2016, MCL § 333.27101 et seq.[1]

**ANSWER: The City admits that the legislature passed the MMFLA, MCL 333.27101 et. seq., which speaks for itself. The City lacks sufficient knowledge or information to**

---

[1] Per MCR 2.112(M), attached as Exhibits to this Complaint are all ordinances and other documentary evidence in support of Plaintiffs claims.

**ANSWER: The City admits that Plaintiffs have attached Exhibits to their Complaint but denies as untrue any allegation or implication that they have attached all ordinances of the policies, or documents that relate to their claims.**

**form a belief as to the truth of the remaining allegations.**

13. Included in the MMFLA were provisions that prohibited individuals and businesses from applying for licenses thereunder until at least December 15, 2017.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City admits the allegation upon information and belief.**

14. Under the MMFLA, municipalities were allowed to adopt cannabis ordinances authorizing one or more licensees set forth under the MMFLA to operate within the municipality, which was a process known as "opting in." *Id.* at MCL § 333.27205(1).

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City admits the allegation upon information and belief.**

15. The State of Michigan began issuing a majority of its licenses pursuant to the MMFLA in 2018.

**ANSWER: The City lacks sufficient knowledge or information to form a belief as to the truth of this allegation.**

16. On November 6, 2018, 55.9% of Michigan voters approved Proposition No. 1, making Michigan the first state in the Midwest to legalize cannabis for adults 21 and older. Subsequent thereto, the legislature enacted the Michigan Regulation & Taxation of Marihuana Act, Public Act 1 of 2018, MCL § 333.27951 et seq., ("MRTMA"), which sought to regulate the recreational use of marihuana in Michigan.

**ANSWER: The City admits that Michigan voters approved Proposition No. 1 and that the Michigan Legislature enacted the MRTMA, MCL 333.27951 et. seq. relating to the**

**recreational use of cannabis. The City lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations.**

17. Section 6.1 of the MRTMA provides that a municipality may adopt an ordinance to completely limit or prohibit adult-use cannabis licenses within its boundaries.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent a response is required, the City admits that a municipality could adopt an ordinance to limit or prohibit altogether adult-use cannabis licenses within City boundaries.**

18. In contrast to the MMFLA, to which a municipality must affirmatively "opt in," the MRTMA requires a municipality, if it chooses not to permit recreational marihuana businesses in the community, to affirmatively "opt out." MCL § 333.27956(1).

**ANSWER: This allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City admits the rest of this allegation.**

19. The State of Michigan began accepting applications pursuant to the MRTMA in November of 2019, and shortly thereafter began issuing licenses for recreational cannabis use.

**ANSWER: The City admits that the State of Michigan accepted applications related to the MRTMA and subsequently issued licenses for recreational cannabis. The City lacks sufficient knowledge or information to form a belief about the truth of the remaining allegations.**

    **B.**    **The City's Licensing Scheme for the "Cannabis Social Equity Program"**

20. On July 24, 2018, the City adopted its initial cannabis ordinance that primarily focused on decriminalization and the sale of medical marihuana within Grand Rapids.

**ANSWER: The allegation is denied as untrue and misleading in the form and fashion stated. On July 24, 2018, the City adopted an amendment to its general zoning ordinance to provide for land use relating to medical marihuana. Chapter 61, Section 5.9.19 ("Zoning Ordinance").**

21. On December 4, 2018, the City Commission adopted Policy No. 900-58, styled the Marihuana Industry Voluntary Equitable Development Agreement ("MIVEDA"). See **Exhibit 1,** *Policy No. 900-58 (2018).*

**ANSWER: The allegation is admitted except that City Commission Policy No. 900-58 was not "styled," but titled, the Marihuana Industry Voluntary Equitable Development Agreement ("MIVEDA"). The Zoning Ordinance was amended to incorporate MIVEDA at the same time. A copy of Zoning Ordinance as amended is attached as the City's Ex. A.**

22. MIVEDA was established "for marihuana facility applicants to offer voluntary elements to further the City's goals in the administration of marihuana facility applications." At the time Policy No. 900-58 was enacted, it did not contain sanctions for non-compliance or include a so-called equity "point transfer system." *Id.*

**ANSWER: The allegation refers to a document (Ex. 1) which speaks for itself.  While the City admits that City Commission Policy 900-58 contains this quoted language, the City denies as untrue, incomplete, and/or misleading any allegations or implications in paragraph 22 that are contrary to, and/or inconsistent with, the full text of the document. Further, the policy as enacted, stated that "[t]he City Commission, at its sole discretion, shall determine whether modifications to this policy are necessary to increase the effectiveness of its programs in achieving desired outcomes." Ex 1, p 2.**

23. On October 8, 2019, the City adopted Marihuana Related Municipal Licensing Ordinance, Chapter 105, Ordinance No. 2019-66 (the "Ordinance"), which, *inter alia*, allowed the City to license and regulate marihuana facilities and establishments as authorized by the MMFLA. See **Exhibit 2**, *Marihuana Ordinance*.

**ANSWER: The City admits that it adopted a Licensing Ordinance, Chapter 105, Ordinance no. 2019-66 ("Licensing Ordinance") related to medical marihuana under the MMFLA and did so to license an regulate cannabis businesses in the City. The remaining allegations refer to a document (Ex. 2) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegations or implications in paragraph 23 that are contrary to and/or inconsistent with full text of the document.**

24. At the time of its adoption, the Ordinance did not include a social equity component. *Id*.

**ANSWER: The allegation appears to refer to the Licensing Ordinance, described in paragraph 23 above and attached as Plaintiffs' Exhibit 2. The allegation therefore refers to a document (Ex. 2) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegations or implications that are contrary to and/or inconsistent with the full text of the document. By way of further answer, the phrase "social equity component" is vague and undefined. Therefore, the City cannot form a belief as to the truth of this allegation but notes affirmatively that the licensing ordinance's application requirements (Sec 7.366) required proof that the applicant had received zoning approval which incorporated MIVEDA.**

25. Shortly after enacting the Ordinance, the City began accepting applications from entities seeking to operate 'medical' cannabis companies within Grand Rapids.

**ANSWER: The allegation is denied as untrue and misleading in the form and fashion stated. The City had already accepted and prioritized land use applications under the Zoning Ordinance in April 2019.**

26. On or about December 17, 2019, with the enactment of the MRTMA at the state level, the City updated its ordinance to include provisions for "recreational" cannabis businesses.

**ANSWER: The City admits only that, following the passage of the MRTMA, the City amended its zoning and license ordinances and with respect to recreational marihuana businesses.**

27. On July 7, 2020, the City Commission adopted Policy No. 900-59, which amended the Ordinance to add the Cannabis Social Equity Program component ("CSEP") and the requirements that potential licensees adopt a "Social Equity Plan" that, *inter alia*, detailed any "practices, initiatives, or policies the applicant will implement to promote and encourage participation in the cannabis industry by people from communities that have been disproportionately impacted by cannabis prohibition and enforcement and to positively impact those communities." See **Exhibit 3**, *Policy No. 900-59 (2020 version).*

**ANSWER: The allegation is denied as untrue in the form and fashion stated. By way of further answer, the City admits that the City Commission adopted Policy No. 900-59, but this is a City Commission Policy, not an amendment to the Zoning or Licensing Ordinance referenced above. Further, the allegation refers to a document (Ex. 3) which speaks for itself and the City denies as untrue, incomplete, and/or misleading any allegations or implications that are contrary to and/or inconsistent**

**with the full text of the document. Further, the City denies as untrue any allegation or**

**implication in paragraph 27 that potential licensees were required to adopt a "Social**

**Equity Plan" or CSEP in any way participate in the as participation was voluntary.**

28. As a derivative of CSEP, the City also created the Cannabis Industry Social Equity Voluntary Agreement ("CISEVA") form, which once submitted with a land use application, the City deemed a legally enforceable agreement. *Id*.

**ANSWER: The City admits that it created the Cannabis Industry Social Equity Voluntary Agreement ("CISEVA") through which applicants could voluntarily offer certain commitments to the City in exchange for prioritized ranking and consideration for zoning and licensing review. Once submitted with a land use application, the commitments so voluntarily made became binding on the applicant as conditions of approval under Section 5.12.03.B.3, and legally enforceable once the application was approved. See Ex 3, p. 17.**

29. Pursuant to the CSEP component of the amended Ordinance, all licensees are required to "make good faith effort to meet the objectives of the social equity plan submitted with the application or license renewal." *Id.*

**ANSWER: The phrase "CSEP component of the amended Ordinance" is not defined and is vague as to the meaning of "component" and as to which amended "Ordinance" Plaintiffs refer. The City, therefore, lacks knowledge or information sufficient to form a belief as to the truth of the allegation. The City further denies as untrue that Ex 3, [which is <u>not</u> a City ordinance, but City Commission Policy #900-59 (CSEP)] contains the language as quoted. By way of further response, this allegation is denied as untrue for the reasons stated in the City's answer to paragraph 27 and 28**

**which are incorporated by reference.**

30. The CSEP component of the amended Ordinance defines "good faith effort" to mean "efforts designed to implement the established objectives of the licensee's Social Equity Plan which by their scope, intensity and appropriateness to the objective, can reasonably be expected to fulfill the Plan objective." *Id.*

**ANSWER: The phrase "CSEP component of the amended Ordinance" is not defined and is vague as to the meaning of "component" and as to which amended "Ordinance" Plaintiffs refer. The City, therefore, lacks knowledge or information sufficient to form a belief as to the truth of the allegation. The City further denies as untrue that Ex 3, [which is <u>not</u> a City ordinance, but City Commission Policy #900-59 (CSEP)] contains the language as quoted. By way of further response, this allegation is denied as untrue for the reasons stated in the City's answer to paragraph 27 and 28 which are incorporated by reference.**

31. "License renewals shall require reporting on the licensee's good faith efforts" under the CSEP component of the amended Ordinance. *Id.*

**ANSWER: The phrase "CSEP component of the amended Ordinance" is not defined and is vague as to the meaning of "component" and as to which amended "Ordinance" Plaintiffs refer. The City, therefore, lacks knowledge or information sufficient to form a belief as to the truth of the allegation. Further, the City denies as untrue that Ex 3 [which is <u>not</u> a City ordinance, but City Commission Policy #900-59 (CSEP)] contains the language as quoted. By way of further response, this allegation is denied as untrue for the reasons stated in the City's answer to paragraph 27 and 28**

**which are incorporated by reference.  contains the quoted language. By way of further answer, the City admits that Plaintiffs are required to self-report compliance or non-compliance with MIVEDA and CISEVA commitments on a quarterly basis as well as on an annual basis for purposes of renewal.**

32. Following the additions of MIVEDA and CISEVA, license applicants would apply to have their licenses reviewed supposedly on an order of priority that equated to their social equity commitments.

**ANSWER: The allegation is denied as untrue, except that it is admitted that Plaintiffs must apply in a timely and complete manner annually to be considered for renewal.**

33. The City began accepting cannabis applications for medical marihuana in 2019 and recreational marihuana in 2020.

**ANSWER: The allegation is denied as incomplete and misleading. By way of further answer, the City admits only that it began accepting applications for zoning approvals for medical cannabis in 2019 and began accepting applications for zoning approvals for recreational cannabis in 2020.**

34. On April 26, 2022, the City Commission was briefed on the status of social equity compliance in the local cannabis industry, including, but not limited to the fact that most licensees were not in compliance with CSEP, MIVEDA, and CISEVA and could not sustain compliance given the heightened requirements thereof. The City considered different options for cannabis licensees to attempt to achieve compliance, including a recommended option by City staff that entailed a so-called "social equity transfer system."

**ANSWER: The allegation is denied as untrue, incomplete, and misleading in the form and fashion stated. By way of further answer, in April 2022, the Committee of the Whole was presented with several options to address the failure of many licensees to comply with the commitments they had made, which were now contractual obligations, under MIVEDA and CISEVA. Among the options considered were (1) leaving the system intact and enforcing the contractual obligations as is; (2) offering a contract modification whereby the delinquent/non-compliant licensees could return to compliance by means of a point transfer system; and (3) eliminating the obligations altogether. The City Commission thereafter adopted amendments to City Commission Policies 900-58 and 900-59 to permit staff to implement administrative processes and policies to include a pathway for cannabis operations to return to compliance with their social equity commitments.**

35. On May 10, 2022, the City Commission approved a stay of enforcement of CSEP, MIVEDA, and CISEVA policies through August 10, 2022.

**ANSWER: The allegation is denied in the form and fashion stated as misleading and incomplete. By way of further answer, on May 10, 2022, the City Commission approved a City Commission Policy 900-64 to stay local enforcement of the MIVEDA and CISEVA contractual obligations through August 10, 2022.**

36. More than two years after originally incorporating CSEP into its Ordinance, on August 9, 2022, the City Commissioners narrowly approved a resolution to amend the City's CSEP and hold off enforcement until the beginning of 2023. During this meeting, the City Commission recognized, *inter alia,* that: (i) "most cannabis operators will not meet all of their voluntarily offered MIVEDA and/or CISEVA commitments made

14

with Special Land Use applications;" and (ii) "[t]he local cannabis industry faces imminent action at both local and State levels as a result of social equity noncompliance by the end of the stay of enforcement, which would impact State and local licensing renewals and the validity of cannabis Special Land Uses, unless it is addressed otherwise." See **Exhibit 4,** *August 9, 2022, City Commission Meeting Minutes.*

**ANSWER: This allegation refers to a document (Exhibit 4) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegations or implications that are contrary to and/or inconsistent with the full text of the document. The City denies as untrue and misleading the remaining allegations. By way of further answer, the City admits only that, on August 9, 2022, the City Commission approved a resolution (91937) to: (1) "renumber and revise the policy adopted pursuant to proceeding 91691 as City Commission Policy 900-64 temporarily extending enforcement of compliance with local cannabis industry commitments to City Commission policies 900-58 (MIVEDA) and 900-59 (Cannabis Social Equity Policy) through December 31, 2022," and (2) "adopt amendments to City Commission policies 900-58 (MIVEDA) and 900-59 (Cannabis Social Equity Policy/CISEVA) allowing staff to implement administrative processes and policies that include a pathway for cannabis operators to return to compliance with social equity commitments, and allowing staff to attest to compliance with municipal ordinances using forms provided by the State." See, Plaintiffs' Ex. 4, pp 26-27.**

37. Following this meeting, the City amended and restated Policy No. 900-58 (see **Exhibit 5)** and Policy No. 900-59 (see **Exhibit 6),** to include the following:

Policy No. 900-58. §IV(c)(i):
Administrative Policies may establish options that include transferring MIVEDA and CISEVA "points" from one category to another and establishing a fund, managed by directors of the City formed nonprofit.

Policy No. 900-59, §6.1:
Reporting and compliance requirements may be further articulated in Administrative Policies. Administrative Policies may establish an option for compliance to social equity commitments that contemplates transferring MIVEDA and CISEVA "points" from one category to another and establishing a fund, managed by directors of the City formed nonprofit.

**ANSWER: The allegation refers to documents (Exs. 5 and 6) which speak for themselves. The City denies as untrue, incomplete, and/or misleading any allegations or implications in paragraph 37 that are contrary to, or inconsistent with, the full text of the documents.**

38. Policy No. 900-58 had the stated purpose of "establish[ing] criteria for marihuana facility applicants to offer voluntary elements to further the City's goals in the administration of marihuana facility applications" under MIVEDA. See **Ex. 5.**

**ANSWER: The allegation refers to a document (Ex. 5) which speaks for itself. While the City admits Ex 5 contains the quoted language, the City denies as untrue, incomplete, and/or misleading any allegations or implications that are contrary to, or inconsistent with, the full text of the document.**

39. Pursuant to Policy No. 900-58, "[t]he City Commission, at its sole discretion, shall determine whether modifications to this policy or additional Administrative Policies are necessary to increase the effectiveness of its programs in achieving desired outcomes." *Id.*, Section V.

**ANSWER: The allegation refers to a document (Ex. 5) which speaks for itself. While**

the City admits that Ex 5 contains the quoted language, the City denies as untrue, incomplete, and/or misleading any allegations or implications in paragraph 39 that are contrary to, or inconsistent with, the full text of the document.

40. Concurrently on August 9, 2022, the City Commission amended Policy No. 900-59, which greatly expanded the CSEP requirements of the City's Ordinance and licensees' obligations under MIVEDA and CISEVA. See **Ex. 6.**

**ANSWER: The City admits that the City Commission amended City Commission Policy No 900-59 on August 9, 2022, but denies the remaining allegations as untrue. Further, this allegation refers to a document (Ex. 6) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegations or implications that are contrary to, or inconsistent with, the full text of the document.**

41. Policy No. 900-59 also contained seemingly conflicting statements that participation with the CSEP was "voluntary," however, once applications had been submitted and accepted by the City, compliance with CSEP would be "considered legally enforceable." *Compare* **Ex. 6**, Section 1 .2 (Purpose) *with* **Ex. 6**, Section 3.1.

**ANSWER: The allegation refers to a document (Ex. 6) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegations or implications in paragraph 41 that are contrary to, or inconsistent with, the full text of the document. The City specifically denies as untrue any allegation or implication that City Commission Policy No. 900-59 contains "conflicting statements" when read as a whole.**

42. It was through the Amendments to Policy Nos. 900-58 and 900-59 that the City

disclosed to licensees and made possible, a so-called equity "point transfer system".

*Id.,* Section 6.1. See **Ex. 5,** at Section IV(c)(i); **Ex. 6,** at Section 6.1.

**ANSWER: The allegation is denied as untrue and misleading in the form and fashion stated. By way of further answer, the potential for a transfer system was discussed with the cannabis industry in quarterly meetings many months prior to the amendment of City Commission policies 900-58 and 900-59.**

43. Almost three months after amending Policy No. 900-58 and Policy No. 900-59, on November 3, 2022, the City's Manager, Mark Washington, issued Administrative Policy No. 22- 01, that interpreted and further expanded on the City's requirements set forth in Policy No. 900-58 and Policy No. 900-59. See **Exhibit** 7, *Administrative Policy No. 22-01.*

**ANSWER: The City admits that City Manager, Mark Washington, issued Administrative Policy No. 22-01 on November 3, 2022. The remaining allegations are denied as untrue and misleading in the form and fashion stated. Further, the allegation refers to a document (Ex. 7) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegations or implications in paragraph 43 that are contrary to, or inconsistent with, the full text of the document. The City specifically denies as untrue the allegation that the Administrative Policy expanded on any requirements contained in City Commission Policies 900-58/59.**

44. Administrative Policy No. 22-01 pertained to "[a]ll cannabis business operations that received land use approvals that are conditioned upon MIVEDA and/or CISEVA commitments." According to the City, the purpose of Administrative Policy No. 22-01 was to "further articulate the process for achieving compliance

with social equity commitments in the medical and recreational cannabis industries." *Id.*

**ANSWER: The allegation refers to a document (Ex. 7) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegations or implications that are contrary to, or inconsistent with, the full text of the document. The City further denies as untrue. Plaintiffs' alleged quotation of the Administrative Policy's stated purpose. The purpose of the Policy was expressly stated as being "[t]o provide supplemental criteria for achieving compliance with the social equity commitments made by the medical and recreational cannabis industry." See "Purpose," Plaintiffs' Ex 7.**

45. Administrative Policy No. 22-01 provided that prior to the expiration of a local license, the City shall conduct an inspection of the cannabis business. Administrative Policy No. 22-01 provided further that, prior to the inspection, the cannabis licensee shall submit a report of social equity compliance in the most recent year of licensure, and that the "annual City inspection will include an evaluation of social equity compliance." *Id.,* Section V.

**ANSWER: The allegation refers to a document (Ex. 7) which speaks for itself. While the City admits that Ex 7 contains the quoted language, the City denies as untrue, incomplete, and/or misleading any allegations or implications in paragraph 45 that are contrary to, or inconsistent with, the full text of the document.**

46. Pursuant to Administrative Policy No. 22-01, if a licensee was determined to have partial social equity performance, the licensee would be required to "return to compliance" by using a "transfer request" in accordance with Administrative Policy

No. 22-01. *Id.,* Section VI(c).

**ANSWER: The City denies the allegation as untrue, incomplete, and/or misleading. Further, the allegation refers to a document (Ex. 7) which speaks for itself. The City denies as untrue any allegations or implications in paragraph 46 that are contrary to, or inconsistent with, the full text of the document. Further the City denies as untrue that the Administrative Policy <u>required</u> the use of a transfer payment as the only means by which compliance could be regained.**

47. What is not inherent in the otherwise ambiguous language of Administrative Policy No. 22-01, is that submitting to a mandatory "transfer request" requires a licensee to pay to the City up to one percent (1.0%) of its gross revenue to achieve MIVEDA compliance and up to two percent (2.0%) of its gross revenue to achieve CISEVA compliance. *Id.* at Section  VIII.

**ANSWER: The City denies the allegation as untrue, incomplete, and misleading in the form and fashion stated. Further, the allegation refers to a document (Ex. 7) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegations or implications that are contrary to, or inconsistent with, the full text of the document. Specifically, the City denies as untrue the allegation that a transfer payment was mandatory as the only way to achieve compliance. Further the allegation that the City's Administrative Policy is ambiguous is a conclusion of law, which the City expressly denies as untrue.**

48. According to Administrative Policy No. 22-01, licensees with only partial CSEP compliance were required to pay the City up to three percent (3%) of their annual gross sales in order to achieve the City's social equity compliance standards.

**ANSWER: The City denies the allegation as untrue, incomplete, misleading, and nonsensical in the form and fashion stated. Further, the allegation refers to a document (Ex. 7) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegations or implications that are contrary to, or inconsistent with, the full text of the document. Further, the City denies as untrue that a transfer payment was required.**

49. This amounts to nothing more than an improper fee or fine, or an improper tax that has been levied against cannabis licensees in the City of Grand Rapids.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City denies the allegation as untrue.**

50. Moreover, this so-called point transfer system (i.e., fee, fine, or improper tax), was not in place when Plaintiffs submitted their MIVEDA and CISEVA forms prior to the August 9, 2022 amendments.

**ANSWER: The City admits that the Administrative Policy No. 22-01, designed to help Plaintiffs and others alleviate the potential consequences of their failure to meet their contractual obligations and conditions of approval under MIVEDA and CISEVA, was not in place when the Plaintiffs originally made their agreements under MIVEDA and CISEVA. The City denies all other allegations and implications of paragraph 51 as untrue and incorporates its answer to paragraph 49 by reference.**

51. Policy Nos. 900-58, 900-59, and Administrative Policy No. 22-01, were administrative policies that were created by the City Manager and City Executives.

**ANSWER: The City admits that Administrative Policy No. 22-01 was issued by the City Manager. The City denies the remaining allegations as untrue as Policy Nos. 900-**

**58 and 900-59 were City Commission policies adopted by resolution of the City Commission.**

52. A failure to adhere to the City's CSEP requirements may also result in the City issuing the cannabis licensee a Notice of Violation. Thereafter, the City may conduct supplemental inspections, during business hours to "verify adherence with social equity elements ...." *Id.,* Section IX.

**ANSWER: The City denies the allegation as untrue, incomplete, and misleading in the form and fashion stated. Further, the allegation refers to a document (Ex. 7) which speaks for itself. While the City admits that Ex 7 contains the quoted language, the City denies as untrue, incomplete, and/or misleading any allegations or implications that are contrary to, or inconsistent with, the full text of the document.**

53. Cannabis licensees that remain out of compliance with the City's social equity requirements will be reported to the State and will be subject to local enforcement action, including, but not limited to: (i) fines; (ii) denial of certificate of occupancy and/or final permit for future expansions of the cannabis facility; (iii) denial of local license renewals; (iv) revocation of current local licenses; and (v) any other penalties or remedies available via City Ordinance, at law, or in equity. *Id.,* Section IX(c).

**ANSWER: The City denies the allegation as untrue, incomplete, and misleading in the form and fashion stated. Further, the allegation refers to a document (Ex. 7) which speaks for itself. The City denies as untrue any allegations or implications that are contrary to, or inconsistent with, the full text of the document.**

54. Since its inception, there has been little substantive enforcement of the City's social equity requirements placed on cannabis licensees, and the only true mechanism the

City appears to have employed is the "transfer option," which in substance, is nothing more than a financial penalty.

**ANSWER: The City denies the allegation as untrue, incomplete, and misleading in the form and fashion stated. Further, the City incorporates its answers to paragraphs 49 and 50 by reference. The City also incorporates by reference its answers to paragraphs 34-36 and affirmatively states that the stay of enforcement was granted by the City Commission in order to provide an opportunity to develop a means by which the licensees could return to compliance and thereby avoid the potential consequences of the cannabis operators' failure to meet their contractual obligations under MIVEDA and CISEVA. The City specifically denies as untrue the allegation that the "transfer option" is a "fine and penalty."**

55. By directive of the City Council, enforcement of the City's social equity requirements pertaining to cannabis licensees was deferred from at least 2020 until sometime in 2023, at which time the City began issuing invoices for the "fees" licensees were required to satisfy in order to remain compliant with the City's social equity requirements.  See e.g., **Exhibit 8,** *Fluresh 9/29/2023 Invoice;* **Exhibit 9,** *Fluresh 6/26/2024 Invoice.*

**ANSWER: The City denies the allegation as untrue, incomplete, and misleading. By way of further answer, the City denies that it has a City Council for the reason that it has, instead, a City Commission. Further, the City denies as untrue that the enforcement that was "deferred from at least 2020 until sometime in 2023," or that any stayed enforcement was of the "City's social equity requirements." Rather the stay was of enforcement of the Plaintiffs' contractual obligations given freely under**

**MIVEDA and CISEVA in return for priority consideration of their Special Land Use applications, without which none of the Plaintiffs would have obtained the ability to operate their cannabis establishments in Grand Rapids. Further, while the City did begin sending invoices in 2023, the invoices were for the Seeding Justice contributions that Plaintiffs voluntarily elected to offer in order to return to compliance with their contractual obligations. See eg. the City's Ex C, Fluresh 2023 Transfer Request form and Plaintiffs' Ex 8 (referencing Seeding Justice contributions). The City denies as untrue the allegation that the transfer payments were the only method by which license could "remain compliant."**

> **C.      Facts Regarding Fluresh's Business Along With State and Municipal Licensing History**

56. Fluresh was formed in 2018 for the purpose of obtaining cannabis licenses and operating in the Michigan cannabis industry.

**ANSWER: The City lacks sufficient knowledge or information to form a belief as to the truth of this allegation.**

57. On October 22, 2018, Fluresh achieved prequalification status with the State in order to seek State licenses under the MMFLA. Thereafter, Fluresh was approved for its first State licenses under the MMFLA on or about July 16, 2019.

**ANSWER: The City lacks sufficient knowledge or information to form a belief as to the truth of this allegation.**

58. Concurrent with seeking cannabis licenses from the State of Michigan, Fluresh also sought cannabis licenses from the City.

**ANSWER: The City admits that, at some point, Fluresh sought Special Land Use**

**approval and related licenses from the City, but the City lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations.**

59. On or about March 1, 2020, Fluresh submitted a Special Land Use Application and Supplemental Applications to the City seeking a municipal cannabis license. In conjunction with submitting the Special Land Use Application, Fluresh also submitted its original MIVEDA Form to the City.

**ANSWER: The City denies this allegation as Fluresh submitted its Special Land Use application and related documents including its MIVEDA form on or about March 4, 2019. See attached City's Ex B.**

60. On or about September 16, 2020, Fluresh received its first set of municipal cannabis licenses from the City, which enabled Fluresh to cultivate and sell medical marihuana within the City, pursuant to the MMFLA.

**ANSWER: The City admits this allegation.**

61. After Michigan enacted the MRTMA, Fluresh began to apply for the applicable State and municipal adult-use (also called 'recreational') cannabis licenses. In accordance therewith, on or about July 20, 2020, Fluresh submitted a Social Equity Plan and CISEVA form to the City. Thereafter, Fluresh sought to expand its operations by seeking growers' licenses to be co-located at its existing facility (September 16, 2020) and by continuing to seek additional cannabis licenses within the City.

**ANSWER: The City admits that Fluresh applied for local recreational SLU approval and license in July, 2020 and that it submitted a CISEVA at the same time. The City denies as untrue that Fluresh submitted a "Social Equity Plan" as it submitted instead its required "Good Neighbor Plan."**

62. Fluresh has been fully licensed to grow, process, and sell both medical and adult use cannabis since October 2021.

**ANSWER: The City admits that Fluresh was licensed by the City to grow, process, and sell medical and adult use cannabis, but lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations.**

63. Today, Fluresh operates a brick-and-mortar licensed cannabis indoor grow, production, and retail establishment located at 1213 Phillips Avenue SW in the City, and it also maintains non-licensed office space for its employees elsewhere in the City. Fluresh currently employs around 130 employees, with around 129 of those employees working in its Grand Rapids locations. Fluresh currently maintains 15 State cannabis licenses issued under the MMFLA or MRTMA, likewise Fluresh maintains 13 municipal licenses with the City and 2 municipal licenses with the City of Adrian.

**ANSWER: The City admits that Fluresh operates a cannabis establishment at 1213 Phillips Ave in Grand Rapids and that it holds 13 local licenses. The City lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations.**

64. Fluresh, and its closely held affiliate, Steele Oz LLC, have invested over $60 million dollars into the 1213 Phillips Ave SW property, which qualities as an opportunity zone. Fluresh is located on one of the 17 census tracks in the near west and south side of Grand Rapids that has been designated as a Neighborhood of Focus due to systematic and historic inequities. Per the Cities own publications, these neighborhoods have experienced the most disparate outcomes in income, educational attainment

26

opportunities, home ownership, and wealth accumulation compared to the other Grand Rapids census tracks and the City as a whole.

**ANSWER: The City admits Fluresh is located in a Neighborhood of Focus. The City lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations.**

### D.     Facts Regarding Ascend's Business Along With State and Municipal Licensing History

65. Ascend is a subsidiary of Ascend Wellness Holdings, a vertically integrated multistate cannabis operator with licenses and assets in Illinois, Michigan, Ohio, Massachusetts, New Jersey, Pennsylvania, and Maryland.

**ANSWER: The City lacks sufficient knowledge or information to form a belief as to the truth of this allegation.**

66. Ascend was formed in 2018 for the purpose of obtaining cannabis licenses and operating in the Michigan cannabis industry.

**ANSWER: The City lacks sufficient knowledge or information to form a belief as to the truth of this allegation.**

67. On May 29, 2019, Ascend achieved prequalification status with the State in order to seek State licenses under the MMFLA. Thereafter, Ascend was approved for its first State licenses under the MMFLA on or about October 14, 2019.

**ANSWER: The City lacks sufficient knowledge or information to form a belief as to the truth of this allegation.**

68. On or about March 15, 2019, Ascend's predecessor, Oak Flint LLC ("Oak Flint"), submitted a Special Land Use Application and Supplemental Applications to the City

seeking a municipal cannabis license for the 28th Street and Scribner Avenue locations. In conjunction with submitting the Special Land Use Application, Oak Flint also submitted its original MIVEDA Form to the City.

**ANSWER: The City admits that Oak Flint submitted a special land use application and MIVEDAs to the City for these addresses. Oak Flints MIVEDAs was submitted on March 14, 2019 and are attached as the City's Ex D. The City lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations.**

69. On July 25, 2019, the City Planning Commission approved the medical Special Land Use Application for the 28th Street location and on July 16, 2019 the City Planning Commission approved the medical Special Land Use Application for the Scribner Avenue location.

**ANSWER: The City admits this allegation, except that the correct approval letter date for 28th Street is August 20, 2019 upon information and belief.**

70. Special land use approval for an adult use retail facility was granted for 28th Street on December 11, 2020, and on January 30, 2021 for Scribner Avenue.

**ANSWER: The City admits the gist of this allegation accept that, for 28th Street, the Planning Commission meeting was on November 12, 2020 with an approval letter on December 15, 2020 and for Scribner, the Planning Commission meeting was January 14, 2021 with an approval letter on February 2, 2021. Ascend's CISEVA for each location are attached as Ex E.**

71. In March 2022, Ascend opened its third retail establishment in the City located at 503 Century Avenue.

**ANSWER: The City admits this allegation on information and belief.**

72. Today, Ascend's Michigan operations include a grow and processing facility, seven brick-and-mortar licensed cannabis retail establishments, including three retail establishments in the City. Ascend's parent company, AWH, operates 6 cultivation and processing facilities, and 39 dispensaries across seven states. AWH has demonstrated commitment to equity in the industry through contributions to the Last Prisoner Project ("LPP"), and through its own official brand and campaign for social equity work, The Ascend CO-LAB for Social equity ("CO-LAB"). The CO-LAB works with local partners to make contributions more rooted in our local communities, investing over $350,000 in donations to local grassroots organizations. It has hosted more than 23 expungement clinics/resource fairs to date, across 5 states, serving 1,200 community members.

**ANSWER: The City admits that Ascend operates three related establishments in the City. The City lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegation.**

**E.    Facts Regarding High Profile's Business Along With State and Municipal Licensing History**

73. High Profile is a subsidiary of Ann Arbor based C3 Industries, Inc., a vertically integrated multistate cannabis operator with licenses and assets in Michigan, Missouri, Massachusetts, Illinois, Connecticut, and New Jersey, which currently operates 31 cannabis dispensaries across the country, in addition to multiple production and processing facilities.

**ANSWER: The City lacks sufficient knowledge or information to form a belief as to**

**the truth of this allegation.**

74. QPS was formed in 2017 and Fish Ladder was formed in 2018 for the purpose of obtaining cannabis licenses and operating in the Michigan cannabis industry.

**ANSWER: The City lacks sufficient knowledge or information to form a belief as to the truth of this allegation.**

75. On August 10, 2018 (QPS) and September 10, 2020 (Fish Ladder), achieved prequalification status with the State in order to seek State issued cannabis licenses.

**ANSWER: The City lacks sufficient knowledge or information to form a belief as to the truth of this allegation.**

76. On or about October 20, 2020, High Profile submitted a Special Land Use Application and Supplemental Applications to the City seeking a municipal cannabis license. In conjunction with submitting the Special Land Use Application, High Profile also submitted its original MIVEDA and CISEVA Forms to the City.

**ANSWER: The City denies the allegation as untrue. High Profile did not submit a MIVEDA for either QPS or Fish Ladder. The remaining allegations are admitted and the CISEVAs submitted on October 27, 2020 for QPS and Fish Ladder are attached as Ex F.**

77. On or about March 11, 2021, High Profile received its first set of municipal cannabis licenses from the City, which enabled High Profile to sell medical marihuana commercially within the City.

**ANSWER: The City denies the allegation as untrue in the form and fashion stated for the reasons that approvals were not granted until March 29, 2021.**

78. Today, High Profile operates two brick-and-mortar licensed cannabis retail

establishments in the City, with nearly 50 employees. QPS is itself a wholly minority-controlled entity, being managed by Ankur Rungta and Vishal Rungta, both first generation Indian- Americans. QPS is owned by C3 Industries, Inc., in which Ankur Rungta and Vishal Rungta have substantial ownership and broad control over both Board and day-to-day operations as CEO and President, respectively. C3 Industries, Inc. and its local partners also hold state certified equity licenses in New Jersey, Connecticut, and Massachusetts.

**ANSWER: The City admits that High Profile operates two cannabis establishments in the City. The City lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations.**

### F.    Facts Regarding Skymint's Business Along With State and Municipal Licensing History

79. Skymint is a subsidiary of Ann Arbor based Green Peak Industries, Inc., a company that has 18 different cannabis dispensaries in Michigan.

**ANSWER: The City lacks sufficient knowledge or information to form a belief as to the truth of this allegation.**

80. In 2019, Skymint' s predecessor company, 3Fifteen Cannabis, submitted a Special Land Use Application and Supplemental Applications to the City seeking a municipal cannabis license. In conjunction with submitting the Special Land Use Application, Skymint also submitted its MIVEDA and CISEVA Forms to the City.

**ANSWER: The City denies the allegation as untrue for the reason that the SLU applicants MIVEDAs and CISEVAs were submitted by Green-Skies Healing Tree for Skymints two locations. See the City's Ex G.**

81. On information and belief, in 2019 the City approved Skymint's MIVEDA form and in 2020 the City approved Skymint's CISEVA form.

**ANSWER: The City denies the allegation as untrue in the form and fashion stated. By way of further answer, the City did not "approve" the MIVEDA and CISEVA forms. Rather the City accepted the voluntary commitments made in the MIVEDA and CISEVA in exchange for prioritization in the land use approval process which thereby rendered these commitments enforceable contractual obligations.**

82. Today, Skymint operates two brick-and-mortar licensed cannabis retail establishments in the City, and maintains 35 employees, nearly all of whom are City residents.

**ANSWER: The City lacks sufficient knowledge or information to form a belief as to the truth of this allegation.**

83. Skymint is currently in receivership. *See Tropics, L.P. v. Green Peak Industries, Inc., et al.,* Case No. 23-00149-CB, Ingham County Circuit Court, Judge Jamo presiding. The court-appointed receiver is **in** support of the relief sought herein.

**ANSWER: The City admits, upon information and belief, that Skymint and/or Green Peak Industries, is or was, in receivership. The City lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations.**

<u>**COUNT I**</u>
**Violations of the Headlee**
**Amendment to the Michigan**
**Constitution**

84. The forgoing Paragraphs are all incorporated herein by reference.

**ANSWER: The City incorporates its Answers to all of the prior paragraphs by**

**reference.**

85. Units of local  government are prohibited from levying any tax not authorized by law or charter or from increasing the rate of an existing tax above that rate authorized by law or charter, without the approval of a majority of the qualified electors of that unit of local government voting thereon.  MI CONST Art. 9, § 31.

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the allegation refers to the Michigan Constitution which speaks for itself. The City denies any allegation or implication contrary to, or inconsistent with, the full text of the Michigan Constitution. Further, the City denies as untrue any allegation or implication in paragraph 85 that it has violated the Michigan Constitution in any manner with respect to these Plaintiffs.**

86. The City's so-called CSEP, MIVEDA, and CISEVA regulations and the penalties assessed thereunder are, in substance, a prohibited tax.

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the allegation is denied as untrue.**

87. Since 2022, the City has taxed, or is attempting to tax Plaintiffs in the aggerate amount of $2,254,898.03.

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the allegation is denied as untrue.**

88. A majority of the qualified electors of the City never voted to allow the City to tax cannabis licensees pursuant to its Ordinance based on the social equity components thereof.

**ANSWER: The City denies the allegation to the extent that it is intentionally**

**misleading and/or nonsensical. By way of further answer, the City does not and has never taxed cannabis licensees under either its Zoning or Licensing Ordinances in connection with Plaintiffs' contractual obligations under MIVEDA or CISEVA and consequently, no vote of the electorate was ever required.**

89. The City's social equity taxes are calculated as a percentage of the cannabis licensee's annual gross sales.

**ANSWER: The City denies the allegation as untrue and for the reason that there are no "social equity taxes."**

90. In 2022, 2023 and 2024, there was no direct or indirect benefit conferred upon Plaintiffs based on the City's CSEP, MIVEDA, and CISEVA social equity requirements.

**ANSWER: The City denies the allegation as untrue, incomplete, and misleading. The City further denies the allegation as mischaracterizing the Plaintiffs' voluntarily offered commitments under their MIVEDA and/or CISEVA agreements as the City's "requirements." By way of further answer, Plaintiffs' voluntarily offered commitments under MIVEDA and/or CISEVA became contractually binding upon them, and conditions of approval when they accepted the benefit of prioritization of their Special Land Use applications and/or specific review, and received Special Land Use approvals as a result, which approvals continue in force.**

91. There is no reasonable relationship between the City's social equity requirements, and the funds derived by the City therefrom, to any benefit conferred directly on Plaintiffs.

**ANSWER: The City denies the allegation as untrue, incomplete, and misleading.**

**Further, the City incorporates its Answer to paragraph 90 by reference. To the extent that Plaintiffs refer to their commitments under CISEVA to make Community Reinvestment Fund contributions and/or to make Seeding Justice contributions in order to return to compliance with their original contractual obligation under MIVEDA and CISEVA, the City further denies as untrue that no benefit was conferred upon them.**

92. The City's stated purpose of the CSEP portion of its Ordinance is to "embed equality throughout government operations" and "be a step toward helping to support equitable economic initiatives, including job creation, removing barriers to local ownership, and contracting opportunities for traditionally disadvantaged groups within the community." **Ex. 6,** Section **1.**

**ANSWER: The City denies the allegation and/or implication that "CSEP" is a "portion of its [undefined] Ordinance" as untrue. By way of further answer, the Cannabis Social Equity Policy (CSEP) is a City Commission Policy (No. 900-59), not an Ordinance. See Plaintiff's Exhibit 6. Further, the allegation refers to a document (Ex 6) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegations and/or implications in paragraph 92 that are contrary to, or inconsistent with, the full text of the document, including, but not limited to, its statement of purpose contained in Section 1.**

93. Invoices from the City pertaining to CSEP, MIVEDA, and CISEVA indicate that funds need to be paid directly to the Grand Rapids City Treasurer. See e.g., **Ex. 8; Ex. 9; Ex. 10; Ex. 11; Ex. 12; Ex. 13; Ex. 14; Ex. 15; Ex. 16; Ex. 17; Ex. 18; Ex. 19; Ex.20.**

**ANSWER: The allegation refers to documents (Exs. 8-20) which speak for themselves.**

**The City denies as untrue, incomplete, and/or misleading any allegations and/or implications in paragraph 93 that are contrary to, or inconsistent with, the full text of the documents. By way of further answer, the documents do not expressly refer to "CSEP, MIVEDA, and CISEVA," but to the "Social Equity Transfer Option –Seeding Justice Fund Contribution" commitment these Plaintiffs elected to in place of full compliance with their contractual obligations under MIVEDA and/or CISEVA. The City admits that the Seeding Justice contributions were to be paid to the City Treasurer for the benefit of the Seeding Justice nonprofit during its formation and process to obtain 501(c)(3) status which remains ongoing.**

94. On information and belief, the social equity funds that are collected from cannabis licensees are deposited into the City's general fund.

**ANSWER: The City admits only that the "Seeding Justice Fund Contribution," when paid, would be deposited into the City's general fund for the benefit of the Seeding Justice non-profit. The City incorporates by reference its answer to paragraph 94. The City denies the remaining allegation as untrue and misleading in the form and fashion stated.**

95. The City's social equity requirements for cannabis licensees are being imposed for a public, rather than a private purpose.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City lacks sufficient knowledge or information to determine what the reference to "social equity requirements" means in the context of Plaintiffs' Headlee Amendment claim.**

96. Per the City's regulatory social equity policy, it was to form a City-controlled

nonprofit pursuant to the Home Rule City Act MCL § 117.40 for a "public purpose" into which the City would transmit any funds it received from cannabis licensees. See Ex. 7, *Administrative Policy No. 22-01.*

**ANSWER: The allegation refers to a document (Ex. 7) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegations and/or implications in paragraph 96 that are contrary to, or inconsistent with, the full text of the document. Further, the City denies as untrue that Ex 7 reflects this alleged purpose or goal and further denies as untrue that the Seeding Justice non-profit is a "City-controlled."**

97. The stated purpose of the City in forming a city-controlled nonprofit for the purpose of receiving social equity funds was due to the fact that a nonprofit can perform many of the activities that the city cannot due to its restrictions on use of public funds, budgeting concerns, and relative inexperience in execution of equitable initiatives.

**ANSWER: The City denies the allegations as untrue in the form and fashion stated. By way of further answer, the City denies as untrue that the Seeding Justice nonprofit is a City controlled nonprofit.**

98. The City's CSEP, MIVEDA, and CISEV A programs are designed to raise revenue for the City either directly, or through distributions to a City-controlled non-profit.

**ANSWER: The City denies the allegation as untrue.**

99. The City is not using CSEP, MIVEDA, or CISEVA funds to defray the cost of administering its cannabis Ordinance.

**ANSWER: The City denies as untrue the allegation that there are "CSEP, MIVEDA,**

**or CISEVA funds" for the reason that those policies do not generate funds for the City.  To the extent that Plaintiffs are attempting to refer to their election to commit to making contribution to Seeding Justice contributions in order to return to compliance with their obligations under MIVEDA and/or CISEVA, the City admits that it is not using Seeding Justice contributions to defray the City's costs of administering the cannabis licenses under its Zoning or Licensing Ordinances or for any purpose whatsoever.**

100. There is no legitimate regulatory purpose for the City imposing CSEP, MIVEDA, or CISEVA.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the allegation is denied as untrue and misleading and for the reason that the City has a legitimate purpose with respect to enhancing social equity in the City and in vetting the fitness of proposed cannabis businesses.**

101. The City has wielded adherence to the social equity provisions in its Ordinance in a manner that makes compliance contingent on cannabis license renewal and maintaining a cannabis license.

**ANSWER: The City denies the allegation as untrue and nonsensical.**

102. If Plaintiffs refuse to comply with the tax levied under CSEP, MIVEDA, and CISEVA, the City will either suspend or revoke their cannabis licenses, or refuse to renew their license annually.

**ANSWER: The City denies the allegation as untrue in the form and fashion stated. By way of further answer, the City denies as untrue the allegation that it levies taxes**

**under CSEP, MIVEDA, and/or CISEVA. The City does not and has never levied a tax against cannabis licensees under either its Zoning or Licensing Ordinances or any policies in connection. Instead, the City has offered an alternative means by which the Plaintiffs can choose to comply with their contractual obligations under MIVEDA or CISEVA. The City further denies that it has suspended or revoked any Plaintiff's local licenses.**

103. The City has made the monetary amounts chargeable under CSEP, MIVEDA, and CISEVA against cannabis licensees compulsory by law.

   **ANSWER: The City denies the allegation as untrue.**

104. Originally, the MMFLA imposed a 3% tax on retail revenues generated under the act. MCL § 333.27601; MCL § 27602(5).

   **ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the allegation refers to a statute that speaks for itself. The City denies as untrue, incomplete, and misleading any allegations or implications in paragraph 104 that are contrary to, or inconsistent with, the full text of the statute.**

105. When the City amended Policy Nos. 900-58 and 900-59 and enacted Administrative Policy No. 22-01, it adopted a "social equity transfer" provision that, in essence, taxes cannabis licensees at up to 3% of their annual gross sales. See **Ex. 5, Ex. 6., Ex. 7.**

   **ANSWER: The City denies the allegation as untrue in the form and fashion stated, except that the City admits it amended City Commission policies 900-58 and 900-59 and that the City Manager issued Administrative Policy No. 22-01. Further, this**

**allegation refers to documents (Ex. 5-7) which speak for themselves. The City denies as untrue, incomplete, and/or misleading any allegation or implication in paragraph 105 that is contrary to, or inconsistent with, the full text of the documents. Further the City denies as untrue any allegation or implication in paragraph 105 that the voluntary transfer option offered by the City and accepted by Plaintiffs as a means of returning to compliance with their contractual obligations under MIVEDA and CISEVA constitutes a tax on licensees.**

106. In substance, the City's so-called "social equity transfer" provision is clearly modeled off the MMFLA 's original 3% excise tax and is being implemented by the City as a means to tax cannabis licensees in violation of the Michigan Constitution.

   **ANSWER: The City denies the allegation as untrue.**

107. Plaintiffs believe the facts alleged herein will be disputed by the City, and the Court will be required pursuant to MCR § 2.112(M) to reach a resolution regarding these disputed facts.

   **ANSWER: The City lacks sufficient knowledge or information to form a belief as to the truth of what Plaintiffs believe.**

   WHEREFORE, based upon the City's violation of the Headlee Amendment to the Michigan Constitution, Plaintiffs seek the following: (i) a refund of any CSEP, MIVEDA, or CISEVA amounts paid to the City in 2023 and 2024; (ii) injunctive relief against the City for the enforcement of the CSEP portion of its Ordinance; (iii) declaratory relief against the City finding that the CSEP constitutes an unconstitutional tax; and (iv) the costs and attorneys' fees Plaintiffs incurred in invalidating the CSEP as an unconstitutional tax.

**ANSWER: The City denies as untrue that it has violated the Headlee Amendment or that Plaintiffs are entitled to any relief whatsoever. Further, the City denies the allegations as untrue and misleading due to Plaintiffs' misrepresentations including: (1) of the nature of any amounts they have committed to and/or paid, (2) the characterization of CSEP as a "portion of its Ordinance," and (3) their conflation of CSEP, which is merely a policy, with the concept of a "tax."**

**COUNT II**
**Violations of the MMFLA**
**and MRTMA's $5,000 Fee**
**Provision**

108. The forgoing Paragraphs are all incorporated herein by reference.

   **ANSWER: The City incorporates its answers to the foregoing paragraphs by reference.**

109. If the social equity regulatory scheme adopted by the City is not a prohibited tax, then it is a veiled licensing fee or fine that is being levied against cannabis licensees.

   **ANSWER: The allegation states a legal conclusion to which no response is required. To the extent a response is required, the allegation is denied as untrue.**

110. Under the Michigan Constitution 1963, art. 7, § 22, a Michigan municipality's power to adopt resolutions and ordinances relating to municipal concerns is subject to the constitution and law.

   **ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the allegation refers to the Michigan Constitution, which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegation or implication in paragraph 110 that is contrary to, or**

**inconsistent with, the Michigan Constitution.**

111. The City is prohibited from enacting an ordinance that is in direct conflict with the State statutory scheme or where the State statutory scheme preempts the ordinance by occupying the field of regulation.

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the City admits the allegation, generally but denies as untrue any allegation or implication in paragraph 111 that it has engaged in any prohibited activity in this case or to the extent that Plaintiffs mistake the law.**

112. Preemption may be established (1) where state law is expressly preemptive; (2) by examination of the legislative history; (3) by the pervasiveness of the state regulatory scheme, although this factor alone is not generally sufficient to infer preemption; or (4) where the nature of the subject matter regulated demands exclusive state regulation to achieve the uniformity necessary to serve the state's purpose or interest. *People v Llewellyn,* 401 Mich 314, 322 (1977).

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the City denies the allegation to the extent that it is an incomplete and misleading statement of the law and further denies as untrue any allegation or implication in paragraph 112 that preemption applies in this case.**

113. Michigan MMFLA provides that the City "may adopt an ordinance to authorize 1 or more types of marihuana facilities within its boundaries and to limit the number of each type of marihuana facility." See MCL § 333.27205(1).

**ANSWER: The allegation refers to a statute which speaks for itself. The City admits**

that the statute contains the quoted language, but denies any allegation or implication in paragraph 113 that is contrary to, or inconsistent with, the full text of the statute.

114. The MMFLA provides further that the City "may establish an annual,  nonrefundable fee of not more than $5,000.00 to help defray administrative and enforcement costs associated with the operation of a marihuana facility in the municipality." *Id.,* MCL § 333.27205(1 ).

**ANSWER: The allegation refers to a statute which speaks for itself. The City admits that the statute contains the quoted language, but denies any allegation or implication in paragraph 114 that is contrary to, or inconsistent with, the full text of the statute.**

115. Similarly, the MRTMA states that the City "may charge an annual fee of not more than $5,000 to defray application, administrative, and enforcement costs associated with the operation of the marihuana establishment in the municipality." MCL § 333.27956(4).

**ANSWER: The allegation refers to a statute which speaks for itself. The City admits that the statute contains the quoted language, but denies any allegation or implication in paragraph 115 that is contrary to, or inconsistent with, the full text of the statute.**

116. The City charges Plaintiffs an annual fee of $5,000 per year for renewal of each of their municipal cannabis licenses ("Renewal Fees").

**ANSWER: The City admits only that it charges Plaintiffs an annual fee of $5000 in connection with Plaintiffs' applications to renew a license. Any remaining allegations are denied as untrue.**

117. In addition to the annual Renewal Fees, the City charges Plaintiffs a yearly CSEP, MIVEDA, and/or CISEVA "fee" that is calculated based on a percentage of Plaintiffs annual gross sales.

**ANSWER: The City denies the allegation as untrue, incomplete, and/or misleading in the form and fashion stated. Specifically, the City denies as untrue any allegations that it "charges" Plaintiff any "yearly…fee" other than the fees connected with the renewal of their licenses as addressed in paragraph 116. To the extent that Plaintiffs are referring to their commitments to make Seeding Justice or Community Reinvestment Fund contributions these are contributions they have voluntarily offered either directly in their CISEVA commitments (to obtain priority consideration of their licensing and/or Special Land Use applications for recreational cannabis) or as a means of returning to compliance with the MIVEDA and/or CISEVA commitments (which were also made in exchange for priority consideration). See Plaintiffs' Ex 7.**

118. The social equity fees the City charged Fluresh in 2023 and 2024 were approximately $65,984.53 and $344,785.38, respectively. **Ex. 8** and **Ex. 9.**

**ANSWER: The allegation refers to documents (Exs. 8 and 9) which speak for themselves. The City denies as untrue, incomplete, and/or misleading any allegation that is contrary to, or inconsistent with, these documents. The City incorporates by reference its answer to paragraph 117. By way of further answer, the City denies as untrue any allegation that it "charged" Fluresh in 2023 and 2024 in any amount. Rather, Fluresh submitted a Transfer Request form in 2023 to the City seeking to return to compliance with its MIVEDA commitment with which it had failed to comply during prior performance year. See City Ex H. Similarly, in 2024, Fluresh submitted a Transfer Request form seeking to return to compliance with its commitments under both MIVEDA and CISEVA. See, the City's Ex I. Further, the**

**City states Fluresh has not made the contribution promised in 2024.**

119. The social equity fees the City charged Ascend in 2023 and 2024 were approximately \$142,387.28 and \$297,167.89, respectively. **Ex. 14, Ex. 15, Ex. 16** and **Ex. 17.**

**ANSWER: The allegation refers to documents (Exs. 14-17) which speak for themselves. The City incorporates by reference its answer to paragraph 117. Further, the City denies as untrue any allegation that it "charged" Ascend in any amount. Rather, like Fluresh, and for similar reasons Ascend made transfer requests. However, unlike Fluresh, Ascend had made commitments to contribute to the Community Reinvestment Fund as part of its original CISEVA as well. See the City's Ex E (Ascend CISEVAs).**

120. The social equity fees the City charged High Profile in 2023 and 2024 were approximately \$40,507.06 and \$211,620.90, respectively. **Ex. 18, Ex. 19,** and **Ex. 20.**

**ANSWER: The allegation refers to documents (Exs. 18 - 20) which speak for themselves. The City denies as untrue, incomplete, and misleading any allegation that is contrary to, or inconsistent with, these documents. The City incorporates by refence its answer to paragraph 117. Further, the City denies as untrue any allegation that it "charged" High Profile in any amount. Rather, like Fluresh and Ascend, and for similar reasons, High Profile made transfer requests. Further, High Profile had made multiple commitments to contributions to the Community Reinvestment Fund as part of their CISEVAs. See the City's Ex. F.**

121. The social equity fees the City charged Skymint in 2022, 2023 and 2024 were approximately \$512,904.78, \$302,435.34, and \$337,104.87, respectively. **Ex. 10** and

Ex. 11.

**ANSWER: The allegation refers to documents (Exs. 10, 11) which speak for themselves. The City denies as untrue, incomplete, and misleading any allegation that is contrary to, or inconsistent with, these documents. The City incorporates by reference its answer to paragraph 117. Further, the City denies any allegation that it "charged" Skymint in any amount.  Rather, like Fluresh, Ascend, and High Profile, and for similar reasons, Skymint made transfer requests. Further, Skymint made a commitment to contribute to the Community Reinvestment fund as part of its CISEVAs. See City Ex G.**

122. Through years 2022 to 2024, the City has levied approximately $2,254,898.03 in social equity fees against the Plaintiffs.

   **ANSWER: The City denies the allegation as untrue in the form and fashion stated. The City incorporates by reference its answer to paragraph 117-121.**

123. The City maintains a cannabis licensee application called the Automated Cannabis Enforcement and Licensing Application ("Accela") portal, which amongst other things, allows cannabis licensees to track and pay fees owed to the City.

   **ANSWER: The City admits that it operates the Accela portal through which a cannabis licensee can file an application and track its status, including any fees owed to the City and/or contributions to the Community Reinvestment Fund that Plaintiffs elect to make in connection with their CISEVA commitments and/or to Seeding Justice in lieu of compliance with some or all of their MIVEDA and CISEVA contractual obligations.**

124. Once the City issues an invoice for its so-called social equity point transfer, a tandem

entry appears in Plaintiffs' Accela portal as "APPLICATION FEES," and notes the "TOTAL FEES" to be paid by each licensee. See e.g., **Exhibit 21, Exhibit 22,** and **Exhibit 23.**

**ANSWER: The City incorporates its Answer to paragraph 123 by reference. Further, the allegation refers to documents (Exs. 21 - 23) which speak for themselves.**

125. Once Plaintiffs make their social equity fee payments to the City, it is reflected in Plaintiffs' Accela Portals referencing both the City's invoice and the "FEES" paid. Contrast **Exhibit 18** (Invoice No. 1000486274), to **Exhibit 25** (Fees paid for Invoice No. 1000486274).

**ANSWER: The City incorporates its Answer to paragraph 123 by reference. Further, the allegation refers to documents (Exs. 18. 25) which speak for themselves. The City incorporates by reference its answer to paragraph 117.**

126. While the City may sometimes refer to the amounts that it charges cannabis licensees pursuant to its social equity policies as something other than "fees," the substance over the form of these payments dictates that they are in fact fees.

**ANSWER: The allegation is denied as untrue in the form and fashion stated incomplete, and/or misleading. By way of further answer, to the extent that Plaintiffs refer to their Seeding Justice contributions, Social Equity Transfer Option – Community Reinvestment Fund contributions, and/or Social Equity Commitment – Community Reinvestment Fund contributions, the allegation is denied as untrue.**

127. The City's Accela portal specifically identifies that the monetary sums attributable to its social equity point transfer system are "FEES."

**ANSWER: The City incorporates its Answer to paragraph 126 by reference and**

**further denies the allegation as incomplete and misleading as the Aceela system includes the contributions described in paragraph 126 by default as "Application Fees." The City incorporates by reference its answers to paragraph 117, 123 and 126.**

128. The MMFLA and MRTMA both explicitly provide that the City may not charge Plaintiffs more than a $5,000 fee per year to help defray administrative and enforcement costs associated with the operation of a marihuana establishment in the municipality.

**ANSWER: The City incorporates by reference its answers to paragraphs 114 and 115.**

129. Under the MMFLA and MRTMA, the City has exceeded the allowable fees it may charge Plaintiffs per year.

**ANSWER: The City denies the allegation as untrue. Further, the City incorporates by reference its answer to paragraph 117.**

130. Any additional fees charged by the City under its cannabis Ordinance are explicitly preempted by the MMFLA and MRTMA.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City denies the allegation as untrue. Further, the City incorporates by reference its answer to paragraph 117.**

131. The MMFLA and MRTMA preempt the City from charging cannabis licensees additional social equity "fees" by occupying the field of regulation which the City seeks to enforce, even if there is no direct conflict between State law and the City's cannabis Ordinance.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City denies the allegation as untrue. Further, the City incorporates by reference its answer to paragraph 117.**

132. The nature of the regulated subject matter under the MMFLA and MRTMA with respect to the fees that a municipality may charge a cannabis licensee demand exclusive state regulation to achieve the uniformity necessary to serve the State's purpose in regulating such fees.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City denies the allegation as untrue. Further, the City incorporates by reference its answer to paragraph 117.**

133. The legislative history behind the MMFLA and MRTMA supports that State legislators did not intend for municipalities to be able to charge cannabis licensees fees in excess of the $5,000 annual renewal fees permitted by State law.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City denies the allegation as untrue. Further, the City incorporates by reference its answer to paragraph 117.**

WHEREFORE, based upon the social equity portion of the City's Ordinance being preempted by the MMFLA and MRTMA, Plaintiffs seek the following: (i) monetary damages in amount of any social equity fees paid to the City in 2022, 2023, and 2023, and 2024, with accruing interest; (ii) injunctive relief against the City finding that the fees assessed against cannabis licensees pursuant to the City's social equity policies were preempted by State law; and (iv) Plaintiffs' costs and attorneys' fees.

**ANSWER: The City denies the allegations as untrue that its actions are preempted by State law or that Plaintiffs are entitled to any relief whatsoever.**

## COUNT III
### Violations of the MMFLA and MRTMA's prohibition

**on Interfering with Licensees, Enacting Unreasonably Impractical
Ordinances, and Charging Penalties in Excess of $500**

134. The forgoing Paragraphs are all incorporated herein by reference.

**ANSWER: The City incorporates its answer to all prior paragraphs by reference.**

135. Under the Michigan Constitution 1963, art. 7, § 22, a Michigan municipality's power to adopt resolutions and ordinances relating to municipal concerns is subject to the constitution and law.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the allegation refers to the Michigan Constitution which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegation or implication that is contrary to, or inconsistent with, the Michigan Constitution.**

136. The City is prohibited from enacting an ordinance that is in direct conflict with the state statutory scheme or where the state statutory scheme preempts the ordinance by occupying the field of regulation.

**ANSWER: The City incorporates its Answer to paragraph 111 as though fully stated herein by reference. Further, the City denies as untrue any allegation or implication that it has engaged in any prohibited activity.**

137. The MMFLA provides that the City "may adopt other ordinances relating to marihuana facilities within its jurisdiction, including zoning regulations, but *shall not impose regulations ... interfering or conflicting with this act or rules for licensing marihuana facilities*." MCL § 333.27205(1) (emphasis added).

**ANSWER: The allegation refers to a statute which speaks for itself. The City admits**

**that the statute contains the quoted language, but denies any allegation or implication in paragraph 137 that is contrary to, or inconsistent with, the full text of the statute. The remaining allegation is denied as untrue. Further, the City denies as untrue any allegation or implication that it has violated this or any other provision of law.**

138. ln a similar vein, the MRTMA provides that the City "may adopt other ordinances that *are not unreasonably impracticable* and do not conflict with this act or with any rule promulgated pursuant to this act." MCL § 333.27956(2)  (emphasis added).

**ANSWER: The allegation refers to a statute which speaks for itself. The City admits that the statute contains the quoted language, but denies any allegation or implication in paragraph 138 that is contrary to, or inconsistent with, the full text of the statute. The remaining allegation is denied as untrue. Further, the City denies as untrue any allegation or implication that it has violated this or any other provision of law.**

139. Section 3 of the MRTMA defines "unreasonably impracticable" to mean "the measures necessary to comply with the rules or ordinances adopted pursuant to this act subject licensees to unreasonable risk or require such a high investment of money, time, or any other resource or asset that a reasonably prudent businessperson would not operate the marihuana establishment." *Id.* at MCL § 333.27953(cc).

**ANSWER: The allegation refers to a statute which speaks for itself. The City admits that the statute contains the quoted language, but denies any allegation or implication in paragraph 139 that is contrary to, or inconsistent with, the full text of the statute. The remaining allegation is denied as untrue as the citation given is incorrect. Further, the City denies as untrue any allegations or implications that it has violated**

this or any other provision of law.

140. Likewise, under the MRTMA the City "may not impose qualifications for licensure that conflict with this act or rules promulgated by the department." *Id.,* MCL § 333.27956(3).

**ANSWER: The allegation refers to a statute which speaks for itself. The City admits that the statute contains the quoted language, but denies any allegation or implication in paragraph 140 that is contrary to, or inconsistent with, the full text of the statute. The remaining allegation is denied as untrue. Further, the City denies as untrue any allegations or implications that it has violated this or any other provision of law.**

141. Furthermore, the MRTMA provides that the City may only "designate a violation of [its] ordinance and provide for a penalty for that violation by a marihuana establishment, provided that such violation is a civil infraction and such penalty is a civil fine of *not more than $500." Id.* at MCL § 333.27956(2)(d) (emphasis added).

**ANSWER: The allegation refers to a statute which speaks for itself. The City admits that the statute contains the quoted language, but denies any allegation or implication in paragraph 141 that is contrary to, or inconsistent with, the full text of the statute. The remaining allegation is denied as untrue. Further, the City denies as untrue any allegations or implications that it has violated this or any other provision of law.**

142. The social equity portions of the City's Ordinance are in direct conflict with the MMFLA and MRTMA, or at a minimum, the MMFLA and MRTMA preempts the field of regulation that the social equity portions of the City's Ordinance seek to regulate.

**ANSWER: The allegation states legal conclusions to which no response is required. To the extent that a response is required, the City denies the allegation as untrue,**

**incomplete, and misleading.**

143. In 2024, the City caused significant disruptions in the renewal of Fluresh's State issued cannabis licenses by filing with the State Cannabis Regulatory Agency ("CRA") Notices of Noncompliance in accord with the CSEP.

**ANSWER: The City denies the allegation as untrue in the form and fashion stated. The City specifically denies as untrue that it caused any disruption in the renewal of Fluresh's state issued cannabis license. Further, the City denies as untrue any allegation or implication that the municipal notice of non-compliance was sent "in accord with CSEP" for the reason that said notice was requested by the State under Section 6 of the MRTMA in connection with Fluresh's applications to the State as to renew its State licenses. Further, the City denies as untrue that it was responsible for any disruption whatsoever, as any delay in Fluresh's renewal process was caused by its own delay in beginning the renewal process at the City level as well as its delay in returning to compliance with its MIVEDA commitment and conditions of approval under 5.12.02B.3 of the Grand Rapids Zoning Ordinance.**

144. This action prevented Fluresh from renewing its State issued licenses in a timely manner and nearly forced Fluresh to close all of its Grand Rapids based operations, as well as its operations based in other municipalities.

**ANSWER: The City lacks information or knowledge sufficient to form a belief as to the truth of this allegation, but denies as untrue, incomplete, and misleading any allegation or implication that any action taken by City led to Fluresh's licensing issues, if any, with the State. Further, the City incorporates its answer to paragraph 143 as though stated herein by reference.**

145. During this time period, Fluresh was in constant communication with the City and it was clear that the City expected payment of its CSEP, MIVEDA, and/or CISEVA fees as a condition of removing the Notice of Noncompliance with the CRA.

**ANSWER: While the City admits it responded to Fluresh's communications, the City denies the remaining allegation as untrue in the form and fashion stated.**

146. Eventually, the City was told by the CRA to remove or withdraw the Notices of Noncompliance that it filed against Fluresh because a violation had not occurred, and as a result of this, Fluresh's state issued licenses were renewed on the last day possible under state law.

**ANSWER: The City denies as untrue the allegation that "the City was told by the CRA to remove or withdraw the Notices of Noncompliance that it had filed against Fluresh because a violation had not occurred[.]" The City lacks information or knowledge to form a belief as to the truth of the allegation that "Fluresh's state issued licenses were renewed on the last day possible under state law." The remaining allegations are denied as untrue.**

147. As part of its coercive scheme, the City files notices of noncompliance with the State a few weeks before Plaintiffs' state and municipal licenses are set to expire, citing as the basis for noncompliance the City's CSEP, MIVEDA, and CISEVA policies. Then, in the narrow window in which licenses have to renew their licenses, the City forces licensees to choose between paying the City's social equity fees or making a decision that would force Plaintiffs to lose both their municipal _and_ state licenses. In pattern and practice, the City would only remove the notices of noncompliance within days - and sometimes hours - before Plaintiffs' licenses were set to expire, and only after Plaintiffs

agreed to pay the coerced fees.

**ANSWER: The City denies the allegations as untrue.**

148. By undertaking the activities described in the aforementioned Paragraph, the City also invaded the authority of the CRA by, in effect, making unilateral dispositive decisions as to whether Plaintiffs were entitled to hold state-issued cannabis licenses. In this regard, there was no due process or recourse afforded to Plaintiffs when the City made decisions which held their state- issued licenses at stake.

**ANSWER: The City denies these allegations as untrue and further incorporates its answer to paragraph 147 by reference as though stated herein.**

149. To comply with the City's social equity framework, Plaintiffs have hired their own compliance employees or have needed to seek outside counsel in order to interpret the City's ever- evolving social equity requirements.

**ANSWER: The City lacks information or knowledge sufficient to form a belief as to actions taken by Plaintiffs with respect to hiring employees or counsel, or their reasons therefore. The City denies the remaining allegations as untrue.**

150. The CSEP, MIVEDA, and CISEVA requirements of the City's Ordinance are unreasonable and impractical, and far exceed the requirements placed on cannabis licensees by the State of Michigan or comparable municipalities.

**ANSWER: The allegations state legal conclusions to which no response is required. To the extent that a response is required, the City denies as untrue that its City Commission policies (CSEP, MIVEDA and CISEVA) or its conditions of approval under the City's Zoning Ordinance (5.12.02.B.3) are unreasonable and impractical or that they "far exceed" the requirements of the State of Michigan. The City lacks**

**information or knowledge sufficient to form a belief as to the truth of the remaining allegations, and further avers that the City is not bound by the policies or ordinances enacted by other municipalities.**

151. If the funds derived from the social equity portion of the City's Ordinance are not a tax nor are they a fee, they must be, at minimum, a fine that is imposed upon municipal cannabis licensees by the City.

**ANSWER: The allegation states legal conclusions to which no response is required, to the extent that a response is required, the City admits that Plaintiff's contributions to Seeding Justice and/or the Community Reinvestment Fund are not a tax or a fee, and denies as untrue the remaining allegation that they are a "fine."**

152. Section 6.2 of the City's CSEP list all of the sanctions that the City may levy against a non-compliant licensee, which include:

- Written warning (published list of businesses with violations)
- Opportunity to cure
- Reduction in duration of licenses
- Report to the State if related to type of business activity licensed under the MRTMA or MMFLA
- Contractual remedies as may exist
- Revocation (for egregious violations)
- Zoning violations will be addressed under the zoning ordinance
- The City's existing municipal ordinances provide for administrative appeals procedures related to city code/ordinance violations and enforcement.

**Ex. 6,** Section 6.2.

**ANSWER: The allegation refers to a document (Ex 6) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegation or implication that is contrary to, or inconsistent with, the full text of the document.**

153. Notably, the City's Ordinance does not allow for monetary sanctions to be imposed on non-compliant licensees, in excess of the amounts provided for under the MMFLA and MRTMA. See **Ex. 2.**

**ANSWER: The allegation refers to a document (Ex. 2) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegations or implications in paragraph 153 that are contrary to, or inconsistent with, the full text of the document. Further, the City denies as untrue any allegation or implication that Ex 2 restricts its ability to require compliance with any other local law, including but not limited to the City's Zoning Ordinance, or to otherwise enforce contractual commitments Plaintiffs made in exchange for prioritization of their Special Land Use applications and/or in exchange for relief from some or all of their enforceable MIVEDA and CISEVA commitments. Further, the City denies as untrue any allegation or implication that Plaintiffs' voluntary–elected contribution to Seeding Justice and/or the Community Reinvestment Fund are monetary sanctions.**

154. In essence, however, Plaintiffs are being fined by the City for failing to adhere to the social equity components of its Ordinance.

**ANSWER: The City admits that Plaintiff's are, in whole or in part, failing to comply with their agreed to commitments under MIVEDA and CISEVA. The City denies the remainder of this allegation, including the accusation that the City is imposing a "fine," as untrue.**

155. To remain compliant with the CSEP, the City forces Plaintiffs to purchase so-called "transfer points" by agreeing to pay the City a percentage of their annual sales revenue. The costs to Plaintiffs of this is severely detrimental to their business operations and is

not sustainable.

**ANSWER: The City denies as untrue the allegation that the City has "forced" these Plaintiffs to "purchase" "transfer points." By way of further answer, these Plaintiffs made voluntary commitments under MIVEDA and/or CISEVA in exchange for priority consideration of their Special Land Use applications, which became enforceable obligations and specific conditions of approval of the land use. Further, when these Plaintiffs failed to meet their enforceable commitments, the City offered a pathway back to compliance by way of City Administrative Policy 22-01, rather than revoking or declining to renew their licenses. To the extent the pathway included the option of committing to contribute to the non-profit, Seeding Justice, this was only one of the alternatives under the policy. These Plaintiffs elected this option and thereby modified their existing contractual obligations accordingly. The City lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegation.**

156. If Plaintiffs refuse to pay for these so-called "transfer points," they are in jeopardy of having their cannabis licenses revoked by the City, which would cause all of their operations to immediately cease.

**ANSWER: The City denies the allegation as untrue in the form and fashion stated. The City incorporates its answer to paragraph 155 by reference. By way of further answer, some of these Plaintiffs have elected to contribute to Seeding Justice by means of their 2024 Transfer Requests but, to date, have not made their contributions and their licenses have not been revoked by the City. See eg Ex I (Fluresh Transfer Request).**

157. In form, the City attempts to refer to the process set forth in the paragraphs above as a

Case 1:25-cv-00252-HYJ-PJG    ECF No. 4,  PageID.533    Filed 03/14/25    Page 59 of 94

"voluntary donation," however, in substance, this amounts to a fine and/or fee from the City for a licensee's failure to adhere to the City's social equity requirements.

**ANSWER: The City denies the allegation as untrue in form and fashion stated. The City incorporates by reference its answer to paragraph 155.**

158. The City has imposed the framework around compliance with its social equity requirements in order to circumvent the MMFLA and MRTMA's explicit prohibition on municipalities charging more than $5,000 in annual renewal fees and "penalties" of more than $500.

**ANSWER: The City denies the allegation as untrue.**

159. With respect to MIVEDA, the City appears to be enforcing compliance against licenses outside of the three-year term applicable to MIVEDA.

**ANSWER: The City denies the allegation as untrue.**

160. On information and belief, the City is the only municipality in Michigan that penalizes cannabis licensees for failure to adhere to social equity requirements that are a component of a municipal cannabis ordinance. Moreover, the City is the only municipality that uses non-compliance with the social equity component of its Ordinance as a basis to suspend cannabis licenses or punish licensees.

**ANSWER: The City denies this allegation as untrue and misleading in the form and fashion stated, as its actions do not constitute a penalty or "punishment" but a modification of a contact. The City lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations, but avers that it is not obligated to follow the policies of other municipalities.**

161. While it is true that other municipalities, and even the State, have cannabis regulations

that incorporate some form of a social equity component, it is almost universal across these regulations that obtaining some level of social equity determination merely results in a waiver of licensing fees.

**ANSWER: The City lacks information or knowledge sufficient to form a belief as to the truth of the allegation, except that the City admits that the State offers a social equity program in its regulatory scheme. See https://www.michigan.gov/cra/sections/social-equity-program. Further, the City avers that is not obligated to follow the "regulations," policies, or ordinances enacted by other municipalities.**

162. The City has, in effect, weaponized its social equity policies. These policies are nearly impossible to comply with, and as a result, the City has developed a scheme to tax, fine, or penalize cannabis licensees to generate additional revenue for the City.

**ANSWER: The City denies the allegation as untrue.**

WHEREFORE, based upon the social equity requirements placed on cannabis licensees by the City's Ordinance being in direct violation of the MMFLA and MRTMA, Plaintiffs seek the following: (i) monetary damages for social equity amounts paid to the City in 2022, 2023, and 2024, with accruing interest; (ii) injunctive relief against the City for the enforcement of its social equity requirements; (iii) declaratory relief against the City finding that the fees assessed against cannabis licensees pursuant to the social equity components of the City's ordinance are preempted by State law; and (iv) Plaintiffs' costs and attorneys' fees.

**ANSWER: The City denies as untrue any allegation or implication it has violated the MMFLA or the MRTMA, or that Plaintiffs are entitled to any relief whatsoever.**

**COUNT IV**
**Violation of the Michigan Constitution's Contract Clause**
**And Lack of Mutual Consent for Contract Changes**

163. The forgoing Paragraphs are all incorporated herein by reference.

**ANSWER: The City incorporates its answers to the foregoing paragraphs by reference.**

164. Both the federal and state constitutions prohibit laws that "impair obligations under contracts." See US Const, Art I § I0, cl. I et seq.; Mich Const, Art I, § 10. The contracts clauses of the Federal and State Constitutions provide that vested rights acquired under a contract may not be destroyed by subsequent legislation. *Id.*

**ANSWER: The allegation contains a conclusion of law, to which no response is required, and refers to the federal and state constitutions, which speak for themselves. The City denies any allegations or implications that are contrary to, or inconsistent with, the full text of the constitutions. Further, the City denies any allegation or implication as untrue that Plaintiffs possess a "right" to either a Special Land Use approval, a license, or a license renewal.**

165. The City treats the MIVEDA and CISEVA social equity components of its Ordinance as enforceable contracts.

**ANSWER: The City admits that the voluntary commitments made by Plaintiffs under MIVEDA and CISEVA in exchange for prioritization of their applications for Special Land Use under the Zoning Ordinance are enforceable contracts. Any remaining allegation is denied as untrue and misleading.**

166. Fluresh's MIVEDA form was submitted to the City on March 1, 2019. Fluresh's

MIVEDA form was accepted by the City on September 12, 2019. Fluresh's CISEVA form was submitted to the City on or about July 20, 2020. Fluresh's CISEVA form was accepted by the City on September 16, 2020.

**ANSWER: The City admits that Fluresh's MIVEDA was submitted in March 2019, but on March 4, not on March 1. The City admits that Fluresh submitted its CISEVA on July 20, 2020. The City denies the remaining allegations as misleading and for the reason that the correct reference would be to the date on which Fluresh gained its Special Land Use approval, at which time the commitments under MIVEDA and CISEVA became enforceable contract obligations; those dates were September 12, 2019 and September 16, 2020, respectively.**

167. All of the Plaintiffs' MIVEDA and CISEVA forms were submitted to the City, and approved by the City, prior to May 9, 2022.

**ANSWER: The City admits that Plaintiffs' MIVEDA (when offered) and CISEVA forms were submitted before May 9, 2022, and that in exchange they received prioritization and, ultimately, approval of their Special Land Use applications. The City denies any remaining allegations as untrue and misleading.**

168. On or before May 10, 2022, it was apparent to the City that a majority of its cannabis licensees could not comply with CSEP, MIVEDA, and CISEVA. As a result of this, the City Council made the decision to defer enforcement of the social equity components of its Ordinance. See **Ex. 4,** *Council Meeting Minutes.*

**ANSWER: The allegation refers to a document (Ex 4, incorrectly labelled "Council" meeting minutes) which speaks for itself. The City denies as untrue, incorrect, and/or**

**misleading any allegation or implication in paragraph 168 that is contrary to, or inconsistent with, the full text of the document. Further, the City denies this allegation as untrue and misleading in the form and fashion stated, as it incorrectly: (1) states that it was "apparent" that the cannabis licensees "could not comply with CSEP, MIVEDA, and CISEVA" when, in fact, what they did not comply with were their enforceable commitments made under MIVEDA and CISEVA in exchange for prioritization of their Special Land Use applications; (2) labels the City Commission as a "City Council" when in fact it is the City Commission; and (3) describes the City's decision. The decision was not to delay enforcement "of the social equity components of the Ordinance," but to delay enforcement of the Plaintiffs' contractual obligations under MIVEDA and CISEVA and was adopted specifically to give the City time to consider whether to enforce the MIVEDA and CISEVA commitments as is, or whether the City could-or should- offer alternate pathways to compliance.**

169. In reaction to the City Council's conclusions about a majority of its cannabis licensees not being able to comply with CSEP, MIVEDA, and CISEVA/on or about August 9, 2022-more than two years aftermost of the Plaintiffs had submitted their MIVEDA and CISEVA commitments - the City amended Policy Nos. 900-58 and 900-59, which greatly expanded on cannabis licensees' social equity requirements and implemented an "equity transfer" provision that was not contemplated by the City's original Ordinance the prior versions of MIVEDA and CISEVA.

**ANSWER: The City of Grand Rapids denies that it has a City Council – it has a City Commission. The City admits only that, on August 9, 2022, the City Commission "adopt[ed] amendments to City Commission policies 900-58 (MIVEDA) and 900-59**

**(Cannabis Social Equity Policy/CISEVA) allowing staff to implement administrative processes and policies that include a pathway for cannabis operators to return to compliance with social equity commitments, and allowing staff to attest to compliance with social equity commitments using forms provided by the State." Plaintiffs' Exhibit 4 (Official Proceedings of the City Commission of the City of Grand Rapids, Michigan Regular Session, August 9, 2022). Further, Ex 4 is a document that speaks for itself and the City denies as untrue, incomplete, and/or misleading any allegation or implication that is contrary to, or inconsistent with, this document. Further, the City incorporates its Answer to paragraph 168 by reference.  The City denies as untrue, incomplete, and/or misleading the remaining allegations. Specifically, the City denies as untrue that the City "greatly expanded" the licensees "requirements."**

170. In doing so, the City essentially changed its so-called social equity "contract" with cannabis licensees many years after the adoption of CSEP, MIVEDA, and CISEVA.

**ANSWER: The City denies the allegation as untrue and misleading in the form and fashion stated, and incorporates its Answer to paragraph 169 herein by reference. By way of further answer, the adoption of the amendments merely allowed for development of a process by which the City could offer Plaintiffs a means to modify their contractual commitments made in MIVEDA and CISEVA and return to compliance.**

171. Almost three months after amending Policy No. 900-58 and Policy No. 900-59, on November 3, 2022, the City's Manager, Mark Washington, issued Administrative Policy No. 22-01, that interpreted and further expanded on the City's requirements set forth in Policy No. 900- 58 and Policy No. 900-59.  See Ex. 7, *Administrative Policy*

*No. 22-01.*

**ANSWER: The City admits that, on November 3, 2022, City Manager, Mark Washington, issued Administrative Policy No. 22-01, which Plaintiffs attached as Ex. 7 to their Complaint.  Exhibit 7 is a document that speaks for itself, and the City denies as untrue, incomplete, and/or misleading any allegation or implication that is contrary to, or inconsistent with, the full text of the document. The City denies the remaining allegations as untrue.**

172. In relevant part Administrative Policy No. 22-01 required "Social equity performance that remains incomplete shall return to compliance using a transfer request in accordance with this Policy." *Id* at Administrative Policy No. 22-0l(Vl)(c).

**ANSWER: The allegation refers to a document that speaks for itself. While the City admits that Administrative Policy No. 22-01 contains the quoted language, the City denies as untrue, incomplete, and/or misleading any allegation or implication that is contrary to, or inconsistent with, the full text of the document.**

173. There is no question that the City's actions in implementing Policy No. 900-58, Policy No. 900-59, and Administrative Policy No. 22-01, was a material change from the original CSEP, MIVEDA, and CISEVA provisions that were incorporated into the City's Ordinance in 2020.

**ANSWER: The City admits that it implemented City Commission policies 900-58 and 900-59 and Administrative Policy No. 22-01.  The City denies the remaining allegations as untrue and incorporates by reference its answers to paragraph 168 and 169.**

174. The parties did not achieve mutual consent to the changes in MIVEDA and  CISEVA

that were brought on by the City's unilateral actions in amending Policy Nos. 900-58 and 900-59 and enacting Administrative Policy No. 22-01.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City denies the allegation and untrue and misleading in the form and fashion stated. The City denies as untrue any allegation or implication that MIVEDA or CISEVA, themselves, were changed by any unilateral action of the City, including by amendment of City Commission Policies 900-58 and 900-59 or by Administrative Policy 22-01. The City incorporates by reference its answers to paragraphs 169-173 as though stated herein by reference.**

175. The impairments caused by the City's social equity policies are substantial. Plaintiffs did not anticipate, and could not have anticipated, such large fines/fees/taxes in deciding to locate their businesses within the City and invest tens of millions of dollars into a federally- designated economically disadvantaged opportunity zones when they submitted their MIVEDA and CISEVA forms.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the allegation is denied as untrue in the form and fashion stated and for the reasons that: (1) The City has not imposed fines, fees or taxes as alleged; (2) Plaintiffs voluntarily made commitments under MIVEDA and CISEVA in order to obtain priority consideration of their Special Land Use applications, which they did, in fact, receive; (3) as sophisticated business owners and operators, they knew, or should have known, and could reasonably be expected to investigate whether, they could comply with the voluntary commitments they made in advance of any decision to locate their business in the City or to engage in any amount**

of investment; (4) Plaintiffs could reasonably expect that failure to honor their enforceable commitments under MIVEDA and CISEVA could lead to consequences, including loss or revocation of their licenses and special land use approvals; and/or (5) Plaintiffs knew from the outset that they would not be able to comply with their MIVEDA and CISEVA commitments, but made the commitments regardless in order to obtain Special Land Use Approvals and licenses, on the theory that the City would be forced to be flexible with respect to any non-compliance once Plaintiffs were established businesses. In this last regard, Plaintiffs engaged in material misrepresentation, not only with respect to the City, but with respect to other applicants who were deprived of the opportunity to obtain a Special Land Use approval by virtue of the prioritized consideration that Plaintiffs received for their Special Land Use applications as a result of Plaintiffs' misrepresentation. The City denies as untrue any remaining allegation.

176. At the time when Plaintiffs submitted their MIVEDA and CISEVA forms, the City's Ordinance did not contain a provision for requiring that the Plaintiffs "*shall return to compliance*" by paying the City up to 3% of their annual gross sales. *Id.* at Administrative Policy No. 22-0l(VI)(c).

**ANSWER: The City denies the allegations as untrue and intentionally misleading. The City's "Ordinance" has never contained a provision such as the one alleged in this paragraph and does not contain such a provision now.**

177. Additionally, by unilaterally amending MIVEDA and CISEVA and enacting Administrative Policy No. 22-01, the City greatly enhanced the sanctions that it could place on licensees for partial social equity compliance.

**ANSWER: The City denies the allegation as untrue in the form and fashion stated and for the reasons that MIVEDA and CISEVA have not been amended unilaterally or otherwise, nor has the City enhanced any "sanction." The City incorporates by reference its answers to paragraphs 169-171 as though fully stated herein.**

178. Continuation of these improper fees, fines, and or taxes, as well as the additional risks to licensure, threatens the ongoing viability of Plaintiffs' businesses. Plaintiffs have all demonstrated good faith compliance with the City's ordinance and, in fact, each maintains a true desire to promote social equity and the employment of economically-disadvantaged City residents and those impacted by the past criminalization of cannabis.

**ANSWER: The City denies the allegation as untrue in the form and fashion stated. By way of further answer, the City denies as untrue: (1) that it has imposed, much less continued, any "improper fees, fines, and/or taxes;" (2) that it has implemented any additional risks to Plaintiffs' licensure or viability, as the risks, if any, are the result of Plaintiffs' failure to comply with their MIVEDA and CISEVA commitments despite the efforts of the City to offer of a pathway back to compliance by means Administrative Policy 22-01; and (3) that Plaintiffs have not demonstrated "good faith compliance" with either the City's Zoning Ordinance or Licensing Ordinance, much less with their enforceable contractual obligations under MIVEDA and CISEVA. The City lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations.**

179. Indeed, if Plaintiffs were not forced to engage in the City's so-called "equity transfer option" (i.e., paying the City's fine in order to keep their cannabis licenses), then Plaintiffs could put those funds towards further investment in the City and attracting

more employees that have been disproportionately impacted by cannabis regulations in the past.

**ANSWER: The City denies as untrue that Plaintiffs have been "forced" to pay a "fine" to keep their cannabis licenses. The City lacks sufficient information or knowledge to form a belief as to the truth of the remainder of this allegation,**

180. The City's implementation of CESP, MIVEDA, and CISEVA is not necessary for the public good, and the means chosen by the City to address the public need are unreasonable-- particularly given that the fines, penalties, and/or the unauthorized tax Plaintiffs have been forced to pay is not in the spirit of social equity-it is purely being done by the City as a means to raise revenue.

**ANSWER: The allegation appears to state legal conclusions to which no response is required. To the extent that a response is required, the City denies the allegation as untrue.**

181. At the time of submitting its applications under the City's Ordinance and taking into account CSEP, MIVEDA, and CISEVA, Plaintiffs would have made different social equity considerations or located their business in a different municipality if they had known that the City would subsequently enact policies that would require them to pay up to 3% of their annual gross sales as a fine, tax, or penalty for non-compliance with the City's near impossible social equity requirements.

**ANSWER: The City lacks sufficient information or knowledge to form a belief as to what Plaintiffs may or may not have done with respect to making different social equity commitments or locating their businesses elsewhere. The City denies the remaining allegations as untrue. Further the City incorporates by reference its answer**

**to paragraph 175.**

182. The City's violation of the Contracts Clause has substantially damaged Plaintiffs.

**ANSWER: The City denies as untrue the allegation that the City violated the Contracts Clause or that the City has damaged Plaintiffs in any way.**

WHEREFORE, Plaintiffs seek the following: (i) injunctive relief against the City for enforcement of CSEP, MIVEDA, and CISEVA; and (ii) declaratory relief against the City finding that Plaintiffs' obligations under CSEP, MIVEDA, and CISEVA are null and void on a contractual basis.

**ANSWER: The City denies that Plaintiffs are entitled to any relief whatsoever.**

<u>**COUNT V**</u>
**Violation of the Michigan and U.S. Constitutions' Equal Protection Clauses and Commerce Clause**

183. The forgoing Paragraphs are all incorporated herein by reference.

**ANSWER: The City incorporates its Answers to the prior paragraphs by reference.**

184. The United States Constitution empowers the federal Congress "[t]o regulate Commerce ... among the several States." US Const, art I, § 8, cl 3.

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the allegation refers to the United States Constitution which speaks for itself. While the City admits that the United States Constitution contains the quoted language, the City denies any allegation or implication in paragraph 184 that is contrary to, or inconsistent with, the full text of the Constitution. Further, the City denies any allegation or implication that it has violated the United States Constitution in any manner with respect to these Plaintiffs.**

185. The United States Supreme Court has "long held that this Clause also prohibits state and municipal laws that unduly restrict interstate commerce." *Tenn Wine & Spirits Retailers Ass 'n v Thomas,* 139 US 2449, 2459 (2019); see also *Dean Milk Co v City of Madison,* 340 US 349,354 (1951).

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the City admits that the case cited contains the quoted language, but the City denies any allegation or implication in paragraph 185 that is contrary to, or inconsistent with, the full text of the case law. Further, the City denies any allegation or implication that it has violated the United States Constitution in any manner with respect to these Plaintiffs.**

186. It is well established that a corporation is a "person" within the meaning of the Fourteenth Amendment. *Metro Life Ins Co v Ward,* 470 US 869,881 (1985).

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the City admits the allegation.**

187. A law that discriminates against interstate commerce is "virtually per se invalid, and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." See *Dep 't of Revenue of Ky v Davis,* 553 US 328, 338 (2008).

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the City admits that the case cited contains the quoted language, but the City denies any allegation or implication in paragraph 187 that is contrary to, or inconsistent with, the full text of the case law. Further, the City denies any allegation or implication that it has violated the United States**

Constitution in any manner with respect to these Plaintiffs.

188. The Michigan Constitution provides that "[a]ll political power is inherent in the people. Government is instituted for their equal benefit, security and protection." Const 1963, art 1, § 1.

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the allegation refers to the Michigan Constitution which speaks for itself.  While the City admits that the Michigan Constitution contains the quoted language, the City denies any allegation or implication in paragraph 188 that is contrary to, or inconsistent with, the full text of the Constitution. Further, the City denies any allegation or implication that it has violated the Michigan Constitution in any manner with respect to these Plaintiffs, or that a damage claim can be raised against it under the Michigan Constitution here.**

189. The Michigan Constitution further guarantees that"[n]o person shall be denied the equal protection of the laws  "Const 1963, art 1, § 2.

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the allegation refers to the Michigan Constitution which speaks for itself.  While the City admits that the Michigan Constitution contains the quoted language, the City denies any allegation or implication in paragraph 189 that is contrary to, or inconsistent with, the full text of the Constitution. Further, the City denies any allegation or implication that it has violated the Michigan Constitution in any manner with respect to these Plaintiffs, or that a damage claim can be raised against it under the Michigan Constitution.**

190. The Michigan Constitution also provides that "[n]o person shall be deprived of life,

liberty or property, without due process of law." Const 1963, art 1, § 17.

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the allegation refers to the Michigan Constitution which speaks for itself.  While the City admits that the Michigan Constitution contains the quoted language, the City denies any allegation or implication in paragraph 190 that is contrary to, or inconsistent with, the full text of the document. Further, the City denies any allegation or implication that it has violated the Michigan Constitution in any manner with respect to these Plaintiffs, or that a damage claim can be raised against it under the Michigan Constitution here.**

191. Collectively, these constitutional provisions guarantee, among other things, a right to intrastate travel, a right to interstate travel, a right to pursue one's livelihood, and right to be free from arbitrary or impermissible discrimination.

**ANSWER: The allegation states a conclusion of law to which no response is required. To the extent that a response is required, the allegation appears to refer, to the United States and Michigan Constitutions which speak for themselves. The City denies any allegation or implication in paragraph 191 that is contrary to, or inconsistent with, the full text of the Constitutions, or the binding precedential case law interpreting same. Further, the City denies any allegation or implication that it has violated the United States and/or Michigan Constitutions in any manner with respect to these Plaintiffs, or that a damages claim can be raised against it under the Michigan Constitution here.**

192. The CSEP portion of the City's Ordinance violates these provisions of the U.S. and Michigan Constitution because its prefers City of Grand Rapids resident applicants in

awarding cannabis licenses and punishes Plaintiffs, and their owners, for exercising their rights to intrastate and interstate travel, violates their right to pursue a livelihood, and draws distinctions between the owners of Plaintiffs and other City of Grand Rapids residents that are not rationally related to any legitimate government purpose.

**ANSWER: The allegation states legal conclusions to which no response is required. To the extent that a response is required, the City denies the allegation as untrue. Further, the City denies as untrue and misleading, the allegation that there is a "CSEP portion" of the City's Zoning or Licensing Ordinances. Rather, CSEP is a City Commission Policy. The City incorporates by reference its answers to paragraphs 29 and 30.**

193. The CSEP portion of the City's Ordinance violates the U.S. Constitution Commerce Clause because it discriminates against out-of-state residents and punishes people for moving between states.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City denies the allegation as untrue. Further, the City denies as untrue and misleading, the allegation that there is a "CSEP portion" of the City's Zoning or Licensing Ordinances. Rather, CSEP is a City Commission Policy. The City incorporates by reference its answers to paragraphs 29 and 30.**

194. The CSEP portion of the City's Ordinance violates the Michigan Commerce Clause because it discriminates against residents and punishes people for moving outside of Kent County.

**ANSWER: The allegation states a legal conclusion to which no response is required.**

**To the extent that a response is required, the City denies the allegation as untrue. Further, the City denies as untrue and misleading, the allegation that there is a "CSEP portion" of the City's Zoning or Licensing Ordinances. Rather, CSEP is a City Commission Policy. The City incorporates by reference its answers to paragraphs 29 and 30. Further the City denies as untrue any allegation or implication that a damages claim can be brought against it under the Michigan Constitution here.**

195. The Ordinance's preference for City of Grand Rapids applicants does not advance a legitimate local purpose--and, even to the extent that it does, that interest could be adequately served by reasonable nondiscriminatory alternatives.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City denies the allegation as untrue.**

196. In September of 2020, Brandon Kanitz, a founder and the Chief Executive Officer (CEO) of Fluresh, moved from the City of Grand Rapids to Traverse City, Michigan. The move was precipitated by the COVID-19 pandemic, which had effectively closed his children's schools in Grand Rapids and disrupted his family's childcare infrastructure. This factor forced Kanitz to move back to the Grand Traverse region where his wife's family resided and could provide better support for his family. This was one of the factors by which Fluresh was found to be noncompliant under the City's cannabis social equity policies, and Fluresh was fined $65,984.53 by the City in 2023.

**ANSWER: The City lacks sufficient information or knowledge to form a belief as to the truth of this allegation, except that the City admits that Fluresh filed paperwork with the City admitting its non-compliance with its MIVEDA commitments and that Fluresh filed a Transfer Request Form in 2023 reflecting a voluntarily elected**

**contribution to the Seeding Justice Fund in the amount of $65,9984.53. See the City's**

**Ex. H (Flurseh Transfer Request Form). The City denies as untrue any allegation or**

**implication in paragraph 196 that it "fined" Fluresh in any amount.**

197. Plaintiffs have been damaged by the City's discriminatory CSEP, MIVEDA, and CISEVA policies.

**ANSWER: The City denies the allegation as untrue.**

WHEREFORE, Plaintiffs seek the following: (i) injunctive relief against the City for the enforcement of CSEP, MIVEDA, and CISEVA; and (ii) declaratory relief against the City finding that CSEP, MIVEDA, and CISEVA are unconstitutional.

**ANSWER: The City denies as untrue any allegation that Plaintiffs are entitled to any relief whatsoever.**

<u>**COUNT VI**</u>
**42 U.S.C. § 1983 Claim**

198. The forgoing Paragraphs are all incorporated herein by reference.

**ANSWER: The City incorporates its answers to the prior paragraphs by reference.**

199. 42 U.S.C. § 1983 provides in relevant part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …

**ANSWER: The allegation refers to a statute which speaks for itself. The City admits**

**that the statute contains the language quoted, but denies as untrue any allegation or**

**implication in paragraph 199 that the City subjected any Plaintiff to a deprivation of any rights, privileges or immunities secured by the United States Constitution or that the City is liable to any Plaintiff under any such theory.**

200. In seeking to enforce the social equity provisions of its Cannabis Ordinance, the City has violated Plaintiffs' Fourteenth Amendment rights to equal protection and substantive rights under the dormant commerce clause of the U.S. Constitution.

**ANSWER: The allegation states legal conclusions to which no response is required. To the extent that a response is required, the City denies the allegation as untrue.**

201. The City has enacted the social equity component of its Ordinance under the color of state law and is thus explicitly acting in its official capacity, and by doing so it has violated Plaintiffs' constitutional rights.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City admits it acted under the color of law in enacting the zoning and license ordinances and the policies related to cannabis at issue here. The City denies as untrue the remaining allegations.**

202. Plaintiffs have been damaged, and continue to be damaged, as a result of the City's unconstitutional Ordinance.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City denies the allegation as untrue.**

WHEREFORE, as a result of its U.S. Constitutional rights being violated, Plaintiffs seek the following: (i) monetary damages for any actual injury caused by the City's Ordinance; (ii) compensatory damages, including the out of pocket fees the City charged under the

social equity component of the Ordinance, as well as damages for impairment to Plaintiffs'

reputation; and (iii) Plaintiffs' reasonable attorneys' fees, costs, and expenses incurred in

sustaining this litigation.

**ANSWER: The City denies as untrue that Plaintiff's constitutional rights have been**

**violated or that Plaintiffs' are entitled to any relief whatsoever.**

**COUNT VII**
**The Social Equity Component of the**
**City's Ordinance is Void for Vagueness**

203. The forgoing Paragraphs are all incorporated herein by reference.

**ANSWER: The City incorporates its answers to the prior paragraphs by reference.**

204. A statute may qualify as void for vagueness if: (1) it is overbroad and impinges on

First Amendment freedoms; (2) it does not provide fair notice of the conduct it

regulates; or (3) it gives the trier of fact unstructured and unlimited discretion in

determining whether the statute has been violated. *Proctor v White Lake Twp Police*

*Dep't,* 248 Mich App 457, 467; 639 NW2d 332 (2001). Laws may also be void for

vagueness where there is "arbitrary and discriminatory enforcement." *People v*

*Boomer,* 250 Mich App 534, 539; 655 NW2d 255 (2002).

**ANSWER: The allegation states legal conclusions to which no response is required. To**

**the extent that a response is required, the allegation relies on case law which speaks**

**for itself. The City denies as untrue, incomplete, and/or misleading any allegation or**

**implication in paragraph 204 that is contrary to, or inconsistent with, the full text of**

**the controlling precedent in this body of law.**

205. The City's Ordinance fails to provide fair notice of its social equity requirements.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, Plaintiffs fail to identify which Ordinance they refer to, or to describe how fair notice is lacking. Consequently, the City lacks sufficient knowledge or information to form a belief as to the truth of this vague allegation.**

206. The City's cannabis Ordinance was enacted in 2019 and was amended in 2020 to include the CSEP component.  Numerous provisions of the CSEP are decidedly vague, including, but not limited to the following:

   a.  The Ordinance only requires that licensees provide the City with a "social equity plan detailing any practices, initiatives, or policies the applicant will implement to promote and encourage participation in the cannabis industry by people from communities that have been disproportionately impacted by cannabis prohibition and enforcement and to positively impact those communities." The City's enforcement of the Ordinance has far exceeded this standard.

   b.  The Ordinance does not specify what penalties a licensee will face for non-compliance with submitting a social equity plan.

   c.  The Ordinance only states that a licensee must make a "good faith effort" to meet the objectives of its social equity plan. This so-called "good faith effort" seems to be rendered nearly unobtainable by the City, as evidenced by its 2022 recognition that a majority of its cannabis licensees cannot comply with CSEP, MIVEDA, and CISEVA.

    d.   Nowhere in the Ordinance does it give the City the right to fine, tax, or penalize cannabis licensees for non-compliance with social equity requirements.

    e.   Nowhere in the Ordinance does it give the City rights to engage in a "social equity transfer" with licensees, which is in essence a thinly-veiled program the City uses to transfer up to 3% of licensees' annual sales revenue to the City or city-controlled nonprofits.

**ANSWER: The City denies as untrue that it has a "cannabis Ordinance." To the extent that Plaintiffs refer to the City Zoning Ordinance or its Licensing Ordinance, the allegation is denied as untrue as these ordinances do not "include a CSEP component." By way of further answer CSEP is a City Commission Policy, not an ordinance. The City incorporates its answers to paragraphs 29 and 30 by reference. Further, the City denies the allegation in subparagraphs a-e as follows:**

    **a.   While the City admits that its Licensing Ordinance contains the quoted language, the subparagraph is denied as untrue and misleading and for the reason that it appears to intentionally and wrongfully, conflate "a social equity plan." The remaining allegation is denied as untrue as it has no application here.**

    **b.   The subparagraph is unintelligible as written and, therefore, the City lacks sufficient knowledge or information to form a belief as to the truth of the allegation. However, the City denies as untrue any allegation or implication in subparagraph (b) that any applicable City Ordinance contains a penalty for**

"non-compliance with submitting a social equity plan."

    c.    **The subparagraph is denied as untrue and misleading and for the reason that no Ordinance "only states that a licensee must make a 'good faith effort' to meet the objectives of its social equity plan" or that Plaintiffs are alleviated from compliance with the enforceable MIVEDA and CISEVA commitments by any such reference. The remaining allegation, to the extent decipherable, is denied as untrue in the form and fashion stated and for the reasons stated in the City's answer to paragraph 168 which is incorporated by reference.**

    d.    **The subparagraph is denied as untrue and for the reason that no "Ordinance" relative to Plaintiffs imposes a penalty, fine, or tax for noncompliance with Plaintiffs' enforceable MIVEDA and/or CISEVA commitments.**

    e.    **The subparagraph is denied as untrue and for the reason that, to the extent this allegation appears to refer to the processes and procedures available under Administrative Policy 22-01, which was authorized for development by the City Commission. The remaining allegations are denied as untrue.**

207. The City amended Policy Nos. 900-58 and 900-59, which greatly expand on the social equity provision of the City's Ordinance. Likewise, the City Manager has signed Administrative Policy No. 22-01, which implemented the City's "social equity transfer" scheme. Collectively, these policies have strayed far from the City's original Ordinance, which has rendered the Ordinance vague and impossible to comply with.

    **ANSWER: The City admits that (1) the City Commission adopted City Commission polices 900-58 and 90059, amending both in 2022, but only to "allow[] staff to**

**implement administrative processes and policies that include a pathway for cannabis operators to return to compliance with their enforceable commitments made under MIVEDA and CISEVA (not the Licensing Ordinance), and allowing staff to attest to compliance with municipal ordinances using forms provided by the State[;]" and (2) the City Manager signed Administrative Policy No. 22-01, which is a document that speaks for itself. The City denies as untrue and misleading the remaining allegations including that the City's applicable Ordinances or Policies are "impossible to comply with."**

208. The social equity requirements of the City's Ordinance are not clear. As proof of this, after more than two years in existence, the City Manager's stated purposed in effectuating Administrative Policy No. 22-01 was "[t]o provide supplemental criteria for achieving compliance with the social equity commitments made by the medical and recreational cannabis industry."

**ANSWER: The City admits only that Administrative Policy No. 22-01 contains the quoted language, but as that policy is a document which speaks for itself, the City denies as untrue, incomplete, and/or misleading any allegation or implication in paragraph 208 that is contrary to, or inconsistent with, that document. The City denies as untrue the remaining allegations.**

209. Administrative Policy No. 22-01 further provided that this "[p]olicy serves as a tool to further articulate the process for achieving compliance with social equity commitments in the medical and recreational cannabis industries."

**ANSWER: The City admits only that Administrative Policy No. 22-01 contains the quoted language, but as that policy is a document which speaks for itself, the City**

**denies as untrue, incomplete, and/or misleading any allegation or implication in paragraph 209 that is contrary to, or inconsistent with, that document.**

210. In reality, Administrative Policy No. 22-01 adds more confusion and regulatory vagueness to the City's social equity policies.

**ANSWER: The allegation refers to a document (Administrative Policy No. 22-01) which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegation or implication in paragraph 210 that is contrary to, or inconsistent with, that document. Further, the City denies the allegation as untrue.**

211. The City has arbitrarily enforced its Ordinance in the past and will continue to do so in the future.

**ANSWER: The City denies the allegation as untrue.**

212. Indeed, the City Council Meeting Minutes from May 10, 2022, show that the City Council decided to defer enforcement of its cannabis social equity policies through August of 2022. On August 10, 2022, the City Council then made the decision to defer enforcement of its cannabis social equity policies until 2023. These decisions were predicated on the observation that a majority of licensees could not comply with the City's so-called social equity requirements.

**ANSWER: The City denies any allegation referring to a "City Council" as untrue as the correct reference is to the City Commission. Further, this allegation refers to Minutes from May 10, 2022 but failed to include a copy of that document. The City denies as untrue, incomplete, and/or misleading any allegation or implication that is contrary to, or inconsistent with, that document. Further, the City denies the remaining allegations as untrue in the form and fashion stated. The City further**

**denies as untrue and misleading any allegation or implication in paragraph 212 that the City deferred enforcement of "cannabis social equity policies" as the City Commission's decision instead related to deferral of enforcement of the commitments made by cannabis operators (including Plaintiffs) under MIVEDA and CISEVA – which at that point were enforceable contractual obligations.  The City further denies as untrue any allegation or implication that the decisions to defer enforcement were based on the observation that the operators could not comply "with the City's so-called social equity requirements." Rather, these decisions were based on information that "most cannabis operators [including Plaintiffs] will not meet all of  their voluntarily offered MIVEDA and/or CISEVA commitments made with their Special Land Use applications" and that a different pathway to compliance would be needed if the cannabis industry was to avoid  the impact of noncompliance on "State and local licensing and the validity of [their] cannabis Special Land Uses." See, Plaintiffs' Ex. 4, pp 26-27.**

213. Accordingly, there was more than a three-year period of non-enforcement (or selective enforcement) of the City's CSEP, MIVEDA, and CISEVA requirements; running at least from the time its amended Ordinance was enacted in 2020, until sometime in 2023 when the City began enforcement. As it stands in early-2025, the City's cannabis social equity requirements have seen longer periods of non-enforcement than enforcement.

**ANSWER: The allegation is denied as untrue, misleading, and incomplete. The City incorporates its answer to paragraph 212 by reference.**

214. The City has also attempted to enforce the Ordinance's social equity requirements in an arbitrary and overbearing manner. For example, in order to assess Fluresh's workplace

diversity, the City requested all of the *personal tax returns for the past 10 years* of Fluresh's employees. In a similar vein, the City has requested documents from Brandon Kanitz verifying his personal residency and has requested an ever-evolving set of documents to support so-called "supplier diversity."

**ANSWER: The City denies allegation as untrue and misleading and for the reasons that: (1) the City is entitled to make reasonable requests to verify whether Fluresh was compliant with the contractual obligations under MIVEDA and CISEVA; (2) licensees have continuing duty under the licensing ordinance to provide information requested by the City and to cooperate in any investigation conducted by the City. See Section 7.365(c).**

215. Compliance with the social equity provisions of the City's Ordinance is nearly impossible from a purely regulatory standpoint, but in practice, the City also treats licensees arbitrarily under the Ordinance on a reoccurring basis. Inherent in all of this is the fact that compliance was never intended, when non-compliance puts the City in a position to collect up to 3% of cannabis licensees' annual gross sales.

**ANSWER: The City denies the allegation as untrue.**

216. Plaintiffs' compliance personnel and attorneys have engaged in numerous written and verbal communications with the City's Cannabis Manager regarding the City's social equity policies, and they have received vague and often conflicting advice on how to comply with the Ordinance.

**ANSWER: The City admits only that some personnel and some attorneys for some Plaintiffs have engaged in communications, both written and verbal, with the Cannabis Manager regarding their noncompliance, transfer requests, and other**

topics. **The City denies the remaining allegations as untrue.**

217. On information and belief, the City holds cannabis licensees to different standards and applies a discriminatory application of the CSEP, MIVEDA, and CISEVA requirements of its Ordinance.

**ANSWER: The allegation appears to state legal conclusions to which no response is required. To the extent that a response is required, the City denies the allegation as untrue in the form and fashion stated. The City further denies as untrue any allegation or implication that it employs different standards or discriminates in any impermissible way with respect to its actions relating to these Plaintiffs, or any other cannabis operator or licensee within the City. Further the City states affirmatively that participation in MIVEDA, CISEVA and CSEP is voluntary.**

WHEREFORE Plaintiffs seek relief consisting of the following: (i) an injunction against the City for the enforcement of CSEP, MIVEDA, and CISEVA; and (ii) declaratory relief against the City finding that Plaintiffs' obligations under CSEP, MIVEDA, and CISEVA are null and void.

**ANSWER: The City denies as untrue that Plaintiffs are entitled to any relief whatsoever.**

<u>**COUNT VIII**</u>
**The Social Equity Component of the**
**City's Ordinance is in Violation of the Michigan Zoning Enabling Act**

218. The forgoing Paragraphs are all incorporated herein by reference.

**ANSWER: The City incorporates its answers to the prior paragraphs by reference.**

219. Under the MZEA, "conditions imposed with respect to the approval of a land use or activity shall be recorded in the record of the approval action and remain unchanged

except upon the *mutual consent of the approving authority and the landowner.* The approving authority shall maintain a record of conditions which are changed." MCL 125.3504(5) *(emphasis added).*

**ANSWER: The allegation refers to a statute which speaks for itself. While the City admits that the statute contains the language quoted, the City denies as untrue, incomplete, and/or misleading any allegation or implication in paragraph 219 that is contrary to, or inconsistent with, the full text of the statute. Further, the City denies as untrue any allegation or implication that it has violated the statute in any way with respect to Plaintiffs.**

220. In this instance the Plaintiffs all committed to CSEP, MIVEDA, and/or CISEVA commitments in 2020, but then the City materially changed the requirements of the Ordinance in 2022 by amending Policy Nos. 900-58, 900-59, and enacting Administrative Policy No. 22-01.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, while the City admits that Plaintiffs all made commitments under MIVEDA and CISEVA in order to obtain priority consideration of their Special Land Use applications, the City denies as untrue that they did so in 2020, as some made the commitment earlier. The City denies the remaining allegations as untrue. Further, the allegation refers to documents which speak for themselves. The City denies as untrue, incomplete, and/or misleading any allegation or implication that is contrary to, or inconsistent with, those documents.**

221. These new changes in 2022, not only required Plaintiffs to pay up to 3% of their annual gross sales to the City in order to remedy partial compliance, the City also elevated the

standards for licensees to sustain compliance with CSEP, MIVEDA, and CISEVA.

**ANSWER: The City denies the allegations as untrue and misleading in the form and fashion stated. The City incorporates by refere4nce its answer to paragraphs 40, 47, 48 and 50.**

222. Specifically, ever evolving administrative policies changed the interpretation of "supplier diversity." Previously, the City's Ordinance defined "[a] diverse supplier [as], *in the broadest sense possible,* a business owned and operated by an individual or group that is part of a traditionally underrepresented or underserved group." See **Exhibit 6,** CSEP Ordinance, 3.6.3 Supplier Diversity *(emphasis added).* ln a continuing evolution of its Ordinance, the City now appears to require that diverse suppliers actually be certified by the state or City as minority owned business, woman owned businesses, etc.

**ANSWER: The allegation refers to a document which speaks for itself. The City denies as untrue, incomplete, and/or misleading any allegation or implication contrary to the full text of that document. The City denies as untrue the allegations that it has "ever-evolving administrative policies," that there is a "CSEP Ordinance" (as CSEP is a City Commission Policy, not an Ordinance), or that "the City's Ordinance" defined diverse supplier with the quoted language. Th City further incorporates is answers to paragraphs 29 and 30 by reference. The remaining allegations are denied as untrue and misleading.**

223. This specific requirement does not adhere to the explicit language of the Ordinance where "diverse suppliers" are to be determined "in the broadest sense possible." This has led City officials to question and deny Plaintiffs' assessments of a diverse supplier on the basis that these suppliers might not have state or City certification.

**ANSWER: This allegation appears to quote language from City Commission Policy 900-59. The City denies that this document is an Ordinance or that any "Ordinance" uses the language quoted in this allegation. The City denies the remaining allegations as untrue.**

224. Unlike the City's Ordinance, which was adopted by a legislative body at a public meeting in 2018, Policy Nos. 900-58, 900-59, and Administrative Policy No. 22-01, were administrative policies that were unilaterally created by the City Manager and City Executives.

**ANSWER: The City incorporates by reference its answer to paragraph 51.**

225. Policy Nos. 900-58, 900-59, and Administrative Policy No. 22-01 represent material changes to the City's Ordinance and zoning enforcement, and these provisions were never approved or consented to by the landowner Plaintiffs.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the allegation is denied as untrue and misleading. By way of further answer, the adoption by the City Commission of Policy 900-58 and 900-59 as well as issuance of Administrative Policy 22-01 do not require the consent or approval of Plaintiffs.**

WHEREFORE Plaintiffs seek relief consisting of the following: (i) an injunction against the City for the enforcement of CSEP, MIVEDA, and CISEVA; and (ii) declaratory relief against the City finding that Plaintiffs' obligations under CSEP, MIVEDA, and CISEVA are null and void.

**ANSWER: The City denies that Plaintiffs are entitled to any relief whatsoever.**

**COUNT IX**
**Declaratory Judgment Pursuant to MCR § 2.605**

226. The forgoing Paragraphs are all incorporated herein by reference.

**ANSWER: The City incorporates its answers to the prior paragraphs by reference.**

227. To assert a claim for declaratory judgment, Plaintiffs must allege a case of actual controversy within the jurisdiction of the Court, and Plaintiffs must be an interested party in seeking a declaratory judgment.

**ANSWER: The allegation states legal conclusions to which no response is required. To the extent that a response is required, the City denies any allegation or implication in paragraph 227 that is contrary to, or inconsistent with, the law governing declaratory judgment. The City further denies any allegations or implication that Plaintiffs are entitled to declaratory relief.**

228. As set forth in the Paragraphs above, Plaintiffs have asserted claims against the City relative to CSEP, MIVEDA, and CISEVA: (i) under the Headlee Amendment to the Michigan Constitution; (ii) for state law preemption of its Ordinance; (iii) for violation of the Michigan Constitution's contracts clause; (iv) for violations of the equal protection and commerce clause of both the U.S. and Michigan constitutions; (v) pursuant to 42 U.S.C § 1983; (vi) under the void for vagueness doctrine; and (vii) under the Michigan Zoning Enabling Act.

**ANSWER: The allegation states legal conclusions to which no response is required. To the extent that a response is required, the City denies as untrue that Plaintiffs have asserted any viable claim against the City on any basis.**

229. Undoubtedly, there is an actual case in controversy between the parties.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City incorporates its answer to paragraph 228 by reference.**

230. Plaintiffs are also an interested party to this matter because their rights and business interests are being adversely affected by the City's actions.

**ANSWER: The allegation states a legal conclusion to which no response is required to the extent a response is required, the City denies any allegation or implication that Plaintiff's rights or business interests have been, or are being, adversely affected by any action taken by the City.**

231. Plaintiffs are entitled to a declaratory judgment regarding the abovementioned causes of action.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City denies the allegation as untrue.**

232. Pending an outcome of this litigation, the Court should issue a declaratory judgment regarding the enforceability of the social equity components of the City's Ordinance to clarify for Plaintiffs and other cannabis licensees that compliance with those conditions is no longer mandated.

**ANSWER: The allegation states a legal conclusion to which no response is required. To the extent that a response is required, the City denies the allegation as untrue.**

WHEREFORE, Plaintiffs seek a declaratory judgment from the Court declaring the social equity components of the City's Ordinance, to include CSEP, MIVEDA, and CISEVA, unenforceable as a matter of law.

**ANSWER: The City denies as untrue that Plaintiffs are entitled to the declaratory**

**judgment that they seek.**

Respectfully submitted,

THE CITY OF GRAND RAPIDS,

Dated: March 14, 2025

*/s/ Elizabeth J. Fossel.*
Elizabeth J. Fossel (P41430)
Director of Civil Litigation
Attorney for Defendant
300 Monroe Ave. NW, Ste. 620
Grand Rapids, MI 49503
Ph: (616) 456-3099
efossel@grand-rapids.mi.us

## <u>AFFIRMATIVE DEFENSES</u>

The City gives notice that it may rely on some or all of the Affirmative Defenses stated below.

1. Plaintiffs fail to state a claim upon which relief may be granted.

2. Plaintiffs' claims are, or may be, in whole or in part, barred by the applicable statute of limitations.

3. Plaintiffs have not suffered irreparable harm, therefore, they are not entitled to the equitable relief they seek.

4. Plaintiffs' "losses," if any, were caused in whole or in part by Plaintiffs' own actions.

5. Plaintiffs assumed the risk of loss.

6. Plaintiffs' claims are, or may be, barred by waiver.

7. Plaintiffs' claims for equitable relief are barred by the doctrine of unclean hands.

8. Plaintiffs have failed to act in good faith.

9. Plaintiffs' claims are barred by the doctrine of estoppel.

10. Plaintiffs' claims are barred by failure of consideration.

11. Plaintiffs' claims are barred by fraud in that they knowingly undertook commitments under MIVEDA and CISEVA without the intention of meeting those commitments and did so for the purpose of obtaining priority consideration of their Special Land Use applications at the expense of other applicants who were then buffered out by Plaintiffs.

12. Plaintiffs' claims may be barred in whole or in part by their failure to satisfy a condition precedent to their filing this lawsuit.

13. Plaintiffs' have failed to mitigate their damages.

14. Plaintiffs' claims may be barred by governmental immunity, or any other immunity provided by law.

15. Plaintiffs' claims may be barred by their express or implied consent.

16. Plaintiffs' claims may be barred in whole or in part because they ratified the City's actions.

17. Plaintiffs' claims constitute an abuse of process as one or more of them may be promulgated for improper purpose or motive.

18. Defendant reserves the right to add further defenses as they are discovered.

Respectfully submitted,

THE CITY OF GRAND RAPIDS,

Dated: March 14, 2025

*/s/ Elizabeth J. Fossel.*
Elizabeth J. Fossel (P41430)
Director of Civil Litigation
Attorney for Defendant
300 Monroe Ave. NW, Ste. 620
Grand Rapids, MI 49503
Ph: (616) 456-3099
efossel@grand-rapids.mi.us

## <u>RELIANCE ON JURY DEMAND</u>

The City hereby relies on the demand for jury trial previously filed by Plaintiffs.


Respectfully submitted,

THE CITY OF GRAND RAPIDS,

Dated: March 14, 2025

*/s/ Elizabeth J. Fossel.*
Elizabeth J. Fossel (P41430)
Director of Civil Litigation
Attorney for Defendant
300 Monroe Ave. NW, Ste. 620
Grand Rapids, MI 49503
Ph: (616) 456-3099
efossel@grand-rapids.mi.us