UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FLURESH, LLC, et al.,

    Plaintiffs,

v.

CITY OF GRAND RAPIDS,

    Defendant.

_____/

Case No. 1:25-cv-252

Hon. Hala Y. Jarbou

## OPINION

Plaintiffs Fluresh, LLC ("Fluresh"), FPAW Michigan, LLC ("Ascend"), QPS Michigan Holdings LLC, Fish Ladder Holdings, LLC (QPS and Fish Ladder, collectively, "High Profile"), The District Park, LLC, and Green Skies-Healing Tree LLC (The District Park and Green Skies-Healing Tree, collectively, "Skymint") operate medical and adult-use retail cannabis businesses in Grand Rapids, Michigan.  Before the Court are their motion for a preliminary injunction (ECF No. 1-5) and motion for a temporary restraining order ("TRO") (ECF No. 10) prohibiting the City of Grand Rapids from enforcing its requirement that Plaintiffs meet certain conditions or pay fees in order to maintain their licenses to operate cannabis businesses.  For the reasons herein, the Court will deny both motions.

### I. BACKGROUND

**A. Legal Status of Marijuana in Michigan**

Article 7 of Michigan's Public Health Code makes it illegal to "manufacture, create, deliver, or possess with intent to manufacture, create, or deliver a controlled substance."  Mich. Comp. Laws § 333.7401(1).  Marijuana is a controlled substance.  Mich. Comp. Laws § 333.4214(e).

### 1. MMMA

In 2008, Michigan started creating exceptions to its criminal code regarding marijuana. Voters passed the Michigan Medical Marihuana Act (MMMA), Mich. Comp. Laws § 333.26421 et seq., via ballot initiative. Its purpose is "to allow a limited class of individuals the medical use of marijuana." *People v. Kolanek*, 817 N.W.2d 528, 535 (Mich. 2012). It "does *not* create a general right for individuals to use and possess marijuana in Michigan." *Id.* "Rather, the MMMA's protections are limited to individuals suffering from serious or debilitating medical conditions or symptoms, to the extent that the individuals' marijuana use 'is carried out in accordance with the provisions of [the MMMA].'" *Id.* at 536 (quoting Mich. Comp. Laws § 333.26427(a)).

The MMMA "defines the parameters of legal medical-marijuana use, promulgates a scheme for regulating registered patient use and administering the act, and provides for an affirmative defense, as well as penalties for violating the MMMA." *People v. Tasselmyer*, No. 353404, 2021 WL 1236116, at *1 (Mich. Ct. App. Apr. 1, 2021). Among other things, the MMMA permits a "qualifying patient"—i.e., someone diagnosed with a "debilitating medical condition"—to obtain a "registry identification card" that allows them to possess, manufacture, and use marijuana to treat or alleviate their condition, provided that they do not possess more than 12 marijuana plants "kept in an enclosed, locked facility." Mich. Comp. Laws § 333.26426(a); Mich. Comp. Laws § 333.26423 (defining "qualifying patient" and "medical use" of marijuana).

Such patients can designate a "caregiver" to assist them in the cultivation of marijuana. Mich. Comp. Laws § 333.26424(b). Caregivers who possess a "registry identification card" issued by the state are permitted to cultivate and possess up to 12 marijuana plants per qualifying patient, so long as the plants are kept in an "enclosed, locked facility." *Id.* An enclosed, locked facility is a fully enclosed area equipped with a lock that permits access "only by a registered primary

caregiver or registered qualified patient." Mich. Comp. Laws § 333.26423(d). Such caregivers are "not subject to arrest, prosecution, or penalty in any manner" for assisting a qualified patient in accordance with the act. *Id.*

The caregiver is allowed to receive compensation for their costs associated with assisting the registered qualifying patient, Mich. Comp. Laws § 333.26424(f); however, sale of marijuana to someone not permitted to use it for medical purposes under the act is a felony. Mich. Comp. Laws § 333.26424(l). Similarly, possession with intent to unlawfully deliver marijuana is still a felony, even where possession alone is lawful. *People v. Terry-Outlaw*, No. 360457, 2023 WL 5651961, at *7 (Mich. Ct. App. Aug. 31, 2023).

### 2. MMFLA

In 2016, the Michigan legislature enacted the Medical Marihuana Facilities Licensing Act (MMFLA), Mich. Comp. Laws § 333.27101 et seq., in order to "license and regulate medical marihuana growers, processors, provisioning centers, secure transporters, and safety compliance facilities." *Tasselmyer*, 2021 WL 1236116, at *2 (quoting Preamble to the MMFLA). The act "provides protections for those granted a license and engaging with activities within the scope of the MMFLA." *Id.* (quoting *Hoover v. Mich. Dep't of Licensing & Regul. Affs.*, No. 19-cv-11656, 2020 WL 230136, at *2 (E.D. Mich. Jan. 15, 2020)). Those growing and possessing marijuana under a "state operating license" are protected from search, prosecution, and criminal penalties. Mich. Comp. Laws § 333.2701(2).

### 3. MRTMA

The Michigan legislature enacted the Michigan Regulation and Taxation of Marihuana Act (MRTMA), Mich. Comp. Laws § 333.27951 et seq., in 2018. Its purpose is to make marijuana use by adults generally legal under state law and to "control the commercial production and distribution of marihuana under a system that licenses, regulates, and taxes the businesses

3

involved." Mich. Comp. Laws § 333.27952. It did not completely decriminalize the use, possession, or sale of marijuana. Rather, it permits adults 21 years and older to possess, purchase, store, and consume up to 2.5 ounces of marijuana, and to cultivate and possess up to 12 marijuana plants for personal use. Mich. Comp. Laws § 333.27955(a). It also allows entities to apply for a license from the state to become a marijuana retailer, safety compliance facility, transporter, processor, microbusiness, or grower. Mich. Comp. Laws § 333.27959. The state will approve such licenses only if "the municipality in which the proposed marihuana establishment will be located does not notify the department that the proposed marihuana establishment is not in compliance" with a municipal ordinance enacted consistent with the MRTMA. *Id.* § 333.27959(3)(b).

### B. Grand Rapids Ordinances

Under the MMFLA, municipalities like the City of Grand Rapids can adopt cannabis ordinances authorizing one or more licensees under the MMFLA to operate within the municipality, a process known as "opting in." (Compl. ¶ 14 (citing Mich. Comp. Laws § 333.27205(1)).)

Under the MMRTA, a municipality may "opt out" by adopting an ordinance completely prohibiting or limiting marijuana establishments within its boundaries. *See* Mich. Comp. Laws § 333.27956(1). In addition, municipalities can require such establishments to obtain a municipal license, so long as the qualifications for licensure do not conflict with the MMRTA. *Id.* § 333.27956(3).

According to Plaintiffs, in December 2018, the City adopted a policy for what it called a "Marihuana Industry Voluntary Equitable Development Agreement" ("MIVEDA"). (*See* City Comm'n Policy re MIVEDA (Dec. 4, 2018), ECF No. 1-1, PageID.49.) According to the policy, a MIVEDA is a "voluntarily-offered document that is proposed by an applicant for a marihuana

facility use which shall become part of the applicant's submission." (*Id.*) Applicants for a medical marijuana facility license who submit a MIVEDA using the City's approved form would receive "consideration precedence, based on the number of voluntarily offered conditions contained in the MIVEDA." (*Id.*, PageID.50.)

In October 2019, the City adopted an ordinance (the "Ordinance") allowing the City to license and regulate marijuana facilities authorized by the MMFLA.  (Compl. ¶ 23.)  Shortly thereafter, the City began accepting applications for licenses to operate medical marijuana facilities in accordance with the MMFLA.  In December 2019, the City updated the Ordinance to include provisions for licensing cannabis businesses selling marijuana for "recreational" (i.e., non-medical) adult use, in accordance with the MRTMA.  (*Id.* ¶ 26.)

In July 2020, the City amended the Ordinance to include a "Cannabis Social Equity Program" component ("CSEP").  (*Id.* ¶ 27.)  Among other things, that component required potential cannabis licensees to adopt a "social equity plan" that detailed "practices, initiatives, or policies the applicant will implement to promote and encourage participation in the cannabis industry by people from communities that have been disproportionately impacted by cannabis prohibition and enforcement and to positively impact those communities."  (*Id.*)

As part of the CSEP, the City created a "Cannabis Industry Social Equity Voluntary Agreement" ("CISEVA") form, which would become enforceable when an applicant submitted one with a "land use application."  (*Id.* ¶ 28.)  These agreements would allow applicants for marijuana licenses to commit to furthering the City's social equity goals, including "provid[ing] opportunities to members of . . . disadvantaged communities in the form of local ownership, supplier and/or workforce diversity, new business development, and/or [making] contribution[s] to the [City's] Cannabis Reinvestment Fund."  (City of Grand Rapids Agenda Action Request

5

(July 7, 2020), ECF No. 1-1, PageID.64.)  Applicants submitting such agreements would be "ranked based on a points system for social equity commitments." (*Id.*, PageID.64.)  These points would "determine the priority for license and zoning application review and approval, as well as renewal license duration and frequency of license renewal."  (City of Grand Rapids, Cannabis Social Equity Policy (July 7, 2020), ECF No. 1-1, PageID.74.)

The Ordinance required licensees to make a "good faith effort" to meet the objectives of their respective social equity plans, and to report on those efforts at the time of license renewal. (Compl. ¶¶ 29, 31.)

By August 2022, the City's Commissioners concluded that cannabis licensees were not meeting their MIVEDA and CISEVA obligations.  (*Id.* ¶ 36.)  Consequently, the City created a new policy whereby such licensees would be evaluated for compliance with their obligations at the time of license renewal.  (*Id.* ¶¶ 45-46.)  If found to be out of compliance, or only in partial compliance, a licensee could achieve full compliance with its obligations through a "point transfer system" that allowed the licensee to transfer their accumulated points to a higher weighted category.  (*Id.* ¶ 42.)  In other words, the City evaluated licensees and assigned points according to the following categories:  "Local Ownership," "Workforce Diversity," "Supplier Diversity," "New Business Development (Minority Business Incubator)," and "Cannabis Community Fund Investment." (City Comm'n Policy re CSEP (Aug. 9, 2022), ECF No. 1-1, PageID.134.)  The last category is given the highest weight.  (*Id.*)  Also, licensees could pay their way to compliance through contributions to a "Community Reinvestment Fund" created by the City.  (City of Grand Rapids, Administrative Policy (Nov. 3, 2022), ECF No. 1-1, PageID.147-48.)  That fund later became known as the "Seeding Justice Fund."  A licensee could pay the City up to one percent of its gross revenue to achieve MIVEDA compliance, and up to two percent of its gross revenue to

achieve CISEVA compliance. (Compl. ¶¶ 42, 47.) Failure to adhere to these requirements could result in the City issuing a notice of violation to the licensee and reporting the licensee's noncompliance to the State of Michigan. (*Id.* ¶¶ 52-53.)

The City purportedly deferred enforcement of the CSEP requirements until sometime in 2023, when the City began issuing "invoices" to Defendants for the fees they needed to pay in order to achieve compliance. (*See id.* ¶ 55.)

### C. Plaintiffs' Licenses

Fluresh applied for adult-use cannabis licenses in July 2020 and submitted its CISEVA form to the City at that time. (*Id.* ¶ 61.) The City represents that one of Fluresh's CISEVA forms is attached as Exhibit 11 to the City's response to the motion for preliminary injunction. (*See* City's Response Br. 7, ECF No. 5; Fluresh CISEVA, ECF No. 5-11.) In that agreement, Fluresh apparently committed to having "75%-100%" "workforce diversity," to having "5.0% - 9.9%" "supplier diversity," and to provide "Support for Internal Incubation (Cannabis)." (Fluresh CISEVA, PageID.763-764.) It did not make promises regarding, or accumulate any points in, the categories for "local ownership" or for contributions to the Cannabis Community Reinvestment Fund. (*Id.*)

Fluresh received its first set of licenses in September 2020. (Compl. ¶ 60.) It made a points transfer request on April 20, 2023, committing to pay over $300,000 to the Seeding Justice Fund to make up for its lack of full compliance with its MIVEDA and CISEVA commitments. (Fluresh Transfer Request Form, ECF No. 5-12, PageID.771.) The City apparently sent Fluresh invoices for the CSEP transfer fees in September 2023 and June 2024. (Compl. ¶ 55; *see* Invoices to Fluresh, ECF No. 1-1, PageID.152, 154.)

Similarly, Ascend obtained its first licenses under the MMFLA in October 2019, and its predecessor obtained licenses under the MRTMA in December 2020 and January 2021. (Compl.

7

¶¶ 67-70.)  The City sent invoices to Ascend for CSEP transfer fees in January and December 2024 (Invoices to Ascend, ECF No. 1-1, PageID.164, 166, 168, 170.)  Ascend apparently submitted transfer request forms in September and November 2024, agreeing to pay almost $150,000 to the Seeding Justice Fund.  (Ascend Transfer Request Forms, ECF No. 5-6, PageID.792, 799.)

High Profile received its first set of licenses in March 2021, after submitting CISEVA and MIVEDA forms with its applications.  (Compl. ¶¶ 76, 77.)  The City sent invoices to High Profile in January and March 2024 (Invoices to QPS, ECF No. 1-1, PageID.172, 174, 176.)  High Profile submitted transfer request forms in February and April 2024, agreeing to pay over $200,000 to the Seeding Justice Fund.  (High Profile Transfer Request Forms, ECF No. 5-21, PageID.841, 848.)

Sykmint apparently received licenses in 2019 and 2020 after submitting MIVEDA and CISEVA forms.  (Compl. ¶¶ 80-81.)  The City sent invoices to Skymint in February and April 2024, and again in January 2025. (Invoices to Skymint, ECF No. 1-1, PageID.156, 158, 160, 162.) Skymint submitted transfer request forms in December 2024 and January 2025, agreeing to pay over $300,000 to the Seeding Justice Fund.  (Skymint Transfer Request Forms, ECF No. 5-19, PageID.819, 826.)  Skymint is currently in receivership.  (Compl. ¶ 83.)

Plaintiffs argue that the fees sought by the City for obtaining compliance with the CSEP requirements amount to a tax, and that since 2022, the City "has taxed, or is attempting to tax" Plaintiffs a total of over $2 million.  (*Id.* ¶ 87.)

**D. Plaintiffs' Claims**

Based on the foregoing, Plaintiffs assert several claims against the City.  Count I of the complaint contends that the CSEP's fee requirements impose an improper tax in violation of the Michigan Constitution.  Count II contends that the fees exceed the $5,000 maximum amount a municipality may charge for licensing fees under the MMFLA and the MRTMA. Count III asserts that the fees violate other prohibitions in the MMFLA and the MRTMA.  Count IV asserts that the

fee requirements impair Plaintiffs' right to contract, in violation of the Michigan and federal constitutions, because those requirements became law after Plaintiffs submitted their MIVEDA and CISEVA forms. Count V contends that the CSEP requirements of the Ordinance violate Plaintiffs' right to equal protection under the Michigan and federal constitutions, and unduly restrict commerce, in violation of the commerce clauses of the Michigan and federal constitutions. Count VI contends that enforcement of the CSEP requirements has violated Plaintiffs' rights to equal protection and to "substantive due process under the dormant commerce clause of the U.S. Constitution." (Compl. ¶ 200.) Count VII asserts that the CSEP components of the Ordinance are impermissibly vague. Finally, Count VIII asserts that CSEP components of the Ordinance violate Michigan's Zoning Enabling Act.

Plaintiffs now seek a preliminary injunction and TRO prohibiting the City from enforcing the requirements of the CSEP, MIVEDA, and CISEVA against Plaintiffs. Specifically, Plaintiffs ask the Court to stop the City from (1) attempting to collect amounts owed under the MIVEDA and CISEVA agreements, (2) issuing notices of noncompliance to the State of Michigan Cannabis Regulatory Agency due to noncompliance with the CSEP, or with the MIVEDA and CISEVA agreements, (3) revoking or failing to renew any of Plaintiffs' municipal licenses due to such noncompliance, and (4) retaliating against Plaintiffs for the claims raised in their complaint. (*See* Proposed Injunction Order, ECF No. 1-6, PageID.236.)

## II. PRELIMINARY INJUNCTION STANDARD

"'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995)). The Court considers four factors when deciding whether to grant a preliminary injunction or TRO:

9

> (1) whether the movant has a "strong" likelihood of success on the merits;
>
> (2) whether the movant would otherwise suffer irreparable injury;
>
> (3) whether issuance of a preliminary injunction would cause substantial harm to others; and
>
> (4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc).

In general, "[t]hese factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). However, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). Moreover, irreparable harm is an "indispensable" requirement for a preliminary injunction, and "even the strongest showing" on the other factors cannot justify a preliminary injunction if there is no "imminent and irreparable injury." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

**A. Irreparable Harm**

Plaintiffs' motions fail on the second factor because they do not demonstrate the existence of irreparable harm without an injunction. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Here, Plaintiffs ask the Court to excuse them from paying fees to the City to retain their licenses (fees that Plaintiffs apparently represented they would pay). But they do not contend that irreparable harm will result if they pay those fees, which are a small percentage of Plaintiffs' revenue. Instead, Plaintiffs contend that if they *do not* pay the fees, they will lose their licenses, which will cause irreparable harm because they will be unable to continue operating their businesses. That may be so, but

10

Plaintiffs have another option. They can pay the fees, retain their licenses, and sue the City for damages to recover the fees. By all appearances, a damages remedy would be wholly adequate to compensate Plaintiffs while avoiding any irreparable harm. The City made this very argument in its response brief and Plaintiffs ignored it in their reply. On this basis alone, Plaintiffs have not shown that preliminary injunctive relief is warranted.

Plaintiffs suggest that there is irreparable harm where a government defendant is immune from monetary relief, but Plaintiffs do not explain why the City would be immune and the Court cannot discern the basis for such immunity. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 701 (1978) (holding that municipal entities are not immune from monetary relief for constitutional claims brought under 42 U.S.C. § 1983).

In addition, the Court notes that Plaintiffs inexplicably waited almost a year before asserting their rights. Based on the invoices attached to the complaint, Plaintiffs were all aware no later than February 2024 that the City expected them to pay fees to renew their licenses,[1] and Plaintiffs apparently responded by agreeing to pay those fees. Yet Plaintiffs did not bring this action and seek injunctive relief until February 2025, just a few weeks before some of their licenses were due to be renewed.[2] That delay, along with their actions in response to the City's invoices, undermines their assertion that they will suffer irreparable harm without Court intervention.

To be sure, Plaintiffs allege violations of their federal constitutional rights, and there is a "presumption of irreparable harm" for a violation of such rights, particularly First Amendment rights, Fourth Amendment rights, the right to privacy, *see Overstreet*, 305 F.3d at 578-79, and the

---

[1] The City contends, without evidence, that some Plaintiffs made points transfers or began paying fees to the Seeding Justice Fund as early as 2023. (Def.'s Resp. Br. 6, ECF No. 5.) However, the Court will confine its analysis to the evidence in the record.

[2] Fluresh contends that its licenses will expire on April 20, 2025.

11

right to vote, *see Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). But Plaintiffs do not make this argument in support of their motion, and it is unclear whether that presumption applies to the facts here. After all, the central issue presented by Plaintiffs here is whether they should be forced to pay fees the City claims are necessary for license renewal. Whether or not the policies requiring payment of those fees are unconstitutional, Plaintiffs have not demonstrated that payment of such fees would result in irreparable harm.

At any rate, even if the presumption of irreparable harm applies, the Court is not persuaded that Plaintiffs have established a substantial likelihood of success on the merits of their constitutional claims, for the reasons discussed below.

**B. Likelihood of Success - Constitutional Violations**

**1. Equal Protection**

Plaintiffs argue that the CSEP requirements violate their right to equal protection by favoring City residents over non-City residents. Generally, "[t]he Equal Protection Clause prohibits state and local governments from treating similarly situated persons differently." *Redmond v. The Jockey Club*, 244 F. App'x 663, 669 (6th Cir. 2007) (quoting *Rector v. Denver*, 348 F.3d 935, 949 (10th Cir. 2003)). Here, the CISEVA form awards more points (and thus a higher priority of review of applications) for entities that commit to having at least 25% ownership by City residents, or that use real estate that is at least 25% owned by local residents. (*See* CISEVA Form, ECF No. 1-7, PageID.285.) And the MIVEDA form ostensibly awards more points to entities who commit to having at least 25% ownership by residents of the City of Grand Rapids, Kent County, or the State of Michigan. (MIVEDA form, ECF No. 1-7, PageID.310.)

Plaintiffs do not identify any harm to themselves stemming from these preferences. They simply point to the residency factors and conclude that the City's policies are unconstitutional. But they do not point to any facts or evidence indicating that these factors have had any impact on

them individually.  They do not indicate whether they meet these residency conditions or whether any failure to do so has impacted them in the past or will impact them in the future.  In other words, they do not show that they have been, or will be, treated differently from similarly situated entities on account of the residency factors.  Indeed, they were not denied licenses, and they do not contend that any residency factors hinder them in obtaining renewal of their licenses.  Instead, Plaintiffs apparently promised the City they would meet certain goals when operating their businesses, in return for priority consideration of their license applications, and Plaintiffs face the possibility of losing their licenses because they did not abide by those promises.

Absent any identifiable past or threatened future harm to Plaintiffs stemming from the purportedly discriminatory residency factors in the City's policies, Plaintiffs have not shown a substantial likelihood of success on their equal protection claim.  *Cf. Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021) (finding likelihood of success on equal protection claim where an applicant for marijuana licenses in Detroit faced disadvantages in applying for a limited number of available licenses, half of which were reserved for long-term Detroit residents, and the applicant did not qualify for the residency preference).

### 2. Commerce Clause

Plaintiffs' commerce clause claim falters for similar reasons.   Plaintiffs argue that the residency factors discussed above are facially unconstitutional because they favor in-state interests over out-of-state ones.  As discussed, Plaintiffs do not tie these factors to their own circumstances, so they have not shown a substantial likelihood of success.

### 3.  Contracts Clause

Plaintiffs argue that they City has impaired their contractual obligations by imposing new requirements on them in the form of the transfer fees.  The Contract Clause of the U.S. Constitution provides that "[n]o State shall . . . pass any . . . Law impairing  the Obligation of Contracts."  U.S.

Const. art. I, § 10, cl. 1.  The test for impairment of contract is " (1) whether there is a contractual relationship; (2) whether a change in law impairs the contractual relationship; and (3) whether the impairment is substantial." *Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 833 F.3d 590, 600 (6th Cir. 2016).

As the City points out, its policies make clear that the transfer fees are an *alternative means* of complying with the CSEP obligations that Plaintiffs initially agreed to abide by in their MIVEDA and CISEVA agreements.  Moreover, both such agreements made clear at the outset that they were binding and that failure to comply with them could result in denial of the licenses.  The CISEVA agreement expressly states that failure to abide by it will result in denial of "permit issuances" and "Cannabis Related Municipal License(s)."  (CISEVA form, ECF No. 1-7, PageID.313.)  The MIVEDA agreement likewise states that failure to comply will result in denial of "permit issuance."  (MIVEDA form, ECF No. 1-7, PageID.311.)  Thus, the City did not substantially impair the existing contracts; rather, it gave Plaintiffs another means of complying with those contracts so they could renew their licenses.  Consequently, Plaintiffs have not demonstrated a substantial likelihood of success for this claim.

### 4. Dormant Commerce Clause

Plaintiffs claim that the residency preferences in the CSEP program violate the dormant Commerce Clause of the Constitution.  The Commerce Clause provides that "Congress shall have Power . . . To regulate Commerce . . . among the several States." U.S. Const. Art. I, § 8, cl. 3.  The dormant Commerce Clause is "a self-executing limitation on state authority to enact laws imposing substantial burdens on interstate commerce even in the absence of Congressional action." *United Egg Producers v. Dep't of Ag. of Commonwealth of Puerto Rico*, 77 F.3d 567, 570 (1st Cir. 1996).  It "prohibits states from differentiating between 'in-state and out-of-state economic interests' to benefit the former and burden the latter." *Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126

F.4th 476, 486 (6th Cir. 2025) (quoting *Granholm v. Heald*, 544 U.S. 460, 472 (2005)). The "fundamental objective" of the dormant Commerce Clause is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Co. v. Tracy*, 519 U.S. 278, 299 (1997).

First, as discussed above, Plaintiffs make no attempt to show that they are or will be impacted by the residency preferences in the CSEP. Thus, the Court cannot conclude they are likely to succeed on the merits of their claim.

Second, many courts have articulated persuasive reasons for why a court should not apply the dormant Commerce Clause to commerce in a controlled substance like marijuana. Congress has the authority to restrict a national market in specific goods, and it prohibited a national market for marijuana via the Controlled Substances Act ("CSA"). *See generally Gonzalez v. Raich*, 545 U.S. 1 (2005) (rejecting a Commerce Clause challenge to application of the CSA to the use of medical marijuana legalized under state law). "[I]t defies common sense to find that the dormant Commerce Clause, drawn from Congress' power to regulate interstate commerce, prevents the states from passing laws which inhibit a market which Congress has already declared prohibited." *Jensen v. Md. Cannabis Admin.*, 719 F. Supp. 3d 466, 483 (D. Md. 2024); *accord Peridot Tree WA Inc. v. Wash. State Liquor & Cannabis Control Bd.*, No. 3:23-cv-06111, 2024 WL 69733, at *9 (W.D. Wash. Jan. 5, 2024) ("[T]he dormant Commerce Clause does not apply to federally illegal markets."); *Variscite NY Four, LLC v. N.Y. State Cannabis Control Bd.*, No. 1:23-cv-1599, 2024 WL 406490, at *12 (N.D.N.Y. Feb. 2, 2024) ("Given that the national market for cannabis is illegal, it would make little sense to apply the dormant Commerce Clause to New York's cannabis licensing scheme."); *Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*, No. C20-5661 BHS, 2023 WL 1798173, at *11 (W.D. Wash. Feb. 7, 2023) ("The dormant Commerce Clause

does not apply to federally illegal markets, including Washington's cannabis market and, thus, it does not apply to Washington's residency requirements.").

Some courts, including the Court of Appeals for the First Circuit, disagree with this reasoning. *See Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542 (1st Cir. 2022). The panel majority in that case noted that there is, in fact, a market for marijuana, albeit an illegal one. *Id.* at 547. And according to that court, no federal statute expressly prohibits such a market. In fact, Congressional action after the CSA suggests that Congress contemplated that an interstate market in medical marijuana could exist "free from federal criminal enforcement." *Id.* at 549. As support for its argument, the court identified riders to Congress's annual appropriations bills, which prohibited funds allocated to the Department of Justice from being used to prevent states from implementing laws that authorize the use or distribution of medical marijuana. *Id.* at 547-48.

However, the dissenting opinion in *Northeast Patients* persuasively undercuts the majority's logic. As it notes, Congress's appropriations bills did not legalize the use or distribution of marijuana, and "illegal markets are constitutionally different in kind" from legal ones; "the dormant Commerce Clause does not provide the right to engage on equal footing in a federally illegal market." *Id.* at 559-60 (Gelpi, J., dissenting). In other words, because Congress has outlawed a national market for marijuana, that market is not one that the dormant Commerce Clause intended to protect. Like the courts in *Jensen* and in the other cases mentioned above, this Court finds the dissenting opinion in *Northeast Patients* to be more persuasive than the majority opinion. Accordingly, for all the foregoing reasons, Plaintiffs have not shown they are likely to succeed on the merits of this claim.

### C. Other Factors

Because Plaintiffs have failed to meet the most important factors for preliminary injunctive relief, the Court need not analyze the other factors in great detail. Even assuming Plaintiffs have shown there would be no harm to others from an injunction and that an injunction would serve the public interest, the balance of factors would not warrant that relief.

### III. CONCLUSION

In summary, Plaintiffs have not shown they are entitled to a preliminary injunction or TRO. Consequently, the Court will enter an order denying their motions.

Dated: April 16, 2025                     /s/ Hala Y. Jarbou
                                          HALA Y. JARBOU
                                          CHIEF UNITED STATES DISTRICT JUDGE